**DREIFUSS, BONACCI & PARKER, LLP**
26 Columbia Turnpike
Florham Park, New Jersey 07932
Phone (973) 514-1414
Fax (973) 514-5959
*Attorneys for Plaintiff United States*
*Fire Insurance Company*

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| UNITED STATES FIRE INSURANCE COMPANY, Plaintiff, | 03-2811C |
| v. | No.______ |
| THE UNITED STATES, Defendant. | FILED DEC 11 2003 U.S. COURT OF FEDERAL CLAIMS |

**COMPLAINT**

Plaintiff, United States Fire Insurance Company (hereinafter "U.S. Fire Insurance Company"), by way of Complaint as against Defendant, The United States Air Force (hereinafter "U.S. Air Force"), alleges and says:

1. Plaintiff, U.S. Fire Insurance Company, is a New Jersey corporation with principal offices located at 518 Stuyvesant Avenue, P.O. Box 615, Lyndhurst, New Jersey.

2. Defendant, U.S. Air Force, is a government agency with offices at 305th Contracting Squadron, 2402 Vandenberg Avenue, McGuire Air Force Base, New Jersey 08641.

**JURISDICTION**

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1941.

4. This venue is appropriate pursuant to 28 U.S.C. § 1941, which allows for federal government contractors to sue the federal government for breach of contract.

**FIRST COUNT**

5. U.S. Fire Insurance Company is in the business of, amongst other things, providing surety bonds at the request of construction companies.

6. The U.S. Air Force solicited bids to perform construction work at McGuire Air Force Base in New Jersey on a project referred to as "Replace Overhead Power Distribution" (hereinafter "project").

7. Tri-Gems Builders Inc. (hereinafter "Tri-Gems"), a construction company, responded to the advertisement and a bid of $1,202,800.00 was awarded to Tri-Gems to perform the construction work on the project (hereinafter "the contract").

8. U.S. Fire Insurance Company issued the required performance and payment bonds on behalf of Tri-Gems.

9. The U.S. Air Force's contract with Tri-Gems called for progress payments to be made based upon the amount of work completed, in accordance with the contract.

10. Over the course of at least one year, the U.S. Air Force paid Tri-Gems numerous payments for work invoices submitted by Tri-Gems.

11. Contrary to its contractual obligations, the U.S. Air Force did not limit payment to Tri-Gems for the amount of work completed in accordance with the contract.

12. On or about February 24, 1999, the U.S. Air Force declared Tri- Gems in default of its obligations under the contract and called upon U.S. Fire Insurance Company to perform duties with respect to the surety bonds.

13. The U.S. Air Force's own inspector admitted that Tri-Gems was, as of the date of termination, substantially overpaid. (*See* attached **Exhibit A).**

14. U.S. Fire Insurance Company immediately investigated the matter of Tri-Gems default and the work remaining on the project.

15. U.S. Fire Insurance Company thereafter solicited bids for completion of the work, while, at all times, reserving its rights including its rights as to overpayment.

16. Notwithstanding the foregoing, U.S. Fire Insurance Company entered into a Takeover Agreement and Reservation of Rights with the U.S. Air Force, in which U.S. Fire Insurance Company agreed to undertake completion of the outstanding work and obligations on Tri-Gems contract with the Defendant, while reserving its rights to pursue the Defendant for damages. This Takeover Agreement and Reservation of Rights, executed by the Defendant, expressly provided that the Plaintiff reserved its rights as to overpayment.

17. The Defendant caused U.S. Fire Insurance Company to suffer damages as a result of its breach of contract causing the surety's collateral, i.e. contract funds, to be improperly depleted by making payments to Tri-Gems for unsatisfactory and/or partially completed work.

18. As of the date of this Complaint, U.S. Fire Insurance Company has suffered damages on the payment bond claims which were submitted to and paid by U.S. Fire Insurance Company, as well as the costs incurred to complete in excess of the remaining contract funds.

