IN THE UNITED STATES COURT OF FEDERAL CLAIMS
NO. 03-2811C

- - - - - - - - - -

UNITED STATES FIRE INSURANCE COMPANY, Plaintiff,

-vs-

THE UNITED STATES, Defendants

- - - - - - - - - - -

DEPOSITION OF:

BRUCE DICKSTEIN, ESQ.

ORIGINAL

B E F O R E:

THERESA GARRITY, a Certified Shorthand Reporter and Notary Public of the State of New Jersey at the offices of DREIFUSS, BONACCI & PARKER, ESQS., 26 Columbia Turnpike, Florham Park, New Jersey, on July 21, 2005, commencing at 10:20 a.m., pursuant to Notice.

REPORTING SERVICES ARRANGED THROUGH

WAXMAN & SCHAFFER REPORTING
A Veritext, L.L.C. Affiliate
25B Vreeland Road
Florham Park, New Jersey 07932
Telephone (973) 410-4087
Fax (973) 410-1313

A P P E A R A N C E S:

DREIFUSS, BONACCI & PARKER, ESQS.
BY: DAVID C. DREIFUSS, ESQ.
26 Columbia Turnpike
Florham Park, New Jersey 07932
(973) 514-1414
Attorneys for Plaintiff

CHRISTIAN J. MORAN, ESQ.
DEPARTMENT OF JUSTICE
1100 L. Street
Washington, D.C. 20530
(202) 307-0290
Attorney for Defendant United States

CHRISTOPHER S. COLE, ESQ.
AIR FORCE LEGAL SERVICES AGENCY (AFLSA-JACN)
1501 Wilson Boulevard, Suite 615
Arlington, Virginia 22209
(703) 696-9325
Attorney for McGuire Air Force Base

# I N D E X

| WITNESS | DIRECT |
|---|---|
| BRUCE DICKSTEIN | |
| By Mr. Moran | 5 |

## E X H I B I T S

| IDENT. | DESCRIPTION | PAGE |
|---|---|---|
| D-100 | Notice of Deposition | 5 |
| D-101 | Two indeminty agreements | 31 |
| D-102 | Copy of payment and performance bonds | 32 |
| D-103 | Notification of Tri-Gem's performance to U.S. Fire | 53 |
| D-104 | Scedule of payments made by U.S. Fire/Universal Bonding | 54 |
| D-105 | Show Cause Notice | 56 |
| D-106 | Document DOJ 00149, dated 1/7/98 | 60 |
| D-107 | One-page document DOJ 00170 | 65 |
| D-108 | 11/98 letter to Bruce from Miseo | 66 |
| D-109 | DOJ 01378 - DOJ 01381 | 68 |
| D-110 | DOJ 00415, letter to U.S. Fire from DeMito | 77 |
| D-111 | Unidentified document | 79 |
| D-112 | DOJ 00502 - 00523 bid package | 84 |

| IDENT. | DESCRIPTION | PAGE |
|---|---|---|
| D-113 | DOJ 00496-00501<br>Claims register | 108 |
| D-114 | DOJ 01198 - DOJ 01202 | 121 |
| D-115 | DOJ 01397 - 01428 | 123 |
| D-116 | DOJ 01382 | 132 |
| D-117 | DOJ 01383, 5/3/00 letter | 132 |

B R U C E D I C K S T E I N, E S Q., 26 Columbia Turnpike, Florham Park, New Jersey, having been first duly sworn according to law, testified as follows:

(D-100 is marked for identification.)

DIRECT EXAMINATION BY MR. MORAN:

Q. Good morning, Mr. Dickstein.
A. Good morning.
Q. My name is Christian Moran. I'm an attorney for the United States Department of Justice and I represent the United States in a case brought by the United States Fire Insurance Company in the Court of Federal Claims. Have you ever been deposed before?
A. I have been.
Q. Approximately how many times have you been deposed?
A. I don't have to take off my socks and shoes to count them, somewhere between five and ten.
Q. Have you also taken depositions?
A. I have.
Q. Approximately how many depositions have you taken?
A. I don't know.
Q. More than 20?

A. Yes.

Q. Let me just go over some of the basic ground rules. It's important for you to speak with a yes or no as opposed to a nod of the head or say "uh-huh" or "uh-uh." That's just for the benefit of the court reporter. If you need a break at any time, I'll be happy to give you one. Just let me know and we can get you a break. Is that okay?

A. Sure.

Q. Are you taking any medications that affect your ability to testify today?

A. No.

Q. And then in front of you has been marked Deposition Exhibit D-100. And that's -- is that the Notice of Deposition that brings you here today?

A. As far as I know.

Q. Have you seen that before today?

A. Yes.

Q. And when was the first time you saw that?

A. Probably two weeks ago.

MR. MORAN: And, Mr. Dreifuss, is it correct that Mr. Dickstein is the designated representative of U.S. Fire Insurance Company to

testify about all the topics listed in the deposition notice?

MR. DREIFUSS: Yes.

Q. What's the current status of the United States Fire Insurance Company?

A. I don't know what you mean by that.

Q. Is it currently operating?

A. As far as I know.

Q. Is it currently writing policies?

A. As far as I know.

Q. Is it writing policies for construction contracts?

A. Is it issuing bonds?

Q. Yes.

A. That I don't know.

MR. DREIFUSS: Do you want me to clarify on the record maybe why he's testifying?

MR. MORAN: Sure.

MR. DREIFUSS: Okay. The bond that's in question here was underwritten by Universal Bonding Insurance Company and the claims were handled by Universal Bonding Insurance Company. So even though the plaintiff is United States Fire Insurance Company, which is a separate entity, they had given underwriting authority, as well as claims authority,

Q. Yes.

A. No, and what I -- just to clarify, without making this too complicated, as I said, the relationship between Universal Bonding and U.S. Fire, at least insofar as my world is concerned, is one of a -- is a reinsurance relationship. So that, for example, Universal Bonding would be obligated under the treaty from time to time to report losses and that was usually done by way of a bordereaux, a spread sheet, so that, for example, so using that background, I am assuming that U.S. Fire, if it's not already disposed of, through some document destruction policy or whatever, there are -- you could walk into U.S. Fire's offices and say, can I see your Tri-Gems file, but it would not consist of the claims files, the underwriting files, bond files, litigation, all that. It would consist of, you know, reporting of losses. And under treaty, U.S. Fire had an obligation to provide reinsurance versus a certain retention level to Universal Bonding. So it's merely those type of documents that -- I don't mean to judge anything, that really are unrelated to the litigation.

