**DREIFUSS, BONACCI & PARKER, LLP**
26 Columbia Turnpike
Florham Park, New Jersey 07932
Phone (973) 514-1414
Fax (973) 514-5959
*Attorneys for Plaintiff United States*
*Fire Insurance Company*

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **UNITED STATES FIRE INSURANCE COMPANY,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant.** | **No. 03-2811C**<br>**(Judge Horn)** |

**PLAINTIFF'S MEMORANDUM OF LAW**

**ISSUE:** Whether the United States Owed Any Duty to the Surety Such That The United States Was Obligated To Retain Certain Funds?

The position of the Government as indicated by counsel is that the United States did not owe a duty to the surety until after the surety provided notice to the Government of the default of Tri-Gems.

**DISCUSSION**:

It is respectfully submitted that the Government's position has been rejected in connection with a claim such as that asserted here. Before addressing the relevant case law, certain important facts should be considered.

As set forth in paragraph 7 of the Joint Stipulations of Fact, FAR 52.232-5 provides in

relevant part as follows:

> (b) Progress Payment. The Government shall make progress payments monthly as the work proceeds or at more frequent intervals as determined by the Contracting Officer, on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer.

As set forth in paragraph 19 of the Joint Stipulations of Fact, after the modifications, the total price of the TriGems contract was $1,481,396. As set forth in paragraph 25 thereof, after the last payment was made to TriGems on or about December 2, 1997, the Air Force had paid TriGems $1,285,5553.14 or more than 85% of the total contract price. Yet, as set forth in paragraph 35 of the Joint Stipulations of Fact, Steven Lyman, an electrical engineer employed by the Government, prepared a report in which he stated, among other things, that TriGems completed only 60% of the work and of that 60% one-third needed to be reworked. Thus, essentially 40% of the work performed by TriGems had been performed in accordance with the contract documents, but TriGems had been paid more than twice that amount. This is based upon the Government's own electrical engineer. There are additional documents from the contracting officer and prior counsel for the Government in which they specifically indicate that the Government had substantially overpaid TriGems. In fact, in one letter, the Government's prior counsel indicated that the Government was considering suing TriGems to recover the substantial overpayment.

Before addressing the relevant case law, it should be noted that this is a situation whereby the plaintiff, United States Fire Insurance Company, undertook completion of the project. If the Government had only paid for the approximately 40% that had been completed in accordance with the contract, there would have been substantial additional contract funds available to be applied to the completion effort by United States Fire Insurance Company. This is not a

situation where United States Fire Insurance Company is pursuing the Government based upon payments made to subcontractors or suppliers. As we intend to be able to show at time of trial, the Government was aware of problems with TriGems on a number of occasions during the course of the project. In fact, in a memorandum prepared by Mr. Lyman dated August 6, 1996, approximately 5 months after TriGems started work, Mr. Lyman indicated:

> "We cannot allow this contractor to continue in this manner. It is not fair to the other bidders who submitted proposals with the acceptation to carry out the project according to the specifications and drawings. This contractor is defrauding the Government and we must put a stop to it!!!"

Yet, as set forth in paragraph 25 of the Joint Stipulations of Fact, the Government continued to make payments to TriGems through December 1997 and TriGems was not notified that its contract was terminated for default under February 24, 1999. (paragraph 37 of the Joint Stipulations of Fact)

In the Takeover Agreement between the surety and the Government, the Government agreed that the surety could reserve its rights with respect to claims, including the claim of overpayment. Frankly, the Government's position is surprising. If, in spite of such agreements, the Government is not obligated to the surety, whenever there is a claim of overpayment, the sureties will not undertake completion of projects which means that the Government will need to find the funds from other sources or not find the funds (with a resultant lengthy delay in completion) to complete and pursue recovery from the surety which will assert overpayment as a defense.

