**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| UNITED STATES FIRE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 03-2811C<br>(Judge Horn) |

**BRIEF ON BEHALF OF PLAINTIFF, UNITED STATES FIRE INSURANCE COMPANY, UPON CONCLUSION OF THE EVIDENTIARY PORTION OF THE TRIAL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ 2

I. INTRODUCTION ........ 3

II. STATEMENT OF THE ISSUES ........ 4

III. STATEMENT OF THE CASE ........ 4

ANALYSIS ........ 13

POINT I
THE AIR FORCE'S ADMISSIONS OF OVERPAYMENT ........ 13

POINT II
THE EVIDENCE OF OVERPAYMENT IS COMPELLING ........ 19

POINT III
U.S. FIRE CAN MAINTAIN THIS ACTION IN THE ABSENCE
OF NOTICE TO THE AIR FORCE ........ 30

CONCLUSION ........ 41

# TABLE OF AUTHORITIES

**Cases**

*American Insurance Co., v. United States*, 62 Fed. Cl. 151, 156 (2004)..................... 35, 37, 38,39

*Argonaut Ins. Co. v. United States*, 193 Ct.Cl. 483, 494, 434 F.2d 1362, 1368 (1970) ............... 39

*C& H Commercial Contractors Inc., v. United States*, 35 Fed. Cl. 246 (Fed. Cl. 1996) ............ 18

*Clark v. United States,* 8 Ct.Cl. 649 1985)..........................................................18

*Fireman's Fund Ins. Co. v. The United States*, 909 F.2d 495 (Fed. Cir. 1990)...................... 36, 39

*Goebel v. Denver and Rio Western R.. Co.*, 215 F.3d. 1083, 1088 (10th Cir. 2000)..................... 27

*International Fidelity Insurance Company v. United States* 41 Fed. Cl. 706 (1998)............. 36, 37

*Lumbermens Mutual Casualty Company v. United States*, 67 Fed. Cl. 253, 256 (2005) ............ 39

*Myers Investigative and Security Services v. United States*, 47 Fed. Cl. 288 (Fed. Cl. 2000) ..... 18

*Nat'l Surety v. United States*, 118 F.3d 1542, 1546 (Fed.Cir.1997) ............................ 30,31,35, 36

*Transamerica Premier Insurance Company v. United States*, 32 Fed. Cl. 308 (1994).........36,37

*U.S. Fidelity & Guar. Co. v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377, 1384 (1973) ............. 30

*United Pacific Insurance Company v. United States*, 16 Cl. Ct. 555, 558 (1989).................. 39

*United States v. Diaz*, 300 F.3d 66, 74 (1st Cir. 2002); Fed.R. Evid. 103 (d). ............................ 27

**Regulations**

FAR 52.235-5 ........................................................................................................... 4,30

FAR 52.246-12 ......................................................................................................... 5, 31

# I. INTRODUCTION

A trial of this matter was held before this Court from October 24, 2005 to October 27, 2005. At the conclusion of the trial and before hearing closing statements, this Court requested the submission of post trial briefs. The plaintiff, United States Fire Insurance Company (hereinafter "U.S. Fire") respectfully submits that, based upon a detailed analysis of the law, the testimony and the documents that were admitted into evidence, judgment should be rendered in favor of plaintiff, U.S. Fire.

In that regard, as the Court may recall, there was discussion regarding the "heavy burden" which a party suing the federal government must bear. However, here, it is respectfully submitted that the Government's agents, including the Contracting Officer, admitted a very substantial (more than 100%) overpayment to TriGem's Builders (hereinafter "Tri-Gem's") and, in the absence of substantial contradictory and supportable evidence, this Court should find in favor of U.S. Fire. It is also respectfully submitted that the Government's evidence which allegedly contradicted the admissions was relatively minimal, unreliable and/or lacked credibility. In contrast, the admissions of the Government's agents were based upon reliable, substantial analyses and evidence.

Nevertheless, if this Court disagrees with that analysis, it is still respectfully submitted that U.S. Fire satisfied its burden of proof when all of the evidence is considered. There are several key documents which were admitted into evidence as per the agreement of the parties and about which there was no direct testimony. This evidence as well as all relevant evidence and relevant precedent will be reviewed in great detail below.

