> contract price. Therefore, Tri-Gems has been **over paid for the work accomplished.** (emphasis added).

(Joint Exhibit 39, Bate Stamped No. 336, last paragraph). During the trial Mr. Bruce confirmed he relied upon the first report by Mr. Lyman to reach his conclusions. (Page 342, Ln. 4 – 10).

In another letter from Mr. Bruce to Thomas M. Keely-Cain, Tri-Gems attorney, he stated:

> In the government's opinion the work being invoiced has not been satisfactorily completed. The Government only pays for work satisfactorily completed. It is not the Government's policy to finance the contractor who is performing the work.

(Joint Exhibit 37, Bate Stamped No. 330, third paragraph).

The first report of Steven Lyman, the electrical engineer employed by the Air Force as the Project Manager, provided that:

> The Government has paid the contractor 86% of the contract total, including the addendum's. CE has determined that the project is actually about 60% installed, of this 60% approximately 1/3rd needs to be reworked, repaired or renewed due to poor workmanship on behalf of the contractor.

(Joint Exhibit 46, Bate Stamped No. 420, First paragraph).

Even before Mr. Lyman authored Joint Exhibit 46, on March 20, 1998, he sent an e-mail to Kathleen DeMito, a Contracting Officer, questioning the amount of work completed by Tri-Gems. In that e-mail Mr. Lyman stated:

> It has come to my attention that Tri-Gems project is supposedly 86%. We have paid 86% however he is no where close to 86% construction complete. They are more like 50%.

(Plaintiff Ex. 147, Bate No. 631). Mr. Lyman listed a number of items that needed to be reworked or had yet to be completed. He then stated that: "These are very big items that will require a qualified crew months to complete." Id.

Further, in a letter sent by Captain Baxley, counsel for the Air Force, to the Bankruptcy Trustee appointed in the bankruptcy proceedings of Tri-Gems, he reiterated that Tri-Gems had

only done 60% of the work of which 1/3 would need to be corrected. He further stated, in relevant part, as follows:

> My review of the file indicates that Tri-Gems owes the Air Force approximately $592,558.40 for incomplete work (40% of $1,481,396.00) and $13,500 liquidated damages. This figure does not include the cost of correcting flawed work. I've been recently informed that the amount of work that needs correcting may be as high as the entire 60% that was initially completed by Tri-Gem because Tri-Gem left substantial portions of the electrical cable exposed when they walked off the job.
>
> The net result is that Tri-Gems has claimed a total of $348,033.07 against the Air Force, while the Air Force will be pursuing a minimum of $606,058.40 against Tri-Gems, and possibly as much as the entire $1,481,396.00, plus liquidated damages.

(Plaintiff Ex. 169, Page 2, Bate Stamped No. 706 at the Third and Fourth paragraphs).

Again Donald Bruce, as Contracting Officer for the Air Force, sent a letter apparently sometime between February 10, 1999 and February 24, 1999 to U.S. Fire in which he reiterated the Air Force's position that only 40% of the work had been completed and that Tri-Gems had been paid over 80% of the contract amount. (Plaintiff Exhibit 152, Bate Stamped No. 644). During the trial Mr. Bruce testified that at the time he sent out this letter it was true and accurate. (Page 317, Ln. 24 – 25). He confirmed that he relied upon the report from Mr. Lyman when he testified that:

Q So is it fair to conclude that the document was written sometime between those two dates?
A I would assume that. Yes.
Q It states that in the third paragraph only 40 percent of the work has been completed under the above-mentioned contract. Do you see that?
A Yes, I do.
Q What's the basis for that statement?
A The basis of that statement would have been Mr. Lyman's report.

(Page 341, Ln. 13-22).

