were major line items for which the "weight" significantly varied from the start of the Project until the end without any significant change in the amount of work for that or other line items. (Page 876, Ln. 12-17 (percentage change in trenching); Page 877, Ln. 4-25 (same); Page 879, Ln. 13- Page 880, Ln. 12,(percentage change in conduit); Page 882, Ln. 2-20 (pull wire and cable); Page 882, Ln. 21- Page 883, Ln.6 (manholes and pads); Page 885, Ln. 14 – 19 (transformers)). There was never an indication as to which of the various "weights" were appropriate, if any.

The Spinelli reports stipulated into evidence (Page 635, Ln. 8 – Page 636, Ln. 12) which were prepared in response to this second report by Mr. Lyman, criticized as improper engineering Mr. Lyman's attempts to determine the quantities of materials by "weighting of work elements established as a bookkeeping function" compared to the actual physical work completed that served as the basis for the original Lyman report. (Plaintiff Exhibit 178, Bate Stamped No.760, last paragraph.). Mr. Spinelli concluded that even using these "weighted" values, the completion estimate is "substantially overstated." (Id. at 761, second paragraph).[3] As the Spinelli reports of July 21, 2005 ( Plaintiff Exhibit 177, Bate Stamped No. 756-758) and September 30, 2005 (Plaintiff Exhibit 178, Bate Stamped No. 759-763) point out: the exact quantities of materials installed by Tri-Gems and Eastern is unknown and therefore the re-calculation of the Work Elements is impossible (Id. at Bate Stamped No. 757, 1st paragraph; Bate Stamped No. 761, 2nd paragraph); the report lumps together all of the conduit and cable to compare the value of all the contractual required conduit without regard for the differing values accorded to the different sizes of conduit on the Project (Id. at Bate Stamped No. 757, 3rd

[3] The court raised an issue as to whether Mr. Spinelli was in fact an expert. Neither party made a *Daubert* objection to the testimony of the experts and both parties had stipulated to the introduction of their expert reports into evidence. If an objection was now raised by the Government, it is respectfully submitted that review of the admission of the expert testimony is only for plain error. *See Goebel v. Denver and Rio Western R.. Co.*, 215 F.3d. 1083, 1088 (10th Cir. 2000); *United States v. Diaz*, 300 F.3d 66, 74 (1st Cir. 2002); Fed.R. Evid. 103 (d).

paragraph; Bate Stamped No. 761, 5th paragraph – Bate Stamped No. 762, 2nd paragraph), Lyman's second report indicates that the first report should have discounted "any tasks that required rework or repair as that would not normally be known until the final inspection is performed", a statement which defies logic and defies standard inspection procedures in the construction industry. (Id. at Bate Stamped No. 757, last paragraph; Bate Stamped No. 762, 4th and 5th paragraph; Defense Exhibit 286 at Bate Stamped No. 1577), and that Lyman's second report "is not reliable because it is based upon assumptions and calculations that are either inaccurate or unsubstantiated." (Plaintiff's Exhibit 178, Bate stamped 760, second paragraph.

Thus, Mr. Lyman's new approach was fundamentally flawed. Instead of inspecting the work as he had done 6 years before, he "weighed" the completed work based upon the requisitions rather than on the amount of work itself. "Weighing" the work in this fashion was fundamentally flawed, because as set forth above, the 'weighted' factor for the work changed dramatically during the course of the Project even though the amount of work for a particular element did not change. (see, i.e., Defense Exhibit 232, Bate Stamped No. 239 wherein Tri-Gems notes a decrease in percentage completed because of increase in the contract amount).

Thus, this newly created report upon which the Government seeks to rely to support its efforts to deny U.S. Fire's claim was not based upon reliable or credible evidence. It also contradicts Mr. Lyman's contemporaneous 1998 report, prepared after 9 man-days of labor, relied upon by Col. Smith and the Contracting Officer (Joint Exhibit 39) when terminating Tri-Gems and advising Tri-Gems surety as to the scope of what needed to be completed. It is very disturbing that the Government would represent percentages to the surety and then seek to undermine its own representations when it has a better understanding of the consequences.

