NO. 03-2811C
(Judge Horn)

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

UNITED STATES FIRE INSURANCE COMPANY,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S POST TRIAL BRIEF

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

MICHAEL O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, DC 20530
Tele: (202) 307-0282
Fax: (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

CHRISTOPHER S. COLE
AFLSA/JACN
1501 Wilson Boulevard
Arlington, VA 22209-2403

WILLIAM M. LACKERMAN, JR.
Air Force Material Command
Law Office
Wright-Patterson Air Force Base
Dayton, OH

March 3, 2006

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . I

TABLE OF AUTHORITIES . . . . . . . . . . ii

DEFENDANT'S POST TRIAL BRIEF . . . . . . . . . . 1

PROPOSED FINDINGS OF FACT . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . 41

I. This Court Does Not Possess Jurisdiction To Consider U.S. Fire's Claims . . . . . . . . . . 41

A. There Is No Waiver Of Sovereign Immunity For U.S. Fire's Claims . . . . . . . . . . 41

B. The Contract Bars U.S. Fire's Claims . . . . . . . . . . 44

C. The Contracting Officer Did Not Abuse Her Discretion . . . . . . . . . . 48

II. The Court Does Not Possess Jurisdiction To Consider U.S. Fire's Defective Work Claim . . . . . . . . . . 49

III. The Air Force Did Not Overpay Tri-Gems . . . . . . . . . . 51

IV. There Was No Reasonable Basis For U.S. Fire To Blindly Rely Upon One Sentence In The 1998 Lyman Memo . . . . . . . . . . 56

V. U.S. Fire Failed To Prove Its Damages . . . . . . . . . . 58

CONCLUSION . . . . . . . . . . 64

## TABLE OF AUTHORITIES

### CASES

ADVO, Inc. v. Philadelphia Newspapers, Inc.,
51 F.3d 1191 (3d Cir. 1995) . . . . . 55

Abraham v. Rockwell Intern. Corp.,
326 F.3d 1242 (Fed. Cir. 2003) . . . . . 44

Adams v. Dep't of Trans.,
735 F.2d 488 (Fed. Cir. 1984) . . . . . 54

American Insurance Co. v United States,
62 Fed. Cl. 151 (2004) . . . . . 42, 44

Bilokumsky v. Tod,
263 U.S. 149 (1923) . . . . . 54

Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,
509 U.S. 209 (1993) . . . . . 55

Concord Boat Corp. v. Brunswick Corp.,
207 F.3d 1039 (8th Cir.), cert. denied, 531 U.S. 979 (2000) . . . . . 55

DeVito v. United States,
413 F.2d 1147 (Ct. Cl. 1969) . . . . . 49

Fireman's Fund Insurance Company v. United States,
909 F.2d 495 (Fed. Cir. 1990) . . . . . 42, 49

Gonzales v. Defense Logistics Agency,
772 F.2d 887 (Fed. Cir. 1985) . . . . . 48

In re Citric Acid Litigation,
191 F.3d 1090 (9th Cir. 1999), cert. denied, 529 U.S. 1037 (2000) . . . . . 55

Insurance Co. of the West v. United States,
243 F.3d 1367 (Fed. Cir. 2001) . . . . . 49

International Fidelity Ins. Co. v. United States,
41 Fed. Cl. 706 (1998) . . . . . 47, 48

Matter of James Wilson Associates,
965 F.2d 160 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Lisbon Contractors, Inc. v. United States,
828 F.2d 759 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Lockheed Martin IR Imaging Systems, Inc. v. West,
108 F.3d 319 (Fed.Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

National Surety Corp. v. United States,
118 F.3d 1542 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Ransom v. United States,
17 Cl. Ct. 263 (1989), aff'd, 900 F.2d 242 (Fed. Cir. 1990)). . . . . . . . . . . . . . . . . . . . . . 43

Reliance Insurance Company v. United States,
27 Fed. Cl. 815 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Sullivan v. National Football League,
34 F.3d 1091 (1st Cir. 1994), cert. denied, 513 U.S. 1190 (1995) . . . . . . . . . . . . . . . . . . 55

Transamerica Premier Ins. Co. v. United States,
32 Fed.Cl. 308 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

United Pacific Ins. Co. v. Roche,
380 F.3d 1352 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

United States Fire Ins. Co. v. United States,
61 Fed. Cl. 494 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 41, 42

United States v. Affleck,
776 F.2d 1451 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

United States v. Buchanan,
70 F.3d 818 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

States v.] Seaboard Surety Co.,
817 F.2d [956, ] 962 [2nd Cir. 1987] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Virgin Atlantic Airways Ltd. v. British Airways PLC,
69 F. Supp.2d 571 (S.D.N.Y.1999), aff'd, 257 F.3d 256 (2d Cir. 2001) . . . . . . . . . . . . . 55

Willem Industries, Inc. v. United States,
155 Ct. C 295 F.2d 822 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Wunderlich Contracting Co. v. United States,
351 F.2d 956 (Ct. Cl. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

## STATUTES

**United States Codes**

40 U.S.C. § 3131(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

40 U.S.C. § 3131 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNITED STATES FIRE INSURANCE COMPANY, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-2811C |
| | ) | (Judge Horn) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S POST TRIAL BRIEF

Pursuant to Appendix A, paragraph 19, to the Rules of the Court of Federal Claims, and the Court's instructions at the close of trial, defendant respectfully submits this post trial brief.

PROPOSED FINDINGS OF FACT

1. United States Fire Insurance Company ("U.S. Fire") is in the business of providing surety bonds at the request of construction companies. Joint Stipulation of Fact ("JSF") 1.

2. Universal Bonding Company was authorized by U.S. Fire to issue bonds on U.S. Fire paper based upon the reinsurance treaties, and to administer claims against U.S. Fire bonds. JSF 2.

3. The Miller Act, 40 U.S.C. § 3131 (2000), states that, on contracts over $100,000.00, a contractor performing "construction, alteration, or repair of any public building or public work of the Federal Government" must post two types of bonds. First, the contractor must post a "performance bond with a surety ··· in an amount ··· adequate, for the protection of the Government" against contractor defaults. 40 U.S.C. § 3131(b)(1). Second, the contractor must post a "payment bond with a surety ··· for the protection of all persons supplying labor and

material in carrying out the work ....” 40 U.S.C. § 3131(b)(2). United States Fire Ins. Co. v. United States, 61 Fed. Cl. 494, 495 (2004).

4. Plaintiff, United States Fire Insurance Co. (“U.S. Fire”), has had a business relationship with Tri-Gems Builders, Inc. (“Tri-Gems”) since at least May 1985. Joint Exhibit (“JX”) 1 at 13-15. Part of that relationship includes a general indemnity agreement between U.S. Fire and Tri-Gems. Id. The United States is not a party to the general indemnity agreement between U.S. Fire and Tri-Gems. Id. at 1-4.

5. Apart from the general indemnity agreement and the actual Miller Act bonds (JX No. 3), there are no other documents in the record related to the underwriting and issuance of bonds by Plaintiff to Tri-Gems. There is no evidence in the record that any of defendant's personnel had any knowledge of what business dealings U.S. Fire and Tri-Gems had with each other (for example, entering into the general indemnity agreement) related to plaintiff's issuance of bonds to Tri-Gems.

The Contracting Officer

6. The contracting officer, Kathleen DeMito, testified at trial. Transcript pages (“Tr.” ) 115-188. She started work at McGuire Air Force Base ("McGuire AFB") in February 1989 as a contract specialist. Tr. 116 at lines 20-21 (hereinafter “Tr. 116/20-21"). In December 1990, she became the contracting officer for the construction flight at McGuire AFB. Tr. 117/8-9. Ms. DeMito participated in the solicitation, award and administration of Contract No. F28609-96-C-0003 (the “contract”) between the United States and Tri-Gems. Tr. 119/5-12; see, e.g., JX 2 at 17; JX 5; JX 23; JX 30; JX 61. She also participated in the default termination of the Tri-Gems contract. Tr. 119/13 to 120/15.

7. Ms. DeMito supervised Donald Bruce. Tr. 120/16-20; 158/7-12; 309/10-15. Mr. Bruce worked at McGuire AFB between 1997 and 1999. Tr. 307/24-25. He worked first as a contract administrator and then as a contracting officer. He worked on the Tri-Gems contract in both capacities. Tr. 308/10-24. He became a contracting officer in September or October 1997. Tr. 308/25 to 309/6.

8. Beth Ann Mendell worked at McGuire AFB from 1993 to 1997 as a contract specialist/administrator. Tr. 674/8-10. Ms. Mendell has been involved in government contracting since 1985 and has a Department of Defense Level 3 certification in contracting (the highest level). Tr. 673/18 to 674/1. Ms. Mendell was involved with both the solicitation and administration of the contract with Tri-Gems. Tr. 674/23 to 675/5.

McGuire AFB Civil Engineering Office

9. Scott Wilson is currently the acting base civil engineer (since May 2005, while the Base Civil Engineer is deployed). Tr. 445/13-20. The base civil engineer manages all facilities at McGuire AFB. Tr. 462/7-8. He has been the deputy base civil engineer at McGuire since December 1998. Tr. 446/9-11. As the Chief of the Engineering Flight (and later as the Deputy Base Civil Engineer), both Steven Lyman and the Government construction inspectors reported to him (through intermediate supervisors). Tr. 448/2-20.

10. Joseph Fleming was the chief of construction management at McGuire AFB from late 1994 to October 1998. Tr. 351/17-20. Mr. Wilson was his supervisor. Tr. 364/14-16. As chief of construction management, Mr. Fleming was responsible for managing Government construction inspectors. Tr. 351/21-25. In contrast to the project managers, the inspectors were

the individuals directly responsible for implementation of the specifications and drawings. Tr. 364/17-23.

11. Mr. Lyman is a licensed electrical engineer with a masters degree in electrical engineering. Tr. 373/8-11. Mr. Lyman was hired by the Air Force at McGuire AFB as a project manager in September 1995 (shortly after the contract was awarded to Tri-Gems). JX 2; Tr. 375/14-16. As a project manager, Mr. Lyman was directly responsible for the design of projects and indirectly responsible for overseeing the construction of projects. Tr. 375/17-23. He was the project manager for the contract. Tr. 376/4-16.

12. Mr. Lyman did not supervise the Government construction inspectors. Tr. 414/5-7. As a project manager, Mr. Lyman did not contemporaneously review either progress schedules (AF Forms 3064) or progress reports (AF Forms 3065). Tr. 413/12-17. Mr. Lyman was not involved with paying Tri-Gems and did not have any experience as a contracting officer approving or rejecting contractor progress payment invoices. Tr. 420/4-9.

Tri-Gems's Performance On Prior Construction Contracts At McGuire AFB

13. Ms. DeMito and other Government witnesses testified that Tri-Gems had a good reputation at McGuire AFB for construction projects it had done in the past. Tr. 153/12-25; 462/22 to 463/5. Mr. Bruce described Tri-Gems's reputation on prior projects as "stellar." Tr. 327/6-13. Mr. Flemming testified that Tri-Gems "performed very well, if not excellent" on prior projects. Tr. 364/24 to 365/5. Mr. Flemming testified that Tri-Gems's performance problems on the terminated contract were "a surprise" given Tri-Gems's past performance at McGuire AFB. Tr. 364/24 to 365/6.

Contract No. F28609-96-C-0003 Between the United States and Tri-Gems

14. The Air Force solicited the contract on a sealed bid basis. On October 26, 1995, the Air Force and Tri-Gems entered into the contract . JSF 3. The contract generally required Tri-Gems to renovate an electric distribution system by removing overhead power lines and burying these lines in conduits underground. JSF 4. The initial price of the contract was for the lump sum of $1,200,000 with a not to exceed amount of $1,202,800. JSF 5.

15. The contract was modified four times between contract award and March 20, 1997 to add, delete, and change work. JSF at 14-17; JX 50-53. The net effect of these contract modifications was to increase the contract price by a total of $281,386. JSF 19.

16. Tri-Gems's bid preparation 0papers are not in evidence. There was no testimony concerning how Tri-Gems prepared its bid. Tri-Gems is not a party to this litigation. JSF 71. U.S. Fire did not call any witnesses who had worked for Tri-Gems or Tri-Gems' subcontractors on the contract.

17. There is some evidence in the record indicating that Tri-Gems underbid the cost of contract performance by over $320,000. As early as June 1996, there was a disagreement between Tri-Gems and the Government regarding whether all of the primary conduit had to be encased in concrete. PX 108 at 581-82. The record further indicates that on March 31, 1997, Tri-Gems filed a claim with the Air Force requesting $320,677.00 for having to lay more expensive, rigid (steel) conduit and PVC piping encased in concrete (rather than cheaper, un-encased PVC piping). PX 169 at 705. The Air Force denied this claim and Tri-Gems appealed the final decision to the Armed Services Board of Contract Appeals ("ASBCA") (where it was docketed as ASBCA No. 50969). PX 169 at 705. The ASBCA appeal was eventually

dismissed with prejudice when the bankruptcy trustee decided not to proceed with prosecution of the appeal. JSF 59; Defendant's Exhibit (DX) 297 at 3-4.

18. U.S. Fire was not a party to the contract when it was awarded to Tri-Gems. JX 2. The Government had no contractual obligations to U.S. Fire pursuant to the contract.

