**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| UNITED STATES FIRE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 03-2811C<br>(Judge Horn) |

**REPLY BRIEF ON BEHALF OF PLAINTIFF, UNITED STATES FIRE INSURANCE COMPANY, UPON CONCLUSION OF THE EVIDENTIARY PORTION OF THE TRIAL**

DAVID C. DREIFUSS, ESQ.
DREIFUSS BONACCI & PARKER, LLP
26 Columbia Turnpike
Florham Park, NJ 07932
Tel: (973) 514-1414
Attorneys for Plaintiff

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

PRELIMINARY STATEMENT .......... 1

POINT I
THIS COURT POSSESSES JURISDICTION OVER THIS MATTER .......... 3

POINT II
THE GOVERNMENT HAD THE DUTY TO ONLY PAY FOR WORK PERFORMED IN ACCORDANCE WITH THE CONTRACT AND/OR TO PROPERLY EXERCISE ITS DISCRETION, WHICH IT DID NOT DO .......... 5

POINT III
THE GOVERNMENT HAS NOT UNDERMINED THE OVERWHELMING EVIDENCE THAT TRI-GEMS WAS OVERPAID .......... 9

A. The Two Lyman Reports .......... 13

B. Potential Reductions to the Overpayment Claim .......... 16

C. U.S. Fire's Completion Costs .......... 19

D. The Government Has An Obligation To Properly Administer the Contract .......... 20

CONCLUSION .......... 23

# TABLE OF AUTHORITIES

## Cases

American Anodco, Inc. v. Reynolds Metals Co., 743 F.2d 417, 424 (6th Cir.1984) .................... 12

American Insurance Company v. United States, 62 Fed. Cl. 151 (2004)........................ 3, 6, 21,22

Argonaut Ins. Co. v. Town of Cloverdale, 699 F.2d 417, 419 (7th Cir. 1983)............................ 21

Balboa Ins. Co. v. United States, 775 F.2d 1158 (Fed.Cir. 1985)..................................7

Fireman's Fund Ins. Co. v. United States, 909 F.2d 495,498-499 (Fed. Cir. 1990)..................... 21

Insurance Co. of the West v. U.S., 243 F.3d 1367, 1371 (Fed. Cir. 2001)................................. 20

Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995)........................................................................................................................ 6

National Surety v. United States, 118 F.3d 1542 (Fed Cir. 1997)................................. 3,20,21,22

National Union Indem. Co. v. G. E. Bass & Co., 369 F.2d 75, 77 (5th Cir. 1966)...................... 20

Transamerica Premier Ins. Co. v. United States, 32 Fed.Cl. 308 (1994)...........................22

United Pac. Ins. Co. v. United States, 16 Cl. Ct. 555 (1989.....................................7,8,21

United States v. Ivy, 83 F.3d 1266, 1287 (10th Cir.1996)......................................................... 12

United States v. Reliance Ins. Co., 799 F.2d 1382, 1385 (9th Cir. 1986) .................................. 20

## Regulations

FAR § 52.235-5 .......................................................................................................... 5

## PRELIMINARY STATEMENT

The Government, in its Post Trial Brief, has submitted 143 proposed findings of fact in connection with this case. It is respectfully submitted that most of those proposed findings are irrelevant to the relatively narrow issue presented. The sole factual issue presented in this case is, succinctly stated, whether the Air Force overpaid Tri-Gems for the work which it performed in connection with the project. At the time before and when Tri-Gems was terminated, the Air Force employees knowledgeable of the project and Tri-Gems performance in connection therewith unanimously indicated that the Air Force overpaid Tri-Gems in a very substantial amount. As set forth in our initial Post Trial Brief, this was conceded by Donald Bruce, the Contracting Officer, in several letters and his testimony (Trial Transcript ("Tr.") 312/7-24; 317/10-25; 342/4-10; Plaintiff Exhibit ("PX") 152, Bate No. 644; Joint Exhibit ("JX") 39, Bate No. 336-337). Mr. Lyman, until preparation of his report 6 years later, so indicated in his detailed 1998 report (JX 46, Bate No. 420-427) as well as in prior correspondence (See PX 147, Bate No. 631; JX 13, Bate No. 77-78) which the Government conveniently ignores. Mr. Lyman's report indicated that the inspector on the project, Airman Rodriguez, agreed with his analysis as did Mr. Ott, the new Inspector. That was after the 3 of them performed a detailed 3 day inspection of the project. (JX 46, Bate No. 420). When that report was later discussed with others from the contracting office, all were in agreement. (Testimony of Donald Bruce, Tr. 312, lines 7-17) Captain Baxley, from the Air Force's Law Department, also joined in that position based upon an undiscovered "audit", which is either what the Government's legal arm then classified the 1998 Lyman Report as or some other unknown more compelling report that constituted an actual "audit." (PX 169, Page 2, Bate No. 706).

