The Government differentiates between the 1998 Lyman report and the 2004 Lyman report on the theory that the first report failed to include material purchases by Tri-Gems. Although the applications for payment do include a line item for material valued at 22% of the entire contract (JX 61 at Bate No. 536), the installation of any of the work necessarily included the materials. Therefore, when Mr. Lyman and 2 inspectors visually inspected the project and noted the extent of the work performed and what needed to be reworked, and that report was reviewed and agreed to by members of the Contracting Office, he necessarily accounted for the materials. Certainly, someone from the Contracting Office would have otherwise disagreed since their reaction should have been to justify the payments they had made. Furthermore, no one testified that Tri-Gems had stockpiled materials on the Project and that Mr. Lyman failed to consider those stockpiles in his calculation. Again, Mr. Lyman knew this Project and stated in no uncertain terms that only 60% was completed. That 60% included the materials that had been paid for by the Government.

Further, as stated above, Mr. Spinelli and Eastern confirmed the accuracy of the 1998 report as stated. Certainly, Mr. Spinelli took into consideration the materials when he so testified. Further, there were not a great deal of materials left over to contend that the Government should receive a credit for. As Mr. Spinelli testified, there was no significant amount of materials left at the site by Tri-Gems. Mr. Spinelli testified as follows:

> A I have no specific recollection of significant materials. Typically, if there are significant materials we address them in our invitation to bid. We have a whole section on available materials in the invitation to bid, and we tell the potential completion contractor that to the extent that there are materials available on site, they are free to use them at no cost.
>
> But that they have to evaluate those materials and determine whether or not those materials are good materials or bad materials or defective if the surety doesn't make any representations. Usually if it's just miscellaneous material laying around, that cause is sufficient.

> If there are significant items of any consequence or value, we'd try an inventory and make it an exhibit to the invitation to bid to call to the attention of the bidders.
>
> Again, if I have material that has a value on site, and I can bring it to the attention of the bidder, it would more than likely result in a lower completion cost to the surety. So I would point that out to the bidder that there was material on site.
>
> Q And I think you may have said this in the first part, but just to be clear, was there material, more than possibly some miscellaneous items on this particular project when you went there?
>
> A I don't recall any significant material on site other than some miscellaneous items, and I can't even recall what those miscellaneous items were.
>
> Q Okay. But what you're saying is if it was significant, you would have put it --
>
> A I would have put it in the invitation to bid.
>
> (Tr. 627/3- 628/9).

The invitation to Bid was entered into evidence (JX 39-54, Bate Nos. 334 to 337) and there is no listing of materials on the site. By contrast, there is nothing in the Lyman report nor in any progress report or daily report noting the storage and placement of significant materials on the site. The material storage claim found in the 2004 Lyman report came about because of the need to somehow cover-up the overpayment and attempt to offer a plausible explanation as to how the amounts paid to Tri-Gems and the 1998 Lyman report were in agreement.

The 2004 Lyman report (DX 286, Bate No. DX286 - 286/4) started with the presumption that the 1998 report was inaccurate and then began with a review of the requests from Tri-Gems for payment which formed the basis for the payments made to Tri-Gems. This was not some independent review of the numbers but was undertaken by the person who most needed to establish the inaccuracy of his own 1998 report. The "weighted" approach employed by Mr. Lyman the second time around was to bolster the percentage completed by increasing the value of the materials as a percentage of the items completed as well as other work items. (See PX 177, Bate No. 756-758; PX 178, Bate No. 759 - 763). As the cross-examination of Mr. Lyman

clearly disclosed (Please see Cross-examination beginning at Tr. 857), the weighted approach had no basis in fact since the "weight" of the items changed repeatedly even though the scope of work did not change. As set forth in our initial Post Trial Brief on pages 26-28, Mr. Lyman's attempt at this approach of starting with the last requisition and using the "weights" therein means that, in 2004, he started with the Air Force's final position and attempted to back his way into justifying that position in order to attempt to undermine or cover-up his prior report prepared six years earlier after 9 man days of effort and as to which all who reviewed it were then in agreement. Clearly, the visual inspections by Mr. Lyman with the intimate knowledge he had about the Project at the time he prepared the 1998 report is patently more reliable and credible than the 2004 report prepared to correlate the payments that were made to Tri-Gems. The percentage of completion he assigned to the work he and the two government inspectors visually observed was not "off the cuff." As Mr. Spinelli observed, that is simply just something engineers do not do after an inspection. (Tr. 615/18 – 616/16). Frankly, it is respectfully submitted that such a position is not only a cover-up, but should be offensive to the intellect of all included. It is respectfully submitted that the 2004 report is totally devoid of credibility.

**B. <u>Potential Reductions to the Overpayment Claim</u>**

The overpayment claim at issue is based upon the amount which Tri-Gems should have been paid as compared to what it was paid for work properly completed in accordance with the contract and specifications. The issue is how much money should have been available to the plaintiff after the termination of Tri-Gems' contract.