19. The U.S. Air Force paid Tri-Gems $394,911.79, for work not performed and $296,839.20, for work which was improperly done for a total of $691,750.99.

20. In addition to the foregoing, U.S. Fire Insurance Company has incurred damages in the form of attorney's fees and consulting fees in connection with Tri Gems default.

21. As a result of the U.S. Air Force's failure to adhere to the contract and exercise

proper due diligence in connection with payments to Tri-Gems for unperformed or improperly performed work, U.S. Fire Insurance Company has been damaged.

22. In spite of the fact that the Defendant's own inspector admitted substantial overpayment, the Contracting Officer on April 30,2003, denied Plaintiff's claim with respect thereto after a lengthy negotiation process. (*See* attached **Exhibit B**)

**WHEREFORE**, Plaintiff, U.S. Fire Insurance Company, requests that judgment be entered against Defendant, for:

a. Compensatory damages;

b. Pre-judgment interest as provided by the applicable law on all of the above damages;

c. Consultant fees;

d. Ongoing attorneys fees and costs of suit; and

e. Such other relief as the Court deems proper.

**SECOND COUNT**

23. U.S. Fire Insurance Company repeats and re-alleges each and every allegation contained in the First Count of this Complaint as if set forth herein in its entirety.

24. The U.S. Air Force, as obligee on the surety bonds, has certain common law duties towards U.S. Fire Insurance Company, the surety.

25. The U.S. Air Force breached its duty of care in releasing funds to Tri-Gems when it knew or should have known that such an action would put the Plaintiff, U.S. Fire Insurance Company, at risk of suffering damages due to Tri-Gems default.

26. As a result of the Defendant's failure to exercise its duty of care over contract funds by making payments based on inaccurate and mistaken invoices, without performing

proper due diligence to substantiate the accuracy of the invoices, Plaintiff has suffered damages.

27. Defendant was negligent in that it failed to exercise its discretionary responsibility in releasing the contract funds and failed to exercise due care in managing the contract funds.

**WHEREFORE**, Plaintiff, requests a demand for judgment in the amount of $691,750.99 against Defendant for:

a. Compensatory damages for the full amount to which Plaintiff is entitled to be indemnified;

b. Pre-judgment interest as provided by the applicable law on all of the above damages;

c. Consultant fees;

d. Ongoing attorneys fees and costs of suit; and

e. Such other relief as the Court deems proper.

**DREIFUSS, BONACCI & PARKER, LLP**
*Attorneys for Plaintiff United States Fire Insurance Company*

By: ______________________
DAVID C. DREIFUSS
26 Columbia Turnpike
Florham Park, New Jersey 07932
Tel: (973) 514-1414
Fax: (973) 514-5959

DATED: December 10, 2003

G:\FPDATA\MP\Complaint-TriGems.doc

U.S. AIR FORCE
1947 - 1997

DEPARTMENT OF THE AIR FORCE
305TH SUPPORT GROUP (AMC)

Date: 19 May 1998

Memorandum for LGCC
ATTN: Don Bruce

From: 305TH CES/CECE
3209 West Arnold Avenue
McGuire AFB, NJ 08641

SUBJ: PTFL 94-4007, Replace Overhead Electrical Distribution – FCN 4000 & 4200 Area
*Interim Inspection Report*

SRA Rodriguez, Bill Ott, and Steve Lyman from the 305th Civil Engineering (CE) office conducted an interim inspection for the subject project. Mr. Don Bruce from the contracting office was in attendance on the first day of the inspection. This inspection was conducted on 3 separate days April 01, April 06, and April 13, 1998. The Government has paid the contractor 86% of the contract total, including the addendum's. CE has determined that the project is actually about 60% installed, of this 60% approximately 1/3rd needs to be reworked, repaired or renewed due to poor workmanship on behalf of the contractor.

The following lists of items are a collection of discrepancies reviewed during the inspection conducted by CE on the subject contract.