Q. Does Universal Bonding possess any computerized files relating to the Tri-Gems matter?

A. Again, not with regard to the litigation.

There are -- again, I happen to see the discovery. For example, I believe that there's a computer printout that was provided of bonds issued, I think. As far as I'm aware, the only -- other than, for example, if someone has written a letter in computer form and may be stored in the computer, but I would think there's a hard copy somewhere, but the Universal Bonding had a software system which it could generate certain reports, one such report being you could ask the computer to spit out a report of all bonds issued at the request of Tri-Gems. So there are also reports that tell you what the losses have been. Those types of reports are on the computer, but the same information is available in the source documents.

So, for example, as I indicated, the bond file is here so that, assuming the integrity of the file, you would have the same -- the bonds, you actually have copies of the bonds. So there's nothing really in the computer that's not otherwise available in the files.

Q. Who keeps the electronic copies, electronic information that could present -- that could generate reports?

A. At this point, it's a third party administrator.

Q. And who's that?
A. Vincent G. Fasano, L.L.C.
MR. DREIFUSS: F-A-S-A-N-O.
Q. And do you know where Mr. Fasano's offices are located?
A. I believe they're in Mount Laurel. It's in Mount Laurel, New Jersey.
Q. Asking some questions now about your background, who is your current employer?
A. This law firm.
Q. Have you ever been an employee of U.S. Fire Insurance Company?
A. I have not.
Q. I'm sorry, I didn't hear you.
A. I have not, I'm sorry.
Q. Have you ever been an employee of Universal Bonding?
A. Yes.
Q. When did you work as an employee of --
A. I started on May 19, 1997. Exactly why I remember the date is unclear, but it's May 19, 1997 and I left Universal Bonding in the end of June of 2004.
Q. And what position did you hold with Universal Bonding?

A. During the entire time I was at Universal Bonding, I was vice president and general claims counsel.

Q. Can you provide a brief description of what your duties were as vice-president and general claims counsel.

A. I managed a surety claims department and would, from time to time, somewhat on an ad hoc basis, provide legal advice to the rest of the company.

Q. Can you describe your education after high school?

A. Sure. I went to Northwestern University from which I received a B.A. I went to the Jewish Theological Seminary from which I received an M.A. and rabbinic ordination. From there, I went to the Benjamin N. Cardoza School of Law and received a J.D. and, apparently, didn't qualify for medical school. I would have done that as well.

Q. Still time.

A. Yeah, I guess so.

Q. Do you hold any professional licenses?

A. Just a J.D.

Q. Where are you licensed?

A. New York and New Jersey.

Q. Do you have any education about -- did

you go to any educational institution for construction matters, to learn about construction matters?
A. I've attended seminars. Nothing formal.
Q. Do you have any particular background about electrical engineering?
A. No.
Q. Looking at what's been marked as Defendant's Exhibit 100, which requests that U.S. Fire Insurance Company designate someone to testify regarding various topics that we'll cover in today's deposition, do you know who selected you to testify for United States Fire Insurance Company?
A. I believe Mr. Dreifuss.
Q. Was any consideration given to selecting someone other than you to testify for the corporation?
A. I don't know the answer and I assume it's privileged.
Q. Are you being paid for your time in testifying today?
A. No.
Q. How did you prepare to testify as a corporate representative today?
A. I reviewed portions of the file, primarily those that involved the time period that I was here at

Universal Bonding.

Q. How much time did you --

A. Let me rephrase that, okay? Primarily, the time that the claims department at Universal Bonding was actively handling it, the Tri-Gems matter, there's a -- there came a time when counsel became -- outside counsel became involved in the prosecution of the claim against the government and I didn't focus all that much on that portion of the file, certainly, more in terms of being a fact witness for this deposition.

Q. How much time did you spend reviewing documents to prepare to testify as a corporate representative?

A. I would say three or four hours.

Q. Did you speak with anyone regarding your -- to prepare to testify as a corporate representative?

A. Nothing substantively, just where might certain documents be found, that kind of a thing.

Q. Without providing any information about the substance of your conversation, did you also speak with an attorney to prepare for your deposition?

A. Do you have someone in mind?

Q. Mr. Dreifuss or Ms. Pundalik?

A. Again, nothing other than: Where is this

file? That kind of a thing, and procedural stuff like: What time does the deposition start? And that kind of thing.

MR. DREIFUSS: Just for the record, by letting him testify to that, I'm not waiving attorney/client privilege in any way.

MR. MORAN: No.

MR. DREIFUSS: Okay.

Q. To prepare as the corporation's representative, did you attempt to speak to anyone, but found them to be unavailable?

A. No. Well, I didn't attempt to speak to anyone, so.

Q. Do you know who Robert Miller is?

A. Yes.

Q. And what's his current position?

A. My understanding is that he's an employee of Vincent G. Fasano, L.L.C., if we're talking about the same Robert Miller, and I assume we are.

Q. Mr. Miller certified the first set of Answers to Interrogatories.

A. We are talking about the same Mr. Miller.

Q. Do you know what Mr. Miller's relationship is as far as Universal Bonding Company?

A. Well, Vincent Fasano, L.L.C., serves as a

to vendors, by which I mean subcontractors. If there were a series of -- if he had established relationships with a group of subcontractors or contractors, might seek to obtain confirmation from a bank with regard to its deposits and whatever the underwriter deemed to be prudent.

Q. How would Universal Bonding use the information that the applicant provided as far as determining whether or not to enter into a bonding relationship?

A. Well, it depends what information you're talking about specifically. Make a long story short, you would form a picture. And that picture is composed of lots of little dots.

Q. Would Universal Bonding use the information provided by the applicant to set a rate for the bond?

A. I assume you mean the rate to charge for the premium?

Q. Yes.

A. Yes -- not really. Let me state it otherwise. My understanding, just my understanding for what it's worth, is -- and I don't -- there are certain filings that are made by sureties with states, departments of insurance, I assume. I'm not 100 percent sure. There

are also rates established by the Surety Association of America. I don't know -- I think there was some time during my tenure at Universal Bonding when the rate filings, either there was no longer a requirement for a rate filing or there was -- it was treated less formally or the surety had more discretion, but the bottom line is this, is that the surety Universal Bonding would charge a certain rate based upon the contract amount. That rate could increase if -- but I'm sorry, that rate could increase provided that there was a disclosure made to the applicant, to the principal -- eventual bond principal, that he was being charged a rate higher than Universal Bonding standard rate.

Q. So my understanding, and see if this is correct, is that the information that the applicant could provide would allow Universal Bonding to say whether they wanted to enter into a bonding relationship, but the price of that relationship was probably going to be already fixed?