This case is closely akin to National Surety v. United States, 118 F3d 1542 (Fed. Cir. 1997). In that case, like this case, the surety's principal was terminated by the Government for default. As here, the surety undertook completion and was paid the difference between the

contract price and the payments that had been made to its principal, less liquidated damages for late completion. National Surety then filed a claim in which it sought to recover the funds that were required to have been retained by the Government from the progress payments to its principal. No notice had been given to the Government. In that case, the Court indicated that the Government had a duty to "administer the Contract, during the course of its performance, in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded." Id. at 1546. The Court further indicated that:

> "Surety bonds are integral to the Government contracting process, for through the surety system the Government enters into arrangements with reduced risk, by drawing on the responsibility and resources of the surety. Contract terms that provide security for the bonded performance cannot be ignored, waived or modified without consideration of the surety's interest. [citations omitted] The Government's failure to retain the required sums during performance of the Dugdale Contract was a change in the terms from those on which the surety provided its bonds. When National Surety completed the contract in accordance with its performance bond, it was entitled to the benefit of a contractually-required retainage. The Government's improper release of this security does not avoid liability to the surety for the losses thereby sustained. Id. at 1547.

As this Court recognized in International Fidelity Insurance Company v. United States, 41 Fed. Cl. 706 (1998), the Federal Circuit found in the National Surety case that the notification requirement was not applicable when the contract required withholding of funds. Id. at 714.

Likewise, in Transamerica Premier Insurance Company v. United States, 32 Fed. Cl. 308 (1994), decided prior to National Surety, the Court expressly rejected the Government's current position. There, the Court reviewed the decision of the Federal Circuit in Fireman's Fund Ins. Co. v. The United States, 909 F.2d 495 (Fed. Cir. 1990), in which the Court did indicate that notice by the surety was necessary for the Government to become a stakeholder with respect to

funds which it released prior to receiving any notice from the surety. The Court of Claims noted that, in Firemans' Fund, the Court rejected the surety's contention that the Government should have recognized, at the time of its release of contract retainages, the likelihood of the contractor's default because of complaints of late payment from subcontractors and suppliers. The Court, in the Transamerica Premier case, noted that the Government was then contending, as it apparently is doing here, that Fireman's Fund defined a "rule of law applicable to all subrogation actions, i.e. that no duty is owed the surety by the Government save where the Government has been informed by the surety of the contractor's default." Id. at 315. The Court went on to indicate that it did not agree with that position and that the statement which the Government was contending applied was actually intended by the Court "to address the specific facts before the Court rather than to proclaim a rule of universal application that would displace, without comment or discussion, the principles adhered to in earlier cases." Id.

In Pearlman v. Reliance Insurance Company, 371 U.S. 132, 83 S.Ct. 323, 9 L.Ed. 2d 190 (1962), the Supreme Court of the United States confirmed the surety's equitable rights to the funds held by the Government. It is respectfully submitted that those rights would be severely prejudiced if, especially in a performance bond situation where sureties are generally not aware of breaches by either the owner or its principal until the owner advises the surety, such rights of equitable subrogation are found not to exist where a surety has not given notice of something of which it was not aware.

Here, it is respectfully submitted that the surety did not give notice to the Government prior to the payments that the Government made. If the Government felt that that was a complete defense, it is unknown why the Government did not proceed with a motion for summary judgment. The surety never contended that it provided such notice. In fact, if this

Court were to determine that such notice was necessary before a duty arose, it is respectfully submitted that it would be in the best interest of the Court and the parties for the Court to render such a decision prior to proceeding with a costly trial.

However, it is the position of the surety here that, as indicated by the Court in the National Surety case, and the other cases cited above, such notice was not a precondition to recovery. It is further indicated that the facts will indicate that, as recognized by Mr. Lyman in the above quoted memorandum, the Government was aware that TriGems was not complying with the contract. Therefore, if as this Court suggested in International Fidelity, constructive notice is appropriate, the Government had constructive notice of deficiencies in the performance of TriGems. In that regard, it should be noted that the Government had inspectors who were performing inspections on almost a daily basis and also had Mr. Lyman, an electrical engineer, conducting regular inspections.

## CONCLUSION

For the reasons set forth above, it is respectfully submitted that the Government's position as indicated above should be rejected.

DREIFUSS BONACCI & PARKER, LLP
Attorney for Plaintiff,
United States Fire Insurance Company

By: ______________________
DAVID C. DREIFUSS

G:\FPDATA\Clients\Universal Bonding-Lumbermens\TRIGEMS\Litigation\Plaintiff Memo of Law - 2 r.doc

**CONTENTS OF BOX**

MEETING MINUTES
SOME CORRESPONDENCE
A LARGE AMOUNT OF FAI DOCUMENTS