## II. STATEMENT OF THE ISSUES

1. WHETHER THE GOVERNMENT OVERPAID TRI-GEMS FOR INCOMPLETE WORK, UNSATISFACTORY WORK AND/OR DEFICIENT WORK.

2. WHETHER THE GOVERNMENT MADE PAYMENTS TO TRI-GEMS IN VIOLATION OF THE CONTRACT.

3. WHETHER THE GOVERNMENT MADE PAYMENTS TO TRI-GEMS IN COMPLIANCE WITH THE APPLICABLE FAR PROVISIONS.

4. WHETHER U.S. FIRE CAN MAINTAIN THIS ACTION AGAINST THE GOVERNMENT FOR IMPAIRMENT OF SURETY STATUS BASED UPON THE ADMITTED OVERPAYMENTS WHICH OCCURRED PRIOR TO ANY NOTIFICATION FROM U.S. FIRE. [1]

## III. STATEMENT OF THE CASE

A. Contract Award.

On October 26, 1995, the United States, acting through the Department of the Air Force ("Air Force"), awarded a Contract to Tri-Gems. Pursuant to the Contract, Tri-Gems was generally required to renovate an electric distribution system at McGuire Air Force Base, Falcon Court North, by removing overhead power lines and by burying these lines in conduits underground for an original contract price in the amount of $1,202,800.00. (Joint Exhibit 2, Bate Stamped No. 16 - 55) This amount was adjusted by change order to $1,481,396 (Revised Joint Stipulations of Fact Number 19; Joint Exhibits 51-53).

B. Contract Provisions

The Contract incorporated by reference the Federal Acquisition Regulations ("FAR") (Joint Exhibit 2, Bid Solicitation, Bate Stamped No. 19). Pursuant to FAR 52.235-5, Payment Under Fixed-Priced Construction Contracts (April 1989) (the "Payment Clause"), the Air Force

---

[1] Our analysis focuses upon the evidence introduced at trial. Thereafter, the first (3) issues identified are analyzed in the first two sections of the analysis. The fourth issue is addressed separately in the third section of the analysis.

was to make "payments monthly as the work proceeded, or at more frequent intervals as determined by the Contracting Officer, on estimates of work accomplished which meets the standards of quality established under the contract." (Joint Exhibit 2 at Bate Stamped No. 31; Revised Joint Stipulations of Fact No. 7). As reviewed in detail below, it was undisputed that a substantial amount of work performed by Tri-Gems did not "meet the standard of quality established under the contract."

The Contract also provided as follows:

1.01 DESCRIPTION OF WORK

> The Contractor shall provide all plant, labor, tools, equipment, appliances, and materials, and perform all work necessary to remove overhead electric lines and replace them with new lines underground <u>in strict accordance</u> with the specifications and drawings forming parts hereof, subject to the terms and conditions of the Contract [emphasis added] (Section 1.01, Defendant's Exhibit 206, page DX 206/3).

The Contract also included a number of provisions indicating that the Government would inspect the work performed. For example, one section provided that: "Inspection of work by the Government <u>will</u> normally be accomplished along with the work as it progresses." [emphasis added] (Section 1.11, Defendants Exhibit 206, page DX 206/5). Another section provided that: "The Contractor <u>shall</u> have all electrical inspected by the following agencies and this work <u>shall pass such inspections</u> [emphasis added]…2. Construction Contract Inspector." [Emphasis added] (Section 1.03A, Defendant Exhibit 207, page DX 207/23). Further, the contract incorporated FAR 52.246-12 (July 1986). (Joint Exhibit 2 at Bate Stamped No. 21). In relevant part, FAR 52.246-12 provides:

> (b) The Contractor shall maintain an adequate inspection system and perform such inspections as will ensure that the work performed under the contract conforms to the contract requirements. The Contractor shall maintain complete inspection records and make them available to the Government. All work

> shall be conducted under the general direction of the Contracting Officer and is subject to Government inspection and test at all places and at all reasonable times before acceptance to ensure strict compliance with the terms of the contract.
>
> (c) Government inspects and tests are for the sole benefit of the Government and do not —
>
> (1) Relieve the Contractor of responsibility for providing adequate quality control measures;
>
> (2) Relieve the Contractor of responsibility for damage to or loss of the material before acceptance;
>
> (3) Constitute or imply acceptance; or
>
> (4) Affect the continuing rights of the Government after acceptance of the completed work under paragraph (i) below. (Revised Joint Stipulations of Fact Number 9)

The Contract further required Tri-Gems to obtain a performance bond and a payment bond. (Joint Exhibit 2 at Bate Stamped No. 25; Revised Joint Stipulations of Fact Number 10) U.S. Fire issued the required performance and payments bonds on behalf of Tri-Gems. (Joint Exhibit 3, Bate Stamped No. 56-62; Revised Joint Stipulations of Fact Number 12).