Mr. Bruce further testified regarding the first report from Mr. Lyman as follows:

Q Can you tell me what your discussions were with Mr. Lyman with respect to that report?
A It would have been a general discussion with regards to the report, but it was basically talked about. I don't remember verbatim discussion about it, but I know we discussed it.
Q Was anyone else present when you discussed it with Mr. Lyman?
A I would believe Mr. Ott would have been present.
Q I'm sorry?
A Mr. Ott.
Q With Mr. Ott. Okay. That was the CCI?
A He was one of them. Yes.
Q Do you recall what Mr. Ott indicated during that time?
A I think we were all in the same opinion that the report was correct.
Q Now, was Tri-Gems terminated in connection with this project?
A Yes, they were.
Q Did you as contracting officer issue the letter terminating Tri-Gems?
A Yes, sir.
Q Prior to your issuing that letter did you have discussions with anyone employed at McGuire Air Force Base as to whether or not Tri-Gems should be terminated?
A Yes, sir.
Q Can you tell me with whom?
A Probably Lt. Col. Smith, Ms. DeMito, our JAG at the time -- I don't remember his name -- and probably with Mr. Lyman. Mr. Ott, also.
Q Was everyone in agreement that Tri-Gems should be terminated?
A To the best of my recollection, yes.

(Page 312, Lns. 7 – 17). Clearly, the Lyman report was given considerable weight to justify the termination of Tri-Gems on this Project. For the Air Force to now claim that the report was not accurate is, it is respectfully submitted, totally inappropriate and lacks credibility.

Kathleen DeMito, who for a time served as a Contracting Officer with respect to the project and was Donald Bruce's superior (Page 120, Ln. 16-20), confirmed that Joint Exhibit 46 was an interim inspection report (Page 121, Ln. 18 - Page 122, Ln. 12) and that prior to Tri-Gems termination for default she was never advised that the Lyman report was not accurate.

Q. Prior to the termination of Tri-Gems for default, had anyone ever indicated to you that Mr. Lyman's report, that May, 1998 one that's Joint Exhibit 46, was inaccurate in any respect? This is prior to Tri-Gems being terminated.
A Not that I recall, no.

(Page 124, Ln 2-6).

As early as August 6, 1996, Steven Lyman expressed concerns over the quality of the work being performed by Tri-Gems. In Joint Exhibit 13, Bate Stamped No. 77-78, Mr. Lyman indicated that "the contractor is failing to conduct under the subject contract" and "seems to do whatever he pleases." Mr. Lyman concluded his memorandum by stating: "**This contractor is defrauding the Government** and we must put a stop to it." (Emphasis added). (Id. at Bate Stamped No. 78). During his testimony at the trial, Mr. Lyman explained what he meant by that statement:

Q If you'd turn to Joint Exhibit No. 13, the last paragraph?
A Was that Exhibit No. 13?
Q Yes.
A Yes.
Q It says this contractor is defrauding the government and we must put a stop to it!!
A Yes.
Q What did you mean by that?
A That they weren't following the contract documents the way they were written in a lot of cases. If you look at it from the standpoint of other contractors' bidding, you know, they bid it to do it a certain way and if somebody's going to change from that slightly, you know, it should be -- there's ways of doing that.

(Page 408, Ln. 8-23).

Mr. Lyman also testified that he had prepared the report to help with the transition between inspectors and that the report was intended to reflect what had been completed properly and what had not been completed properly.

Q Referring to your report, Joint Exhibit No. 46, why did you create this report?
A It appeared that either they were going to get defaulted or they just were going to leave the job and just never come back. So I figured it was important to write a document to kind of say what was going on and what needed to be done, what was done, what needed to be done to finish the project. I also had conversations with the contracting officer. I believe at one point she even asked me to write this report.
Q She being Ms. DeMito?
A That's correct.
Q Was the purpose of this report to justify a termination for default?

A Not really. Not for me anyway.
Q Was the purpose of this report at least for you to give to the surety?
A No. This was to give to the next CCI. That's why we had Mr. Ott go out there with us, so he could have this document in hand either when Tri-Gems came back to work or when a new contractor came on.

(Page 421, Ln. 6 – Page 422, Ln. 2).

It is respectfully submitted that the above statements of Mr. Bruce, Mr. Lyman, Captain Baxley and Ms. DeMito clearly constitute admissions as against the Government. As relevant case law acknowledges, statements of appropriate representatives of the federal government made within the scope of their employment are admissible as against the Government. *Clark v. United States*, 8 Ct. Cl. 649, (Ct. Cl. 1985); *Myers Investigative and Security Services v. United States*, 47 Fed. Cl. 288 (Fed. Cl. 2000); *C& H Commercial Contractors Inc., v. United States*, 35 Fed. Cl. 246 (Fed. Cl. 1996) (Held statements by a contracting officer pertaining to the contract are admissible against the Government).