The only other possible evidence of the Government upon which it sought to rely to justify its claim of lack of overpayment was the testimony of Diana Bunting from the Defense Contract Audit Agency. First, it is respectfully submitted that it was remarkable that the Government decided not to introduce her report into evidence. (Page 724, Ln. 1-8). Secondly, she admitted that she was unable to actually perform an analysis of the Plaintiff's claim because while the Contracting Office requested her assistance, it failed to provide her with the technical assistance which she requested and which she needed to perform an appropriate analysis. (Page 719, Ln. 4-18).

While she testified that, based upon her review, Eastern had a larger profit on its completion of the Tri-Gems project than its average profit on prior projects (Page 717, Ln. 6-25), she did not testify and could not testify as to why. Did Eastern obtain materials at a better price? Did Eastern add a factor based upon the completion of another electrical contractor's work and the potential risks which were not realized here? Did Eastern realize a savings because it was working on other projects at McGuire Air Force Base? None of these potential reasons have anything to do with the issues before this Court as to the accuracy of Mr. Lyman's first report and/or whether the Government overpaid Tri-Gems. Any assumptions would be based upon sheer speculation and also contradict the unrefuted report by Mr. Spinelli, stipulated into evidence, that Eastern indicated that the conditions it experienced were consistent with Mr. Lyman's 1998 report. (Plaintiff Exhibit 174, Bate Stamped Nos. 747-749).

Therefore, it is respectfully submitted that based upon the only reliable evidence of the Government's representatives, as detailed above; the surety's representatives, as detailed above, and the completion contractor, it is clear that Tri-Gems was overpaid and U.S. Fire should prevail.

## POINT III

## U.S. FIRE CAN MAINTAIN THIS ACTION IN THE ABSENCE OF NOTICE TO THE AIR FORCE

The Air Force asserts that U.S. Fire cannot maintain this action because it failed to give notice to the Air Force to withhold payment from Tri-Gems and, therefore, the overpayment claim must fail. This argument is not supported by the facts or law applicable to this matter.

U.S. Fire's claim is based upon an impairment of its surety status due to the failure of the Air Force to follow the contractual provisions for approving payments to Tri-Gems and/or the failure of the Contracting Officer to properly exercise discretion. Pursuant to the relevant case law, the Government owes the surety a duty to administer the contract so as to not materially increase the risk that the surety assumed. *Nat'l Surety v. United States*, 118 F.3d 1542, 1546 (Fed.Cir.1997); *U.S. Fidelity & Guar. Co. v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377, 1384 (1973) (A change or modification of the construction contract which materially increases a compensated surety's risk discharges the obligation). The courts have recognized that "[s]urety bonds are integral to the government contracting process, for through the surety system the government enters into arrangements with reduced risk, by drawing on the responsibility and resources of the surety. Contract terms that provide security for the bonded performance cannot be ignored, waived, or modified without consideration of the surety's interests." *Nat'l Surety v. United States*, 118 F.3d at 1547.

The parties agree that Tri-Gems' contract incorporated FAR 52.232-5 (April 1989). That FAR provision provides in relevant part as follows:

> (b) Progress Payment. The Government shall make progress payments monthly as the work proceeds or at more

> frequent intervals as determined by the Contracting Officer, on estimates **of work accomplished which meets the standards of quality established under the contract**, as approved by the Contracting Officer. (emphasis added.)

Accordingly, the Air Force had a duty to approve progress payments for "work accomplished" which meets certain standards of quality. In addition, as set forth on page 4, infra, the contract required performance "in strict accordance with the specifications...." (Section 1.01, Defense Exhibit 206, Page DX 206/3). FAR 52.246-12 (July 1986) detailing certain inspection requirements under the contract provided that all "work shall be conducted under the general direction of the Contracting Officer and is subject to Government inspection and test at all places and at all reasonable times before acceptance to ensure strict compliance with the terms of the contract." (Emphasis added). Also as set forth on page 4, infra, there are several contractual provisions indicating that the Government shall inspect to insure compliance (Section 1.11, Defense Exhibit 206/5 and Section 1.03A, Defense Exhibit 206, page DX 206/23). The import of these provisions is that the Air Force was required to make progress payments only for work performed and which was done in compliance with the terms of the contract. This interpretation was repeatedly reinforced during the testimony of the Air Force during this trial.

Ms. DeMito testified in relevant part as follows:

Page 117, Ln. 14-19:

Q Now, as a contracting officer, and this is while you were employed by McGuire Air Force Base in particular, did your responsibilities include making certain that a contractor completed its work in accordance with the plans and specifications for the project?
A Yes.