Relevant Clauses In The Contract

19. The contract incorporated by reference various clauses from the Federal Acquisition Regulation ("FAR"). JX 2 at 19 (Clause B 1(a)) and 27 (FAR Clause 52.252-2). The following relevant FAR clauses were incorporated by reference in the contract:

a. 52.212-5, Liquidated Damages-Construction (Apr 1984);

b. 52.212-3, Commencement, Prosecution and Completion of Work (Apr 1984);

c. 52.232-5, Payments Under Fixed-Price Construction Contracts (Apr 1989);

d. 52.232-23, Assignment of Claims (Jan 1986);

e. 52.233-1, Disputes (Dec 1991);

f. 52-236-5, Material and Workmanship (Apr 1984);

g. 52.236-6, Superintendence by the Contractor (Apr 1984);

h. 52.236-7, Permits and Responsibilities (Nov 1991);

I. 52-236-15, Schedules for Construction Contracts (Apr 1984);

j. 52.243-4, Changes (Aug 1987);

k. 52.246-12, Inspection of Construction (Jul 1986);

l. 52.246-21, Warranty of Construction (Apr 1984); and

m. 52.249-10, Default (Fixed-Price Construction) (Apr 1984).

Id. at 21 (E-18), 22 (F-20), 29 (I-100), 31 (I-387, I-409, I-417 &I-418), 32 (I-448, I-449, I 450, I-559, I-624 & I-702); JSF 6 & 8. Copies of the full text versions of these clauses are attached as an appendix to this brief for the convenience of the court.

Relevant Clauses In The Contract Implementing FAR Clauses

20. In addition to the FAR clauses incorporated into the contract by reference, there were other clauses in the contract in full text implementing the FAR clauses. Relevant clauses include clauses H-705 and clause 5352.232-1000. Clause H-705 implemented FAR clause 52-236-15, "Schedules for Construction Contracts," by directing that the required reports be accomplished on and in accordance with the instructions pertaining to AF Form 3064, "contract progress schedule," and AF Form 3065, "contract progress report." JX 2 at 25. In similar fashion, clause 5352.232-1000, "Payment for Materials Stored on Site," implemented FAR Clause 52.232-5, "Payments Under Fixed-Price Construction Contracts," with regard to progress payments for materials delivered to the work site. Id. at 26.

Performance and Payment Bonds For Contract No. F28609-96-C-0003

21. Tri-Gems obtained payment and performance bonds from U.S. Fire. JSF 11-12; JX 3. The penal sum of the performance bond was $1,202,800. JX 3 at 56. The performance bond premium for the contract was $22,350. Id. at 57. The Air Force reimbursed Tri-Gems in full for the bond premium with the first progress payment to Tri-Gems. JX 61 at 568-70.

22. The performance bond expressly waived any notice to the surety of contract modifications. JX 3 at 56. The "Changes" clause in the Tri-Gems contract (FAR 52.243-4) was consistent with this waiver provision, stating that the "Contracting Officer may, at any time, without notice to the sureties, . . . make changes in the work . . . ." JX 2 at 32 (emphasis added).

23. U.S. Fire only called one witness, Bruce Dickstein, who had ever worked for either U.S. Fire or Universal Bonding Insurance Co. Mr. Dickstein began working at Universal Bonding in May 1997, more than 18 months after the contract was awarded to Tri-Gems. Tr. 47/12-16; JSF 3. He was not involved with the underwriting decision to issue the bonds to Tri-Gems. Tr. 83/2-10, 13-16.

24. There is no evidence in the record regarding what, if anything, U.S. Fire or Universal Bonding Co. did in deciding to issue bonds for the contract. There is no evidence that U.S. Fire or Universal Bonding Co. contacted the Government before deciding to issue bonds to Tri-Gems for the contract, nor is there any evidence that U.S. Fire reviewed the solicitation or contract.

25. Mr. Dickstein now works for the outside law firm representing plaintiff in this litigation. Tr. 48/17-20.

<u>Tri-Gems's Initial Problems In Performing The Contract</u>

26. The Air Force issued a "Notice to Proceed" with the contract work on November 15, 1995. PX 101. Subsequently, in a series of letters in February and March 1996, the contracting officer expressed concern to Tri-Gems that Tri-Gems apparently had not begun contract performance. <u>E.g.</u>, PX 101, 103. At a March 19, 1996 meeting with the contracting officer, Tri-Gems admitted that "the initial sub-contractor hired by Tri-Gems to perform the work under this contract backed out of their contract at the last minute." PX 103; Tr. 152/15 to 153/3.

27. Ms. DeMito testified that Tri-Gems eventually switched to a second subcontractor (Dynamic Developers). Tr. 152/22 to 153/5. However, Ms. Demito testified that Dynamic Developers committed labor violations (of the Davis-Bacon Act) which it would not resolve, so

that Tri-Gems had to terminate the subcontract and turn to its third highest bidder, Watt Electric. Tr. 153/4-9.

28. The contract, FAR clause 52.236-6, required Tri-Gems to have a superintendent on the work site at all times to "superintend the work." In addition, the contract, FAR clause 52.236-5, required that, "[a]ll work under this contract shall be performed in a skillful and workmanlike manner." There was no corresponding contractual requirement for Government personnel to superintend the Tri-Gems work.

29. Mr. Lyman identified the significance of Tri-Gems' subcontractors (and their problems) for the Tri-Gems work when he testified that Tri-Gems provided only the site superintendent ("Randy") and subcontracted the bulk of the work. Tr. 415/1-12. Mr. Lyman testified that his impression of Randy was that, "[h]e appeared to be in over his head" and Randy did not appear to have any background in electrical distribution work. Tr. 381/21 to 382/1.

30. In March 1997, Watt Electric (the new subcontractor for Tri-Gems) discovered that Tri-Gems had installed a single tape shield cable for the primary circuit with no neutral conductor. JX 25. Mr. Lyman testified that this was a situation where "Randy kind of got confused." Tr. 415/13 to 416/6. While the original contract called for two separate conductors, Addendum No. 1 had changed the contract requirements to a single conductor with a concentric neutral (two wires in one). JX 46 at 420, ¶ 2. Mr. Lyman testified that the single cable could pass the "high pot" test, but he testified that the problem had to be corrected by adding a neutral cable. Tr. 416/7-15; JX 25; JX 46 at 420-21, ¶ 2. A high pot test is a high voltage test conducted on primary cable prior to energizing the cable. JX 46 at 420, ¶ 1.

31. Tri-Gems developed a solution for this problem (that is, installing a separate neutral conductor along side the single tape shield conductor) which the Government accepted. JX 46 at 421, ¶ 2. Mr. Lyman testified that Tri-Gems (through Watt Electric) corrected this problem "for the most part," but that the surety ended up installing some of the cable (as indicated in Mr. Lyman's 2004 report). Tr. 416/12-18; DX 286 at 2.

32. Another apparent result of Randy's lack of experience was Tri-Gems's failure to ensure that installed manholes and vaults were properly sealed. JX 26 at 200. When the manholes and vaults were not properly sealed, this allowed soil and water to get into the vaults. Tr. 417/14-22. The Government discovered this problem in April 1997. JX 26 at 200. The problem still existed in May 1998 when Mr. Lyman walked the site and reported on the visible site conditions. JX 46 at 421, ¶ 3.

Responsibility For Materials and Work

33. Pursuant to the contract, FAR clause 52.236-7, Tri-Gems was "responsible for all materials delivered and work performed until completion and acceptance of the entire work" (with one exception which does not apply in this case). JX 2 at 32.

34. Tri-Gems installed primary cable in 1996, but then failed to energize it, failed to properly seal the ends, and left the cables laying in water-filled manholes and vaults. JX 29 at 264. In August 1997, Mr. Lyman expressed his concern to the contracting office about this situation (and that the cable would not withstand the "high pot" test). Id. Between August 1997 and May 1998, Tri-Gems "came out and taped up the ends" and successfully did a "High-Pot" test on a portion of the cable. JX 46 at 420 (1). The condition still existed, in part, in May 1998 when Mr. Lyman walked the site and reported on the visible site conditions. JX 46 at 420, ¶ 1.

35. In a May 1998 memorandum, Mr. Lyman expressed concern that since the cable had not been energized after the test, water might have migrated through the insulation of the cable since the test. Id. Accordingly, Mr. Lyman expressed his opinion that the cable should be re-tested prior to energizing. Id. In addition, Mr. Lyman expressed his concern that the "contractor may have to replace a portion (maybe all) of this cable." Id. As Mr. Lyman testified, he "assumed" there might be problems with the cable since, "as we all know, water and electricity don't mix too well." Tr. 417/23 to 418/11.

Contract Work Schedules

36. The contract, FAR clause 52.236-15, required Tri-Gems to provide the contracting officer with "a practicable schedule" showing how it "proposed to perform the work." The schedule was to be "a progress chart" which indicated "approximately the percentage of work scheduled" by any given date over the course of the project. Subsequently, Tri-Gems was supposed to "enter the actual progress" on the schedule and provide it to the contracting officer to determine if Tri-Gems was staying on schedule.

37. Contract Clause H-705 implemented FAR Clause 52-236-15, "Schedules for Construction Contracts," by directing that the required reports be accomplished on and in accordance with the instructions pertaining to AF Form 3064, "Contract Progress Schedule," and AF Form 3065, "Contract Progress Report." JX 2 at 25.

Contract Progress Schedules and Contract Progress Reports

38. As both Mr. Wilson and Ms. Mendell testified, Tri-Gems chose the number of work elements, the description of the elements, and the percentages assigned to each work element on the contract progress schedule. Tr. 463/13-23; 684/23 to 685/2; 685/15-24. For

example, Tri-Gems provided as its first work element "Bond and Mobilization" and assigned that element five percent of the total job. Tr. 463/21-23; see, e.g., DX 233 at 1307; DX 288 at 1.

39. Mr. Wilson reviewed and recommended approval to the contracting officer of the contract progress schedules submitted by Tri-Gems. E.g., DX 233 at 1; Tr. 463/6-12; 464/1-7. He testified that the "key thing" for which he reviewed the contract progress schedule was "contractor front loading" (since the contractor invoiced for progress payments based upon the percentage of the total job worked). Tr. 464/8-15; Tr. 684/23 to 685/2. Ms. DeMito ultimately approved the contract progress schedules submitted by Tri-Gems. Tr. 134/20-21; see, e.g., JX 11 at 75.

40. If the percentage of the total job changed for any work element (for example, as a result of a contract modification changing the work), Tri-Gems had to submit a revised progress schedule for approval before revised progress reports could be submitted. Tr. 131/10-18, 132/15 to 133/10, 684/17-22, 686/10 to 687/1; DX 214-15; JX 11. The contract progress schedule was revised several times during contract performance. See, e.g., JSF 14 & 16-17; JX Nos. 6, 8 & 11; DX 214, 233.

41. The earlier progress reports had 19 categories instead of the 15 that the schedule contained at the end of the project. Tr. 907/6-11. Two of the contract modifications increased the amount of work. Modification 1 added $104,236 (JX 50, JSF 14). Modification 3 (DX 226/12-13, JSF 16, JX 52) added $177,874 to the contract. All of the changes to the contract would have had an impact on the total percentages by the time the contract was terminated. Thus, in an April 10, 1997 fax of the progress schedule to the Air Force, Tri-Gems stated: “Note that percentages have changed due to increase in contract amount.” DX 232.

42. The contract progress report normally was submitted every two weeks during contract performance by both Tri-Gems and the Government inspectors. Tr. 130/16-19, 680/22 to 681/1; DX 288. The form used the "work element" and "% of total job" information from the contract progress schedule, but also included columns for recording "% completed this period" and "% completed cumulative." DX 288.

43. Mr. Lyman did not contemporaneously review either progress schedules or progress reports. Tr. 413/12-17.

Contract Progress Payments

44. Pursuant to the contract (FAR clause 52.232-5(b)), Tri-Gems was entitled to receive (and the Government was obligated to pay) "progress payments" on a monthly basis on "estimates of work accomplished" which met the contract standards. There was no requirement under this clause for work to be "completed" by Tri-Gems (or "accepted" by the Government) before Tri-Gems received progress payments.

45. The contract, clause 52.232-5(b), required Tri-Gems to "furnish a breakdown of the total contract price showing the amount included therein for each principal category of the work which shall substantiate the payment amount requested in order to provide a basis for determining progress payments in such detail as requested by the Contracting Officer." Tri-Gems accomplished this requirement by submitting the contract progress reports.

46. Pursuant to clause 52.232-5(b), the contracting officer had the discretion, that is, she “may” authorize "material delivered on the site" to be taken into consideration in preparing the estimates of work accomplished for progress payment purposes. Contract clause 5352.232-1000, "Payment for Materials Stored on Site," implemented FAR Clause 52.232-5,

"Payments Under Fixed-Price Construction Contracts," with regard to progress payments for materials delivered to the work site. JX 2 at 26.

47. Clause 52.232-5(c), required Tri-Gems to submit a certification along with each request for a progress payment that, "to the best of [Tri-Gems's] knowledge and belief," the amounts requested were "only for performance in accordance with the specifications, terms, and conditions of the contract." Further, pursuant to clause 52.232-5(d), if Tri-Gems later discovered (after making certified request for progress payments) that it had requested payment for work which did not conform with the specifications, terms, and conditions of the contract, it was required to notify the contracting officer and would be obligated to pay "interest" on the unearned amount.

48. If Tri-Gems achieved "satisfactory progress" during a progress payment period, clause 52.232-5(e) required that the contracting officer shall "authorize payment to be made in full." However, that clause also gave the contracting officer discretion, "may" retain a "maximum of 10 percent" if "satisfactory progress [had] not been made."

49. Clause 52.232-5(f) stated that progress payments "shall not be construed" as "relieving the contractor from the sole responsibility for all material and work upon which [progress] payments have been made or the restoration of any damaged work" or "waiving the right of the Government to require the fulfillment of all of the terms of the contract." The contract also required the Government to reimburse Tri-Gems for performance and payment bond premiums.