The Government, at this time, asks this Court to ignore all of the admissions identified in our brief and find that the report which Mr. Lyman performed more than 6 years later, allegedly on his own even though he directed it to an attorney (See Tr. 728/12-17 and DX 286, Bate No. 1574-1577), is the accurate version. The only other evidence presented by the Government was the testimony of Diana Bunting, an auditor whose audit report was prepared but not introduced into evidence by the Government and who admitted that she did not analyze the issue of overpayment which was presented to the Court because even though the technical arm requested her assistance, the technical arm did not provide her with assistance when she requested same in an effort to perform the analysis of the surety's claim. (Tr. 719, Ln 4-18)

Essentially, the Government is attempting to rewrite history by indicating that all of the prior admissions were based upon Mr. Lyman's "off the cuff" statement and therefore they should be disregarded. In that regard, it should also be noted that Mr. Spinelli testified that the Lyman Report was consistent with his observations. (Tr. 657, Ln. 24-659, Ln. 11); that he met with Mr. Lyman in 2002 who confirmed/admitted that his report was accurate (Tr. 614, Ln. 3 – 616, Ln. 16), and that the input which he received from the completing contractor, Eastern, which was included in a letter that was introduced into evidence without objection, (PX 174, Bate No. 748) was consistent with Mr. Lyman's report as well. It is respectfully submitted that this Court should not countenance this attempt to "cover up" that which the Government previously conceded.

**POINT I**

**THIS COURT POSSESSES JURISDICTION OVER THIS MATTER**

After the Government moved to dismiss this case for lack of jurisdiction, this Court rejected the Government's arguments and held that jurisdiction existed. The plaintiff did not contend then nor has it ever contended that it requested the Air Force to cease making payments. Unlike the Government, the surety is not seeking to rewrite history.

The Government now contends that this Court's decision was wrong and that this Court does not possess jurisdiction over the subject matter here. The Government bases its position on the fact that the surety did not request it to cease payment. It also contends that there is no contract provision here that required the Contracting Officer to pay only for work performed and/or performed in accordance with the contract. While the surety disagrees as to the contract language, it is respectfully submitted that this Court possesses jurisdiction over the suit here even if the Government were correct as to the contractual provisions.

In its pre-trial submission, the Government relied heavily upon American Insurance Company v. United States, 62 Fed. Cl. 151 (2004). In that case, the Court clearly exercised jurisdiction and granted the Government's motion for summary judgment. There, as here, the surety had not provided notice to the Government requesting nonpayment. In contrast, there the surety actually asked the Government to continue making payments to its principal.

In American Insurance Company, the Court ruled that there were no contractual provisions such as in National Surety v. United States, 118 F.3d 1542 (Fed. Cir. 1997) which mandated that the Government retain a certain sum. Nevertheless, the Court focused upon the Contracting Officer's exercise of discretion, stating that "various cases suggest that if the Air Force abused its discretion in making progress payments that too could be viewed as an

impairment of plaintiff's suretyship and give rise to damages." American Insurance Company v. United States, 62 Fed. Cl. 151, 157 (2004). While we will further address below the issues as to the contractual provisions pertaining to payment and the Contracting Officer's exercise of discretion, it is respectfully submitted that this Court clearly possesses jurisdiction over this matter irrespective of its findings as to the contractual provisions regarding payment.

## POINT II

## THE GOVERNMENT HAD THE DUTY TO ONLY PAY FOR WORK PERFORMED IN ACCORDANCE WITH THE CONTRACT AND/OR TO PROPERLY EXERCISE ITS DISCRETION, WHICH IT DID NOT DO

The Government now contends that the Contracting Officer had no duty to pay Tri-Gems only for work completed and which conformed with the contract documents. Initially, it should be noted that this is directly contrary to the testimony of its own representatives. In that regard, Donald Bruce, the Contracting Officer, testified that payments to the contractor should have been made only for work performed in accordance with the contract. (Tr. 315/17-23; JX 38, Bate No. 333). Further, Mr. Lyman, the government's expert, also so testified (Tr. 408/9-23) Once again, the Government is attempting to ignore admissions of its own representatives, even though one was the Contracting Officer who issued the letter terminating Tri-Gems and the other was the Government's expert witness.