In our initial claim, we also alleged that the Government had caused the work in question to exceed the penal sum of the bond due to the change orders issued as well as the corrective work that was required. It was against that portion of the claim that the Government would have

been entitled to a credit for the remaining contract funds that were actually paid to the surety. However, the surety is not pursuing that claim at this time and that claim was not developed in any great detail during the trial. As to the overpayment claim which is being pursued, the Government is not entitled to a credit for the remaining contract funds because the issue is "overpayment." By definition, funds that were not paid do not comprise any portion of the overpayment. The allegation is not that 100% of the funds were paid, but rather the math is based upon Mr. Lyman's 1998 report which indicates that 86% was paid. Therefore, the Government is not entitled to a credit or reduction against the "overpayment" claim.

Based upon the admissions of the Government's representatives, the amount which should have been paid to Tri-Gems is 40% of the adjusted contract balance of $1,484,196.00 (JX 56, Bate No. 493) or $593,678.40. The actual amount paid to Tri-Gems was $1,285,429.39.(DX. 170.) Had Tri-Gems been paid only for the work properly completed in accordance with the contract and specifications as attested by the Government, the plaintiff should have been paid by the Air Force an additional $691,750.99 in contract balance over and above the contract balance of $198,766.61 (while not all of this actual balance was paid to the surety due to claims of the Department of Labor and/or liquidated damages, we are providing the Air Force with a credit for the full amount that remained at the time of takeover). It cost U.S. Fire $930,000.00 to complete the Project (JX 55, Bate No. 475-492) against which it could only collect the $198,766.61. Consequently, the entire overpayment of $691,750.99 damaged U.S. Fire.

The Government stated that U.S. Fire's claim should be reduced because of a payment to U.S. Fire in the amount of $100,165.50 (Government's Brief ¶ 130 at page 37). As set forth in the Takeover Agreement (JX. 56, Bate Nos. 493-497) the available money at the time of the takeover was $198,642.61 before the aforementioned deducts. As set forth on U.S. Fire's Invoice

No. 1, the Government's deductions left a total of $101,177.27 for payment (PX 171 at Bate Stamped No. 742). As set forth above, upon completion of the Project, U.S. Fire was entitled to the remaining contract balance. Therefore, the payment of $100,165.50 does not reduce the overpayment claim.[1]

In an effort to further dilute U.S. Fire's claim, the Government asserts that somehow the $5,000.00 collected from the Indemnitors should reduce U.S. Fire's claim. (Government's Brief at Page 63). The Indemnity Agreement executed by the Indemnitors required them to hold harmless and indemnify U.S. Fire for all costs and expenses, including attorneys fees, sustained as a result of the issuance of any bond. (JX 1 at Bate Nos. 13-15). Therefore, this recovery offsets the costs and expenses incurred by U.S. Fire in pursuit of that money which substantially exceed the $5,000.00 (Please see JSF 70).

The Air Force attempts to establish that Tri-Gems was not overpaid not by way of showing that the amounts paid were consistent with the work performed but by insinuating that somehow Tri-Gems underbid this Project by its request for an additional $320,000 for encasing some conduit in concrete. See Air Force Brief at ¶¶ 16, 17, 18, and 24. There is absolutely no testimony or documentary evidence for this Court to conclude that Tri-Gems underbid this Project. The fact that a contractor submits a request for additional compensation based upon a discrepancy in the contract documents is not evidence that the item was missed at the time of the bid. Given the bidding requirements that a contract be awarded to the lowest responsible bidder a savy contractor may use an issue such as this to try to obtain more money which if approved would be purely profit. Without evidence to the contrary, the Air Force is not able to establish that the request for additional money had an impact on the bid price submitted by Tri-Gems.

[1] We cannot explain the difference between the remaining funds of $101,177.27 and the payment of $100,165.00.50. No claim is submitted as to same.

Even assuming Tri-Gems underbid this Project, the bid price still represented 100% of the amount of work to be performed and the amounts paid by percentage still had to match the percentage of work accomplished. Furthermore, the amounts sought are based upon the value of Tri-Gems contract regardless of whether it should have been $320,000 higher or not.

### C. <u>U.S. Fire's Completion Costs</u>

Finally, the Government attempts to assert that U.S. Fire overpaid Eastern for the completion work. However, as set forth in our supporting brief, Ms. Bunting lacked the technical expertise so she never conducted an audit of the claim; she was unable to obtain technical assistance from other Air Force personnel, failed to obtain complete records and failed to take into account other factors such as Eastern's presence on other projects at the base that may have impacted its overhead. Ms. Bunting also contended that certain costs were somehow not allocable to this Project (Tr. 715/15-16). Because Eastern's contract was with U.S. Fire there was no reason for Eastern to contest or otherwise attempt to disprove any of Ms. Bunting's conclusions. More importantly, the audit conducted by Ms. Bunting was never placed into evidence and an adverse inference certainly should be drawn from the failure to submit the auditor's audit report.

Furthermore, U.S. Fire solicited bids for the completion of the Project and Eastern was the lowest. Eastern was a subcontractor to U.S. Fire and U.S. Fire made no profit on this Project. No evidence indicating that this was erroneous was introduced by the Air Force. U.S. Fire had no control over the rate of profit, if any, nor did it matter to U.S. Fire because the goal was to obtain the lowest price to minimize U.S. Fire's losses. In the final analysis the issue is not what U.S. Fire paid to Eastern but whether the Government properly paid Tri-Gems for the work it completed.