1. *Primary Cable*

When the contractor installed the primary cable he failed to terminate or seal it properly @ time of installation. This cable laid in the water filled ducts/vaults for about 18 months before the contractor came out and taped up the ends. According to Watt Electric (the last sub for Tri-Gems) a portion of this cable did pass a high-pot test (A high pot test is a high voltage test conducted on primary cable prior to energizing). This cable was never energized after the high-pot test. This test was conducted about a year ago. Water migrates through the insulation of non-energized cable. When energized the heat from this cable prevents this migration. Since the cable was tested about a year ago and never activated, this cable needs to be re-tested prior to energizing. The contractor may have to replace a portion (maybe all) of this cable.

2. *Neutral Primary Wire*

The Government issued addendum #1 changing the primary cable from 2 separate conductors to one conductor with a full concentric neutral (2 wires in one). The

contractor accepted this modification to change the cable. They installed a single "tape shield" conductor without a separate neutral, not the cable negotiated under addendum #1. The original contract called for this "tape shield" conductor along with a separate neutral conductor. The Government did not accept this process. The contractor came up with a fix, installing a separate neutral conductor along side the "tape shield" conductor. To keep the contact moving along, the Government accepted this fix. The contractor has installed this separate neutral conductor on about 30% of the system and needs to install this wire on the rest of the primary system.

3. *Manhole/Vault Conduit Penetrations*

The manholes/vaults were never sealed in accordance with the contract documents. The contractor broke open access holes for the conduits through these manholes/vaults with a sledgehammer. The conduits were placed through these openings and covered with soil. The contractor then smeared cement from the inside to seal the openings. In most cases this mortar mix has cracked or fallen out. Every vault is currently filled with water, soil, and/or debris. All these new vaults/manholes (and the existing manholes that the contractor opened) need to be cleaned out and all these conduit entries need to be sealed properly in accordance with the contract documents. The contractor needs to remove the backfiled soil to 6 (in) below the conduits and 3 (ft) past the manhole/vault wall. These conduits can then be sealed and the concrete abutments installed in accordance with spec section 16301, page 5, and paragraph 3.05.

4. *Grounding*

Tri Gems' sub Watt Electric claims they did the grounding on the transformers that they connected which accounts for approximately 20% of the grounding. The inspection team could not examine the grounding because it is underground and the team could not determine if it was done in accordance with the contract documents. However, this grounding can be inspected when the contractor returns to clean out and seal the manholes/vaults properly. The grounding of these manholes/vaults shall be done as detailed on drawings E-9 and E-10.

5. *Street Light Posts*

The contractor installed steel bolts in the concrete bases for the street lighting poles in lieu of galvanized bolts as stated on the contract documents. Many of these bolts have rusted and failed. The contractor is currently replacing these bolts. During our inspection, the team did not see the contractor on the job site. According to Bill Ott they are about 80% complete with the bolt replacement. Also, the feeds from the transformers to the streetlights have not been installed and a few of the street crossings have not been completed to these streetlights. The streetlights cannot be energized until this work is completed.

6. *Transformer Pads*

Due to the contractor improperly installing the pre-casted transformer pads, many of these pads need repair. They are broken and badly marked-up in places. The repairable pads need to be properly concrete patched and re-"water proofed". The pad for transformer T16 appears to be beyond repair and may require replacement.

7. *Grading and Landscaping*

The contractor has failed to accomplish about 80% of the grading and seeding required. The trenching was completed approximately 2-1/2 years ago and most of the areas look as if the work has just been done. Grass has yet to grow on approximately 80% of these trenched areas.

8. *Inspection Sheet Summary*

The inspection report (Attachment #1) indicates all the work that is complete and needs completing. The contractor needs to seal the driveways where they sawcut the asphalt and decided to install the conduit elsewhere. Also, as indicated from this report the contractor has failed to install the risers that were part of addendum #6. The following legend describes the annotation of this report.