A. Again, you're speaking generally. I mean, the way the surety industry works is that a surety never anticipates receiving -- incurring a loss. When you apply and obtain medical insurance, your medical carrier presumably has statistics coming out of its

ears so that it knows, for example, if you're a certain age, depending upon your sex, depending upon your medical background, it knows what claims -- what losses it will incur because it knows that people have to go to the dentist and all that kind of stuff. So that your premium is based upon those types of factors.

That's not the way the surety industry works. The way the surety industry works, it does not anticipate ever incurring a loss. If the underwriter believes that -- again, I'm speaking a little bit informally, if the underwriter believes it's a 50-50 chance of this contractor's going to finish the job successfully, the remedy to that, which is, as far as I'm concerned, is not a very good rating, the remedy for that is not to charge a higher premium. The remedy for that is not to issue the bond in the first place. The premium is essentially considered and it's based -- it's a percentage -- a percent of the contract price. It's not an evaluation of risk.

Q. So I guess that's what I was getting to. The information is almost like a black or white test, a go, no go test as opposed to saying, we're willing to go, but we're willing to undertake this risk, but only if you pay us $100 more or something --

A. That's correct. If you think about it, I'll try not to get into a discussion, just to answer your question, but just to try to, you know, close the wagons on this thing, if you issue, for example, a $1,200,000 bond, your -- the rate that you're going to charge for that bond is anywhere between one and a half and 3 percent, my experience in Universal Bonding. If there's a default on the contract, the likelihood that the surety's loss would be less than 3 percent of the contract is to say that it's remote is an understatement. If you're going to incur a loss, the premium is going to hardly matter.

Q. Turning now to the second topic, any investigation performed by or for U.S. Fire Insurance Company of Tri-Gems' builders before U.S. Fire Insurance issued the performance bond/payment bond relevant to this case?

A. Yes.

Q. How did you, as the designated corporate representative, obtain knowledge about this topic?

A. I looked through the bond file and I was unable to locate anything specific with regard to the project.

Q. Do you know who, at Universal Bonding,

could try to be helpful during the deposition on other parts of the case.

Q. So let me ask maybe a broad general question, maybe eliminate the need to ask a lot of specific questions. As the corporate representative, what information do you possess about how Universal Bonding investigated Tri-Gems before entering into a bonding relationship with Tri-Gems?

A. Well, I don't know if -- it did due diligence. I don't know if investigated is the -- when you use investigated, I'll -- when I hear investigated, maybe I attribute a meaning a little bit more sinister trying to uncover the truth kind of thing, but we usually call it due diligence. I don't have any specific information and, as I said, it's not my understanding that was at issue in the lawsuit, so.

MR. MORAN: Can you mark that one.

(D-101 is marked for identification.)

Q. Have you had an opportunity to mark -- to review what's been marked as D-101?

A. Yes.

Q. And just for the record, it contains Bates numbers DOJ 00656 through DOJ 0063.

A. Okay.

Q. And can you identify what this is?

A. They are two indemnity agreements obtained by Universal Bonding with respect to Tri-Gems.

Q. Can you explain why this agreement is dated in 1993 recognizing that the bonds in this case were issued in 1995 or 1996?

A. Yes.

Q. Okay. Why is this dated 1993 for bonds issued --

A. Well, first you should note the second one is dated 1985, but be that as it may, you would only have one indemnity agreement. You would not have a indemnity agreement specific to each bond. The indemnity agreement covers -- it's usually obtained upon the inception of the relationship with the contractor and it will pertain to the -- it will be -- the indemnity agreement, excuse me, will cover losses incurred with -- in connection with a bond that presumably is being reviewed by the surety at the time together with all subsequent bonds. So that it would be absolutely fine that the indemnity agreement were dated 1993, but the bond wasn't issued for several years later. Sometimes it could be 20 years later.

(D-102 is marked for identification.)

Q. Have you had a chance to review what's been marked as D-102?

A. Yes.

Q. And can you identify what that is?

A. Yes. It's the -- a copy of the payment and performance bonds issued for the project that brings us here today.

Q. For the record, it's Bates marked USF 00369 through 00382. After the indemnity agreement, Defendant's Exhibit 101, could Universal Bonding refuse to issue bonds on specific projects for Tri-Gems?

A. It depends.

Q. Why -- what does it depend upon?

A. Well, let me -- I'm assuming what you're asking is, if Tri-Gems became interested in a new project and/or a different project or another project and turned to the surety and said, would you issue the payment and performance bonds for this project as well, if that's what you mean, the answer is yes. It could decline to issue those bonds.

Q. How would Tri-Gems -- after entering into the general indemnity agreement, how would Tri-Gems notify Universal Bonding that it wanted to pursue a new project?

A. Through the broker.

Q. Did Tri-Gems have to notify Universal

Bonding through the broker every time it wanted to pursue a new project?

A. For which it wanted Universal Bonding to issue a bond, yes.

Q. Did Universal Bonding request or -- strike that.

Did Universal Bonding require that Tri-Gems provide information about each project each time it wanted Universal Bonding to issue another bond?

A. Yes.

Q. What information did Universal Bonding require that Tri-Gems provide each time it requested a new bond from Universal Bonding?

A. I testified earlier about that, that slip by which I mean 8 1/2-by-11 piece of paper that, I think, actually had a title of Bond Request Form and you would have pertinent information, who is the owner? What is the size of the project? And not all that detailed. And then I think may have also included a section for the bid results, but be that as it may; and then whatever the underwriter believed he or she needed, if anything, beyond that would be on a case-by-case basis.

Q. Before Tri-Gems entered into this

general indemnity agreement with Universal Bonding Insurance Company, my understanding is that Tri-Gems would have provided information about the management and list of subcontractors and that type of information?

A. Correct. That's right.

Q. Did Tri-Gems -- after the relationship was established, would Tri-Gems have to provide that information or update that information every time it requested a bond for a new project?

A. No.

Q. Regarding Defendant's Exhibit 101, does Universal Bonding contend that this document constitutes an assignment of Tri-Gems' right to sue the United States regarding the project at McGuire Air Force Base?

A. I didn't understand that I was here to testify as to legal conclusions or legal positions. It's my understanding as having been involved with the indemnity agreement for several years is that -- well, the document says what it says. There are certain assignment provisions. Exactly whether they're relied upon in this litigation is, as I said, not my understanding of why I was showing up today.

Q. I think that is why you're showing up

Q. The next page is USF 00376, which is captioned Payment Bond.

A. Right.

Q. Just as a kind of a fundamental matter, what's the difference between a performance bond and a payment bond?

A. In this case, about $600,000. Performance bond concerns the obligations of the bonding company as to the owner with respect to the contractors completing the work.