C. Contract Performance

Tri-Gems began performing the contract in March 1996. (Revised Joint Stipulations of Fact Number 20) The Air Force assigned certain personnel to act as construction contract inspectors ("inspectors" or "CCI") to monitor and to inspect the work performed by Tri-Gems. The CCI's for this project were Sean Pederson, Matthew Ward, and Ricardo "Richie" Rodriguez. (Page 378, Ln. 7-9; Page 392, Ln. 9-12; Revised Joint Stipulations of Fact Number 21)[2].

Periodically throughout the Project, Tri-Gems submitted requests for payments to the contracting office. (Joint Exhibit 61, Bate Stamped No. 513-570; Revised Joint Stipulations of Fact Number 22) In connection with these requests, Tri-Gems was required to certify the amount of progress it had made on the job as well as certifying the accuracy of its information. (Joint Exhibit 61, Bate Stamped No. 515; Revised Joint Stipulations of Fact Number 22) For its

[2] Page and line references are to the transcript of the trial.

part, the Air Force inspector also submitted a report stating how much progress Tri-Gems completed. (Joint Exhibit 61, Bate Stamped No. 536). In addition, other Air Force personnel monitored the project. This included Steve Lyman, an electrical engineer, who inspected the project approximately twice per week from beginning to end (Page 864, Ln. 19-23). During the course of the Project, Mr. Lyman and others indicated that there were major problems with the performance of Tri-Gems and/or the amount it was being paid vis-a-vis the amount of work performed in accordance with the contract documents. (see e.g., Joint Exhibit 10, Bate Stamped No. 74; Joint Exhibit 13, Bate Stamped No. 77-78; Joint Exhibit 16, Bate Stamped No. 114; Joint Exhibit 30, Bate Stamped No. 265-266; Joint Exhibit 32, Bate Stamped No. 269; Joint Exhibit 35, Bate Stamped No. 328; Joint Exhibit 46, Bate Stamped No. 420-427; Defense Exhibit 231, Bate Stamped No. 274; Defense Exhibit 240, Bate Stamped No. 1339; Defense Exhibit 241, Bate Stamped No. 1340-1345; Defense Exhibit 242, Bate Stamped No. 562-563; Defense Exhibit 246, Bate Stamped No. 1360; Defense Exhibit 252, Bate Stamped No. 1380; Defense Exhibit 254, Bate Stamped No. 1384; Plaintiff Exhibit 101, Bate Stamped No. 572; Plaintiff Exhibit 147, Bate Stamped No. 631).

In spite of the warnings from Mr. Lyman and Joseph Flemming, the Air Force made payments to Tri-Gems totaling $1,285,553.14 with the last approved payment taking place on or about December 2, 1997 in the amount of $31,899.77. (Joint Exhibit 61, Bate Stamped No. 513; Revised Joint Stipulations of Fact Number 25).

D. Termination and Takeover.

Throughout the course of the construction of this Project, Tri-Gems was cited for numerous deficiencies and advised that it needed to undertake corrective work. (See Def. Exhibit 216, Bate Stamped No. 553-554; Def. Exhibit 223, Bate Stamped No. 556-559; Def. Exhibit 240, Bate Stamped No. 1339; Def. Exhibit 241, Bate Stamped No. 1340-1345; Joint Exhibit 13, Bate Stamped No. 77-78; Joint Exhibit 15, Bate Stamped No. 104; Joint Exhibit 18, Bate Stamped No. 151, 153, 167; Joint Exhibit 20, Bate Stamped No. 187; Joint Exhibit 22, Bate Stamped No. 194; Joint Exhibit 23, Bate Stamped No. 195-196; Joint Exhibit 25, Bate Stamped No. 199; Joint Exhibit 26, Bate Stamped No. 200). On September 5, 1997, the contracting officer sent Tri-Gems its first notice to show cause as to why the contract should not be terminated for default. (Joint Exhibit 30, Bate Stamped No. 265-266). The contracting officer threatened to impose liquidated damages starting May 8, 1997. On December 12, 1997, the contracting officer sent Tri-Gems a second notice to show cause as to why the contract should not be terminated for default. (Joint Exhibit 32, Bate Stamped No. 269). On January 7, 1998, the contracting officer informed Tri-Gems that liquidated damages in the amount of $90 per day were being imposed. (Joint Exhibit 35, Bate Stamped No. 328) In total, the Air Force imposed and deducted only $36,360 in liquidated damages from the contract balance as a result of the failure of Tri-Gems to timely complete the Project. (Joint Exhibit 56, Takeover Agreement at ¶ 2, Bate Stamped No. 493).

In the beginning of 1998 when the Government began to consider terminating the contract with Tri-Gems, Mr. Steven Lyman, Project Manager for the Project, was asked to prepare a report about Tri-Gem's performance. (Page 382, Ln. 11-23). On May 19, 1998, Mr.