The admissions in this case were made to support the draconian measure of terminating Tri-Gems. In addition, Mr. Bruce, the contracting officer, as indicated above, advised U.S. Fire of the overpayment before it entered into the Takeover Agreement. (Plaintiff Ex. 152, Bate Stamped No. 644; Trial - Page 317, Ln. 24-25; and the date of the Takeover Agreement is set forth on Joint Ex. 56, Bate Stamped No.493). The effect of these admissions on Tri-Gems is clear and not subject to dispute. The Air Force terminated the contract. Likewise, the effect upon the surety is clear. As Michael Spinelli testified, he included the report in the bid package he circulated in order to provide potential bidders with information as to the Government's position regarding the status of the Project and to avoid any claim of misrepresentation. (Page 613, Ln. 1- Page 614, Ln. 2; see also Mr. Dickstein's testimony as to this issue, Page 61, Ln.4 – Page 62, Ln. 20; Plaintiff Exhibit 177 at Bate Stamped No. 758). Again, Mr. Bruce placed the surety on notice

in his letter. (Plaintiffs Exhibit 152, Bate Stamped No. 644). When the surety relied upon that input and procured the bids, the damage was done. (Spinelli at Page 625, Ln. 22 – Page 626, Ln. 17, and Dickstein at Page 64, Ln. 9-14, Page 65, Ln. 8 – Page 66, Ln.13; Plaintiff Exhibit 177 at Bate Stamped No. 758).

It is respectfully submitted that the burden of proof in this case, which the Court acknowledged was a "heavy burden," rested with the Government to refute these admissions. However, even if that is not the case, the evidence clearly indicates that these admissions were based upon a careful analysis not just by Mr. Lyman. As set forth in the May 1998 report by Mr. Lyman, it was prepared after a three day inspection which he performed with Airman Rodriguez, who had been the inspector on site on almost a daily basis, and Mr. Ott, who was to become the inspector on the Project. (Page 869, Ln. 3-12). They were all in agreement. (Page 312, Lns. 7 – 17). Mr. Lyman had been out to the site two to three times per week from the onset of the Project. (Page 864, Ln. 19-24). While we will review below the evidence consistent with the report, the report itself was not "off the cuff" as Mr. Lyman now conveniently suggests (Page 438, Ln. 16-23) but based upon a detailed analysis by 3 Air Force representatives, 2 of whom were extremely familiar (Airman Rodriguez as the daily inspector and Mr. Lyman as the engineer involved from the beginning) with the Project when they did the inspection and the report was prepared. (Page 435, Ln. 4- 14).

## POINT II

## THE EVIDENCE OF OVERPAYMENT IS COMPELLING

The evidence of overpayment is compelling. As set forth above, Mr. Lyman the Project Manager had expressed concerns early on that Tri-Gems was "defrauding" the Air Force. (Joint

Ex. 13, Bate Stamped No. 78, last sentence). These same concerns were expressed by other Air Force personnel. Ms. DeMito testified that:

Q What was your general impression of Tri-Gems' performance under this contract?
A They needed to be defaulted.
Q At the beginning of the contract, how was Tri-Gems performing?
A They did not start the contract immediately after receiving notice to proceed, which was normally not their case to do, so much so that we had to call them in and ask them where are the material submittals, ask them where their progress schedule was, ask them why they hadn't started yet.

(Page 152, Ln.12-21).

This was further supported by Joseph Flemming, the Chief of Construction Management at the McGuire Air Force Base (Page 351, Ln. 9 – 20), when he testified that there were problems on the job starting during the first 6 months. He testified as follows:

Q First of all in terms of what the inspectors told you were you advised that there were any problems with Tri-Gems' performance in connection with the project?
A Yes, sir.
Q During what timeframe?
A That would be hard for me to tell because I don't know when the project formally started and I'd have to look at some notes, but I'm guessing if you would talk timelines I would surmise and this is just a guess four to six months into the project starting. It was basically there were quality and performance issues that started to arise.
Q Can you tell me when you say quality and performance issues that were starting to arise can you be more specific as to what you meant by that?
A Yes, sir. Basically the first time I went out into the construction site which was in occupied housing the contractor, the initial I guess it was a subcontractor was doing massive trenching and excavation leaving mounds of dirt I believe and concrete almost one story high in the middle of courtyards with ditches all over the place, with poor fencing I believe, and then the mechanical side or the electrical side started, the installation, where the conduit was not put together correctly, areas weren't graded correctly, the wire connections I don't believe were done correctly. It was pretty bad, but to answer your question with specifics I can't remember all the details, sir.