Page 117 , ln 25 – Page 118, Ln 1-8:

A. We paid a contractor according to the progress schedule and the progress reports submitted to us by Civil Engineering.

Q Okay. And in terms of your review of those reports was in order to make certain that the work complied with the plans and specifications? Was that part of what was involved?

A To the best of the CCI's knowledge and the contracting officer's knowledge, yes.

Page 118, Ln 25 – Page 119, Ln 1-4:

Q And what was your understanding as to what the CCI's responsibilities were?

A The CCI is supposed to make sure that the government gets what it's paying for in accordance with the plans and specifications in that particular contract.

Page 142, Ln 23 – Page 143, Ln.18:

Q Were you involved in the process of paying Tri-Gems?

A Yes.

Q And who ultimately determined how much to pay to Tri-Gems?

A The contract inspector, and the contracting officer.

Q Can you explain how the process for paying the contractor, in this case Tri-Gems, works at McGuire?

A When the invoice is submitted, contract progress reports should have already been submitted by the contractor and the contract inspector for the government. If they agree with the percentage on the invoice, the contract administrator brings it to the contracting officer for certification for payment.

Q What happens when there's a conflict in the progress reports?

A If it's more than five percent, a meeting is held. Normally a contract inspector and the contractor representative on site get together to make sure that they agree on their progress reports before submitting them.

Page 146, Ln. 17 – Page 147, Ln. 4:

Q Are people in the civil engineering department responsible for paying contractors?

A No, the contracting officer is responsible for paying the contractors by their certification of signature on the invoice. However, they're signing off on the percentage complete is what the contracting officer bases her decision, his or her decision on paying of the invoice.

Q Why does the contracting office need information from civil engineering?

A They are our eyes and ears on the project. They are out there every day inspecting what they can see above ground, making sure, from what they see, that the government is getting what they're paying for.

When Joseph Flemming testified he noted the importance of the progress schedules:

Q. If you'd pull out the different binder with Defendant's Exhibit No. 233?

A This would have been basically the progress schedule predicated for payment basically. We intended to do one and to accomplish the work.

Q Is this something that you would have normally reviewed?

A I would have given it a cursory review, but Mr. Wilson was the expert because this was actually submitted by the contractor.
Q Who did the contractor submit it to?
A The contractor would have submitted it to the contracting office, the contracting office would have submitted it to construction management as a submittal, I would have reviewed it cursory and then Mr. Wilson would have reviewed it in depth because he had extensive knowledge into construction practices and timelines.

(Page 368, Ln 14 – Page 369, Ln. 6).

Ms. Mendel also testified about the importance of the progress reports and how Tri-Gems was paid.

Page 680, Ln. 22- Page 681, Ln 16:

Q Can you explain what a progress report is?
A A progress report is a report that contractors and government inspectors submit to the contracting office every two weeks during the course of a project that's in excess of 60 days.
Q And would you look at Exhibit 288/58 please?
A Okay.
Q And 288/58 and 59 could you tell me if these are progress reports and why they appear to be different in what they're meaning and why there's two separate progress reports for this?
A Yes. These are both progress reports. 288/59 was submitted by Tri-Gems Builders who was the contractor for a two-week performance period, and 288/58 is progress report for the same time period submitted by the government inspector.
Q And how is a contractor paid?
A A contractor is paid on percentage of completion based on these progress reports.

Page 684, Ln. 14- Page 685:

Q Yes. Would you take a look at Exhibit 214, please?
A Yes.
Q And what is Exhibit 214?
A 214 is a note from myself to Guthrie Short, the president of Tri-Gems advising them that the revised progress report that they submitted looks okay, but until they submit a revised progress schedule, this document can't be used.
Q And a progress schedule is what?
A A progress schedule is a document that shows all of the work elements and the percentages of those work elements that the contractor will invoice and work against.

Mr. Lyman confirmed during his testimony that Tri-Gems should only be paid for work properly installed according to the contract.