50. In addition to evaluating progress on the work with respect to the contract completion date, the Air Force also used the contract progress reports for making progress

payments. For each progress payment request, there were three documents the contracting officer considered in deciding whether to make a progress payment (and in what amount). JSF 23-24. The documents were two contract progress reports, one submitted by the contractor and one submitted by the Government inspector, while the third document was the contractor's progress payment invoice. See, e.g., JX 61 at 566; Tr. 682/12-24; DX 288 at 63-65. In addition, the contracting officer relied upon the review of the contract progress reports by the contract administrator, Ms. Mendell. JSF 23; Tr. 681/17 to 682/3; Tr. 682/12-17; see, e.g., DX 288 at 63-64. Finally, Ms. DeMito testified that she visited the work site “numerous times” prior to the termination of the Tri-Gems contract. Tr. 122/20-23.

51. The contract progress report specifically stated that the information on the form "may" be used for computing progress payments at the "Contracting Officer's discretion" and in accordance with the payments clause of the contract. E.g., DX 288 at 64. The form also contained a "Progress or Completion Certification" which certified that "the contractor has satisfactorily completed the indicated percentage of the contract per contract specifications." Id.

52. The progress payment invoice was for "work performed" between specific dates. E.g., JX 61 at 566. On all of its progress payment invoices, Tri-Gems's president (Gothrie Short, Jr.) certified that suppliers and subcontractor were being paid and that "the amounts requested are only for performance in accordance with the specifications, terms and conditions of the contract." Id.; JSF 22.

53. In general, if the percentages on the contractor's and the inspector's contract progress reports matched, the contracting officer would approve the progress payment in the

amount requested. Tr. 142/23 to 143/12. However, the contracting officer did not automatically approve every Tri-Gems progress payment invoice.

54. When there was a disagreement between the percentages on the contractor's and the inspector's contract progress reports, the parties would meet to try to reach an agreement on the amount of progress and the contracting officer would use her discretion to determine whether or not to approve the progress payment (and if approved, in what amount). Tr. 143/13 to 144/12; e.g., DX 231. For example, on the contract progress report for the period ending April 22, 1996, Tri-Gems certified that it had completed five percent of the job while the Government inspector only considered the job three percent complete. DX 288 at 63-65. Ms. DeMito ultimately decided to approve the progress payment in the amount of $29,819.44 (four percent). Id.

55. Further, the contracting officer had the discretion pursuant to FAR clause 52.232-5 (and in some cases, used this discretion) to retain funds from a progress payment request. For example, in approving progress payment no. 14, Ms. DeMito retained $27,356.07 of the requested progress payment amount to ensure that light poles (which needed repairs) were properly installed. JX 38 at 333 & JX 61 at 513; DX 240-41, 245. In other cases, the contracting officer merely had to use the threat of retainage to prod Tri-Gems into correcting the problem. E.g., JX 223, 225.

56. Finally, the contracting officer had the discretion to deny Tri-Gems' progress payment invoices and did, in fact, deny some invoices. For example, the record shows that the contracting officer rejected two submissions of Tri-Gems' progress payment invoice no. 13, one dated March 17, 1997 and one dated April 8, 1997, because she did not consider the work to be as complete as Tri-Gems certified. DX 231, 289 at 9, 11; Tr. 146/7-16; Tr. 151/8-22.

57. In accordance with contract clause 5352.232-1000, "Payment for Materials Stored on Site," and FAR clause 52.232-5, "Payments Under Fixed-Price Construction Contracts," Ms. DeMito permitted Tri-Gems to include a "percentage of the total job" on the contract progress schedule (and the contract progress reports) for materials delivered to the work site. JX 11; Tr. 136/16 to 137/5. Tri-Gems estimated materials delivered to the work site as 22 percent of the total job. Tr. 136/16-22; Tr. 137/2-5; e.g., JX 61 at 545 (Line No. 15).

58. In progress payment invoice no. 6, dated August 1, 1996, Tri-Gems invoiced for the materials delivered to the work site, attaching detailed invoices from suppliers showing the materials that had been delivered to the work site. JX 61 at 544-52; Tr. 138/11 to 139/19.

59. Ms. DeMito authorized the last progress payment made to Tri-Gems (no. 14) on December 2, 1997. JSF 25; JX 61 at 513.

60. Ms. DeMito testified that, to "the best of the CCI's [government construction contract inspectors'] and the contracting officer's knowledge," payments to Tri-Gems were made for work that complied with the plans and specifications. Tr. 117/14 to 118/12. Mr. Bruce stated this policy to Tri-Gems in March 1998 (when Tri-Gems was attempting to excuse its non-performance on the Government's refusal to pay Tri-Gem's progress payments in full) stating, "it is not the policy of the government to pay for work that has not been completed or for work that has not been completed satisfactorily." JX 38 at 333.

Contract Inspections

61. The contract, FAR clause 52.246-12(b), required Tri-Gems to "maintain an adequate inspection system and perform such inspections as will ensure that the work performed conforms to the contract." Pursuant to paragraph (c) of this same clause, Government

inspections and tests were expressly stated to be "for the sole benefit of the Government." In addition, FAR 52.246-12(c) expressly stated that Government inspections do not:

> (1) Relieve the Contractor of responsibility for providing adequate quality control measures;
>
> (2) Relieve the Contractor of responsibility for damage to or loss of the material before acceptance;
>
> (3) Constitute or imply acceptance.

62. Further, paragraph (c) of the clause expressly stated that Government inspections do not "affect the continuing rights of the Government after acceptance of the completed work" (that is, warranty and other post-acceptance rights).

63. FAR 52.246-12(d) also stated that the "presence or absence of a Government inspector" did "not relieve the Contractor from any contractual requirement." Finally, paragraph (f) of the clause stated that Tri-Gems would, "without charge, replace or correct work found by the Government not to conform to the contract requirement."

Efforts to Ensure That The Government Received Contractually Compliant Work

64. The Government inspectors were the "eyes and ears for the contracting office." Tr. 146/24 to 147/1; Tr. 365/24-25; Tr. 376/20 to 377/1. Ms. DeMito testified that her understanding of the inspector's responsibilities was that the inspector "is supposed to make sure that the government gets what it is paying for in accordance with the terms and specifications in that particular contract." Tr. 118/19 to 119/4; Tr. 147/1-4.

65. Mr. Fleming testified that sometimes the Government inspectors were not available to visit the work site (e.g., due to military "exercises, mobility . . . training"). Tr. 366/10-15; see, e.g., JX 15 at 83 (no inspection due to training). Even on days when inspectors

were available, the time they spent at the work site was limited since inspectors had 8 or 9 job sites to monitor. Tr. 448/22 to 449/6; e.g., JX 9 at 71(30 minutes at the site); JX 15 at 87 (90 minutes) and at 94 (45 minutes). However, Mr. Fleming testified that if the Government inspectors were not at the site, it would not have affected Tri-Gems's ability to complete work since the contractor was required to comply with the contract terms, specifications and drawings. Tr. 366/16-23.

66. The record has many examples of situations where the Government contract inspectors discovered problems at the work site and noted these problems in their daily inspection records. E.g., JX 20 at 187 (identifying concrete bases that needed to be leveled); JX 27 at 219-20 (photo of damage discovered). All of the inspector's daily inspection logs are in evidence. JX 9, 15, 17-18, 20, 27-28 & 34; DX 294-96.

67. The record also has many examples of inspectors and other civil engineering personnel notifying the contracting office when problems were discovered at the Tri-Gems work site. See, e.g., JX 7, 14, 16, 21, 25-26 & 29. In turn, the record shows that the contracting office notified Tri-Gems of the problems identified by civil engineering. See, e.g., JX 14 & 22-23; DX 216, 223, 238 & 240-41. More importantly, the record shows that Tri-Gems consistently and promptly addressed the Government's concerns. See, e.g., JX 14 & 19; DX 220, 225 & 243-44.

68. In their testimony, both Ms. DeMito and Ms. Mendell gave examples of situations where Mr. Fleming had identified problems to the contracting office which Tri-Gems then stated it would fix. Tr. 147/5 to 148/12; Tr. 687/2-12; 689/18 to 690/17; JX 14 at 80-81. Ms. DeMito testified about other examples of Tri-Gems setting dates and times to fix problems identified by the civil engineers. See e.g., Tr. 149/2-14; DX 225. Ms. Mendell also gave examples of how

she worked as a liaison between Tri-Gems and civil engineering personnel to resolve performance problems. See, e.g., Tr. 692/6 to 694/13; JX 16; DX 220. Ms. Mendell testified that if Tri-Gems failed to correct any of the deficiencies, the Government had several options such as "retainage from their future invoice or give them until a date certain to correct or tell us what corrective action they would take before we would move towards termination." Tr. 702/13-20.

69. Mr. Dickstein admitted during cross-examination that, along with receiving the 1998 Lyman report, he also received "correspondence from the contracting office telling Tri-Gems to correct their work" and "correspondence from Tri-Gems saying we are going to correct the work." Tr. 82/20-25; JSF 42. Further, many of the problems identified earlier during contract performance were not evident when Mr. Lyman made his 1998 interim inspection (or were in the process of being corrected at the time). See, e.g., JX 46 at 421 ("contractor has installed this separate neutral conductor on about 30% of the system") ("about 80% complete with the bolt replacement.").

Contract Warranty

70. The contract, FAR clause 52.246- 21(a), provided that Tri-Gems "warrant[ed] . . . that [the] work performed under this contract conforms to the contract requirements and is free of any defects in equipment, material, or design furnished, or workmanship" for a period of one year "from the date of final acceptance of the work." Pursuant to this clause, Tri-Gems agreed to "remedy at the Contractor's expense any failure to conform, or any defect." The Government's warranty rights were in addition to the Government's rights in the "Inspection" and "Acceptance" clauses of the contract.

Government Efforts to Get Tri-Gems to Complete the Contract

71. Tri-Gems was supposed to complete the contract work by May 7, 1997. JX 30 at 265. On May 7,1997, Tri-Gems faxed the Government a letter requesting 60 additional days to complete the contact based on rain delays and Tri-Gems's pending March 31, 1997 claim for $320,677.00 (for having to lay more expensive, rigid steel conduit and PVC piping encased in concrete rather than cheaper, un-encased PVC piping). Id.; PX 169 at 705. Ms. DeMito spoke with Tri-Gems that same day and reached an agreement that if Tri-Gems put forth a good faith effort to finish the project - defined by Ms. DeMito as having a full work force on the job every day and working overtime (at no additional cost to the Government) - then the Government would not assess liquidated damages. JX 30 at 265.

72. Tri-Gems subsequently made very little progress on the contract. Id. Accordingly, Ms. DeMito issued a show cause notice to Tri-Gems on September 5, 1997 due to Tri-Gems's "failure to complete Contract No. F28609-96-C-0003 within the time required by its terms." Id.; JSF 30. The Air Force sent U.S. Fire a copy of this show cause notice and U.S. Fire received it. JX 30 at 266; JSF 30. There is no evidence in the record of U.S. Fire responding in any way to the Government regarding the show cause notice.

73. While all the relevant correspondence between Tri-Gems and the Air Force is not in evidence, enough of the documents are in the record to indicate what transpired between the parties during the remainder of 1997. After the Air Force sent the show cause notice to Tri-Gems on September 5, 1997, the parties met on September 25, 1997, at which time Ms. DeMito allegedly agreed to approve an invoice for four percent. JX 38 at 333.

74. At the same time, Ms. DeMito decided she needed to re-establish the contract completion date and the date for assessing liquidated damages. On October 15, 1997, Ms. DeMito unilaterally issued Modification No. P00005 "to establish a new contract completion date." JX 31 at 267-68; JSF 18 & 31. This modification extended the contract performance period to December 15, 1997, and informed Tri-Gems that liquidated damages would start accruing on December 16, 1997. JX 31 at 267-68; JSF 18 & 31.

75. Tri-Gems then submitted a progress payment invoice for the four percent agreed to at the September meeting. JX 37 at 330. However, subsequent to the September 25, 1997 meeting, the Government discovered that lamp poles had been installed incorrectly by Tri-Gems (that is, they were not plum). JX 37 at 330 & JX 38 at 333. The contracting officer sent Tri-Gems a letter in late October 1997 notifying Tri-Gems of the deficiencies, asking for a corrective action plan and stating that the Government would not pay the full four percent progress payment. JX 37 at 330 & JX 38 at 333; DX 240-41. In a letter dated 24 November 1997, Tri-Gems provided a corrective action plan. JX 37 at 330; DX 243-44.

76. The Air Force approved Tri-Gems' corrective action plan, but then Tri-Gems informed the contracting officer that Tri-Gems would not start work without being paid. JX 38. At that point (December 2, 1997), the contracting officer decided to pay the progress payment invoice (No. 14) because Tri-Gems stated that it could not meet payroll if it were not paid and had done some work; and because she wanted the lamp pole repairs started. The Air Force retained $27,356.07 to ensure that the light poles were properly repaired. Tr. 161/3-11; JX 38 at 333 & JX 61 at 513; DX 245. The Air Force notified Tri-Gems of this decision in a letter dated

December 10, 1997. DX 245. This was the last payment the Air Force made to Tri-Gems prior to the termination for default. JSF 25.

77. On December 12, 1997, the Air Force sent another show cause notice to Tri-Gems citing Tri-Gems's failure to perform the contract within the time alloted for contract performance. JX 32 at 269; JSF 32. The Air Force sent U.S. Fire a copy of this show cause notice. JSF 32. There is no evidence in the record of U.S. Fire making any response to the Air Force regarding this show cause notice. There also is no evidence in the record of U.S. Fire notifying the Air Force that Tri-Gems would default on its obligations.

78. On December 16, 1997, Tri-Gems sent a letter to the contracting officer requesting full payment of progress payment invoice no. 14 and emphasizing that due to dollars lost on this contract that payment of invoices needed to be expedited and that all future invoices should be paid in full. JX 37 at 331.