As to the contract provisions, those have been reviewed on pages 4 through 6 of our initial Post-Trial Brief and will not be repeated here, with one exception. Pursuant to FAR § 52.235-5, the Air Force was to make "payments monthly as the work proceeded, or at more frequent intervals as determined by the Contracting Officer, on estimates of work accomplished which meets the standards of quality established under the contract." Here, as set forth in the 1998 Lyman report, letters from Contracting Officer Donald Bruce; a letter from the Government's then attorney, Captain Baxley and an email from Mr. Lyman, all of which have been addressed on pages 7, 15, 18 and 34 of our initial Post-Trial Brief, payments were made for work that did not conform with the contract. It is respectfully submitted that this provision, especially when combined with the other provisions to which reference is made on pages 4

through 6 of our initial Post-Trial Brief, required that payments be made only for work performed and that the work performed must be in accordance with the contract. In other words, it is respectfully submitted that the understandings of Mr. Bruce and Mr. Lyman to which reference is made above were accurate and consistent with the contract.

The contract includes multiple provisions dealing with the respective obligations of the Government for the inspection and payment to Tri-Gems. The Government prefers to only focus on certain provisions to the detriment of others. However, it is a "cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other." Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). Accordingly, the Government had an obligation to pay for work accomplished that complied with the contract and specifications.

Further, even if this Court disagrees and determines that none of the contractual provisions were mandatory, the issue then becomes whether the Contracting Officer properly exercised his discretion. American Insurance Company v. United States, 62 Fed. Cl. 151 (2004) In that case, the Court determined that the surety had not submitted any information suggesting that the contracting officer had abused his discretion. There, the surety alleged that the contractor had been paid 96% of the funds but had only completed 80% of the work. There was no allegation presented as to work not being performed in accordance with the contract. The Government, in contrast to its position here, expressly contended that it had intentionally overpaid due to the fact that the contractor was short on capital and the Government had an interest in keeping the project moving. In addition, there were facts indicating that the surety had promised the Government that it would assist the contractor financially with respect to completion and it had requested that the Air Force continue to make payments to its principal.

In contrast here, given Mr. Bruce's testimony, it is clear that the contracting officer did not intentionally exercise discretion so as to overpay Tri-Gems. The Government has not submitted any evidence to the contrary. Furthermore, here, the surety did not ask the Government to continue making payments and did not promise to support Tri-Gems with respect to completion. Further, here, based upon the Lyman report, the Lyman email as well as the letters authored by Mr. Bruce and Captain Baxley, the overpayment ranged from more than 100% in excess of the properly completed work to all of the funds being improperly paid as reflected in Captain Baxley's letter. (PX 169, Bate No. 706). Clearly, here, there has been no justification submitted for the overpayment nor can there be any justification for an overpayment of that magnitude.

Another case which also merits review here is United Pacific Ins. Co. v. United States, 16 Cl. Ct. 555 (1989) in which the Court ruled that the Air Force was liable to the surety for an overpayment due to the Contracting Officer's abuse of discretion. In that case, the Court indicated that "It is generally accepted that progress payments are issued only for work which has already been completed." Id. at 560. The Court there reviewed factors set forth in Balboa Ins. Co. v. United States, 775 F.2d 1158 (Fed. Cir. 1985) as to discretion. While, like here, there was no notice from the surety, the Court's review of the facts indicates that that was not as compelling a case as is true here. Here, the Government was aware of problems with Tri-Gems' performance from the start. (Tr. 152, ln. 12-21, See also references to problems indicated on page 7 of our initial Post Trial Brief), so much so that Mr. Lyman indicated that Tri-Gems was defrauding the Government. (JX 13, Bate Nos. 77-78). Here, the payments were ongoing through the course of the project. The contract here was completed by the surety. Tri-Gems also did not pay at least one major supplier which sued Tri-Gems and U.S. Fire (Joint Stipulation of

Facts (JSF) 53-58). The Government's admitted overpayment was, at a minimum, inconsistent with the contract provisions cited on pages 4-6 of our initial Post-Trial Brief and the completion work was performed at a cost well in excess of the remaining contract funds ($930,000 versus less than $200,000 remaining). Thus, this is even a far more compelling case for finding an abuse of discretion than was United Pacific, where the Court also considered the equities, which here clearly favor U.S. Fire.