### D. The Government Has An Obligation To Properly Administer the Contract

The Government fails to distinguish between the claims it might have against Tri-Gems for defectively installed work and its own obligations to monitor and pay only for "work accomplished which meets the standards of quality established under the contract." FAR 52.232-5. U.S. Fire does not dispute that had Tri-Gems remained on the Project it would not have been relieved of the obligation to make the necessary repairs and/or repay the money it was paid for the defective work as set forth in the subsections of FAR clause 52.232-5. However, this does not relieve the Government of its own obligation to properly administer the contract and to not prejudice the surety's rights. It merely provides a measure of protection if certain events unfold. As the Court noted in Insurance Co. of the West v. U.S., 243 F.3d 1367, 1371 (Fed. Cir. 2001)"the ultimate factual question to be resolved by the trial court is whether a payment to the contractor rather than the surety 'was a reasonable exercise of the discretion conferred on the contracting agency by the terms of the contract and the applicable law and regulations.' Balboa, 775 F.2d at 1165. If the contracting officer did not act reasonably, the surety could recover against the government."

"During the performance of the contract, the Government has a duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other problems encountered in the administration of the contract." National Surety v. United States, 118 F.3d 1542, 1546 (Fed Cir. 1997). Where there has been a material departure from contractual provisions relating to payments, a surety is discharged from its obligations on the performance bond to the extent that such unauthorized payments result in prejudice or injury. National Union Indem. Co. v. G. E. Bass & Co., 369 F.2d 75, 77 (5th Cir. 1966); United States v. Reliance Ins. Co., 799 F.2d 1382, 1385 (9th Cir. 1986). The reasoning is that unauthorized advances reduce

the principal's incentive to complete the contract, which increases the surety's risk, as well as the cost of the surety's substitute performance. Argonaut Ins. Co. v. Town of Cloverdale, 699 F.2d 417, 419 (7th Cir. 1983). By showing that the Air Force departed from its contractual obligations, U.S. Fire may recover the losses suffered as the result of the impairment of its rights under the bonded contract. This Court has jurisdiction over such causes of action. Courts have consistently acknowledged that a surety may recover for such claims irrespective of notice. National Surety v. United States, 118 F.3d 1542 (Fed Cir. 1997) (recovery permitted where government disbursed improper payments prior to notice); American Insurance Co. v. United States, 62 Fed. Cl. 151, 156 (2004) (acknowledging that "a surety may, without providing the requisite notice, recover against an obligee that impairs its suretyship status," but finding no impairment in that case) (emphasis added); United Pac. Ins. Co. v. United States, 16 Cl. Ct. 555 (1989) (despite absence of notice, surety permitted to recover progress payment made by government in violation of the contract's payment provisions).

The Government would have this Court rule that a proper reading of the applicable FAR clauses permits overpayments in all cases because the same FAR clauses provide protection to have the work repaired or have the money repaid. It is respectfully submitted that this is a far too narrow interpretation of the applicable FAR clauses and is without regard to the multitude of cases that require the Government to exercise reasonable discretion so as to not impair the surety's rights. See American Insurance Company v. United States, 62 Fed. Cl. 151 (2004).

The Government also contends that the Government, as an obligee to a surety bond, owes no equitable duty to a surety like U.S. Fire in the absence of notice to the Government that the principal has defaulted under the bond because the surety protects the Government, not the other way around. Fireman's Fund Ins. Co. v. United States, 909 F.2d 495,498-499 (Fed. Cir. 1990).

In Transamerica Premier Ins. Co. v. United States, 32 Fed.Cl. 308 (1994) the court disagreed and held that Fireman's Fund "was intended to address the specific facts before the court rather than to proclaim a rule of universal application that would displace, without comment or discussion, the principles adhered to in earlier cases. It cannot be assumed that the Court would overturn so impressive an array of long standing precedents or depart from a position so firmly established without expressing its intention so to do and the reasons therefor in plain and explicit terms." Id. at 315. Also, that the Government has a duty to a surety has already been determined in National Surety v. United States, infra; American Insurance Co. v. United States, infra and other cases previously cited.

The Government owed a duty to U.S. Fire to properly administer the contract and to pay for work accomplished in accordance with the contract and specifications regardless of any notification from U.S. Fire of a default by Tri-Gems. The failure to conform to the contract requirements or to demonstrate that the payments were the result of some reasonable exercise of discretion entitles U.S. Fire to recover for overpayment. The manner in which U.S Fire proceeded here is not only consistent with longstanding surety law as recognized in the above referenced cases, but the Government should actually be pleased that the surety completed the project under a reservation of rights. In contrast, if this Court rules against the surety here in spite of the compelling evidence from the Air Force's own representatives, wherever there is an overpayment issue in the future the sureties will leave it to the Government to try to find the funds to complete and will assert overpayment as a defense. Therefore, not only is the surety's position consistent with the law and equity, it is also in furtherance of public policy.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter judgment in its favor.

Respectfully Submitted,

s/ David C. Dreifuss