Legend

| | |
|---|---|
| Yes | Work was accomplished (Not to say that it doesn't have to be re-done). |
| No | Work was not accomplished and needs to be completed |
| Exist | Existing to remain (No work is required) |
| Maybe | The team could not determine if it was done or not |
| ---- | The contractor did it a different way |
| Appears | More than likely, the team could not tell for certain |

9. *Impact on Other Projects*

a) The army Corp of engineers had to negotiate a change with their contractor because Tri-Gems installed conduit and wires to the (Army Corps) main disconnect switches. Tri-Gems left these conduits like this with the un-energized cable inside. The army Corp negotiated the change with their contractor to install temporary hook-ups to work around Tri-Gems conduits.

b) Atul (another contractor) is contracted to remove the primary circuit down Gander way. This primary is still being used. The Tri-Gems project was supposed to have this work done so Atul could remove this primary cable.

c) The underground phone and cable TV projects should be funded around October 1998. The construction could start anytime after that date. Under these projects the utility poles in falcon court north are to be removed. If the Tri-Gems project

is not complete sometime in early 1999, these two projects will also be impacted and probably end up costing the Government even more money.

10. *Other Issues*

Addendum #4 (leaving the existing utility poles) is still an open issue. The last letter sent to LGCC was dated 17 October 1996. The Government is due a credit of approximately $6,414 for this addendum.

11. *Conclusion*

There are road crossings that are like speed dips (opposite of bumps), and trenched areas through the grass that were never restored per the contract documents. These areas were trenched through over 2 years ago and the grass has yet to grow. The contractor is installing the new bolts for the streetlight bases. This task should take 2 men about 2 weeks to complete. Tri-Gems has been working (on just these bolts) for about 3 months now and they are only 80% complete. This proves that the contractor is conducting a halfhearted attempt to finish the job.

Steven Lyman
305th CES/CECE
Project Manager

Attachments:
(1) Inspection spreadsheet

Copy To:
CEC
CECE
CECC (Richy)
CECC (Bill Ott)

| BLDG | Blacktop SAWCUT | Blacktop REMOVE | Blacktop PATCH | Riser | Conduit to house | Wire to house | Disconnect Switch | Other Issuses |
|---|---|---|---|---|---|---|---|---|
| 4001 | Yes | No | No | Exist | No | No | Exist | |
| 4002 | Yes | Yes | Yes | Exist | No | No | Exist | |
| 4003 | Yes | Yes | Yes | Exist | Yes | No | Exist | Conduit is stubbed up outside disconnect location |
| 4004 | Yes | Yes | Yes | No | Yes | No | No | Conduit is opened at ground level filled with dirt and debris. |
| 4005 | Yes | Yes | Yes | No | Yes | No | No | Conduit is opened at ground level filleg with dirt and debris. |
| 4006 | Yes | Yes | Yes | No | Kind of | No | No | Can't find the conduit |
| 4007 | Yes | Yes | Yes | No | Yes | No | No | Conduit is opened at ground level filled with dirt and debris. |
| 4008 | Yes | Yes | Yes | No | Yes | No | No | Conduit is opened at ground level filled with dirt and debris. |
| 4009 | Yes | No | No | No | No | No | No | |
| 4010 | Yes | Yes | Yes | No | Yes | No | No | Conduit is opened at ground level filled with dirt and debris. |
| 4011 | No | No | No | No | No | No | No | |
| 4012 | Yes | No | No | No | No | No | No | |
| 4013 | Yes | No | No | Exist | No | No | Exist | |
| 4014 | Yes | No | No | Exist | No | No | Exist | |
| 4015 | Yes | No | No | Exist | No | No | Exist | |
| 4016 | Yes | No | No | Exist | No | No | Exist | |
| 4017 | Yes | No | No | Exist | No | No | Exist | |
| 4018 | No | No | No | Exist | No | No | Exist | Cant find conduit but appears to have trenched to building |
| 4019 | No | No | No | Exist | No | No | Exist | Cant find conduit but appears to have trenched to building |
| 4020 | No | No | No | Exist | No | No | Exist | |
| 4021 | No | No | No | Exist | No | No | Exist | Cant find conduit but appears to have trenched to building |
| 4022 | No | No | No | Exist | No | No | Exist | Cant find conduit but appears to have trenched to building |
| 4023 | Yes | No | No | Exist | No | No | Exist | |
| 4024 | No | No | No | Exist | No | No | Exist | Cant find conduit but appears to have trenched to building |
| 4025 | Yes | No | No | Exist | No | No | Exist | |
| 4026 | Yes | No | No | Exist | No | No | Exist | |
| 4027 | Yes | No | No | Exist | No | No | Exist | |
| 4028 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4029 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4030 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4031 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4032 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4033 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4034 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |

Attachment (1)

| | Blacktop | | | | Conduit | Wire | Disconnect | |
|---|---|---|---|---|---|---|---|---|
| BLDG | SAWCUT | REMOVE | PATCH | Riser | to house | to house | Switch | Other Issuses |
| 4035 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4036 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4037 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4038 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4039 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4040 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4041 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4042 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4043 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4044 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4045 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4046 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4047 | Yes | No | No | Exist | No | No | Exist | |
| 4048 | Yes | Yes | Yes | Exist | Yes | No | Exist | Sawcut Blacktop but did not remove. |
| 4049 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4050 | Yes | No | No | Exist | No | No | Exist | |
| 4051 | Yes | Yes | Yes | Exist | Yes | No | Exist | |
| 4052 | Yes | Yes | Yes | Exist | Yes | No | Exist | Sawcut Blacktop but did not remove. |
| 4053 | Yes | No | No | No | No | No | No | Sawcut Blacktop but did not remove. |
| 4054 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4055 | Yes | No | No | Exist | No | No | Exist | Sawcut wrong side. Must be sealed and sawcut on other side. |
| 4056 | Yes | No | No | Exist | No | No | Exist | |
| 4057 | Yes | Yes | Yes | Exist | Yes | No | Exist | Sawcut Blacktop but did not remove. |
| 4058 | Yes | No | No | Exist | No | No | Exist | Sawcut Blacktop but did not remove. |
| 4059 | Yes | No | No | Exist | No | No | Exist | |
| 4060 | Yes | Yes | Yes | Exist | Yes | No | Exist | Still have to run conduit and wire into disconnect |
| 4201 | Yes | Yes | Kind of | Exist | Yes | Yes | Exist | Conduit and wire is stubbed up near building 4201 |
| 4202 | No | No | Kind of | Exist | Exist | Kind of | Exist | Conduit appears to have equivalent of 6 90's |
| 4203 | --- | --- | --- | Exist | Yes | Yes | Exist | There is no switch in the box, Wire in box. |
| 4204 | Yes | Yes | Yes | No | Yes | Yes | Yes | Sawcut wrong side. Must be sealed and sawcut on other side. |
| 4205 | Yes | Yes | Yes | No | Yes | Yes | No | There is no switch in the box, Wire in box. |
| 4206 | Yes | Yes | Yes | No | Yes | Yes | Yes | |
| 4207 | Yes | Yes | Yes | No | Yes | Yes | No | |
| 4208 | Yes | Yes | Yes | No | Yes | Yes | No | Sawcut wrong side. Must be sealed and sawcut on other side. |

Att. Achment (1)