The payment bond is also -- states the government as the obligee under it, but the beneficiaries are the subcontractors, suppliers and material men of the contractor, assuring the government those people will be protected if not paid. And I think the document that you were just looking at is the same as the second sheet of this packet. I don't think there were two payment bonds, in other words.

Q. Right. Turning now back to the deposition notice, topic No. 3 is the practices and policies of U.S. Fire Insurance Company regarding how U.S. Fire Insurance Company monitored the performance of companies for which U.S. Fire Insurance Company issued performance bond and/or payment bonds between 1994 and 2000.

A. Yes.

Q. And we have an agreement, substitute Universal Bonding for U.S. Fire Insurance Company?

A. Yes.

Q. How did you, as the designated representative of the corporation, acquire information to testify today about that topic?

A. I was there between '97 and 2000.

Q. What were the practices and policies of Universal Bonding regarding monitoring companies for which it issued performance and/or payment bonds?

A. First, the policy was that it did not have a legal obligation to monitor the principal's performance. The underwriting department sometimes sent out what are called general status inquiry forms, which is a letter to the owner asking him how things are going. My experience, just empirically, those types of forms were not sent to the federal government. I don't think the federal government would respond to it anyhow.

MR. DREIFUSS: Can I just ask for a clarification with this. Are you talking about predefault and pre-notice of a problem or are you including that, also?

MR. MORAN: I think I'd have to say

predefault because I think some of the other -- I think like topic No. 5 would probably be more specific towards --

MR. DREIFUSS: I think you're right. I just wanted to clarify, though, as to what he's answering.

MR. MORAN: So this would be just a general --

A. There may also be occasions when, due to a subsequent bond request, the surety may ask the principal, how are your ongoing jobs going? But as I said, Universal Bonding issued thousands of bonds and didn't understand that it had a legal obligation to monitor the principals, sent out general status inquiries from time to time, and that was essentially the process.

Q. Are you aware of whether there were any documents setting forth policies for monitoring the performance of the principal?

A. From 1997 through 2000, through 2004, for that matter, there were none.

Q. Turning to topic 4, any monitoring by or for U.S. Fire Insurance Company, the performance of Tri-Gems' builder on the contract in this case. First we'll substitute -- I guess we could say that was

claim. It wrote to Tri-Gems advising that the surety had received this claim and asking Tri-Gems to state its position with respect to it. And I believe it was in this instance where Vince Miseo wrote to the contracting officer advising that it had received a claim against this payment bond asking the government to advise generally with regard to the status of the performance and asking it specifically whether it was aware of any other unpaid subcontractor, suppliers or material.

Q. Was Mr. Miseo, was he the person responsible for handling the Tri-Gems matter from this point forward?

A. The way it worked at Universal Bonding is that I reviewed all incoming and outgoing mail. So I was generally aware of what was happening. Every -- each principal against which a claim had been filed was assigned a claims attorney, in some instances myself. And there was -- whenever it was a case that was substantial, by which I mean any claim over $100,000, I would be personally involved in it, but in terms of, for example, sending out these three letters that I just described, responsible payment bond, which is a standard response, there would be someone who would be involved day to day.

as far as a claim for rigid conduit or whatever?

A. Well, he wasn't going to be disposing of those claims. I assume, in the back of his mind, he hoped that the surety bond principal prevailed, but, again, if the government allows someone to continue to work after the contract period, after the issuance of a show cause notice, the surety concludes from that that the government has some faith that, if kicked hard enough, that the principal will complete the job.

Q. I guess my question was, do you know that if -- whether Mr. Miseo, to borrow your phrase, was kicking Tri-Gems to complete the performance?

A. I don't recall. I would assume so based upon my experience knowing Mr. Miseo. The dealings with Tri-Gems also included payment bond claims, which, as we saw it from the partial listing you had, were substantial.

MR. MORAN: Off the record.

(There is a luncheon recess.)

(D-107 is marked for identification.)

BY MR. MORAN:

Q. I want to show you what's been marked as Defendant's Exhibit 107. It's a one-page document DOJ 00170.

DOJ 00445.
A. Yes.
Q. Can you identify what this letter is for the record?
A. Yes, it's a letter that Mr. Miseo sent to Donald Bruce on or about November of 1998.
Q. Do you know why Mr. Miseo sent this letter?
A. I don't recall the circumstances at the time. Presumably, for the reasons stated, he wanted the information being requested, but I don't recall what prompted the letter.
Q. Do you know if you received a response to this letter?
A. I don't recall.
Q. Showing you what's been marked as -- previously marked as Plaintiff's Exhibit 34, turning to page number DOJ 00090.
A. Yes, sir.
Q. Can you identify what that is?
A. Yes. It's a -- purports to be a termination notice to Tri-Gems dated February 24, 1999.
Q. And did Universal Bonding receive a copy of that letter more or less contemporaneous with February 24, 1999?

A. Yes.

Q. What did U.S. or what did Universal Bonding know about the status of the job prior to receiving that letter? Meaning like February 22, 1999.

A. I would have to look at the file to be able to give you a complete answer. I mean, there was...

Q. In February 1999 before receiving this letter, was Universal Bonding aware whether Tri-Gems was conducting any work on the job after December 1997?

A. Whether it had performed any work since --

Q. Yes.

A. Like I said, I don't -- I'm not real good with, unless I have it all in front of me, in terms of the chronology in dates. My recollection is that they -- the work wasn't progressing to the government's satisfaction, in terms of the progress.

Q. Did Universal Bonding know whether Tri-Gems appealed the termination for default?

A. That I don't recall.

(D-109 is marked for identification.)

Q. Showing you what's been marked as D-109, which contains Bates numbers DOJ 01378 through DOJ 01381, does this refresh your recollection as to

whether Tri-Gems appealed the termination?
A. It doesn't refresh my recollection, but I can read it if you're asking me to assume the accuracy of it.
Q. Do you know whether Universal Bonding provided any assistance to Tri-Gems in prosecuting its appeal of the termination for default decision?
A. Not that I'm aware of.
Q. You mentioned earlier that, at one point, Universal Bonding brought a lawsuit against Tri-Gems?
A. Yes, sir. I don't remember whether it was against Tri-Gems or whether it was the individual indemnitors. I note that, apparently, the trustee for the bankruptcy of Tri-Gems is addressed in the second portion of D-109 and I don't remember the -- how exactly the indemnity -- and it was an indemnity action, how exactly -- who the parties were. I don't remember whether Short also filed for bankruptcy. I don't recall. It was settled for a nominal amount.
Q. When you say the indemnitors, can you explain what you mean by that?
A. The individuals who signed D-101.
Q. Just so the record's clear, it's the general indemnity agreement?