Lyman prepared a detailed and comprehensive report based upon a 3 day site inspection in which he concluded, among other things, that Tri-Gems had completed 60 percent of the work and of that 60 percent, one-third needed to be reworked. (Joint Exhibit 46, Bate Stamped No. 419-427; Page 383, Ln. 4-7; Page 422, Ln. 17-22; Please see also Revised Joint Stipulations of Fact Number 35). That report was based upon the detailed inspection which he conducted with the outgoing inspector and the incoming inspector. (Page 383, Ln. 8-15; Page 869, Ln. 5-9). No one involved with the preparation of the report advised Mr. Lyman that they disagreed with the results set forth in the report. (Page 383, Ln. 16-19; Page 869, Ln. 17-23). Further, the contracting officer had a meeting of at least 5 Air Force representatives knowledgeable with the Project, all of whom agreed with the report. (Page 312, Ln.7- Page 312, Ln. 17.). The contracting office at Maguire Air Force Base recommended that the contract of Tri-Gems be terminated for default. On February 24, 1999, the contracting officer notified Tri-Gems that the Air Force terminated the contract for default. U.S. Fire Ins. Co. received a copy of this notice. (Joint Exhibit 39, Bate Stamped No. 334-337).

On May 23, 2000, the contracting officer sent a letter to U.S. Fire requesting, among other things, that it supply the name of the replacement contractor to complete performance. (Def. Exhibit 268, Bate Stamped No. 1424). The contracting officer also invited U.S. Fire to visit the Project. (Plaintiff Exhibit 152, Bate Stamped No. 644). Initially, U.S. Fire responded by requesting information about the status of the performance completed by Tri-Gems. (Plaintiff Exhibit 156, Bate Stamped No. 652; Plaintiff Exhibit 157, Bate Stamped No. 653; Plaintiff Exhibit 159, Bate Stamped No. 656-657). The Air Force provided this information, including Mr. Lyman's report. U.S. Fire retained the service of Mr. Michael Spinelli, a consultant, to assist

it in finding a replacement contractor. (Page 54, Ln. 6-8; Page 611, Ln.10; Revised Joint Stipulations of Fact Number 42 and 43).

On August 4, 2000, Mr. Spinelli on behalf of U.S. Fire issued an invitation for bids to approximately six different companies. (Joint Exhibits, 41-54, Bate Stamped No. 340-474; Revised Joint Stipulations of Fact Number 45). The invitation for bids included Mr. Lyman's May 19, 1998 report. (Joint Exhibit 46, Bate Stamped No. 419-427; Revised Joint Stipulations of Fact Number 45). The bidders along with representatives from Mr. Spinelli's office and the Air Force performed a walk through of the project. This site inspection as well as others confirmed the observations recorded by Mr. Lyman in his report. (Page 614, Ln. 17-24; Page 615, Ln. 1-Page 616, Ln. 16; Plaintiff's Exhibit 174, Bate Stamped No. 747-749).

On December 19, 2000, U.S. Fire and Eastern Construction & Electric, Inc. entered into a "Completion Agreement" for a lump sum total of $939,000. (Joint Exhibit 55, Bate Stamped No. 475-492). The contract required that Eastern undertake completion of the remaining work on the Project including the responsibility to make any and all necessary repairs identified in Mr. Lyman's report. (Joint Exhibit 55, Bate Stamped No. 476, Paragraph 2 referencing that the completion contract includes the bid package including Joint Exhibit 46, Bate Stamped No. 420-427). Therefore, once entered into, U.S. Fire was obligated to pay for the scope of work, which included the incomplete work not performed in accordance with the contract.

On January 29, 2001, U.S. Fire and the Air Force entered into a Takeover Agreement. (Joint Exhibit 56, Bate Stamped No. 493-497). This Agreement expressly provided that U.S. Fire reserved its rights to its overpayment claim and that the Government would negotiate the same in good faith. (Id. at Bate Stamped No. 493, Fourth "WHEREAS" clause.). Eastern Electric completed work pursuant to the completion agreement by June 2002 and its experience as to

incomplete and defective work was consistent with the aforesaid Lyman report. (Plaintiff's Exhibit 174, Bate Stamped No. at 748).