( Page 352, Ln. 14 - 353, Ln. 18).

In addition, Mr. Spinelli, the surety's consultant and expert, testified that Mr. Lyman's observations were consistent with his observations of the site prior to the completion contractor Eastern Construction and & Electric, Inc. performing any work at the site. Mr. Spinelli testified:

Q. I think you testified on cross-examination that you were not the person who did the prebid walkthrough, but were you still at the site before Eastern started work?

A Yes, I was.

Q And did you observe the conditions at the site at that time?

A Yes, I did. The prebid walkthrough did not generate anything that made us assume that the conditions on the Lyman report were inaccurate. If something you ever wanted -- would come up on that prebid walkthrough with -- a bunch of bidders, there is absolutely no reason for me to tell bidders they have to perform more work than is required. It's only going to result in a higher price for my client. I only want to give bidders information that's accurate. We believed Mr. Lyman's report was accurate.

Q And did you rely on Mr. Lyman's report and tell bidders to rely on that report?

A We didn't have to tell bidders what they have to rely on. We provide them all the information and tell them, you know, to estimate your assessment of the work that remains. But certainly any responsible bidder would see the memorandum from somebody that's involved on a day-to-day basis as Mr. Lyman was and take that into consideration in preparing their bid.

(Page 657, Ln. 24- Page 659, Ln. 11).

Mr. Lyman confirmed that he provided documents to the surety and helped them with the walk through of the Project with the potential bidders. (Page 439, Ln. 14-18).

In addition, Mr. Spinelli testified about why U.S. Fire relied upon the Lyman report as follows:

Q. Mr. Spinelli, prior to circulating the bid package to the bidders, was Mr. Lyman's report, as far as you're concerned, the most accurate document as to what the government expected to be performed when the surety completed the project?

A Yes.

Q And was the goal on the surety --

(Electronic interference.)

A It was the most accurate document to represent the defective work that had to be completed. The plans and specs were in the document to reflect the global scope of work. But the entire completion contract to finish a job, one of the things you have to do is fix all the defective work otherwise it doesn't fit scope, the owner rejects the contract, so they won't close it out because there's still defective work remaining.

And then you get into a dispute with the contractor as to whether or not the defective work was in his contract. Mr. Lyman's report was the most accurate document that we had. It pointed out the known and probable defective work to give to the contractors to bid.

Q Okay. And that document also indicated Mr. Lyman, or as far as you're concerned is that the government's perspective on the percentage that Tri-Gems had actually completed?

A Correct. They told the bidders that the percent complete that were -- in fact, one of the payment requisitions were inaccurate. Tri-Gems actually included far less work.

(Page 655, Ln. 11- Page 656, Ln. 16).

Furthermore, in addition to numerous meetings with the Air Force in which the report was discussed, Mr. Spinelli and an associate had interviewed Mr. Lyman in 2002 and also consulted with Eastern Construction & Electric, Inc., the surety's completion contractor. Eastern confirmed that Mr. Lyman's observations were consistent with its completion efforts. Mr. Spinelli testified about theses issues as follows:

Q Did anyone ever tell you at least prior to the circulation of the bid package that that document was either inaccurate -- well, let me start with that, inaccurate.
A No.
Q Did anyone ever indicate to you that there was information contained in that document that somebody had indicated was just off-the-cuff?
A No. Did anybody ever tell me, or prebid?
Q Prebid.
A No.
Q Okay. And precontract with Eastern Construction?
A No.
Q Did you ever attempt to determine the accuracy of that document either before Eastern was hired or after Eastern was hired?
A This document was included in our invitation to bid and given to all the bidders and was used on a prebid walkthrough. So during the prebid walkthrough, our observations were consistent with this memorandum. We had no reason to believe that it was inaccurate.
Q After the contract was awarded to Eastern did you have any meetings with Mr. Lyman where you discussed that document?
A Yes. We had several meetings with the Air Force when Mr. Lyman was present over the course of a number of years, and this document was discussed.
Q And can you tell me your recollection as to what took place during the course of those meetings relative to that document?
A He stood by the accuracy of his memorandum. He explained to us how they spent nine man days preparing this. He and two other individuals, Aman Rodriguez and another gentleman, Bill Ott, had walked the site with him, and they prepared this memorandum describing all the defective work. I remember Mr. Lackerman in my opinion twisting his arm trying to tell him that his own memo was inaccurate, but I recall Mr. Lyman standing by his memorandum.
Q Did you ultimately prepare a letter providing your views based on at least one of the meetings with Mr. Lyman?
A Yes. On May 23, 2002, myself along with Richard Rosner, who is a professional engineer from my office, an electrical engineer, very experienced, met with Mr. Lyman. The purpose of the meeting was to meet with Mr. Lyman to discuss the memorandum -- to discuss how Mr. Lyman had put the memorandum together. He discussed the scope of work with us.