Page 863, Line 10 – Page 864, Ln. 18:

Q And is your understanding that even if it's installed improperly or not in accordance with the plans and specifications that the COTAR is still obligated to pay the contractor?
A If that's the way you understood that, then that's not what I exactly meant.
Q Well, I'm just trying to get a clarification. I'm not trying to put words in your mouth, and it's not a question of what I understand.
A If at the time --
Q The Court doesn't care what I understand. It cares, you know, what you understand, and that's what I'm just trying to clarify.
A If at the time the inspector feels that it was done in accordance with the specs and drawings, it should be paid for.
Q Okay. But if it was done and delivered and installed but not in accordance with the plans and specifications, was your understanding that it should still be paid for?
A Not necessarily.
Q Okay. When you say "not necessarily," what does that mean?
A Well, that's how you keep the contractor to come back and do it correctly, you know, and it's one of the methods you have for him to come back is if you don't pay him that he did it properly, but if you feel he did it properly at the time, you know, I don't see why you should pay him. I mean, if you felt at the time that it was installed, that it was installed correctly, you'd pay him.
Q Okay.
A If you knew that it wasn't installed correctly, no, you shouldn't pay him.

Perhaps most importantly, Mr. Bruce, the Contracting Officer, stated in a letter to Tri-Gems' attorney that: "The Government only pays for work satisfactorily completed." (Joint Exhibit 37, Bate Stamped No. 330).

As Ms. DeMito testified if the progress report submitted by the contractor and government differed by five percent or more a meeting would be held to come to an agreement on the amount completed. (Page 143, Ln.15-18; i.e. see Defense Exhibit 231, Bate Stamped No. 274). Arguably, that means there may be between a 1-5% difference between the amount completed and the amount paid. In this matter, the difference is more than 100% more then what was actually completed in accordance with the contract, i.e. the difference between 40% complete and the 86% paid.

This is not a case in which the Air Force can argue that it had the discretion to make judgment calls about the percentage complete. From the beginning of this project the Air Force noticed problems with the performance of Tri–Gems both in terms of the quality of the work performed and the quantity. As set forth above, as early as August 6, 1996 Mr. Lyman expressed concern that Tri-Gems was defrauding the government. (Joint Exhibit 13, Bate Stamped No. 77-78). No less then 3 show cause notifications were sent to Tri-Gems. Tri-Gems was cited for numerous deficiencies and advised that it needed to undertake corrective work. (See Def. Exhibit 216, Bate Stamped No. 553-554, Def. Exhibit 223, Bate Stamped No. 556-559, Def. Exhibit 240, Bate Stamped No. 1339, Def. Exhibit 241, Bate Stamped No. 1340-1345). Joseph Flemming testified that there were problems on the job during the first 6 months. (Page 351, Ln. 9 – 20). Given these early problems, the Air Force had a duty to make sure it was only paying for "work accomplished" which met the standards of quality for acceptance. Unfortunately, the Air Force failed in its responsibilities and not only admittedly paid for work that had not been accomplished but paid for work that was clearly deficient and below the standards acceptable for payment.

The courts have consistently acknowledged that a surety may recover under a claim of impairment of surety irrespective of any notification to the government when they fail to follow the contractual scheme for payment. *National Surety v. United States,* 118 F3d 1542 (Fed. Cir. 1997) (recovery permitted where government disbursed improper payments prior to notice); *American Insurance Co., v. United States*, 62 Fed. Cl. 151, 156 (2004) (acknowledging surety may recover for impairment of suretyship without the requisite notice but not finding any impairment in that case).

In *National Surety v. United States,* 118 F3d 1542 (Fed. Cir. 1997), a case similar to the case at bar, the surety's principal was terminated by the Government for default. The surety undertook completion and then filed a claim in which it sought to recover the funds that were required to have been retained by the Government from the progress payments to its principal. No notice had been given to the Government. In that case, the Court indicated that the Government had a duty to "administer the Contract, during the course of its performance, in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded." *Id.* at 1546. The Court further indicated that:

> "Surety bonds are integral to the Government contracting process, for through the surety system the Government enters into arrangements with reduced risk, by drawing on the responsibility and resources of the surety. Contract terms that provide security for the bonded performance cannot be ignored, waived or modified without consideration of the surety's interest. [citations omitted] The Government's failure to retain the required sums during performance of the Dugdale Contract was a change in the terms from those on which the surety provided its bonds. When National Surety completed the contract in accordance with its performance bond, it was entitled to the benefit of a contractually-required retainage. The Government's improper release of this security does not avoid liability to the surety for the losses thereby sustained. *Id.* at 1547.