79. On January 7, 1998, Mr. Bruce informed Tri-Gems that the Air Force would assess liquidated damages since Tri-Gems did not complete the contract by the contract completion date. JX 35 at 328; JSF 33. The Air Force allowed Tri-Gems to work while on liquidated damages status from December 16, 1997 until May 17, 1998. JX 39 at 337. During that time period, Tri-Gems performed some remedial work, but ultimately "chose not to complete the contract requirements." Id. In total, the Air Force assessed $36,360 in liquidated damages against Tri-Gems. JSF 33.

80. In a letter dated February 12, 1998, the contracting officer reviewed the chronology of events since the September 1997 show cause notice (in particular Tri-Gems's demand to be paid in full for progress payment invoice no. 14) and reminded Tri-Gems "once

again" that "the Government does not finance the work to be completed on a contract but [instead] pays for work completed satisfactorily . . . ." JX 37 at 331.

81. On March 18, 1998, the contracting officer sent Tri-Gems another letter stating that if Tri-Gems failed to mobilize its workforce and return to the job site, the Government would begin termination for default proceedings. JX 38 at 333. The termination for default letter indicates that a show cause notice was also issued on March 17, 1998, but this is apparently a reference to the March 18, 1997 letter. JX 39 at 336.

The 1998 Lyman Memo

82. On three days in early April 1998, Mr. Lyman, accompanied by Senior Airman ("SRA") Rodriguez (the out-going Government inspector), and Bill Ott (the in-coming inspector), performed an "interim inspection" of the Tri-Gems work. JX 46. Mr. Lyman testified that the reason for the interim inspection was to make sure that the new inspector, Mr. Ott, was aware of what work remained to be done when either Tri-Gems returned to the work site or when a new contractor took over the work. Tr. 421/24 to 422/2.

83. On May 19, 1998, Mr. Lyman sent a memorandum (the "Lyman memo" or "memo") to Mr. Bruce regarding the interim inspection. JX 46. The memo stated that "the project is actually about 60% installed, [and] of this 60% approximately 1/3rd needs to be reworked, repaired or renewed due to poor workmanship." Id. at 420. The document does not indicate how Mr. Lyman calculated either the 60% figure or the "approximately 1/3rd" figure. Id. Mr. Lyman testified that the amounts were "off the cuff." Tr. 896/7.

84. The 1998 memo clearly indicated that Mr. Lyman did not know the true condition of all the Tri-Gems work. For example, the memo stated that: "[t]he inspection team could not

examine the grounding because it is underground and the team could not determine if it was done in accordance with the contract documents." JX 46 at 421. Likewise, some of the entries on the attachment to the memo listed the work as "Maybe" (that is, "The team could not determine if it was done or not") and "Appears" (i.e., "More than likely [done], the team could not tell for certain"). Id. at 422.

85. The 1998 Lyman memo also contains some speculation about the condition of the Tri-Gems work. For example, Mr. Lyman acknowledged that Tri-Gems "installed the primary cable" and that "a portion of this cable did pass a high-pot test." Id. at 420. However, Mr. Lyman was concerned that the "high-pot test" was "conducted about a year ago" and, since the "cable was never energized after the high-pot test," water may have migrated through the insulation of the non-energized cable. Id. Accordingly, Mr. Lyman thought that the "cable needs to be re-tested prior to energizing" and that the "contractor may have to replace a portion (maybe all) of this cable." Id.

86. The 1998 memo also acknowledged that Tri-Gems was in the process of making corrections to problems previously identified by the Air Force. For example, the memo acknowledged that the "contractor has installed this separate neutral conductor on about 30% of the system and needs to install this wire on the rest of the primary system." Id. at 421. Likewise, for the street lights (which had many "bolts [which] have rusted and failed"), Mr. Lyman acknowledged that the "contractor is currently replacing these bolts" and was "about 80% complete with the bolt replacement." Id.

87. In addition, Mr. Lyman testified that he was not involved with progress payments and, in contrast with his 2004 report, did not consider progress schedules or progress reports in

preparing the memo. Tr. 433/17-21. He also testified that, in contrast with his 2004 report, he did not consider payments for materials delivered to the site when he made his 1998 "off the cuff" estimates regarding the amount of work remaining to be completed and which might need to be repaired. Tr. 439/4. In contrast to his 2004 report, Mr. Lyman's 1998 memorandum did not discuss all the categories of work shown on the contract progress report. JX 46; DX 288 at 1.

88. The parties stipulated that the 1998 Lyman memo (along with other information in Government files) was provided to U.S. Fire after the termination of the Tri-Gems contract. JSF 42. However, there is no evidence in the record that the Government personnel told U.S. Fire to include the 1998 memo in its invitation for bids ("IFB") soliciting a completion contractor. To the contrary, the only evidence is that Government personnel were unaware that the 1998 memo had been included in the IFB. Tr. 440/16. In fact, Mr. Lyman testified that he did not think it "wise" for U.S. Fire to have used the memo in the IFB because "there were too many unknowns" in the memo. Tr. 440/20-22.

89. The Air Force and U.S. Fire did not make the 1998 Lyman memo part of the takeover agreement between the Air Force and U.S. Fire. JX 56.

90. Mr. Lyman concluded his memo by stating that while Tri-Gems was working, it was "conducting a halfhearted attempt to finish the job." JX 46.

The Termination for Default

91. On February 24, 1999, the Air Force terminated the contract for default. Id. at 336; JSF 37. U.S. Fire received a copy of the termination notice. JSF 37; JX 39 at 337. The termination was for "Non-Performance of the Contract." JX 39 at 336.

92. Tri-Gems filed an appeal of the termination decision with the ASBCA on May 19, 1999. JSF 38. Subsequently, Tri-Gems filed for bankruptcy on June 11, 1999. JSF 39 & 59. The ASBCA dismissed with prejudice the Tri-Gems appeal of the default termination on February 1, 2000 (after the bankruptcy trustee decided not to pursue the appeal). JSF 40.

Bankruptcy Of Tri-Gems And Individual Indemnitors

93. On June 11, 1999, Tri-Gems filed for bankruptcy. JSF 39 & 59. In February and March 2000, the other individual indemnitors for the Tri-Gems bonds also filed for bankruptcy. JSF 63 & 67. U.S. Fire collected $5,000 from the individual indemnitors. JSF 65 & 69.

94. The 2001 U.S. Fire claim against the United States fails to reduce the amount of claimed damages by the amount of U.S. Fire's recoveries from individual indemnitors. PX 170.

95. The record contains an unsigned letter dated July 28, 1999 from a Captain Gregory Baxley (listed as a "trial attorney") to the Tri-Gems bankruptcy trustee. PX 169. In the letter, Captain Baxley makes a number of assertions related to Tri-Gems' ASBCA appeals and concludes the letter by stating his belief "that the Air Force's case is substantially stronger than Tri-Gem's case" and asking if the bankruptcy trustee "intend[s] to proceed with Tri-Gem's appeal." Id. at 706. There is no evidence in the record to indicate whether or not Captain Baxley's arguments - or some other reasons - persuaded the trustee not to pursue the Tri-Gems appeal. The only evidence in the record is the joint stipulation of the parties that the ASBCA dismissed the Tri-Gems case on February 1, 2000 based upon the representation of the trustee that the trustee did not intent to prosecute the case. JSF 40.

96. In the letter, Captain Baxley alleges that the "Air Force case is based on . . . an audit of Tri-Gem's completed work." In his opening statement, plaintiff's counsel admitted that

he had "not found an actual audit as such in the [Government's] file[s]," but he speculated that Captain Baxley may have been referring to the 1998 Lyman memo. However, U.S. Fire chose not call Captain Baxley as a witness. Instead plaintiff's counsel chose to ask other Government witnesses if they knew what Captain Baxley meant when he referred to an "audit" in his letter to the bankruptcy trustee.

97. When questioned about the letter by plaintiff's counsel, Mr. Bruce testified that he had no recollection of ever having seen Captain Baxley's letter to the bankruptcy trustee. Tr. 314/5-7. When asked about Captain Baxley's reference to an audit in his letter, all Mr. Bruce could do was speculate that it could mean a number of things. Tr. 314/9 to 315/5. Mr. Lyman also testified that he did not know what Captain Baxley was referring to in his letter to the Tri-Gems bankruptcy trustee when he referred to an "audit." Tr. 394/15 to 395/10. Finally, Mr. Wilson testified that he did not know Captain Baxley and had not seen Captain Baxley's letter. Tr. 456/11-20. When questioned by plaintiff's counsel about the meaning of Captain Baxley's letter, Mr. Wilson said that he "had no knowledge" and would "be speculating" to try and explain what Captain Baxley meant in his letter. Tr. 456/21 to 457/25.

Actions Of U.S. Fire After Termination Of The Bonded Contract

98. Mr. Dickstein testified that U.S. Fire considered the termination notice "a demand by the federal government against the surety's performance bond." Tr. 53/7-13. He also testified that the surety "didn't have a contract with the government at the time [of the Tri-Gems termination]." Tr. 53/14-15 & 20-21.

99. One of the steps taken by U.S. Fire in 1999 to "figure out how it would respond" to the Government was to hire "a consultant to go look at the job, and calculate how much it

would cost to complete." Tr. 54/1-8. The Megan Group was the first consultant hired by U.S. Fire to look at the Tri-Gems work. Tr. 87/21-23. The Megan Group visited the work site in 1999. Tr. 104/1 to 105/2.

100. Vincent Miseo worked under Mr. Dickstein's supervision at U.S. Fire on the Tri-Gems bond claims. Tr. 96/14-21. In a telephone call with Mr. Bruce on February 10, 1999, Mr. Miseo was asked to visit McGuire AFB regarding the termination for default. PX 152 at 644. Between February 10, 1999 and February 24, 1999, Mr. Bruce wrote to Mr. Miseo and requested that Mr. Miseo or another representative of U.S. Fire visit McGuire AFB "to walk the job site to see what has been accomplished, what is required to be redone/replace and what remains to be completed." Id.

101. On February 25, 1999, Mr. Miseo sent a letter to Mr. Bruce acknowledging receipt of the termination for default. PX 153 at 647. In this letter Mr. Miseo asked for specific information regarding the Tri-Gems project. Id. at 647-48. Mr. Miseo sent a copy of the letter to "Grant Macdonald/The Megan Group." Id. at 648. Mr. Bruce responded with the requested information in a letter dated June 8, 1999. Id. at 645-46. Mr. Bruce sent a copy of his letter to "Grant Macdonald/The Megan Group." Id. at 646.

102. Mr. Bruce testified that he remembered the surety and The Megan Group coming to visit the work site during 1999. Tr. 344/4-19. The record does not contain any notes, reports, or letters concerning the observations made by the surety and The Megan Group consultant at the project site during 1999.

103. Grant Macdonald of The Megan Group sent Mr. Miseo a fax on December 2, 1999 in which Mr. Macdonald attached a "quote from Briteway Electrical to complete the

electrical" and discussed the other work that would need to be done to complete the Tri-Gems contract. DX 315. U.S. Fire called neither Mr. Miseo nor Mr. MacDonald as witnesses at trial, nor did it explain why it did not call them.

U.S. Fire Hires Michael Spinelli

104. On May 23, 2000, Ms. DeMito sent a letter to U.S. Fire requesting the surety to act on the performance bond and inviting U.S. Fire to visit the work site. JSF 41.

105. There is no evidence in the record which explains why U.S. Fire did not continue to use The Megan Group (and Mr. Macdonald) as a consultant. Instead, the record indicates that Mr. Spinelli was hired by U.S. Fire at some point in time after Ms. DeMito's May 23, 2000 letter and before the August 4, 2000 IFB was issued for the completion of the Tri-Gems contract work. JSF 43; Tr. 610/24 to 611/25; JX 41 at 340. Mr. Spinelli testified that when he was first hired by U.S. Fire, he was "advised by your office [Mr. Dreifuss] that the Air Force had given a surety less than 30 days to prepare an invitation to bid and have a contractor working on site . . . ." Tr. 610/24 to 611/6.

106. In his direct testimony, Mr. Spinelli claimed that "during the pre-bid walk through [the job site], our observations were consistent with this [1998 Lyman] memorandum." Tr. 614/22-23. However, during cross-examination, Mr. Spinelli admitted that he was not at the pre-bid walk through for the completion contract IFB. Tr. 652/11-12. Mr. Spinelli stated that a Rick Weaver conducted the pre-bid walk through for the completion contract IFB. Tr. 652/12-13. U.S. Fire did not call Mr. Weaver as a witness or submit any documents from Mr. Weaver regarding the site visit. Mr. Spinelli did not visit the work site until February 2001. Tr. 626/18-23.

107. In his direct testimony, Mr. Spinelli claimed that he had "no specific recollection of significant [Tri-Gems purchased and left at the job site] materials." Tr. 626/24 to 627/3. However, during cross-examination, Mr. Spinelli was forced to admit that he did not recall ever seeing the receipts submitted by Tri-Gems to the Government to support the progress payment made to Tri-Gems for material delivered to the work site. DX 289 at 32-38; Tr. 647/10-14. In addition, the fact that there were materials purchased by Tri-Gems and left at the job site after the termination is indicated by the IFB for the completion contract which states (in Section 9.1) that "construction materials are currently on site and available for the Completion Contractor's use in completing the Project." JX 41 at 356.

108. Mr. Spinelli had worked with Mr. Dreifuss on between "five and ten" other matters prior to Mr. Spinelli being retained for this case. Tr. 654/10-14. Mr. Spinelli was still working with Mr. Dreifuss on other cases at the time he testified. Tr. 654/15 to 655/2.