## POINT III

## THE GOVERNMENT HAS NOT UNDERMINED THE OVERWHELMING EVIDENCE THAT TRI-GEMS WAS OVERPAID

As set forth in our initial Post-Trial Brief, the evidence of substantial overpayment by the Air Force to Tri-Gems is overwhelming. As set forth above, in addition to the 1998 report of Mr. Lyman, there was the email from Mr. Lyman (PX 147, Bate No. 631); the letters from the Contracting Officer, Donald Bruce (PX 152, Bate No. 644; JX 39, Bate No. 336-337) and the letter from Captain Baxley, then counsel for the Air Force (PX 169, Bate No. 706). In fact, four years after the 1998 report was written, Mr. Lyman confirmed to Mr. Spinelli that his 1998 report was accurate in spite of pressure on Mr. Lyman from the then counsel for the Air Force. (PX 174, Bate No. 747-748; Tr. 165/3-17). If all of those admissions were somehow still viewed as insufficient, Mr. Spinelli, an architect, testified that the report was consistent with his observations before Eastern started work (Tr. 657/24 – 658/7) and that the 1998 report was consistent with the experience of Eastern as reported to him. (PX 174, Bate No. 748)

Even if, as suggested by Mr. Lyman, he had not considered the progress schedules or progress reports when preparing his report (Tr. 433/17-21), the report was based upon a visual inspection of the project involving 9 man days (3 men over 3 days). As the project engineer, Mr. Lyman knew the project and was certainly qualified to assess the percentage of completion based upon that knowledge and based upon his own visual observations of what had actually been installed and what needed to be reworked.

That report was provided to the plaintiff as part of its investigation after the termination of Tri-Gems from this project. (JSF 42). The Air Force contends that the surety did not advise it

that the report would be included in its bid package and the surety did not discuss the report with it before relying upon it. However, the report is clear. According to Mr. Lyman, it was prepared to advise Mr. Ott, the new inspector of the status of the project. (Tr. 421/6 – 422/2).(However, see also JX 36, Bate No. 329 in which Joseph Flemming states that Mr. Ott and SrA Rodriguez have been tasked to develop a punchlist and scope of work for the bonding company). Clearly, anyone reviewing the report should be able to understand what it so clearly states. As Mr. Spinelli testified, if the surety had not provided that document to a completion contractor who had not taken into account the remedial work identified in that report and subsequently learned of its existence, U.S. Fire would have exposed itself to a fraudulent concealment claim or fraudulent misrepresentation claim. (Tr. 613/8-16). If such an important document provided by the Air Force was inaccurate, clearly, the Air Force should have so advised the surety, instead of confirming as much as 4 years later that it was accurate. (PX 174, Bate No. 747-748; Tr. 615/3-17).

Once again, the Government seeks to rewrite history by indicating that TriGems may have performed additional work after Mr. Lyman's 1998 report. First, the last payment request from TriGems is dated November 19, 1997 and pertains to work performed through September 25, 1997. (JX 61, Bate 513). Secondly, Mr. Bruce, the Contracting Officer, in his Final Decision terminating TriGems, stated as follows:

> On 17 April 1998, you were put on notice by the Contracting Officer that you would be permitted to continue performance of the contract from the 16 December 1997 date to 17 May 1998. You were advised that if you failed to complete the remaining work on the contract within that timeframe, the Government would be within its rights and would exercise its rights pursuant to the Termination For Default Clause and the law. As of this date, you have failed to make any further progress.... [emphasis added] (JX 39, Bate 337)

Before U.S. Fire undertook completion of the Project, it placed the Air Force on notice of the overpayment issue and all parties agreed to reserve their rights regarding the overpayment until a later time. (JX 56, Bate 493 and 495, paragraph 9) The Air Force knew that U.S. Fire's overpayment claim (based upon the claim itself, PX 170, Bate No. 708-739) was based upon the conclusions raised in Mr. Lyman's report; yet it never advised U.S. Fire that a mistake was made and that U.S. Fire should not consider the report accurate until it provided the 2004 report of Mr. Lyman in 2005 in connection with this litigation. In fact, as noted previously, Mr. Spinelli and another electrical engineer from his office met with Mr. Lyman who confirmed the accuracy of the 1998 report. (PX 174, Bate No. 747-748) The Government now challenges statements in Mr. Spinelli's 2002 letter (JX 174, Bate No. 747-748) as hearsay which should be excluded as facts upon which an expert opinion was based. However, the Government, in so contending, ignores the fact that the Court questioned whether the exhibit was really an expert report or was merely a letter from Mr. Spinelli, (PX 174 Bate No. 747-749; 615, lines 3-17) and admitted it without objection as a letter, not a report. The colloquoy was as follows:

> MR. DREIFUSS: Okay. Your Honor, I would move that into evidence.
> THE COURT: Any objection? You've got a hearsay objection noted.
> MR. MORAN: Your Honor, I believe that Mr. Dreifuss and I have agreed that expert reports would be admitted as expert reports with Mr. Lyman's report coming in and a later time.
> THE COURT: Well, this is a letter, right?
> MR. MORAN: Right, but it's also a report that he did as an expert.
> THE COURT: Okay. So even though it's a letter, you're considering it the expert report?
> MR. MORAN: Right, because it's prepared during the course of litigation.
> THE COURT: So you're calling this part of the expert report? Is that how you're -- it's listed here as a letter, not as the expert report, so I'm just trying to understand exactly what's going on.
> MR. MORAN: I would not consider it to be a business record because it's something that was prepared during the course of litigation, so I don't think it would be admissible as a business record, but we can admit it as an expert report.

MR. DREIFUSS: What this was, Your Honor, was a letter that was prepared while we were having ongoing meetings with the government before we filed this action, but the government was evaluating our claim. I don't have a problem --

THE COURT: I'll admit it as a letter.

(The document referred to, previously identified as Plaintiff's Exhibit No. 174, was received in evidence.)

THE COURT: It is what it is. It's not an expert report, but you have no objection then to letting this come in?

MR. MORAN: No, Your Honor.

(Tr. 617/5 – 618/17.)

In addition, the position taken by the Air Force that U.S. Fire's expert Michael Spinelli had not visited the project before Eastern was retained is misleading in that it was unrefuted that Mr. Spinelli was at the site before Eastern started work and had the opportunity to review the conditions at the Project. Mr. Spinelli further confirmed that his review was consistent with the observations noted by Mr. Lyman. (Tr. 657/24 – 658/7) Mr. Spinelli also interviewed Eastern who confirmed that the conditions at the Project were consistent with the observations of Mr. Lyman. (PX 174, Bate Nos. 747-749)

Federal Rule of Evidence 103(a) requires a timely objection or motion to strike. The Government appears to now object to PX 174 in which Mr. Spinelli recounts some meetings he had with Mr. Lyman and Luis Bolanos of Eastern. (Government brief at page 55.) However, the record is devoid of any objection to the admission of this exhibit. To the contrary, as quoted above, counsel for the Government consented to its admission. (see generally, Tr. 615/18-618/17, in which the contents of PX 174 are discussed and the letter is admitted into evidence). Since the Government stipulated to the introduction of the document into evidence, it has waived any objection it may have had to the exhibit itself. <u>American Anodco, Inc. v. Reynolds Metals Co</u>., 743 F.2d 417, 424 (6th Cir.1984); <u>United States v. Ivy</u>, 83 F.3d 1266, 1287 (10th Cir.1996).

The Government continually tries to distance itself from the 1998 Lyman report. It further attempts to argue that Captain Baxley's letter to Tri-Gems bankruptcy trustee was drafted

independent of the Lyman report despite the similarity to the percentages of completion and the need to repair a substantial portion of the work. (PX 169, Bate Nos. 705-707) The Government would have this court believe the letter was based upon some audit that is not part of the record. (Brief ¶ 96.) If there was a separate audit, it only further confirms the overpayment and suggests that our damage claim should be substantially more. Once again, the Government did not object to Plaintiff's Exhibit 169 being placed into evidence.

The Government requests that the Court draw a negative inference from the failure of U.S. Fire to introduce testimony and documents from Tri-Gems, the Megan Group, Mr. Weaver or Eastern. (Government's Brief at page 54.) However, the Government fails to specify what evidence should have been obtained from them. There was no basis for U.S. Fire to be required to call any of these witnesses. If the Government had thought any of this testimony was crucial, it could have called any of these witnesses as part of its case. Furthermore, despite the assertion by the Government of a failure to introduce documents, there are clearly an abundance of documents entered into evidence both to and from Tri-Gems as well as a proposal from the Megan Group (DX 264, Bate No. DX 264-DX 264/4) and Eastern's Final Invoice (PX 171, Bate Nos. 740-742) There is no basis for a negative inference to be drawn as a result of not calling any of these parties.

In contrast, the Government failed to introduce the audit of Ms. Bunting, in spite of her testimony about it, and/or to call Captain Baxley who wrote to Tri-Gems Bankruptcy's Trustee about the strength of the Government's case for defaulting Tri-Gems and the amount of the overpayment. (PX 169, Bate Nos. 705-707) That does justify a negative inference.

**A. <u>The Two Lyman Reports</u>**