| BLDG | Blacktop SAWCUT | Blacktop REMOVE | Blacktop PATCH | Riser | Conduit to house | Wire to house | Disconnect Switch | Other Issuses |
|---|---|---|---|---|---|---|---|---|
| 4209 | Yes | Yes | Yes | No | Yes | Yes | No | Conduit appears to have equivalent of 5 90's |
| 4210 | Yes | Yes | Yes | No | Yes | Yes | Yes | There's no switch in box, shed appears to have been damaged. |
| 4211 | Yes | Yes | Yes | No | Yes | Yes | Yes | Sawcut wrong side. There is no switch in the box. |
| 4212 | Yes | Yes | Yes | No | Yes | Yes | No | |
| 4213 | --- | --- | --- | No | Yes | Kind of | Kind of | Old switch sitting @ location. Only 1 phase and gr wire run. |
| 4214 | Yes | Yes | Yes | No | Yes | Appears | Yes | Did not look in disconnect switch. |
| 4215 | --- | --- | --- | No | Yes | Yes | Yes | 3 phase disconnect installed. |
| 4216 | --- | --- | --- | No | Yes | Yes | Yes | Did not look in disconnect switch. |
| 4217 | Yes | Yes | Yes | No | Yes | Yes | Yes | Did not look in disconnect switch. |
| 4218 | Yes | Yes | Yes | No | Yes | Yes | Yes | Did not look in disconnect switch. |
| 4219 | Yes | Yes | Yes | No | Yes | No | No | |
| 4220 | Yes | Yes | Yes | No | Yes | Appears | Yes | Did not look in disconnect switch. |
| 4221 | Yes | Yes | Yes | No | Yes | Appears | Yes | Did not look in disconnect switch. |
| 4222 | | | | | | | | These 3 locations were hard to tell where Tri-Gems ended -- |
| 4223 | | | | | | | | Phase II contractor provided the disconnects -- |
| 4224 | | | | | | | | Some of the wires were installed in transformer. |
| 4228 | --- | --- | --- | N/A | Yes | Appears | Yes | Phase II disconnects installed, secondaries connected to xfmr. |
| 4229 | Yes | Yes | Yes | N/A | Yes | Appears | Yes | Phase II disconnects installed, secondaries connected to xfmr. |
| 4230 | Yes | Yes | Yes | N/A | Yes | Appears | Yes | Phase II disconnects installed, secondaries connected to xfmr. |
| 4231 | --- | --- | --- | N/A | Yes | Appears | Yes | Phase II disconnects installed. |
| 4232 | --- | --- | --- | N/A | Yes | Appears | Yes | Phase II disconnects installed. |
| 4233 | --- | --- | --- | N/A | Yes | Appears | Yes | Phase II disconnects installed. |
| 4234 | Yes | Yes | Yes | No | Yes | Appears | Yes | |
| 4235 | Yes | Yes | Yes | No | Yes | Appears | Yes | |
| 4236 | --- | --- | --- | No | Yes | Appears | Yes | |
| 4237 | --- | --- | --- | No | Yes | Appears | Yes | |
| 4238 | Yes | Yes | Yes | No | Yes | Appears | Yes | Patch needs Repair. |
| 4239 | Yes | Yes | Yes | No | Yes | Appears | Yes | |
| 4240 | Yes | Yes | Yes | N/A | Yes | Appears | Exist | |
| 4241 | Yes | Yes | Yes | N/A | Yes | Appears | Exist | Appears to have used an existing pull box and conduit to unit. |
| 4242 | Yes | Yes | Yes | N/A | Yes | Appears | Exist | Old conduit still in box. |
| 4243 | Yes | Yes | Yes | N/A | Yes | Appears | Exist | |
| 4244 | Yes | Yes | Yes | N/A | Yes | Appears | Exist | |
| 4245 | Yes | Yes | Yes | N/A | Yes | Appears | Exist | |

AttAchment (1)