A. Yes, sir.

Q. And if you need to take a moment to look at D-101, but on page DOJ 00659, fourth page into the document?

A. Yes.

Q. Mr. Short -- it purports to be Mr. Short's signature. And, after that, it says, individual indemnitor?

A. Yes.

Q. Is that Mr. Short is individually guaranteeing the payments made by -- guaranteeing payments made by Tri-Gems? How does it work as an individual?

A. He is individually liable for whatever the obligations are that are set forth in the indemnity agreement including indemnifying the bonding company for any loss, cost or expense.

Q. Do you know where, in what court, the action brought by -- well, first let me say, was it brought by Universal Bonding or was it brought by U.S. Fire?

A. I don't recall.

Q. Do you know what court that action was brought in?

A. It would have been State Court of New Jersey

or in the bankruptcy proceeding. I don't remember. I'm assuming it was State Court of New Jersey. Well, it could be both, obviously.

Q. Do you recall approximately how much money either U.S. Fire or Universal Bonding Company collected?

A. I don't remember.

Q. Do you know if it was less than $10,000?

A. I don't recall. I think so, but I really don't recall. I mean, if you're talking net of attorney's fees, probably.

Q. Do you know whether the payments that someone made to Universal Bonding Company or U.S. Fire were made because of loss of money expended pursuant to the performance bond or to the payment bond?

A. No, I don't think there was any one distinguished.

Q. Turning back to the deposition notice, topic No. 7 is the practices and policies of U.S. Fire Insurance Company regarding how U.S. Fire Insurance Company negotiated takeover agreements.

A. Yes.

Q. And how did you, as the designated representative for the corporation, obtain knowledge

the only instance in the seven years I was at Universal Bonding where an owner committed itself in writing to resolving claims in good faith in the context of the takeover agreement. It was very important to the surety that the government understand that the surety's willing to use its money to complete the government's job, notwithstanding serious reservations about the way the government had performed under the contract.

And, again, just as a personal matter, when I heard how the government was conducting itself by way of motion to dismiss or otherwise, I didn't consider that to be in good faith as a signatory to the document.

Q. Turning to topic No. 8, the negotiation of the takeover agreement in this case.

A. Yes.

Q. How did you obtain information about this topic?

A. Personal experience. I signed the agreement.

Q. Do you think that this -- the takeover agreement was a jointly created document?

A. I don't know what that means.

Q. As opposed to being a contract drawn up by one side?

A. It was negotiated, I believe.

(D-110 is marked for identification.)

Q. Let me show you what's been marked as D-110. It's a one-page document bearing Bates number DOJ 00415.

A. Yes.

Q. Can you identify what this document is?

A. Yes. It's a -- purports to be a letter from the Contracting Officer DeMito, I apologize if I'm pronouncing her name incorrectly, to U.S. Fire.

Q. Is this essentially a demand upon the surety?

A. You can read it for what it is.

Q. Would you agree that it's a demand upon the surety?

A. Explain to me what you mean. I'm not sure what you want me to -- I would call it a request for a -- the terms and conditions of a takeover agreement and a threat as well.

Q. Do you know if, before May 23, 2000, that Universal Bonding had already agreed to or had already decided to enter into the terms of a takeover agreement as opposed to pursuing any of its other options?

A. You mean as a conceptual matter had it been

deal with the claims, then it wouldn't have entered into a takeover agreement. It becomes a little bit circular, but theoretically, it probably was in connection with trying to solicit bids with the expectation that the surety would enter into a takeover agreement with the government.

(D-111 is marked for identification.)

Q. Do you recall having an opportunity to walk the job site with people from the air force prior to entering into that completion contract?

A. I didn't.

Q. Do you know if anyone from Universal Bonding did?

A. No. 1, I think they probably always had the opportunity. I believe that Vince Miseo attended a meeting. Whether he walked the job site -- and, quite frankly, whether his walking the job site meant anything is something I don't know. I mean, he's a lawyer.

Q. Kind of the middle of the page, there's a reference to the Megan Group.

A. Yes.

Q. Do you know who the Megan Group is or was?

A. Yes.

Q. Who is the Megan Group?
A. The Megan Group was a contractor based here in New Jersey with which Universal Bonding had a relationship such that Megan Group was used as a completion contractor on more than one project.
Q. The Megan Group, as a completion contractor, that role was eventually filled by Eastern Electric?
A. That's correct.
Q. Megan Group is different from the firm that Mr. Spinelli works for in the sense that Mr. Spinelli serves as a consultant, it seemed like, to Universal Bonding?
A. Mr. Spinelli is with his own firm. He's not with Megan Group.
Q. But Mr. Spinelli's firm performed services different from the services that the Megan Group would perform?
A. Sometimes Megan Group would perform similar services that Cashin Spinelli provided on this. Usually, he -- I don't recall Megan Group being retained by the bonding company to solicit bids as happened in connection with Cashin Spinelli, but to the extent that Cashin Spinelli has been asked by the surety, for example, to look at a project and give us

its thoughts, the Megan Group had been used by Universal Bonding for that purpose as well.

Q. Do you know how the Megan Group is being used in relation to this project?

A. As a proposed completion contractor, I believe.

Q. Topic No. 9 is the practices and policies of U.S. Fire Insurance Company regarding how U.S. Fire Insurance Company obtained companies to replace companies for which U.S. Fire Insurance had issued performance bonds and/or payment bonds between 1995 and 2000.

A. Okay.

Q. Substituting Universal Bonding for U.S. Fire Insurance Company, how did Universal Bonding obtain completion contractors? What were their policies?

A. One of two ways. Either it would contact a particular company and ask that company, are you interested in doing the work? Or it would prepare a formal solicitation, usually with the assistance of a consultant, and that solicitation would be disseminated to anyone who the surety understood might have an interest in being a completion contractor, and that, more likely than not, didn't have a preexisting

relationship or dealings with Universal Bonding.

Q. Between those two approaches, how did Universal Bonding decide what approach to follow?

A. It would depend upon the project. I was not in favor of the first. So that those instances where the first route was followed was, more likely than not, at the suggestion of more senior management than myself. I always liked the second route; namely, to solicit anyone who would be interested, make it a much more formal process.

Q. When Universal Bonding used the more formal solicitation process, did Universal usually retain the services of an outside consultant to help it prepare the bid package?