E. U.S. FIRE'S OVERPAYMENT CLAIM

The evidence of substantial overpayment by the Government which was not in accordance with the contractual provisions is overwhelming. In May of 1998 an inspection report was prepared by Mr. Lyman after his 3 day inspection during which he was accompanied by 2 of the daily inspectors. He concluded that Tri-Gem's had been paid for 86% of the contract but only 60% had actually been installed and, of that 60% of the contract that had been installed, "approximately 1/3rd needed to be reworked, repaired or renewed due to poor workmanship." (Joint Exhibit 46, Bate Stamped No. 420). This meant that while the Air Force had paid 86% of the contract funds, less than half or only 40% of the contract was properly performed. In other words, only 40% of the work accomplished met the "standards of quality established under the contract."

While Mr. Lyman, incredibly, testified that his 40% was "off the cuff" (Page 438, Ln. 16-23), as set forth in detail in the analysis section of this brief, that analysis was agreed upon by 5 Air Force representatives who discussed it (Page 312, Ln.7- Page 312, Ln. 17); was consistent with the surety's consultant's observations (Page 657, Ln. 24- Page 659, Ln. 11); significantly, was consistent with the completing contractor's experience (Plaintiff Exhibit 174, at Bate Stamped No. 748), and was relied upon by the Contracting Office when it recommended to the Officer in Charge that he terminate Tri-Gems (Page 312, Lns. 7 – 17).

As set forth above, the contract amount became $1,481,396.00. (Revised Joint Stipulations of Fact Number 19) Based upon the admissions of the Government's representatives, consistent with observations and experience in the field, the amount which should have been paid to Tri-

Gems is 40% of that amount or $592,558.40 The amount should actually be less because the Government usually withholds retainage. Instead, the Government paid Tri-Gems $1,285,429.39 (Def. Ex. 170, Bate Stamped No. 709), or $692,870.99 more then it should have as per the contract. (Id. at Bate Stamped No. 709-710; overpayment of $397,019.79 for work not performed and $295,851.20 for work performed improperly).

During the course of its investigation into the Project, U.S. Fire obtained a copy of Mr. Lyman's report. (Revised Joint Stipulation of Fact Number 42) This report was included in the bid package to alert the prospective bidders that the bids needed to include all of the remaining work on the Project as well as any known deficient work identified by the Air Force. (Page 655, Ln. 11- Page 656, Ln. 16; Please see also Revised Joint Stipulation of Fact Number 45) U.S. Fire obtained a bid from Eastern Construction and paid them $939,904.00 to complete the Project. The failure of the Air Force to properly pay Tri-Gems resulted in there being $692,870.99 less in remaining contract funds then there should have been if the Air Force had only paid for "work accomplished which meets the standards of quality established under the Contract".

When U.S. Fire entered into a Takeover Agreement with the Air Force it preserved its rights to pursue the overpayment claim and the Air Force agreed to process the claim in good faith. (Joint Exhibit 56, Bate Stamped No. 495 at Paragraph 9). On or about April 30, 2003 the Air Force denied the overpayment claim based, in part, upon a belief that the claims were not "contractual" claims under the Contract because U.S. Fire was not a party to the contract. (Joint Exhibit 58, Bate Stamped No. 507). Contrary to cases cited below, the Air Force Contracting Officer, who knew nothing other then what was set forth in his denial letter, failed to consider that a surety may pursue the Government when its rights have been prejudiced unfairly. Additionally, the Air Force Contracting Officer remarkably determined that there was no

overpayment because Eastern Construction allegedly made a substantial profit under its contract with U.S. Fire. (Id. at bottom of Bate Stamped No. 508.) As set forth in detail below, Eastern Construction's profit is not only irrelevant, but the reason for the same is not based upon anything in the record but only upon sheer speculation by the Air Force. Further, while the Government's auditor indicated that Eastern's profit was greater on this Project than its average profit on other projects (Page 717, Ln. 6-25), she could not indicate why, nor did she indicate whether Eastern's profit was inconsistent with industry standards. Eastern indicated that its experience was consistent with the Lyman report (Page 657, Ln. 24- Page 659, Ln. 11; Plaintiff Exhibit 174, at Bates Stamped No. 748). The higher profit, if established, could be attributable to a new estimator, that some materials were left over from another project or left on site by Tri-Gems, that Eastern was concerned that there were more problems than the Lyman report indicated or a number of other issues. Again as will be addressed in greater detail below, it is respectfully submitted that the credible evidence presented has established an overpayment by the Government.

## ANALYSIS

## POINT I

## THE AIR FORCE'S ADMISSIONS OF OVERPAYMENT

The fact that the Government's representatives admitted that the Government overpaid Tri-Gems should be beyond dispute. In the Contracting Officer's final decision with respect to termination of Tri-Gems for default, Donald Bruce, the Contracting Officer, expressly stated as follows:

> It has been **determined by the Government** completing a walking inspection of the job site, that only 40% of the contract was completed. Tri-Gems has been paid approximately 80% of the