He discussed his background. He discussed how he put the memorandum together, and at the end of the meeting we had a frank and open discussion with the FOS where we said Mr. Lyman is a very credible engineer. He's not the kind of fellow that just guesses. We believe that his memo was very accurate, and we have no reason to believe that all of a sudden this was just suddenly some off-the-cuff guess.

We found it to be very inconsistent that somebody spends nine man-days, walks every linear foot of a distribution system, and at the end of spending nine man-days of work, just puts together an off-the-cuff report to summarize their findings. It's inconsistent with what engineers and architects do.

(Page 614, Ln 3 – Page 616, Ln. 16).

On November 15, 2002 (Plaintiff's Exhibit 174, Bates Nos. 747-749), Mr. Spinelli wrote a letter recounting his meetings with Mr. Lyman during which the defective work was discussed. That letter stated as follows:

> This meeting took place on May 23, 2002 at the McGuire Air Force Base. During that meeting, Mr. Lyman gave a detailed description of the defective work and confirmed the findings stated in his May 19, 1998 memorandum. (Bate Stamped No. 748, first paragraph).

In a further effort to confirm the accuracy of the Lyman report, Mr. Spinelli met with Luis Bolanos, President of Eastern Electric, to discuss the defective work allegations contained in the report. Mr. Spinelli confirmed the accuracy of Mr. Lyman's analysis as to the overpayment. He stated:

> On July 19, 2002, I met with Mr. Bolanos to review the defective work allegations contained in Mr. Lyman's memorandum. Mr. Bolanos stated that approximately 50% of the work performed by Eastern was to remedy defective work.
>
> Mr. Bolanos stated Eastern had to replace approximately 1,800 feet of primary cable, and that the entire 4500 feet of neutral primary wire had to be removed and replaced.
>
> With regard to the manhole/vault conduit penetrations, Mr. Bolanos stated that many of these vaults were set at the wrong elevation. He referenced Detail #7 on Drawing E-9 to demonstrate the problem with these vaults, and also confirmed that the manhole/vaults were not sealed as required by the contract.

> With regard to the street light posts, Mr. Bolanos stated that most of the bolts were replaced with stainless steel bolts, and that approximately 20% of theses bolts were missing or broken.
>
> According to Mr. Bolanos, three of the transformer pads were too badly damaged to be picked up and had to be replaced completely; and approximately 6-8 of the remaining pads had to be repaired.
>
> Mr. Bolanos stated that all of the transformer pads had to be re-waterproofed.
>
> In general, Mr. Bolanos stated that the Steven Lyman's report was "very accurate."
>
> (Plaintiff Exhibit 174, at Bates Stamped No. 748).

Incredibly, Mr. Lyman testified that his 1998 report which was considered in connection with the termination of Tri-Gems (Testimony of Mr. Bruce, Page 342, Ln. 4-10; Joint Exhibit 39), which all who reviewed it felt was accurate (Testimony of Mr. Bruce, Page 312, Ln. 7-17) and the conclusions as to the percentage complete has been the subject of a notice to U.S. Fire in a letter from the Contracting Officer Mr. Bruce (Plaintiff Exhibit 152, Bate Stamped No. 644), was "off the cuff". Referring to the first report, Mr. Lyman testified that:

Q You concluded in your 1998 report that Tri-Gems had accomplished 60 percent of the work with some work needing to be reworked?
A That's correct.
Q How did you come up with this 60 percent figure?
A That was kind of off-the-cuff. It was off-the-cuff, it wasn't kind of off-the-cuff.