As this Court recognized in *International Fidelity Insurance Company v. United States* 41 Fed. Cl. 706 (1998), the Federal Circuit found in the *National Surety* case that the notification requirement was not applicable when the contract required withholding of funds. *Id.* at 714.

Likewise, in *Transamerica Premier Insurance Company v. United States*, 32 Fed. Cl. 308 (1994), decided prior to *National Surety*, the Court expressly rejected the Government's current position. There, the Court reviewed the decision of the Federal Circuit in *Fireman's Fund Ins. Co. v. The United States*, 909 F.2d 495 (Fed. Cir. 1990), in which the Court did indicate that

notice by the surety was necessary for the Government to become a stakeholder with respect to funds which it released prior to receiving any notice from the surety. The Court of Claims noted that, in *Firemans' Fund*, the Court rejected the surety's contention that the Government should have recognized, at the time of its release of contract retainages, the likelihood of the contractor's default because of complaints of late payment from subcontractors and suppliers. The Court in *Transamerica Premier* noted that the Government was then contending, as it apparently is doing here, that *Fireman's Fund* defined a "rule of law applicable to all subrogation actions, i.e. that no duty is owed the surety by the Government save where the Government has been informed by the surety of the contractor's default." *Id.* at 315. The Court went on to indicate that it did <u>not</u> agree with that position and that the statement which the Government was contending applied was actually intended by the Court "to address the specific facts before the Court rather than to proclaim a rule of universal application that would displace, without comment or discussion, the principles adhered to in earlier cases." *Id.*

In *American Insurance Company v. United States*, 62 Fed. Cl. 151 (2004) the Court distinguished between the surety's equitable subrogation rights and those asserted as an impairment of surety claim. The Court held that the equitable subrogation rights never arose because the surety never notified the Air Force to stop making payments. That notwithstanding, the Court reaffirmed that a "surety may, without providing the requisite notice, recover against an obligee that impairs its surety status." *Id.* at 156. The Court, following the holding in *National Surety*, acknowledged that the government's liability to the surety emanated from its obligation to the surety to properly administer the contract and to not materially increase the risk assumed by the surety. The Court then focused on the same FAR provisions that were incorporated into Tri-Gems contract and concluded that based upon the specific facts there, the contracting officer

did not improperly exercise his discretion to make payment in full to the contractor. The Court made no reference to the FAR provision requiring that payments be consistent with the "work accomplished" or which was of the quality that was acceptable under the contract. Further, there the surety first asked the Government to continue to make payments. Even then, the alleged overpayment in *American Insurance Company* was only 17%. Here, there was no request for continued payments and the overpayment was approximately 115% (86% as opposed to 40% of the work).

Even assuming *arguendo* that the Air Force had the discretion to make payments in excess of the amount of work properly completed, the Court in *American Insurance Company* recognized that the government should still be held accountable to the surety for impairment giving rise to damages if the Contracting Officer did not exercise his/her discretion properly. The Court recognized that "the Government has a duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other problems encountered in the administration of the contract." *Id.* at 157. The Court held that "the key question then becomes whether the Air Force's contracting officer did, in fact, responsibly exercise the discretion given him." *Id.* at 158. There is no testimony that the overpayment to Tri-Gems was a conscious exercise of discretion. The testimony clearly established that Tri-Gems was only paid after the progress schedule it prepared matched the one the Air Force prepared. No one testified that they knew the percentage complete was exaggerated or even slightly overstated but that in order to help Tri-Gems complete the project they decided to advance money. In fact, when it finally became apparent to the Contracting Officer that the amount completed was less than the Air Force progress schedule depicted, the Air Force rejected the payment. Ms. DeMito testified that:

Q Ms. DeMito, if you could turn to Defendant's Exhibit 289/9. Can you identify what this document is?

A It's an invoice that was rejected by our office, saying that the contract was not at 93 percent. And it says "see updated progress report for this period."

Q And when you're saying that your office thought that the contract was not at 93 percent, how did you know that?

A From the contract progress reports submitted by the CCI.

(Page 146, Ln 7-16).