U.S. Fire Issues An IFB For The Completion Contract

109. Mr. Spinelli testified that he prepared the IFB. Tr. 611/11 to 612/4. While U.S. Fire was given the opportunity to visit the job site prior to issuing the IFB (JSF 41 & 44), Mr. Spinelli did not make such a visit. Tr. 626/18-23. Mr. Spinelli also admitted that he did not recall reviewing any of the daily inspection reports or progress schedules before issuing the IFB. Tr. 643/15 to 644/3.

110. Mr. Spinelli did not show the IFB to the Air Force before U.S. Fire issued the IFB. Tr. 643/2-5. Ms. DeMito testified that she did not see the IFB before it was issued. Tr. 170/9-11.

111. Mr. Dickstein testified that U.S. Fire did not take any steps to confirm the accuracy of Mr. Lyman's 1998 memo. Tr. 105/13-16 & 22-24. The IFB described the Lyman memo as the "List of alleged defects . . . ." JX 41 at 349. In Section 14.0, "List of Defects," the 1998 Lyman memo is described as containing "known and probable deficiencies" and specifically stated that nothing on the Lyman list would be considered latent. Id. at 360.

112. Mr. Spinelli testified that he decided to put the 1998 Lyman memo (JX 46) in the IFB because he thought the document represented "what the owner believes to be probable defective work on the job site." Tr. 612/21 to 613/3. Mr. Spinelli said that he also included the 1998 Lyman memo because "it would be dishonest" not to disclose it and "we'd be setting ourselves up for a lawsuit" if U.S. Fire did not disclose the information. Tr. 613/8-16.

113. There is no evidence in the record indicating that Mr. Spinelli (or anyone from U.S. Fire) asked the Government any questions about the 1998 Lyman memo before deciding to use it in the IFB.

114. When asked during re-direct examination a leading question suggesting that he relied "on Mr. Lyman's report and [told] bidders to rely on that report," Mr. Spinelli admitted that, "We didn't have to tell bidders what they have to rely on." Tr. 658/17-20. Instead, Mr. Spinelli stated that, "We provide them all the information and tell them, you know, to estimate your assessment of the work that remains." Tr. 658/20-22. Consistent with Mr. Spinelli's testimony, the IFB stated (in Section 11.0, "Representations of Surety") that "the Surety is unable to warrant or represent that the information contained herein is without any inaccuracy or omission." JX 41 at 357.

U.S. Fire's Business Decision To Have The Completion Contract Bid On A Lump Basis

115. U.S. Fire solicited the completion contract work on a lump sum basis. JX 41 at 345. Mr. Spinelli testified that the surety bid the work as a lump sum rather than using unit pricing because "we had less than 30 days to prepare an invitation to bid, arrange for a prebid walk though and get a contractor on site." Tr. 622/19-20. However, Mr. Spinelli's statement is inconsistent with the stipulated facts indicating that, in addition to the 1999 site visit done by Megan Group for U.S. Fire, the Air Force extended U.S. Fire another invitation to visit the work site on May 23, 2000. JSF 41 & 44. U.S. Fire did not issue the IFB for the completion contract until more than 10 weeks later. JSF 45. Further, Eastern Construction & Electric, Inc. ("Eastern") and U.S. Fire did not enter into the completion contract until more than four months after the IFB was issued. JSF 46.

Other IFB Terms And Conditions

116. Section 9.1 of the IFB, "Available Materials," stated that "Certain construction materials are currently on site and available for the Completion Contractor's use in completing the Project." JX 41 at 356. However, the IFB left it to bidders to inventory the materials, "if desired." JX 41 at 356. The IFB stated that the materials would be provided to the successful bidder at no cost, but also, "as is" (and U.S. Fire specifically denied any warranty of the "quantity, quality or the sufficiency of these materials"). Id.

117. Section 10.2 of the IFB established a "Pre-Bid Walk Through." Id. at 357. Section 11.0, "Representations of Surety," stated that "the Surety is unable to warrant or represent that the information contained herein is without any inaccuracy or omission." Id. These provisions linked with Section 12.0, "Representations of Each Bidder," which required each bidder to

represent "without reservation" that the "bidder has had the opportunity to attend the pre-bid walk through and has had the opportunity to examine the Project site and . . . has made its own estimate . . . and that it has based its bid upon its own investigation and has allowed sufficient sums in its bid to provide for or against any and all contingencies." Id. at 358.

The Completion Contract Between U.S. Fire And Eastern

118. U.S. Fire awarded a completion contract to Eastern on December 19, 2000 for a lump sum fixed price of $930,000. JSF 46; JX 55 at 478. The contract required Eastern to "warrant and represent" that Eastern had "fully investigated and is fully informed as to the status and conditions affecting the work." JX 55 at 477. The contract also stated that U.S. Fire had made "no warranties or representations, expressed or implied" to Eastern regarding either the "Contract Document" (which included the 1998 Lyman memo) or the site. Id.

119. Eastern submitted its bid with a lump sum price. Tr. 624/4-6. This lump sum price covered both the cost to complete the work as well as the cost to repair work. Tr. 624/16-17. Eastern's bid preparation papers are not in evidence. There was no testimony concerning how Eastern prepared its bid. Plaintiff did not call any witnesses who had worked for Eastern in preparing the Eastern bid for the completion contract.

120. The completion contract required Eastern to "maintain separate records and accounts covering all costs incurred and expenditure made" in completing the work under the Agreement. JX 55 at 481. The completion contract also required Eastern to "maintain separate records and accounts" for any out of scope work "sufficient to allow U.S. Fire to charge the United States Air Force for these costs." Id. Eastern was also contractually required to keep its records for three years after final acceptance and make these records available to U.S. Fire or

representatives of the Air Force. Id. at 481-82. U.S. Fire did not require Eastern to segregate any of the alleged repair costs from the completion costs. Eastern was required to "correct all defective work and perform all warranty work pursuant to the Contract Documents."

Terms Of The Takeover Agreement Between U.S. Fire And The Government

121. On January 29, 2001, U.S. Fire and the Government entered into a takeover agreement contract. JSF 47; JX 56. The takeover agreement began with a series of "Whereas" clauses. JX 57 at 493. One of the "Whereas" clauses recorded U.S. Fire's "contention" that U.S. Fire "possessed" a claim for alleged "overpayments" to Tri-Gems. Id. In the next "Whereas" clause both the Government and U.S. Fire reserved "all of their respective rights to any and all defenses and claims . . . ." Id.

122. In the body of the takeover agreement, U.S. Fire agreed "to perform or cause to be performed all of the remaining items of work necessary to complete the Contract in accordance with the terms of the Contract documents which include the relevant specification . . . ." Id. The Air Force agreed that nothing in the takeover agreement was intended to increase the liability of U.S. Fire in excess of the penal sum of the performance bond. Id.

123. The takeover agreement specified the total amount of money that remained available from the Tri-Gems contract, that is, $162,282.61. Id. at 494. This amount did not include $36,60.00 deducted for liquidated damages. Id. The Air Force specifically agreed to "pay U.S. Fire the balance of the contract price unpaid at the time of this Agreement . . ." Id.

124. The takeover agreement stated that, "[e]xcept as expressly modified herein, [the] Air Force shall have all rights . . . under the [Tri-Gems] contract with respect to U.S. Fire as [the] Air Force had with respect to Tri-Gems and U.S. Fire shall have all . . . obligations and

responsibilities as Tri Gems had with respect to [the] Air Force under the aforesaid Contract." Id.

125. Ms. DeMito signed the takeover agreement on behalf of the Air Force. She testified that when she signed the takeover agreement she did not understand U.S. Fire to possess any right to be paid for money that the Government allegedly overpaid to Tri-Gems. Tr. 170/15-22. Further, she testified that, as she understood the takeover agreement, the Government did not promise to pay U.S. Fire for any money allegedly overpaid to Tri-Gems. Tr. 171/3-7. Ms. DeMito testified that the Government only promised to pay U.S. Fire the remaining funds on the Tri-Gems contract. Id.

126. Other than the takeover agreement, there is no evidence of any other express or implied contracts or agreements between the Government and U.S. Fire.

2001 U.S. Fire Claim

127. On August 13, 2001, U.S. Fire submitted a claim. PX 170. As described in the "Calculation of Damages" section, the claim contains three parts:

a. $394,911.79 for alleged overpayment of work not performed;

b. $296,839.20 for alleged payment of work performed improperly;

c. $281,396.00 for allegedly doing work above the bond penal sum.

Id. at 709-10. Although these three claims total $973,146.99, US Fire claimed only $930,000, the amount paid to Eastern. Id. at 710. The claimed payments (in "a" and "b", above) were allegedly made as progress payments to Tri-Gems Builders ("Tri-Gems"), the defaulted contractor (which US Fire bonded). Id. at 709.

128. The claimed amounts for repair work were based solely on the percentages stated in Lyman's 1998 memo, not the actual costs that Eastern incurred for repair work. Id.

129. The claimed amount of $281,396.00 was for U.S. Fire allegedly doing work above the bond penal sum. Id. at 710. However, as the contracting officer pointed out in his final decision denying this portion of the claim, the total amount U.S. Fire paid to Eastern to complete the terminated the contract ($930,000.00) was less than the original penal sum for the performance bond (that is, $1,202,800.00) and, thus, U.S. Fire had not been required to do any work above the bond penal sum. JX 58 at 509.

130. The August 13, 2001 claim did not take into account the fact that, at the time of the claim, U.S. Fire had already invoiced for and been paid $100,165.50 (out of the total $101,176.27 Tri-Gems contract balance amount) by the Government. Id.; PX 170. At trial, Mr. Dickstein admitted that U.S. Fire's "damages" calculation should include, at a minimum, a credit for this $100,165.50. Tr. 76/22-24.

131. The claim also did not take into account the materials left on site by Tri-Gems that the Government had paid for and that were available to Eastern to use in completing the contract. JX 58 at 509; JX 41 at 356; PX 170. Finally, although these three claims totaled $973,146.99, a Defense Contract Audit Agency (DCAA) audit of the August 13, 2001 claim revealed that Eastern only had incurred costs of $621,677. Tr. 716/17-22; 725/1-21.

DCAA Audit Of U.S. Fire's Claim

132. Diana Bunting, a DCAA auditor testified at trial. Tr. 709-726. Ms. Bunting has a Bachelor of Science degree in accounting and is a certified public accountant. Tr. 709/19-25. She conducted an audit of U.S. Fire's claim. Tr. 710/17-19. As part of her audit, she looked at

incurred costs documents from Eastern and conducted an exit conference with Eastern's accountant. Tr. 715/1-12.

133. Ms. Bunting testified that she questioned some of Eastern's costs based upon the fact that the costs were not allocable to the contract. Tr. 715/15-16. She also testified that Eastern had some duplicate costs, some unsupported costs and some unreasonable costs. Tr. 715/16-18. Ms. Bunting also questioned Eastern's costs because it did not segregate the repair and completion costs (which would have allowed the Government to tell how much the completion costs were). Tr. 715/18 to 716/1. Ms. Bunting testified that Eastern had the ability to segregate its costs into completion costs and repair costs. Tr. 716/2-16.

134. Ms. Bunting determined that Eastern's total incurred costs on the completion contract were $621,677. Tr. 716/17-22; 725/1-21. Given the lump sum amount U.S. Fire paid to Eastern for the completion contract, Eastern made a 34 percent profit. Tr. 717/4-7. Ms. Bunting testified that this profit percentage was much higher than Eastern's normal profit rate of seven to ten percent. Tr. 717/8-10. Ms. Bunting determined Eastern's normal profit rate by looking at Eastern's audited financial statements for 2001 and reviewing the profit made on four other Eastern contracts. Tr. 717/11-25.

The 2002 Spinelli Letter

135. Mr. Dickstein admitted in cross-examination that between when the certified claim was submitted on August 13, 2001 and when the current lawsuit was filed in 2003, there were negotiations between the parties in an attempt to resolve the claim. Tr. 81/1-5; PX 170. The contracting officer, Mr. Baker characterized these meetings as "fact finding" in his April 30, 2003 final decision. JX 58 at 507.

136. As part of this process, U.S. Fire was given the opportunity to meet with Mr. Lyman on May 23, 2002 to discuss his 1998 memo. PX 174 at 747-48. On November 15, 2002 - nearly six months after the meeting - Mr. Spinelli sent U.S. Fire's counsel (Mr. Dreifuss) a three-page letter in which Mr. Spinelli stated, in a few conclusory statements, that Mr. Lyman was "most professional and credible" and there was "no reason to suspect that the conclusions drawn in Mr. Lyman's May 19, 1998 [memo] are inaccurate."

137. Mr. Spinelli testified that, "after the [completion] contract was awarded to Eastern," he had several meeting with the Air Force "where Mr. Lyman was present . . . and this document [the 1998 memo] was discussed." Tr. 614/25 to 615/17. However, the only documentary evidence of such meetings is Mr. Spinelli's November 15, 2002 letter to Mr. Dreifuss. As Plaintiff's counsel admitted at trial, Mr. Spinelli's November 15, 2002 letter "was prepared while we were having ongoing meeting with the government before we filed this [COFC] action, but [while] the government was evaluating our claim." Tr. 618/4-8.

The 2004 Lyman Report

138. In 2004, Mr. Lyman prepared a report to determine how much of the work had been completed by Tri-Gems. His report breaks down the work using the work elements on the progress schedules and progress reports. DX 286. In contrast to his 1998 memo, Mr. Lyman's 2004 report provides detailed calculations for each work item to establish the total percent completed by Tri-Gems at the time of their default.

139. For example, in his 2004 report, Mr. Lyman used the scales on the contract drawings to calculate the quantities of work or material in linear feet. Tr. 732/24 to 733/25. His calculations are shown, in part, on the contract drawings. Tr. 423/4 to 427/12; DX 292 (pages

E-4, E-5 & E-6). Mr. Spinelli did not challenge this method of calculation, just the degree of accuracy which he thought could be obtained from using the full scale drawings. PX 178 at 761-62.