| BLDG | Blacktop SAWCUT | REMOVE | PATCH | Riser | Conduit to house | Wire to house | Disconnect Switch | Other Issuses |
|---|---|---|---|---|---|---|---|---|
| 4246 | --- | --- | --- | N/A | Yes | Appears | Exist | |
| 4247 | Yes | Yes | Yes | N/A | Yes | Appears | Exist | |
| 4248 | --- | --- | --- | N/A | Yes | Appears | Exist | |
| 4249 | Maybe | Maybe | Maybe | N/A | Yes | Yes | Yes | Phase II Removed Disconnect Switches |
| 4250 | Maybe | Maybe | Maybe | N/A | Yes | Yes | Yes | Phase II Removed Disconnect Switches |
| 4251 | Maybe | Maybe | Maybe | N/A | Yes | Yes | Yes | Phase II Removed Disconnect Switches |
| 4252 | Yes | Yes | Yes | N/A | Yes | No | Exist | Did not look in disconnect switch. |
| 4253 | Yes | Yes | Yes | N/A | No | No | Exist | Did not look in disconnect switch. |
| 4254 | Yes | Yes | Yes | N/A | Yes | No | Exist | Did not look in disconnect switch. |
| 4255 | Yes | Yes | Yes | N/A | Yes | No | Exist | Conduit is at disconnect. |
| 4256 | Yes | No | No | N/A | No | No | Exist | |
| 4257 | Yes | Yes | Yes | N/A | Yes | No | Exist | Conduit is at disconnect. |
| 4258 | Yes | Yes | Yes | N/A | Yes | No | Exist | Conduit is at disconnect. |
| 4259 | Yes | Yes | Yes | N/A | No | No | Exist | |
| 4260 | Yes | Yes | Yes | N/A | Yes | No | Exist | Conduit is at disconnect. |

Attachment (1)

# CONTRACTING OFFICER'S FINAL DECISION

**CLAIM BY:** United States Fire Insurance Co. ("US Fire")

**TYPE OF CLAIMS:** Alleged overpayments; allegedly doing work above the bond penal sum.

**CONTRACT NUMBER:** F28609-96-C-0003

**DATE CLAIM RECEIVED:** Certified, sum certain claim received on 15 August 2001 (original 27 June 2001 submission was not certified or in a sum certain)

**DESCRIPTION OF SERVICES:** Replace overhead power distribution in Falcon Courts North, McGuire AFB Family Housing

**NAME OF CONTRACTING OFFICE:** 305th Contracting Squadron
2402 Vandenberg Avenue
McGuire AFB NJ 08641-1712

**DESCRIPTION OF CLAIMS:** As stated in US Fire's 13 August 2001 "Calculation of Damages", the claim contains three parts:

a. $394,911.79 for alleged overpayment of work not performed;

b. $296,839.20 for alleged payment of work performed improperly;

c. $281,396.00 for allegedly doing work above the bond penal sum.

Although these three claims total $973,146.99, US Fire is only claiming $930,000—which is the amount paid to Eastern Construction & Electric, Inc. ("Eastern"), the completion contractor hired by US Fire. The claimed payments (in "a" and "b", above) were made as progress payments to Tri-Gems Builders ("TGB"), the defaulted contractor (which US Fire bonded).

**CHRONOLOGY OF EVENTS:**

26 Oct 95 Contract No. F28609-96-C-0003 awarded to TGB

15 Nov 95 Notice to proceed issued

5 Sept 97 DeMito Show Cause Notice issued to TGB (not certified)

12 Dec 97 Bruce Show Cause Notice issued (mailed certified)

24 Feb 99 Contract No. F28609-96-C-0003 terminated for default

29 Jan 01 Takeover Agreement contract between US Fire and Air Force signed

## STATEMENT OF FACTS AND CONTRACTING OFFICER'S DECISION:

**Claim No. 1 (Alleged overpayment of work not performed) and Claim No. 2 (Alleged payment of work performed improperly):** As a preliminary matter, I find that claims 1 and 2 are "two sides of the same coin" and so I will address them together since many of the same facts apply to both situations. These claims are denied. My reasoning is as follows.

I find that claims 1 and 2 are not "contractual" claims under the Contract Disputes Act ("CDA"). At the time of the alleged overpayments, the only parties to Contract No. F28609-96-C-0003 were TGB and the Air Force. In other words, at the time of the alleged overpayments, there was no contract between US Fire and the Government. Accordingly, since my authority is limited by the CDA to "contractual" claims, I find that I do not have authority to pay these claims. Further, I do not find that the fact that US Fire may have put in "reservation of rights" language in the Takeover Agreement contract means that US Fire actually has a right to be paid on these claims under the CDA.