A. Yes, I think that's fair to say.

Q. And did Universal Bonding usually, at least for projects in New Jersey, New Jersey/New York area, did it usually retain Mr. Spinelli's firm?

A. No, I think it's fair to say usually there are several consulting firms that we worked with in regard to bid solicitations on defaulted projects.

Q. And how would you decide what solicitation firm, what firm to create the solicitation package to you?

A. I don't know that there's any policy or

example, I didn't have any oral conversations with the government where it orally told me, you know what? The show cause notice we sent out, we really did send it out. It's an accurate document of what happened. It's very rare, quite frankly, in my involvement, am I involved in discussions where the surety receives a document from the federal government where it's necessary for the federal government to orally confirm that it's accurate.

Q. I'm not sure you're responding to my question.

A. Maybe I didn't understand it. I apologize.

Q. Did anyone from the government tell the surety that P-1 was accurate?

MR. DREIFUSS: Object to the form. You mean verbally say to the surety P-1 is an accurate document?

A. Just so I can place my answer in context, my assumption is that the government does not release documents to a surety against who has made a performance bond that are inaccurate without telling the bonding company we are giving you inaccurate information. This document that is signed and is the consequence of three days of visits, including the contracting officers visiting the job, it's

inaccurate, especially when it fits precisely in the context of other documents that the surety has received. So that the very receipt of it for me is representation of its accuracy. Or certainly not -- it's certainly representation to me it's not guesswork, that it's the best they can do under the circumstances, but I did not -- I did not personally participate in any discussions where the government said it was accurate or inaccurate.

Q. Turning to Exhibit 112, did U.S. Fire review the bid package? I'm sorry, did Universal Bonding review the bid package before it was released to the general public?

A. It was never released to the general public, but I think so.

Q. I guess when the government releases solicitations, the government releases solicitations to the general public. I guess Universal Bonding did something of a more limited distribution?

A. That's for sure.

Q. How does Universal Bonding decide who to release solicitations to?

A. I don't know how it happened here, but, usually, it'll do two things. No. 1, it will ask the public owner to provide the list of contractors that

Q. Did Universal Bonding decide who to select as the completion contractor?
A. I think that's fair to say.
Q. As opposed to, for example, Mr. Spinelli?
A. Yes.
Q. And how did Universal Bonding decide who to use as the completion contractor?
A. It was the lowest responsible bid.
Q. Did it matter to Universal Bonding whether a contractor was a minority-owned enterprise?
A. I don't recall that being an issue at the time.
Q. How did Universal Bonding determine that a contractor was responsible?
A. If the bid complied with the requirements of the bid solicitation.
Q. Did Universal Bonding require, like, past performance evaluations or --
A. That I don't recall. I think that Eastern, the eventual completion contractor, had worked successfully on this with the air force at this base, but I may be confusing this file with another one, but I think that's the case.
Q. Did Universal Bonding consult with the

air force before selecting the completion contractor?

A. I know that it identified Eastern. That's for sure.

Q. Before it entered into the contract?

A. Which contract?

Q. The completion contract.

A. Well, the completion contract is conditioned upon the surety entering into a takeover agreement. The surety never wants to commit to Eastern to have Eastern complete the job if the surety can't come to terms with the public owner, whose project it is in the first place. I believe that the takeover agreement does identify Eastern as the completion -- completing contractor.

Q. I guess what I was going to -- was the air force required to approve in any way the completion contractor?

A. My understanding is that, by law, the federal government can reject a proposed completion contractor if it's not in the public interest.

Q. Was there any problem with obtaining consent of the air force to use Eastern in this case?

A. Not that I'm aware of.

Q. After Eastern submitted its bid, did you engage in any negotiations with Eastern about the

A. We can look at the -- if you show me a copy of the completion agreement, we can get it precise. Somewhere in this completion agreement, I'm rather convinced that there's a price. $939,904, excuse me. It's on page No. 4, DOJ 01469 of Exhibit D-104. There's $30 less than what appears as DOJ 01183.

MR. MORAN: We're about to start topic No. 11. So we can take a quick break.

(There is a recess.)

BY MR. MORAN:

Q. Topic 11 is the practices and policies of U.S. Fire Insurance Company regarding how U.S. Fire Insurance Company monitored the performance of companies with which U.S. Fire Insurance Company entered into contracts to complete the performance of contracts.

A. Yes.

Q. Is your knowledge again based upon personal experience?

A. Yes.

Q. And did Universal Bonding have any policies about monitoring completion contractors?

A. It hoped never to have to spend any money in monitoring them. What I mean by that is this:

Usually when the surety entered into a takeover agreement with the owner, we tried not to have a consultant act as a construction manager supervising the completion work. It was an increased expense that sometimes became pretty expensive. So that what we tried to do by way of example is, and I don't recall specifically in this takeover agreement, certain authority was given to the contract -- to the completion contractor to act on behalf of the surety, which was -- who was the party to the takeover agreement after all with regard to day-to-day affairs, that kind of a thing. It was the expectation of the bonding company that the completion price would not be the completion price plus consulting fees and engineering fees, that the completion contractor would become its new contractor and would complete the job.

We would expect to see progress on the job in terms of the surety having receiving -- excuse me, that the surety receiving requisitions so we knew that the job was going on. If six months went on without a requisition, we would scratch our head wondering what was going on. But the more important aspect of it is we would always assume, and I think accurately so, that the public owner, having once defaulted a contractor, would surely let the surety know if there

were problems with regard to the completion contract.

MR. COLE: One second. Would it be any quicker if I've got the disk with all the documents on it.

MR. MORAN: Off the record.

(There is a recess.)

BY MR. MORAN:

Q. When Universal Bonding was -- had retained a completion contractor, how did the completion contractor get paid?

MR. DREIFUSS: Do you want to know generally?

MR. MORAN: Yes.

A. With a check.

Q. But would submit invoices to Universal Bonding?

A. Typically what would happen is that the contractor, the completion contractor, would prepare two requisitions, one in its own name to the bonding company, the second in the name of the bonding company to the public owner. The surety would review them or the consultant would review them, which is what happened here. The government would pay based upon the requisitions prepared by the completion

contractor, but submitted by the surety and then the surety would, within a number of days thereafter, negotiated in the completion agreement, have an obligation to remit the money for that same work, but based upon the values of the completion agreement, not the original contract that the company would pay under.

Q. Topic 12 is any monitoring by or for U.S. Fire Insurance Company of the performance of Eastern Electric on the contract in this case. And is this -- is your knowledge again based upon your personal experience?