(Page 438, Ln. 16-23).

In contrast, he prepared a second report more then six years later (Def. Exhibit 286, Bate Stamped No. 1574-1577), which he prepared after this suit was pending but which he testified no one told him to prepare even though it was directed to Lt. Col. David Bell of the Air Force's legal arm. When he testified about his second report Mr. Lyman testified that:

Q. Mr. Lyman, did anyone direct you to prepare the report?
A. I was approached about the previous report and was also told about the claim against the base. I do not believe I was ever directly told to write this report. No.

(Page 728, Ln. 12-17)

Incredibly, he testified that the new analysis indicated only a very small overpayment. He testified:

Q. What did you conclude about the amount of work that Tri-Gems completed, the percentage.
A. The percentage according to the progress reports was much higher than I guess when you originally go out there and try to assess what needed to be done. Once you go through and work through the work elements, it's a lot clearer to see where the COTARS would have come up with their percentages and how they would have evaluated them.
Q Okay. And what did you conclude in your 2004 report? How much work did Tri-Gems complete?
A It was more on the order of 83 percent. I have it written down here as 83.27. Again, when you take things out to the hundredths, it's just a math thing. It really had nothing to do with like that was exactly the amount that was completed or not.
Q Between your 1998 report and the 2004 report, did you acquire or consider new information?
A I was told when I did my '98 report that we had paid the contractor 86 percent. I was never shown any progress reports, so the main item that I had in hand was the progress reports.
Q Did you also have the progress schedules?
A I believe I viewed the progress schedules. I believe I reviewed those.

(Page 728, Ln.18 - Page 729, Ln. 17).

It is respectfully submitted that the Government's attempt now to rely on the new report is absurd. As set forth above, the first report was prepared contemporaneously with a comprehensive site inspection lasting three days, performed by 3 individuals, 2 of whom had been involved since the beginning. (Joint Exhibit 46, Bate Stamped No. 420, First Paragraph). It was done with the express purpose of showing the extent of the work completed and what was deficient.(Page 435, Ln. 4-14; Page 868, Ln. 4-24). It supported the termination of Tri-Gems. (Joint Exhibit 39; Page 443, Ln. 7 - 14). The contents of the first report were used by the Air Force in letters not only to U.S. Fire (Plaintiff Exhibit 152) but also the bankruptcy trustee for

Tri-Gems to dissuade Tri-Gems from pursuing an action to object to the termination (Plaintiff Exhibit 169); by the Air Force to determine how it would proceed if U.S. Fire declined to takeover the project (Page 420, Ln. 13 – Page 422, Ln. 2), and to assist U.S. Fire in the course of its investigation (Page 81, Ln. 15-23; Page 655, Ln. 11- Page 656, Ln. 16). The first report and the letters relying in part upon it, convinced U.S. Fire that it faced a substantial loss that might exceed the penal sum of its bond. When U.S. Fire obtained a bid which was less then the penal sum of its bond and included remediation of the deficiencies identified by the Lyman report, it entered into a contract to cap that loss and satisfied its obligations to the Government (Page 63, Ln. 13 – Page 65, Ln. 1; Joint Exhibit 56 and 57). The completion contractor's experience was also consistent with that report. (Plaintiff Exhibit 174, at Bates Stamped No. 748). For the Government to come back some six years later and assert that the first report was done "off-the cuff" is totally inappropriate.

Furthermore, Mr. Lyman was cross-examined in great detail as to his newly created report. He testified that his starting point was the inspection reports based upon which payments were made to Tri-Gems. (Page 857, Ln. 19-22; Defense Exhibit 286, Bate Stamped No. 1574, Page 872, Ln. 18-24; See also, Page 727, Ln. 15-22; Page 729, Ln. 11-14; Page 731, Ln.16-20). That reflects what he was really trying to do, namely start at the end as to the amounts paid and try to justify the payments.

Then he proceeded to "weigh" the work items based upon the final approved requisitions of Tri-Gems, which of course was what the payments were based upon. (Page 857, Ln. 19-22; Plaintiff Exhibit 178 at Bate Stamped No. 760, last paragraph). Again, he started at the end to try to justify the amount paid due to U.S. Fire's claim. However, here, as demonstrated in great detail, even he admitted that there were extensive flaws in this approach. For example, there