This Court has long recognized the right of the Government to exercise discretion in administering payments as the work progressed in order to promote performance. *Argonaut Ins. Co. v. United States*, 193 Ct.Cl. 483, 494, 434 F.2d 1362, 1368 (1970). Although the actions of the contracting officer are normally given some deference, the interests of the surety cannot be ignored. *United Pacific Insurance Company v. United States*, 16 Cl. Ct. 555, 558 (1989). The interests of the Government must be weighed against those of the surety. *See Amer. Ins. Co.*, 62 Fed.Cl. at 158 (2004) (*citing Nat'l Surety*, 118 F.3d at 1546; *Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 499 (Fed.Cir.1990); *Argonaut Ins. Co.*, 434 F.2d at 1367-68. The contracting officer's authority to make progress payments is limited by the duty to exercise discretion responsibly. *Argonaut Ins. Co.*, 434 F.2d at 1368.

In this matter, there is no indication that anyone from the Air Force was intentionally exercising discretion in an attempt to balance the decision to make excess payments in order to ensure the completion of the project against any Tri-Gems financial concerns. *Lumbermens Mutual Casualty Company v. United States*, 67 Fed. Cl. 253, 256 (2005). This was confirmed by the Contracting Officer, who testified that payments were to be based upon the amount of work performed in accordance with the contract (Page 118, Ln. 25 – Page 119, Ln. 1-4). Furthermore, under any circumstances, one cannot imagine a time where the exercise of discretion can justify an overpayment of approximately 115%. In this case, it appears that the Contracting Officer relied upon inspection reports and ignored the input from Mr. Lyman and Mr. Flemming that

he/she was in fact paying a substantially greater percentage of the contract balance as compared to the actual percentage of work completed in addition to the significant problems with the work that was installed.

In addition, as set forth in great detail above, Tri-Gems was cited for numerous deficiencies in the work it was performing and questions were raised about the percentage completed. Despite the concerns about the quality and quantity of the work being performed as raised by the Air Force personnel in the field, payments were made without consideration of the FAR provision that payments be based upon the work accomplished which meets the contractual standard. Payments were made solely upon a representation by Tri-Gems that it had completed a certain percentage with an accompanying acknowledgment by the Air Force. It was not until it became apparent that Tri-Gems was not going to complete the project that the Air Force determined the extent of the overpayment and deficient work that Mr. Lyman raised repeatedly during the Project.

On February 2, 1998 Joseph Flemming reported that "the general consensus within Civil Engineer/Contract community is that the contractor will not finish this project" and that Mr. Ott and Mr. Rodriguez "had been tasked to develop a punchlist and scope of work for the bonding company." (Joint Exhibit 36, Bate Stamped No. 329). That task apparently resulted in Mr. Lyman's May 19, 1998 report detailing the problems and the overpayment. The Air Force never exercised any discretion other then to make the payments in accordance with the amounts sought by Tri-Gems. In the absence of the exercise of discretion and in the face of all of the admissions that Tri-Gems was substantially overpaid, it is respectfully submitted that U.S. Fire has established that its surety status was impaired and that it is entitled to recover.

**CONCLUSION**

It is respectfully submitted that the Government's position in this case is nothing short of outrageous. It terminated a contractor, something that the Contracting Office conceded is a very serious act (Page 420, Ln. 20 - 23), based in large part upon a report that the Government has now forced its author to testify was "off the cuff." As stated in great detail above, the report was prepared after 3 Government employees, 2 of whom were very familiar with the Project, conducted a detailed 3 day inspection. (Joint Exhibit 46, Bate Stamped No. 419-427; Page 383, Ln. 4-7; Page 422, Ln. 17-22). All who reviewed it agreed that it was accurate.( Page 312, Ln. 7-1). The surety's consultant agreed it was accurate (Page 655, Ln. 11- Page 656, Ln. 16) as did the contractor who completed the Project (Plaintiff Exhibit 174, at Bates Stamped No. 748). Yet over 6 years later, the author wrote a report to counsel advising that his report was extremely inaccurate and incredibly testified that he did it on his own without direction. This, it is respectfully submitted, is an example of inappropriate positions by the Government which believes that it can take one position in one context (defaulting the contractor) and an extremely inconsistent position in a different context (defense of the overpayment). It is respectfully submitted that U.S. Fire's rights were prejudiced by the overpayment of 115% and it is entitled to recover here.

Respectfully submitted,

DREIFUSS BONACCI & PARKER, LLP
Attorneys for Plaintiff United States
Fire Insurance Company

By: ______s/___________________________
DAVID C. DREIFUSS