140. In contrast to the 1998 memo (which contains some speculation about the condition of the Tri-Gems work), Mr. Lyman's 2004 report contains detailed information he received from Eastern. For example, in his 1998 memo, Mr. Lyman acknowledged that Tri-Gems "installed the primary cable" and that "a portion of this cable did pass a high-pot test." JX 46 at 420. However, Mr. Lyman was concerned that the "high-pot test" was "conducted about a year ago" and, since the "cable was never energized after the high-pot test," water may have migrated through the insulation of the non-energized cable. Id. Accordingly, Mr. Lyman thought that the "cable needs to be re-tested prior to energizing" and that the "contractor may have to replace a portion (maybe all) of this cable." Id. (emphasis added). When he wrote his 2004 report, Mr. Lyman acknowledged that "it turned out that the primary cable was in much better condition than the inspection team anticipated" in 1998. DX 286 at 3.

141. The 1998 memo also acknowledged that Tri-Gems was in the process of making corrections to problems previously identified by the Government. For example, the memo acknowledged that the "contractor is currently replacing these [street light] bolts" and was "about 80% complete with the bolt replacement." JX 46 at 421. When he wrote his 2004 report, Mr. Lyman acknowledged that "Tri-Gems installed all the bases and all but 3 poles/light fixtures" which left Eastern "to provide 3 pole/light fixtures of the required 82." In other words, Tri-Gems had done more of the work by the time it was terminated than Mr. Lyman had noted in May 1998. DX 286 at 3.

142. In 2005 (after U.S. Fire filed this action), Mr. Spinelli reviewed Mr. Lyman's December 10, 2004 report (DX 286) and expressed his opinions of the Lyman report in two letters to Mr. Dreifuss. PX 177-78. The two letters are similar (with PX 178 being a revised version of PX 177).

143. The 2005 Spinelli reports acknowledge that "Mr. Lyman's 'new' [2004] report breaks down the contract by Work Elements and goes through an extended calculation for each item to come up with the total percent complete[d] by Tri Gems at the time of their default" and "Mr. Lyman's original [1998] report [was] noticeably silent with respect to such a Work Element breakdown." PX 177 at 756. Mr. Spinelli claimed that "any comparison between the two reports in that respect is currently impossible." Id. However, the "apples versus oranges comparison" which Mr. Spinelli identifies just emphasizes that the "off the cuff" percentages stated in the 1998 Lyman report were not a comprehensive review of the progress payments made to Tri-Gems.

## ARGUMENT

### I. This Court Does Not Possess Jurisdiction To Consider U.S. Fire's Claims

#### A. There Is No Waiver Of Sovereign Immunity For U.S. Fire's Claims

Subject matter jurisdiction may be challenged at any time by the parties, by the court, sua sponte, and even on appeal. U.S. Fire Ins. Co. v. United States, 61 Fed. Cl. 494, 494 (2004). U.S. Fire bears the burden of proving the jurisdiction of the Court by preponderant evidence. Id. Previously, this Court denied the motion to dismiss for lack of subject matter jurisdiction that we filed at the beginning of this case. Id. However, at that time, facts were still in dispute. For example, as the Court stated in its opinion, U.S. Fire alleged that the Air Force "made improper

payments . . . both before and after the May 19, 1998, interim report that estimated Tri-Gems had been paid eighty-six percent of the contract value for less than sixty percent of the work." Id. at 495 (emphasis added). U.S. Fire has now stipulated that the Air Force made no payments to Tri-Gems after December 1997. JSF 25. Now that the record is closed, it is appropriate for the Court to revisit the jurisdictional issue.

U.S. Fire is attempting to assert its claim based upon what it alleges is an equitable subrogation theory, but, in fact, is at best a tort-like claim for which this Court does not possess jurisdiction. It alleges that the Air Force overpaid Tri-Gems because it paid Tri-Gems for work that was not done, and work that required repair. The United States Court of Appeals for the Federal Circuit has recognized only two limited situations in which a surety may present a claim based upon an alleged overpayment. First, the Government can become a "stakeholder" and owe some duty to the surety after the surety notifies the Government to stop paying the prime contractor. Second, the surety may rely upon a specific mandatory retainage provision in the contract. Neither of these instances are present here.

Case law demonstrates that the Government may owe some duty to the surety after the surety notifies the Government that it believes the contractor is in default and cannot complete the contract. See e.g., Fireman's Fund Insurance Company v. United States, 909 F.2d 495, 499 (Fed. Cir. 1990) ("only notice by the surety triggers the government's equitable duty"). Decisions from this Court also recognize that notice is a prerequisite to any Government duty. See, e.g., American Insurance Co. v United States, 62 Fed. Cl. 151 (2004) (Government did not owe a contractual duty to surety not to release funds to defaulting contractor and surety's right to equitable subrogation never attached where it failed to notify contracting agency to stop making

payments to contractor); Reliance Insurance Company v. United States, 27 Fed. Cl. 815, 827 (1993) (before any obligation arises to withhold or to divert funds, the Government must be notified that the surety believes the contractor is in default and cannot complete the contract) (quoting Ransom v. United States, 17 Cl. Ct. 263, 272 (1989), aff'd, 900 F.2d 242 (Fed. Cir. 1990)).

At trial, U.S. Fire offered no evidence that established that U.S. Fire ever notified the Air Force to stop paying Tri-Gems. In fact, in response to a question from the Court, opposing counsel admitted (during his opening statement) that the "surety did not give notice that the government should stop making payments . . . ." Tr. 36/19-22. Thus, U.S. Fire cannot rely upon this line of cases to state a claim.

The second circumstance in which the Federal Circuit has recognized some duty running from the Government in favor of the surety occurs when the surety can identify a specific contract provision which requires that the Government not make the payment at issue. National Surety Corp. v. United States, 118 F.3d 1542 (Fed. Cir. 1997). In National Surety, the Federal Circuit held that the Government was liable to the surety for the improper release of retainage, even though it had not received formal notice of the default, where the contract required that such funds be retained until the completion of the contract. National Surety, 118 F.3d at 1543-44. In National Surety, the underlying contract provided that the contractor "shall have 10 percent retainage withheld." Id. (Emphasis added).

National Surety does not help U.S. Fire because the retainage provision in the contract here was discretionary rather than mandatory. The contract incorporated FAR clause 52.232-5,

Payments Under Fixed-Price Construction Contracts (Apr 1989), which provided in relevant part:

> (e) If the Contracting Officer finds that satisfactory progress was achieved during any period for which a progress payment is to be made, the Contracting Officer shall authorize payment to be made in full. However, if satisfactory progress has not been made, the Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved.

(Emphasis added). This Court previously considered a similar equitable subrogation claim which included this permissive retainage clause.[1] The Court rejected the same argument that U.S. Fire makes here, that is, that the contract prohibited the Government from overpaying the contractor:

> Contrary to plaintiff's importunings, this provision does not prohibit the contracting officer from making payments beyond those dictated by the progress of work--it merely affirmatively required such payments as progress was made. Any notion that this provision could be applied in the converse to govern unsatisfactory performance ignores the fact that the contract had a specific provision which provided that in the absence of satisfactory progress, "the Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved." The use of the permissive terms "may" and "maximum" plainly allowed, but did not require, the contracting officer to retain up to 10 percent of the payment for a given period.

American Ins. Co., 62 Fed.Cl. at 157.

B. The Contract Bars U.S. Fire's Claims

To avoid this ruling, U.S. Fire attempts to latch onto two isolated sentences in the contract while ignoring all else. Under general rules of contract law, a court must interpret provisions of a contract so as to make them consistent. Abraham v. Rockwell Intern. Corp., 326 F.3d 1242, 1251 (Fed.Cir. 2003). The various contract provisions must be read as part of an

---

[1] U.S. Fire concedes at page 37 of its brief that the FAR clause at issue here is the same as that in American Ins.

organic whole, according reasonable meaning to all of the contract terms. Lockheed Martin IR Imaging Systems, Inc. v. West, 108 F.3d 319, 322 (Fed.Cir. 1997).

First, U.S. Fire points to an earlier portion of FAR clause 52.232-5 which provides that the Government is to pay for "work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer." Thus, it argues that the Air Force breached a duty to U.S. Fire by paying for defective work. However, in making this argument it ignores not only paragraph (e) of the clause discussed in the American Ins. Co. opinion, but also paragraph (d) of the clause. Paragraph (d) requires the contractor, in the event that it discovers that it has requested payment for defective work, to notify the contracting officer, and to be obligated to repay the money, with interest, until the work is corrected. Furthermore, paragraph (f) of this clause provides that:

> (f) All material and work covered by progress payments made shall, at the time of payment, become the sole property of the Government, but this shall not be construed as–
>
> (1) Relieving the Contractor from the sole responsibility for all material and work upon which payments have been made or the restoration of any damaged work; or
>
> (2) Waiving the right of the Government to require the fulfillment of all of the terms of the contract.

Read as a whole, this clause does not prohibit overpayments and clearly anticipates that the contractor may be paid for work which is incomplete or defective. It specifically protects the Government if that occurs because it provides that the Government waives none of its rights, and requires the contractor to fix the work or be liable to the Government for the cost of the unearned amount, with interest. This clause does not help U.S. Fire.

U.S. Fire also points to FAR clause 52.246-12, Inspection of Construction (Jul 1986) which provides at paragraph (b) that "work ... is subject to Government inspection and test at all places and at all reasonable times before acceptance to ensure strict compliance with the terms of the contract." However, it ignores other key portions of this FAR clause:

> (c) Government inspections and tests are <u>for the sole benefit of the Government</u> and do not–
>
> (1) Relieve the Contractor of responsibility for providing adequate quality control measures;
>
> * * *
>
> (f) The Contractor <u>shall, without charge, replace or correct work</u> found by the Government not to conform to contract requirements, unless in the public interest the Government consents to accept the work with an appropriate adjustment in contract price. The Contractor shall promptly segregate and remove rejected material from the premises.

(Emphasis added). Thus, this clause does not help U.S. Fire because it specifically provides that it cannot be read to benefit U.S. Fire. It also does not help U.S. Fire because, like FAR clause 52.232-5, it requires the contractor to repair defective work at no cost to the Government.

U.S. Fire also fails to consider the warranty clause. Pursuant to that clause, FAR 52.246-21, Tri-Gems agreed at paragraph (c) to "remedy at the Contractor's expense any failure to conform, or any defect." The clause further provides at paragraph (f) that if the contractor failed to fix any defect within a reasonable period of time, the Government could fix it at the contractor's expense.

The payments, inspection, and warranty provisions, read as a whole provide no cause of action to U.S. Fire. These clauses clearly do not prohibit the Government from overpaying the contractor and protect all of the Government's rights to either have the work repaired by the

contractor, to have the money repaid with interest, or to have the work repaired at the contractor's expense.

U.S. Fire also cites Transamerica Premier Ins. Co. v. United States, 32 Fed.Cl. 308 (1994), as an additional case which supports its right to recover despite its failure to notify the Air Force to withhold funds from Tri-Gems. U.S. Fire brief at 36-37. The Court's opinion in Transamerica does not help U.S. Fire because it is a type of "notice" case. In Transamerica, the surety notified the contracting officer that it had received notice of claims from materialmen in excess of $125,000, demanded the remaining contract proceeds and further demanded that these proceeds be forwarded to its office. The contracting officer then assured the surety that the final contract payment would be transmitted to the surety. However, due to an administrative error, the final contract payment was forwarded instead to the contractor. Transamerica , 32 Fed. Cl. at 311. The Court held that, even if the surety's notice did not state that the contractor was in default:

> where the Government has on hand contract funds owing for work done and is alerted, by the surety, to the possibility of unpaid materialmen's claims, and to the surety's demand that the contract funds be protected pending investigation, it may not dispense those funds to the contractor ...

Id. at 314. The case at issue does not involve the Government's obligations when it receives notice from a surety of claims upon the payment bond. Since this is not a payment bond case, and there was no notice comparable to that in Transamerica by U.S. Fire here, Transamerica does not help U.S. Fire.

Similarly, U.S. Fire also cites International Fidelity Ins. Co. v. United States, 41 Fed.Cl. 706 (1998) in support of its argument that it was not required to give the Air Force notice. U.S.

Fire's reliance upon International Fidelity, another payment bond case, lacks merit for the same reasons as its reliance upon Transamerica. In International Fidelity, the Government notified the surety and contractor that it had received claims from unpaid suppliers. Id. at 708. This led to the issuance of a unilateral modification by the Government which provided that payments would be sent to the surety. Id. at 709. Notwithstanding this modification, the Government sent a payment to the contractor. The Court held that: "[u]nder the facts and circumstances of this case, the Corps of Engineers should have provided a check jointly to Met-Pro and IFIC, and such action was required by the contract." Id. at 719. Since this is not a payment bond case, and there was no similar contract modification that required the Air Force to send payments to U.S. Fire, International Fidelity does not help U.S. Fire.

C. The Contracting Officer Did Not Abuse Her Discretion

U.S. Fire then falls back on arguing that, even if the contracting officer had discretion to overpay Tri-Gems, she abused that discretion. U.S. Fire brief at 39. There are several problems with this argument. First, it ignores the presumption that Government officials are presumed to act in good faith. Gonzales v. Defense Logistics Agency, 772 F.2d 887, 889 (Fed. Cir. 1985).