Nevertheless, since I (and my predecessor, Ms. Linda Williams) have done fact-finding regarding these claims, I note the following facts related to these two claims. First, Contract No. F28609-96-C-0003 (which US Fire bonded and which work US Fire agreed to complete in accordance with the terms of the contract) incorporated by reference the following FAR clauses:

a. 52.212-5, "Liquidated Damages—Construction (Apr 1984)";

b. 52.212-3, "Commencement, Prosecution and Completion of Work (Apr 1984)";

c. 52.232-5, "Payments Under Fixed-Price Construction Contracts (Apr 1989)";

d. 52.232-23, "Assignment of Claims (Jan 1986)";

e. 52.233-1, "Disputes (Dec 1991)";

f. 52-236-5, "Material and Workmanship (Apr 1984)";

g. 52.236-6, "Superintendence by the Contractor (Apr 1984)";

h. 52.243-4, "Changes (Aug 1987);

i. 52.246-12, "Inspection of Construction (Jul 1986)"; and

j. 52.246-21, "Warranty of Construction (Apr 1984).

These clauses indicate several things relevant to this dispute. For example,

> a. TGB, not the government, was responsible for insuring that work was done in accordance with the terms of the contract prior to final acceptance by the government;
>
> b. Prior to receiving progress payments, TGB certified that work was done in accordance with the terms of the contract; and
>
> c. If it was discovered that TGB did work improperly, TGB (and thus, US Fire, as the surety) had to correct this defective work without additional compensation.

I also find that US Fire's claim is almost entirely built upon one document, a 19 May 1998 memorandum from Steve Lyman (an electrical engineer, but not a contracting officer). In this document, Mr. Lyman expressed his concerns (as the contract was headed toward the default termination) about work that may not have been done or may need to be repaired. I find that the memo did not accurately reflect the conditions at the work site through no fault of Mr. Lyman (for example, because some of the work was below ground).

I further find that US Fire had the opportunity to have two different consulting firms inspect the work site and document the site conditions at the time of the termination and prior to entering into the Takeover Agreement. US Fire has not produced any documentation from these two consulting firms regarding the site conditions. Further, it appears that US Fire (through its consultants) chose to use Mr. Lyman's memo to describe the minimum work that Eastern had to do. However, because conditions were apparently not as serious as Mr. Lyman suspected, the DCAA has informed me that Eastern made a profit of $318,227 on costs of $621,677—in other words, **an over 50 percent profit**! In addition to reporting on Eastern's windfall, the DCAA audit report also identified other accounting deficiencies.

Finally, I find that US Fire was not able to produce any records from Eastern about what portion of the $621,677 was spent on competing the contract

(versus what was spent allegedly correcting defective work). Further, although materials were left by TGB (at the time of the default termination) which Eastern could use (and for which the Air Force had paid TGB), US Fire has not accounted for Eastern's use or disposal of this material.

**Claim No. 3 (Allegedly doing work above the bond penal sum):** This claim is denied. My reasoning is as follows:

a. I find that the original penal sum for the performance bond was $1,202,800.00.

b. I also find that Appellant only paid $930,000.00 to Eastern to complete the terminated Contract No. F28609-96-C-0003 work.

c. The amount paid to Eastern is less than the original penal sum of the performance bond.

d. Further, this US Fire claim does not take into account the fact that US Fire has invoiced for $100,165.50. At the time of termination for default there was a contract balance was $198,642.61 (minus $36,360.00 in liquidated damages and $61,105.34 in Department of Labor violations) leaving $1,011.77 remaining.

**APPEAL RIGHTS:**

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract number. With regard to appeals to the agency board of contract appeals, you may solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime

Contracts) within 12 months of the date you receive this decision. The mailing address for the ASBCA is: Armed Services Board of Contract Appeals, Skyline Six 7th Floor, 5109 Leesburg Pike, Falls Church VA 22041-3208.

30 April 2003

Edward J. Baker
Contracting Officer