A. Yes.

Q. Did anyone monitor the performance of Eastern for Universal?

A. I believe that what happened is that Eastern submitted its -- I don't know whether Eastern submitted its pay request to the surety and the surety sent it on to Cashin Spinelli, but in reviewing the file, what I recall now is that Cashin Spinelli would give us a recommendation as to payment essentially. Yes, you know, X dollar, the Eastern requisition for X dollars and, yes, it appears that that work or that value's been completed. So kindly arrange for a check to be sent to me or to Eastern, I don't remember, for

that.

Q. Someone from Cashin Spinelli would need to approve Eastern's request for payment?

A. They wouldn't need to, but they did. I don't remember how this was set up. As I said, certainly in files that I was -- I apologize. Let me take a step back. The administration of a completion contract should be very easy for a surety. It shouldn't have to think very much. Getting there is a big job, but once it's in place, it shouldn't be a big deal. Usually, when I was involved in the case, I would do it myself. I wouldn't need an expert or think it was necessary to pay for one, particularly when the scope of work was pretty well defined both in terms of the completion agreement and in terms of the remaining work to be done.

So, for example, if the project was to install ten light bulbs, the government has told us five were successfully installed, but five were not, and the amount available for the five light bulbs is $100 a light bulb, it would be pretty easy to administer that because the completion contract, two requisitions, let's say the first requisition is I installed one light bulb for which I'm entitled to $200,000 because -- $200 because that's my bid and the

government's going to pay you $100 because that's the original contract value. That's submitted to the government. The government pays us $100. It's pretty easy to say that work's been accepted. So you submit a check of $200 to the completion contractor. It's a much difficult exercise, however, when the government has already paid for work that needs to be performed that wasn't really completed and there's defective work, then it becomes a much more difficult exercise because the government is not necessarily telling -- approving it because it's not paying for it. It's already paid for. So that becomes a much more difficult exercise.

Q. When the issue is repairing defective work, how would Universal Bonding determine whether work should be paid for done by the completion contractor as far as correcting alleged defective work?

A. One thing the surety strives to do more than anything, when it was aware of the possibility of defective work, is to negotiate it in the completion agreement. In other words, you disclose as much defective work as the surety possibly can. The completion contractor then knows that if I -- that if it really is defective, the price is included. The

nightmare for the surety is having a completion contractor locate defective work that was not obvious by a walk-through or not previously identified because then you have to negotiate the price, and the surety doesn't have much choice.

So, for example, if the completion contractor says unbeknownst to anyone and the surety agrees unbeknownst to anyone, assuming even there's an agreement to that issue, that a wall is not plumb, and the completion contractor gives you a price that's through the ceiling, the surety's between a rock and hard place. What's it going to do? Get another contractor to come in and do this wall to make it plumb? So what the surety tries to do, even if it has to pay for it, is include in the completion agreement a price and identification of as much possible defective work as is known.

Q. In your answer, you were describing that the surety tried to identify all the defective work in the completion agreement for fear of discovering defective work after the completion agreement had already been signed?

A. Well, it didn't identify it. What I meant by identify, it tries to supply whatever information it has.

Q. Now, what about kind of the opposite situation in that the owner identifies what could be defective work? How does the surety go about determining whether the potentially defective work was or was not actually defective?
A. Depends upon how it's bid.
Q. What do you mean by that?
A. If you ask for a lump sum and you get a lump sum, then the contractor made more money than he anticipated, but there's the flip side also, that it could be the opposite.
Q. And was the completing contractor -- strike that.
In this case, was the completion contract a lump sum contract?
A. Yes.
Q. Did Universal consider making the completion contract in this case something other than a lump sum contract, meaning on a linear foot basis you bid your job?
A. I don't recall. What I can tell you is that my experience tells me over the seven years that I was there, and I did surety work prior to that as an attorney, is that when you leave those types of items open, you're going to leave yourself open to disputes.

It's going to be expensive to resolve disputes, and you're probably going to pay a higher price. In the long run, it's safer -- I shouldn't say it's safer. It's more economical from a surety perspective to try to make it a lump sum concept that includes whatever is or might be defective as identified by the public owner. As I said, sometimes you win, sometimes you lose; but you have cut your liability -- I'm sorry, you have capped your liability. There are times -- and I had one situation, I don't are remember who the principal was, where the completing contractor couldn't get a surety to issue a bond because he couldn't tell them what the price of the contract was, because if you have certain work on linear feet and you don't know what your linear feet is, you don't really know what the price of the contract is going to be until you performed it. So the surety wasn't prepared to issue a bond especially when the units concern defective work.

Q. Did anyone from Universal review Eastern's work to determine whether the work that it was doing in correcting alleged defective work, that work was actually necessary because the work done by Tri-Gems was defective?

A. Can you say that again? I'm sorry.

Q. Sure. Did -- in this contract, in the completion contract, did Eastern redo any work that Tri-Gems had already done regardless of whether Tri-Gems had done the work correctly or not?

A. I believe so.

Q. And then trying to narrow that down, does U.S. Fire -- or does Universal Bonding Company know whether the work that Eastern redid, whether the work that Tri-Gems had originally done, whether that Tri-Gems' work was correctly done or not?

A. Let me just explain. I don't know the answer. Maybe the bonding company's consultants do, but the reason why, without being too self-serving about this, the reason I don't know the answer is because it didn't matter. What I mean by that is this: The performance bond obligation required the surety -- all things being equal, all sureties will attack in good faith to complete the project. A certain set of facts and assumptions were conveyed to those who bid on the project. Those facts and assumptions may or may not have been correct, but the bottom line is that the completion agreement was performed to the satisfaction of the federal government and that's what we undertook to do. So that that analysis is not necessarily one that the surety was interested in, although it may be,

in fact, information that is available, but it's not available to me.

Q. Do you know when Eastern completed its performance under the completion agreement?

A. I don't know. No. I don't. I don't remember.

MR. MORAN: Mark this.

(D-113 is marked for identification.)

Q. I've handed you what's been marked as Defendant's Exhibit 113, which contains Bates numbers DOJ 00496 through 00501. Page number 00498, can you explain to me what this document is?

A. Yes. It's what Universal Bonding calls a claims register. It records two things. Well, records whatever it records, but generally, it records every financial transaction that took place in the life of the claim. It also includes the surety's estimated liabilities going forward.

Q. And if you turn the document landscape wise, it says -- the right-hand column says: Estimated cost to complete?

A. Yes.

Q. And then it has a figure of about $260,000.

A. Right.

A. Not that I'm aware of without the file in front of me.

Q. What file would you need to have in front of you?

A. The litigation file.

Q. Did you review that to prepare to testify as a corporate representative?

A. Yes, I did.

Q. But you --

A. But maybe my brain doesn't retain as much information as yours does.

Q. I'm not sure my brain has retained it precisely. Do you know how much money Universal Bonding Company paid to Eastern?