Second, it also fails to consider the constant process during this project in which the Air Force identified problems, reported them to Tri-Gems, and then Tri-Gems fixed them. E.g., JX 14 & 19; DX 220, 225 & 243-44. Later, the Air Force rejected progress payments, and made the last payment to Tri-Gems only when told by Tri-Gems it needed the payment to meet payroll. Tr. 161/3-11; JX 38 at 333 & JX 61 at 513; DX 245. The Air Force made no payments to Tri-Gems after the 1998 Lyman memo. JSF 25. Nor does it consider that at least some of the work which was later found to be defective was not defective when the Government paid for it. For example,

Mr. Lyman testified that none of the transformer pads had defects when the Government paid Tr-Gems for them, but later they cracked. Tr. 902/12-22. Thus, the record is replete with evidence of the Air Force trying in good faith to pay Tri-Gems properly and obtain work in compliance with the contract. There is no evidence that the Air Force waived any provisions of the contract concerning the quality of work to be delivered or that the Air Force made payments to Tri-Gems frivolously.

Third, it also ignores the Government's strong interest in having the original contractor complete the work. As the Court of Claims recognized, the Government is habitually lenient in working with contractors, rather than terminating them, because the Government is interested in performance, not litigation. DeVito v. United States, 413 F. 2d 1147, 1153 (Ct.Cl. 1969). Here, Tri-Gems had what one Government witness described as a "stellar" work history at McGuire AFB. Tr. 327/6-13. With such a contractor, it was eminently reasonable for the Government to work with it and do what it could to enable the contractor to complete the project.

The contracting officer did not abuse her discretion in making payments to Tri-Gems. Because U.S. Fire's claim, therefore, does not fall under any recognized category of equitable subrogation, this Court lacks jurisdiction to consider the claim.

## II. The Court Does Not Possess Jurisdiction To Consider U.S. Fire's Defective Work Claim

U.S. Fire cites no case where a surety has been awarded damages from the Government for repairing defective work under circumstances such as these. We are aware of none. "By definition and agreement, the surety protects the government's interest, not the other way around." Fireman's Fund Insurance Company v. United States, 909 F.2d 495, 499 (Fed. Cir.

1990). In Insurance Co. of the West v. United States, 243 F.3d 1367, 1370, 1374 (Fed. Cir. 2001), the court of appeals stated that a “subrogee, as an assignee by operation of law, has "the same right[s]" as the Government contractor, "with its advantages and disadvantages." Certainly, Tri-Gems could not perform defective work, receive payment, and then demand payment again for fixing that work. Nor can U.S. Fire, possessing the same “advantages and disadvantages” of Tri-Gems, make such a claim.

Tri-Gems, through the contract, was obligated to perform the contract work, including the repair of defective work. U.S. Fire, through its bond, was obligated to step in and cause the contract work to be completed if Tri-Gems failed to do so. Pursuant to the express terms of the contract, this would include the repair of defective work without cost to the Government. U.S. Fire’s claim turns the relationship between surety and obligee on its head. In essence, U.S. Fire is asking the Government to cover the losses that resulted from its business decision to bond Tri-Gems. Thus, the Government would be protecting U.S. Fire’s interests and not the other way around.

The ASBCA has rejected at least one such claim. In that case, the surety also sought to be paid for repairing the defective work of its principal. The board held:

> Where, as here, a performance-based termination for default has been established, the surety becomes liable and stands in the place of the principal. [United States v.] Seaboard Surety Co., 817 F.2d [956, ] 962 [2nd Cir. 1987]. It seems antithetical to UPI's status as a Miller Act surety to argue that defective performance by its defaulted principal is a basis for recovery of damages from the obligee (here, Air Force). Indeed, we note that UPI cites no cases in support of its position. We deny this portion of the appeal.

In re United Pac. Ins. Co., 03-2 BCA ¶ 32,267, 2003 WL 21350374 (A.S.B.C.A.2003)[2] aff'd United Pacific Ins. Co. v. Roche, 380 F.3d 1352 (Fed. Cir. 2004).[3] The board's opinion is entirely correct. U.S. Fire's demand for payment for its alleged repair of the defective work of its principal is antithetical to its status as a Miller Act surety.

U.S. Fire had a remedy here, the indemnitors on the bonds. U.S. Fire has identified no case law which holds that the Government is liable because its indemnitors went bankrupt. The Court should reject this portion of U.S. Fire's claim.

III. The Air Force Did Not Overpay Tri-Gems

The most striking aspect of this case is the lack of evidence put forth by U.S. Fire to carry its burden. At trial, U.S. Fire provided no testimony from employees of U.S. Fire who worked there in 1995 when it bonded this contract, no testimony from employees of Tri-Gems, nor The Megan Group, nor Eastern. There are no documents from Eastern. These gaps in the evidence result in a failure to establish a factual basis for its claim, a failure to state a cognizable claim, and a failure to prove damages within a reasonable certainty. Of course, the burden is on U.S. Fire to prove "liability, causation, and resultant injury" (also called entitlement, causation, and quantum). E.g., Wunderlich Contracting Co. v. United States, 351 F.2d 956, 968 (Ct. Cl. 1965). Failure to prove any one of the three required elements must result in a denial of recovery. Id. at 968. U.S. Fire proves none of these elements.

---

[2] Quoted text is from the penultimate section (not including the conclusion) of the board's opinion.

[3] The Federal Circuit's affirmance does not include the issue covered in the quoted text because the surety did not even appeal this portion of the board's ruling.

Instead of submitting affirmative proof of its claims, U.S. Fire bases its entire case upon the single sentence in Mr. Lyman's 1998 memo which begins "CE has determined that the project is actually about 60% installed . . .." In Mr. Lyman's 1998[4] memorandum he stated that the project was "about 60% installed" and that "approximately" one-third of this work needed to be repaired. JX 46 at 420. Mr. Lyman's memo is accurate for the limited purpose it was intended, but its usefulness to the surety, both then and now, is limited by the audience for which it was intended and the assumptions made in that memo.

As Mr. Lyman and others explained in their testimony, there were instances of defective work performed by Tri-Gems during the project. Many of these problems were corrected. E.g., JX 14, 19; DX 220, 225, 243-44. By the time Mr. Lyman wrote his memo in 1998, it appeared that Tri-Gems might not finish the work. Tr. 421/8-10. In addition, the Air Force had assigned a new inspector to the project, Mr. Ott. Mr. Lyman wrote the memo for Mr. Ott so that he would be aware of existing inspection related issues, not for the benefit of U.S. Fire. Tr. 421/24 to 422/2. It was inherently reasonable for Mr. Lyman as the project manager to write this memo to alert an incoming inspector as to all potential problems with the project. There was no statute, regulation, or contract that required Mr. Lyman to write this memo, and there is nothing in the

---

[4] The Court raised an issue with respect to the testimony of witnesses that the parties had stipulated as experts. The Court asked whether it made a difference where the witnesses were never proffered by the parties as experts and qualified by the Court as such. Tr. 917/21 to 918/9. In United States v. Buchanan, 70 F.3d 818, 832 n. 17 (5th Cir. 1995) the fifth circuit considered this issue. It held that even though witnesses were not proffered as experts, they were asked questions which established their experience and qualifications and could testify as experts. Among other things, Mr. Lyman testified that he has a master's degree in electrical engineering and is a licensed electrical engineer. Tr. 372/5-11. He also testified that he had worked for the Air Force since 1995 as a project manager and as the design chief for the base. Tr. 375/18 to 376/3. Mr. Lyman is an expert in electrical engineering, but not contract administration.

record which indicates that the Government gave this memo to U.S. Fire with the intent that U.S. Fire use it to procure the completion contract without performing its own investigation. Thus, even if the memo was erroneous, there is no statute, regulation, or contract which creates a cause of action for U.S. Fire based upon errors in this memo.

However, even a cursory review of the 1998 memo indicates that it is essentially a "worst case" scenario designed to alert the incoming inspector of the potential problems so that he would be aware of them as the project moved forward with Tri-Gems or another contractor. The memo lists an assortment of problems that are merely potential or theoretical. Thus, it states that the "contractor may have to replace a portion (maybe all) of" the primary cable. Id. (Emphasis added). It states that the inspection team could not examine the grounding because it is underground and the team could not determine if it was done in accordance with the contract documents. JX 46 at 421, ¶ 4. It also states that "the pad for transformer T16 appears to be beyond repair and may require replacement. JX 46 at 422, ¶ 6 (emphasis added).

The difference between Mr. Lyman's 1998 and 2004 memos is explained by the uncertainty as to the state of the work in the 1998 memo, along with what the memo did not consider. The 1998 memo did not break the work down into work elements as the 2004 report did. In 2004, unlike 1998, Mr Lyman used the scales on the contract drawings to calculate the quantities of work or material in linear feet. Tr. 732/24 to 733/25. His calculations are shown, in part, on the contract drawings. In the 1998 memo, Mr. Lyman did not consider the progress reports and schedules. In 1998, he also did not consider that Tri-Gems had been paid for 22 percent materials delivered on site. He also did not take into account things like the five percent of the contract price allocated for bond and mobilization. Tr. 439/4; JX 46. The 2004 memo

considered work that Tri-Gems performed after the 1998 memo (light poles and fixtures). DX 286 at 3. Finally, in the 2004 memo, Mr Lyman recognized that "the primary cable was in much better condition than the inspection team anticipated" in 1998. DX 286 at 4.

Conspicuously absent from U.S. Fire's case is any testimony or documents from The Megan Group as to its observations of the work site. Nor is there testimony or notes from Mr. Weaver of the Cashin Spinelli firm indicating his observations at the prebid walk through. Nor is there any testimony or documents from Eastern indicating that it relied upon the 1998 Lyman memo in formulating its bid. Nor is there testimony from Eastern with respect to materials that Tri-Gems had been paid for but did not install, nor the amount of defective work it had to repair, if any. In fact, in its brief, U.S. Fire concedes that it does not know the quantity of materials that Tri-Gems installed. U.S. Fire brief at 27 (5 lines from bottom).

U.S. Fire failed to offer testimony or evidence which established a breakdown of repair versus completion work performed by Eastern. It also failed to introduce Eastern's bid, and Eastern's cost documents. If not for the liquidated damages and labor violations withholdings, there would have been nearly $200,000 in remaining contract funds for U.S. Fire to complete the project. Based upon this record, it is impossible to tell how far Eastern could have progressed the project with these funds, plus the materials that were available on site. As the party with the burden of proof, these omissions amount to a fatal flaw in U.S. Fire's case.

The Court should draw a negative inference from U.S. Fire's failure to introduce documents and testimony from Tri-Gems, The Megan Group, Mr. Weaver, or Eastern. Bilokumsky v. Tod, 263 U.S. 149, 153-54 (1923) ("Silence is often evidence of the most persuasive character."). When a litigant fails to call the persons having the greatest familiarity

with events, but rather seeks to rely on second-hand, hearsay evidence, a court may draw an inference that the testimony of the person not called would not support a litigant's position or that upon skillful cross-examination adverse testimony might be elicited from that person. Adams v. Dep't of Trans., 735 F.2d 488, 492 (Fed. Cir. 1984).

In place of evidence and testimony from Mr. Weaver and Eastern, U.S. Fire offers only hearsay statements from Mr. Spinnelli, for example, purporting to establish Eastern's agreement that "approximately 50% of the work performed by Eastern was to remedy defective work." U.S. Fire brief at 23 (quoting PX 174 at 748). U.S. Fire now tries to use that hearsay as factual proof in its brief. However, U.S. Fire cannot use the characterization of Mr. Spinelli as an expert to circumvent other rules of evidence. Matter of James Wilson Associates, 965 F.2d 160, 172-73 (7th Cir. 1992).

Federal Rule of Evidence 703 allows an expert to reveal the basis of his testimony during direct examination, even if this basis is hearsay, provided that the facts or data underlying his conclusions are of a type reasonably relied upon by others in his field of expertise. See United States v. Affleck, 776 F.2d 1451, 1457-58 (10th Cir. 1985). However, this hearsay is admitted for the limited purpose only of informing the fact finder of the basis of the expert's opinion and not for proving the truth of the matter asserted. Id. at 1457. "Expert testimony is a useful guide to interpreting [] facts, but it is not a substitute for them." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993). Thus, it has been consistently held that "an expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case." Virgin Atlantic Airways Ltd. v. British Airways PLC, 69 F.Supp.2d 571, 579 (S.D.N.Y.1999), aff'd, 257 F.3d 256 (2d Cir.2001);

accord Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir.), cert. denied, 531 U.S. 979 (2000); In re Citric Acid Litigation, 191 F.3d 1090, 1102 (9th Cir. 1999), cert. denied, 529 U.S. 1037 (2000); ADVO, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1198-90 (3d Cir. 1995). Accordingly, "an expert report cannot be used to prove the existence of facts set forth therein." In re Citric Acid, 191 F.3d at 1102; accord Sullivan v. National Football League, 34 F.3d 1091, 105 (1st Cir. 1994), cert. denied, 513 U.S. 1190 (1995). Mr. Spinelli's hearsay statements, therefore, do not remedy U.S. Fire's failure to submit affirmative proof of its claims.

## IV. There Was No Reasonable Basis For U.S. Fire To Blindly Rely Upon One Sentence In The 1998 Lyman Memo

The parties stipulated that the 1998 Lyman memo (along with other information in Government files) was provided to U.S. Fire after the termination of the Tri-Gems contract. JSF 42. However, there is no evidence in the record that Government personnel told U.S. Fire to include the 1998 memo in its IFB soliciting a completion contractor. To the contrary, the only evidence is that Government personnel were unaware that the 1998 memo had been included in the IFB. Tr. 440/16. There is no evidence of U.S. Fire or Mr. Spinelli asking the Government any questions about this memo. There is no evidence why U.S. Fire focused solely on this document and ignored other documents indicating that Tri-Gems was fixing problems. Perhaps most importantly, it offered no evidence that it had carefully read the memo and considered the significance of Mr. Lyman's repeated use of words and phrases such as "may have to replace," "could not examine," "may require replacement," "maybe," "could," and "appears."