A. I believe the 900,000, plus a change order. I think the change order was far less under a thousand dollars. I don't remember what it was. Stated otherwise, the document -- that's what the surety likes. The surety likes it when it enters into an agreement, it's got a fixed price and, at the end of the day, that's what you paid and that's what happened.

Q. Do you know how much Eastern's costs were for mobilizing to come to the job?

A. Its actual costs?

Q. Yeah.
A. It was of no moment to me. Just like we have no moment to the federal government if it had the lowest responsible bidder. As far as I know, in America, you're allowed to make a profit.
Q. I was talking specifically about for mobilizing to the job.
A. Again, it was of no moment to the surety. It was the low bid. If Eastern set up its line items a certain way, and if they were front loaded and the surety was willing to accept it, God bless them. If it wasn't front loaded and that was a -- it's cost plus 10 percent overhead and 10 percent profit, then that was okay, too. It was the lowest completion bid we received, below the penal sum and well below the second bid that we received.
Q. The second page of -- actually, third page of the document, second page of the calculation of damages has 281,396 for that Universal completed above the penal sum of the bond for which the air force is responsible. Do you see that?
A. Yes.
Q. Can you explain what that is referring to?
A. I would have to look at the file a little bit

more carefully. My understanding is that, No. 1, the contract was increased about 25 percent, which is a pretty big amount. My recollection of reviewing the last file in the last day or two is that I think over half of it was very close to the day of the issuance of the first show cause notice so that, essentially, what was happening is that the government was given Tri-Gems' additional work when it wasn't even performing the original work. I'm not saying that it did so with the intention of, but, certainly, the effect of it was to have the surety pick up that bill, that -- the cost of that extra work or change orders, whatever they happen to be.

Q. Was the original amount of the contract 1,202,800 -- was the original amount 1,202,800?

A. Yes.

Q. Did the addendums increase the contract to 1,484,196?

A. Right, one through five.

Q. Is that what you're referring to, the increase of --

A. Yes.

Q. Is about 25 percent?

A. Right.

Q. When the parties calculated the amount

of funds remaining left when they negotiated the takeover agreement, did the parties use -- start as a top line number, that 1.4 or the 1.2 number?

A. In fairness to the government, I hope it was the 1.4 number. Yes.

Q. It was the 1.4?

A. The reason why I say yes after a pause is because the takeover agreement in paragraph 2 so states.

Q. So did -- how did increasing -- if the government started or if the parties started with the 1.4 as the full value of the contract and then the air force promised to pay Universal the remainder of the contract, which would include the increased amount, how did increasing the full amount of the contract hurt Universal?

A. It shouldn't have. The problem is when you pay for work that was never completed or started. That's the problem. In other words, it shouldn't matter. You increase the contract price, you pay for the work performed so that you have the contract money available to complete the remaining contract work. The bonding company knows that completion bids are likely to be high just because people know that the surety is going to, more often than not, complete the

project. It knows, you know, it can take the -- there's a premium that sureties pay for having to complete work after a default, but what it doesn't think is going to happen is it's going to have to pay twice for the same work. And what I mean by that is first it's going to pay for the work because the government expended the contract funds. Second, it's going to have to pay for the work to be done properly and that's what happened here.

Q. I guess I'm maybe not understanding because I understand that the surety's making claim for 691,000 for work not performed or improperly done work.

A. Yes.

Q. I can understand that. I don't understand how the extra 280,000 comes into play.

A. The way that I understand it, as I said, is that the increase in the contract amount, increase in surety's exposure, okay, above the penal sum of the bond so that, so to speak, the bond is being stretched. So then instead of having $100,000 bond responsible for $100,000 worth of work, you have $100,000 bond that is being asked to cover $125,000 worth of work. So the penal sum of the bond is being stretched to cover a value of work greater than the

penal sum; and, as I said, it's my understanding this work was being awarded at a time that it was clear that Tri-Gems wasn't performing the work.

The first Order to Show Cause was pretty strong. As I said, my recollection from the letter, from the file is, chronologically, it wasn't too far off from a rather substantial increase in the contract price.

MR. MORAN: Off the record.

(There was an off-the-record discussion.)

BY MR. MORAN:

Q. Turning to DOJ 01398, when the surety says it's 60 percent complete and $890,517.60, that's 60 percent of the total contract amount being 1. -- 1,484,196. Is that right?

A. I'm tempted to say we need a calculator, but I think that's correct.

Q. I see that the increase in the contract from 1.2 to 1.4 has already been considered in figuring out how much the work was overpaid and how much work was paid for work not done and work done improperly.

A. Okay.

Defendant's Exhibit 114, Bates page number DOJ 01200.
A. Yes.
Q. There's a line item for Department of Labor withholding.
A. Yes.
Q. Approximately $60,000.
A. Yes.
(D-116 and 117 are marked for identification.)
Q. If you look at Defendant's Exhibit 116, which is a one-page document, Bates numbered DOJ 01382 and Defendant's Exhibit 117, one page document DOJ 01383.
A. Okay.
Q. Turning first to D-117, this appears to be a letter sent by Contracting Officer DeMito, dated May 31, 2000?
A. Yes.
Q. And then it seems like it's a certified green card?
A. Right.
Q. And received by -- is it Nicosia?
A. It's actually Nicosia.
Q. And he's someone who works for Universal?

A. Yes, at the time.

Q. At the time that -- let me have the takeover agreement. And the takeover agreement is dated January 2001.

A. Right.

Q. So that, is it fair to say, that Universal was aware of the loan or claim made by Department of Labor against contract funds?

A. I don't recall. I don't recall.

Q. In regard to invoice No. 1, which appears as part of this Defendant's Exhibit 114 at Bates page No. 1200 --

A. Yes.

Q. -- there's a deduction for the Department of Labor withholding.

A. Yes.

Q. Did U.S. Fire or Universal attempt to prevent the air force from paying money, turning money over to the Department of Labor?

A. I don't know.

Q. Does Universal contend that the air force should not have turned over the money to the Department of Labor?

A. I don't know.

Q. Does Universal contend that the air

C E R T I F I C A T E

I, THERESA GARRITY, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, do hereby certify that prior to the commencement of the examination the witness was sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither of counsel nor attorney for any party in this action and that I am not interested in the event nor outcome of this litigation.

Theresa Garrity

Notary Public of the State of New Jersey
License No. XI01129