To the extent that U.S. Fire actually considered the 1998 Lyman memo, it appears to have read the memo as freeing U.S. Fire from doing any of its own due diligence, as a guarantee that all of the potential problems in fact existed, and that the memo was somehow a plenary review of all payment items. Thus, Mr. Dickstein, U.S. Fire's in- house counsel, testified:

> Q With regard to Mr. Lyman's report, did US Fire take any steps to confirm the accuracy of Mr. Lyman's report?
>
> A It didn't need to, and therefore it didn't. It was part of the information provided to all completion contractors in good faith. A surety would be not well advised to receive a report from the Air Force saying that there's certain defective work, and conclude that it's not defective.
>
> Q But you did nothing to investigate the accuracy of Mr. Lyman's report.
>
> A As I said, there was no reason to, other than hoping that the consequences of it didn't hurt the bonding company in the pocketbook the way it did.

Tr. 105/13 to 106/1 (emphasis added).

For his part, Mr. Spinelli attempted to justify U.S. Fire's use of the 1998 Lyman memo due to an alleged lack of time to ascertain the true nature of the work. He testified on direct examination that he "prepared this invitation to bid in less than a week. That's almost unheard of. We didn't have the time to finesse every single detail of the bid because of the time constraints." Tr. 622/23 to 623/1. In addition to preparing the IFB in less than a week, Mr. Spinelli took more risk for U.S. Fire by not visiting the site until after U.S. Fire awarded the contract to Eastern. Tr. 626/18-23.

While Mr. Spinelli may have faced time constraints imposed by U.S. Fire that prevented him from doing his job properly, these time constraints were not imposed by the Air Force and did not affect U.S. Fire. U.S. Fire and its consultants were invited to the site in early 1999 and,

in fact, visited the site. Tr. 104/1 to 105/2; PX 152 at 644. As set forth at JSF 41-46, on May 23, 2000, the Air Force again requested U.S. Fire provide a completion contractor. DX 268. Mr. Spinelli issued the invitation for bids more than 10 weeks later, on August 4, 2000. JX 41-54. U.S. Fire and Eastern did not enter into a contract until December 19, 2000, nearly seven months after the Air Force requested U.S. Fire provide a completion contractor. With the Air Force having tolerated a lapse of nearly seven months between its May 23, 2000 letter and the date U.S. Fire entered into the contract to provide for the completion of that work, U.S. Fire cannot point to an alleged lack of time for Mr. Spinelli's inappropriate reliance upon the 1998 Lyman memo.

## V. U.S. Fire Failed To Prove Its Damages

U.S. Fire must prove its damages "with sufficient certainty so that the determination of the amount of damages will be more than mere speculation." Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 767 (Fed. Cir. 1987) (quoting Willem Industries, Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961)). U.S. Fire cannot do so here because its theory of damages is based entirely upon the 1998 Lyman memo. As we established above, the 1998 Lyman memo is riddled with uncertainty and is, therefore, not a suitable foundation for a damages calculations.

U.S. Fire's calculation of its damages is based upon the uncertainty in the 1998 Lyman memo rather than putting into evidence Eastern documents showing the actual costs of incomplete and defective work, or having other witnesses with personal knowledge testify as these amounts. U.S. Fire offered no evidence which suggested that this was not possible to do. Nor did U.S. Fire offer any evidence as to why it could not have better gauged the work to be performed in 2000, other than Mr. Spinelli's statement that he had less than a week to prepare the

invitation for bids. In preparing his 2004 report, Mr. Lyman took the drawings and used information that was on them in 1998 to estimate the actual amount of work performed by Tri-Gems and Easter. E.g., Tr. starting at 733/20. Mr. Lyman testified that "with a little more digging" this could have been done in 1998 by U.S. Fire. Tr. 438/3-15.

1. The Spinelli Reports Do Not Prove U.S. Fire's Claim

U.S. Fire has criticized the methodology in Mr. Lyman's 2004 report, but has offered no alternate analysis other than its narrow use of Mr. Lyman's 1998 memo. As the party with the burden of proof, this is a fatal flaw in U.S. Fire's case.

Mr. Spinelli's 2002 letter is not credible for several reasons. PX 174. First, Mr. Spinelli's statements are self-serving since he chose to include the 1998 Lyman memo in the 2000 completion contract IFB without making a site visit or taking any steps to confirm the accuracy of Mr. Lyman's 1998 memo. Tr. 105/13-16 & 22-24; Tr. 611/11 to 612/4; Tr. 626/18-23. Second, Mr. Spinelli had worked with plaintiff's counsel on between "five and ten" other matters prior to Mr. Spinelli being retained for this case. Tr. 654/10-14. Finally, given that his employer had now filed a claim in 2001 based entirely on the 1998 Lyman memo, it is not surprising that Mr. Spinelli would say there was "no reason to suspect that the conclusions drawn in Mr. Lyman's May 19, 1998 [memo] are inaccurate."

Mr. Spinelli's November 15, 2002 letter also included hearsay statements allegedly made by Mr. Luis Bolanos, Eastern's President. Once again, this is a series of self-serving statements. Further, the truthfulness of these hearsay statements allegedly made by Mr. Bolanos is highly suspect since U.S. Fire chose not to call Mr. Bolanos as a witness at trial.

Similarly, Mr. Spinelli's 2005 reports are not credible for many of the same reasons as his 2002 letter. PX 177, 178. First, Mr. Spinelli has a continuing self-interest in supporting the accuracy of the 1998 Lyman memo (which Mr. Spinelli chose to use in the completion contract IFB without first conducting his own site visit or taking any steps to confirm the accuracy of Mr. Lyman's 1998 memo). Tr. 105/13-16 & 22-24; Tr. 611/11 to 612/4; Tr. 626/18-23. As he did in 2002, Mr. Spinelli in 2005 again was preparing reports to support his client's position in on-going litigation. Further, Mr. Spinelli has a business interest in making statement that support U.S. Fire's claim since Mr. Spinelli has an on-going relationship with plaintiff's counsel in several cases. Tr. 654/10-14.

Many of the statements in the 2005 letters are just argument. For example, Mr. Spinelli argues that the 2004 Lyman report was written six years later than the 1998 Lyman memo. PX 177 at 756; PX 178 at 759. At trial, Mr. Spinelli's direct testimony regarding these reports was largely limited to emphasizing the fact that the 2004 Lyman report was written six years later than the 1998 Lyman memo. Tr. 633/2 to 638/4. However, when questioned during cross-examination about specific portion of Mr. Lyman's 2004 analysis, Mr. Spinelli was forced to admit that he did not have objections to many portions or did not have any specific information to say that Mr. Lyman was wrong. Tr. 647/21-24; Tr. 648/3-19; Tr. 649/8-21.

Likewise, in his reports, Mr. Spinelli inappropriately makes legal arguments about when U.S. Fire's damages occurred (that is, when U.S. Fire procured bids for the completion contract using the 1998 Lyman memo). PX 177 at 758; PX 178 at 760. There is no evidence in the record showing that Mr. Spinelli is qualified to express this legal opinion.

Since the two reports are so similar, they suffer from the same defects. For example, both reports attempt to challenge the 2004 Lyman report regarding the 22 percent paid to Tri-Gems for materials delivered to the work site by stating that Spinelli "has never seen these above-referenced material invoices" and had "NO knowledge of material quantities used by Tri-Gems." PX 177 at 757; PX 178 at 761. However, when shown a copy of the Tri-Gems material invoice receipts (submitted by Tri-Gems with progress payment invoice no. 6) in cross-examination, Mr. Spinelli was forced to admit that he did not recall ever seeing the receipts. Tr. 647/10-14; JX 61 at 544-52; DX 289 at 289/32-28.

Both 2005 reports also attempt to impose duties on the Government inspectors based upon documents not in the record and not part of the contract between Tri-Gems and the Government. For example, both reports refer to the Construction Management Association of America's book (or pamphlet or handout; the record is unclear), "Construction Management Standards of Practice." PX 177 at 757; PX 178 at 762. However, this book is not part of the record. Further, the Government inspectors are governed by FAR Clause 52.246-12, "Inspection of Construction," not some unknown, third party publication.

Both Spinelli reports also contain suspect statements. For example, the 2005 reports claim that the 1998 Lyman memo was "consistent with our observations when we were retained by the surety to procure bids for completion . . . ." PX 177 at 758; PX 178 at 759. However, as Mr. Spinelli was forced to admit in cross-examination, he chose to use the 1998 Lyman memo in the completion contract IFB without first conducting his own site visit or taking any steps to confirm the accuracy of Mr. Lyman's 1998 memo. Tr. 105/13-16 & 22-24; Tr. 611/11 to 612/4; Tr. 626/18-23. Further, there are no contemporaneous documents in evidence from either Mr.

Spinelli, Mr. Weaver, or Mr. MacDonald (from U.S. Fire's first consultant, The Megan Group) documenting any alleged "consistent . . . observations."

The Spinelli reports also contain hearsay statements that cannot be verified by the Court since U.S. Fire chose not to call any Eastern witnesses and chose not to put any Eastern documents into evidence. For example, Mr. Spinelli claims to have "reviewed Eastern's daily job reports," but those job reports are not in evidence and, thus, the Court has no way to evaluate the truth of what Mr. Spinelli alleges in his 2005 reports. PX 177 at 757; PX 178 at 761.

2. There Is No Evidence Which Supports U.S. Fire's Damage Calculations

U.S. Fire's damage calculation has two components: 1) $394,911.79 paid to Tri-Gems for work allegedly not performed; and 2) $296,839.20 paid to Tri-Gems for defective work. PX 170 at 709. The basis for the former is the reference in the Lyman memo to work being "about 60% installed;" the latter comes from the memo's reference to "approximately 1/3" of this work needing repair." JX 46 at 420. Mr. Lyman's use of the words "about" and "approximately," when combined with the memo's repeated use of words and phrases such as "may have to replace," "could not examine," "may require replacement," "maybe," "could," and "appears" means that this memo cannot be a basis for providing the necessary reasonable certainty which U.S. Fire must establish.

Moreover, as we established above, there is no evidence of an overpayment in the amount of $394,911.70, or any other amount. Mr. Lyman testified at trial that his reference in the memo to the work being "about 60% installed" did not take into account that the contractor had earned payment for 22 percent of the contract through its purchase of materials. Tr. 342/13; 439/4. The invoices for materials submitted by Tri-Gems indicated that it spent $268,218.76 in materials,

excluding the transformers. DX 289 at 32-38. In addition, Tri-Gems purchased and delivered all of the transformers for the project. DX 286 at 2, ¶ 6. U.S. Fire does not dispute that Tri-Gems purchased and delivered these materials. Nor does it take into account the five percent for bond and mobilization. Thus, this portion of its claim fails.

The second element of U.S. Fire's claim relating to allegedly defective materials fails for reasons we have stated above. U.S. Fire has presented no evidence from Eastern which indicates that it, in fact, had to repair defective work. It has submitted no documentary evidence of Eastern's repair of defective work. According to Ms. Bunting's testimony, Eastern had the capability to classify its costs as completion or repair but failed to do so. Tr. 716/5. U.S. Fire's failure to require Eastern to so classify its damages, or to offer any other evidence on this issue results in a failure to prove its claim for $296,839.20 in repair costs.

Finally, as Mr. Dickstein conceded during his testimony, the Court should also deduct from U.S. Fire's damages the $100,165.50 that the Government paid to U.S. Fire after deductions for liquidated damages and Davis Bacon Act violations attributable to Tri-Gems. Tr. 76/24. The liquidated damages and Davis Bacon Act violations lessened the funds available to U.S. Fire. However, since these reductions were caused by U.S. Fire's principal, not the Air Force, the Government should receive a credit in the full amount of $198,642.61, the amount U.S. Fire would have been paid absent these reductions. PX 171 at 742.

Finally, any award to U.S. Fire should also be reduced by the $5,000 that U.S. Fire collected from its indemnitors.

CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court enter judgment in its favor and dismiss the complaint of U.S. Fire.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/Michael N. O'Connell
MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor,
1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0282
Fax (202) 514-8624

OF COUNSEL:

CHRISTOPHER S. COLE
AFLSA/JACN
1501 Wilson Boulevard
Arlington, VA 22209-2403

WILLIAM M. LACKERMAN, JR.
Air Force Materiel Command
Law Office
Wight-Patterson Air Force Base
Dayton, OH

March 3, 2006

# INDEX TO APPENDIX


| FAR CLAUSE | PAGE |
|---|---|
| 52.212-3, Commencement, Prosecution and Completion of Work (Apr 1984) | 1 |
| 52.212-5, Liquidated Damages-Construction (Apr 1984) | 2 |
| 52.232-5, Payments Under Fixed-Price Construction Contracts (Apr 1989) | 3 |
| 52.232-23, Assignment of Claims (Jan 1986) | 5 |
| 52.233-1, Disputes (Dec 1991) | 6 |
| 52-236-5, Material and Workmanship (Apr 1984) | 8 |
| 52.236-6, Superintendence by the Contractor (Apr 1984) | 9 |
| 52.236-7, Permits and Responsibilities (Nov 1991) | 10 |
| 52-236-15, Schedules for Construction Contracts (Apr 1984) | 11 |
| 52.243-4, Changes (Aug 1987) | 13 |
| 52.246-12, Inspection of Construction (Jul 1986) | 14 |
| 52.246-21, Warranty of Construction (Apr 1984) | 16 |
| 52.249-10, Default (Fixed-Price Construction) (Apr 1984). | |

Certificate of Filing

I hereby certify that on March 3, 2006, a copy of the foregoing notice of appearance was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Michael N. O'Connell