**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| UNITED STATES FIRE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 03-2811C<br>(Judge Horn) |

**SUPPLEMENTAL BRIEF ON BEHALF OF PLAINTIFF, UNITED STATES FIRE INSURANCE COMPANY, AFTER SUMMATIONS**

DREIFUSS BONACCI & PARKER, LLP
26 Columbia Turnpike
Florham Park, NJ 07932
Tel: (973) 514-1414
Attorneys for Plaintiff

On the Brief: David C. Dreifuss, Esq.
Derek A. Popeil, Esq.

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** .......... 2

**ANALYSIS** .......... 5

A. Materials .......... 5

B. Trenching .......... 8

D. Pull Wire and Cable .......... 11

E. Manhole and Pads .......... 13

F. Transformers .......... 14

G. Materials – Additional Comments .......... 14

H. Summary .......... 15

**CONCLUSION** .......... 16

**PRELIMINARY STATEMENT**

As directed by the Court after the summations, this Supplemental Brief is submitted to address the issues raised by the Court in its Order dated April 20, 2006. It is respectfully submitted that the analysis set forth herein supports the surety's claim that the Government substantially overpaid TriGems, as admitted by various governmental representatives, including the Contracting Officer. As to the amount of the overpayment, we respectfully submit that the best evidence remains Mr. Lyman's first expert report (JX 46/419-427) as confirmed by the completion contractor, Eastern, as well as by Mr. Spinelli. (Tr. 614/ 3 – 616/16; PX 174/747-749).

The documentation consisting of the requisitions from TriGems as well as the payment history establish a significant overpayment, especially when compared to other exhibits marked during the course of the trial as well as trial testimony. This evidence, it is respectfully submitted, is consistent with an overpayment of the magnitude to which the Government representatives, including Mr. Lyman, the Government's engineer, and Donald Bruce, the contracting officer, expressly and unequivocally indicated in their reports/letters and trial testimony. (See Tr.312/7-24; 317/10-25; 342/4-10; PX 152/644; JX 39/336-337; JX 46/420-427; PX 147/631; JX 13/ 77-78).

The analysis of the requisitions and payment history as well as related documents is relatively complex for several reasons. First, the requisitions from TriGems do not necessarily match reality. The requisitions included percentages or weights for each of the line items. If TriGems added a line item or a change order amount was added, the percentages and dollars associated therewith changed even though the scope of the work did not necessarily change. This will be established in detail in the analysis which follows. Mr. Lyman referred to the

percentages as weights with respect to each of the items of work (DX 286/1-4). As set forth in great detail during his cross examination, the weights changed on a number of occasions in the requisitions that TriGems was submitting even though the scope of work did not change. (See, for example, Cross-Examination of Steven Lyman at Page 876/12-17 (percentage change in trenching); Tr. 877/4-25 (same); Tr. 879/13- 880/12 (percentage change in conduit); Tr. 882/2-20 (pull wire and cable); Tr. 882/21- 883/6 (manholes and pads); Tr. 885/14 – 19 (transformers)).

Furthermore, Mr. Lyman's application of the weights in his second report (DX 286/1-4) was incorrect as established by Cashin Spinelli & Ferretti in its September 30, 2005 report (PX 178/759-763). Amongst the issues they raised is that Mr.Lyman, in his second report, used the wrong cable footage (off by over 35,000 linear feet-See Exhibit PX 178/761) for purposes of his calculations, made the wrong assumption as to which size cable required more effort to install (PX 178/762) as well as a number of other errors. In addition, his first report, based upon 9 man days of inspections and agreed upon by all Government witnesses who discussed it (See Tr. 383/16-19; 869/17-23) indicates that only 40% of TriGems' work had been performed in accordance with the contract. (JX 46/420). His second report, over 6 years later, indicates that more than twice that was performed properly or over 83% (DX 286/4). For Mr. Lyman and the Contracting Officer and the inspectors involved to all have erred in this 1998 contemporaneous report by over 100% (83% is more that twice 40%) defies reality.

As will be set forth in the analysis which follows, the proofs addressed herein clearly establish significant overpayments at certain times. For example, as set forth in the schedule of payments marked as DX 289, Invoice 6 was submitted on August 1, 1996 and signed by the contracting officer on August 6, 1996. This resulted in TriGems having been paid a total of 79% and included a 33% increase over the prior payment which involved a total of 46%. (DX 289)

That is the exact same time when Steven Lyman indicated in JX 13/77-78, that "the Contractor is failing to conduct under the subject contract" and "seems to do whatever he pleases." Lyman further stated in that document that "this Contractor is defrauding the Government and we must put a stop to it." At trial (Tr. 408/8-23), Mr. Lyman explained that what he meant by that was that "TriGems was not following the contract documents the way they were written in a lot of cases." Mr. Fleming testified that TriGems had a number of problems with its performance, particularly during the early portions, such as the first 6 months. (Tr. 352/14-353/18). Given the fact that TriGems began performing the contract in March of 1996 (Joint Stipulations of Fact No. 20), this payment of the 79% is also during that same time frame. It should also be noted that the payment of that requisition includes certain line items being paid at 100% when, in fact, the first Lyman report (JX 46/419-427) establishes that, in May of 1998, almost two years later, significant portions of that work had not been performed and/or not performed properly. Again, this will be analyzed in greater detail in the analysis which follows.

## ANALYSIS

The analysis directed by the Court is actually quite complex mathematically because the progress reports/requisitions include line items that are not explained in any detail and which are set forth in terms of percentages of the total job. These percentages change at various times during the course of the project based upon an addition of a line item, increases in the contract amount based upon change orders and other reasons never explained by the Government's representatives. We have attempted to address the relevant line items below which help to explain the significant overpayment that occurred here.

### A. Materials

As this Court may recall, the Government, in its briefs, attempted to indicate that the overpayment was not as significant as otherwise would have been due to the decision by the Contracting Officer to pay TriGems for materials, which were set forth in a separate line item as 22% of the contract amount. A review of the relevant documentation indicates that, when the government added the line item to address materials, and then paid TriGems for those materials, this comprised a significant overpayment.

The most detailed listing of "work elements" is that set forth on Progress Report 2 (DX 288/64-65). That incorporates 19 separate work elements. Upon review of other progress reports, such as report no. 3 (DX 288/62), it appears that the number of line items was reduced to 14. However, there is a clear correlation between the 2 reports. The following chart compares Report 3 (DX 288/62) by line item number, work element and percentage with the items apparently comprising the same elements from Report 2 (DX 288/64-65).

| Line Item | Matching of Work Elements from Report No. 3 compared to Report No. 2 | Percent of Total Job |
|---|---|---|
| 1. | Bond and Mobilization which is same for both reports | 5% |
| 2. | Trenching (same for both reports) | 15% |
| 3. | Conduit (Report 3) compared to deliver conduit and install conduit (Report 2) | 19% |
| 4. | Pull Wire and Cable (same for both reports) | 4% |
| 5, | Manholes and Pads (Report 3) Compared to deliver manholes and install manholes and pads (Report No. 2) | 4% |
| 6. | Transformers (Report 3) compared to deliver transformers and install transformers (Report 2) | 14% |
| 7. | Switches (Report No. 3) compared to install switches (Report No. 2) | 2% |
| 8. | Lighting Equipment (Report No. 3) compared to deliver lighting equipment, install lighting equipment and deliver wire and cable (Report No. 2) | 24% |
| 9. | Final Connections (same for Reports 2 and 3) | 2% |

| | | |
|---|---|---|
| 10. | Testing (same for Reports 2 and 3) | 2% |
| 11. | Demolition – (same for Reports 2 and 3) | 3% |
| 12. | Asphalt Paving (same for Reports 2 and 3) | 2% |
| 13. | Site Restoration; Seed (Report 3) compared to site restoration (Report 2) | 2% |
| 14. | Final Inspection (same for Reports 2 and 3) | 2% |

Thus, based on the more complete breakdown shown on Report 2 (DX 288/64 -65), it is clear that on Report 3 the line item identified as Lighting Equipment and valued at 24% included "deliver wire and cable" which was 15% of the contract amount as per Report 2. This is based simply upon a comparison of the 2 documents as reflected in the chart above. As of the time of progress report no. 8 (DX 288/51), when the Government for the first time added a separate line item for the materials described as "cable & manholes and pads (material)" the Government still maintained the "lighting equipment" line item at the 24%. It should also be noted that, as of progress report no. 8, TriGems was approved at 22 out of 24% or approximately 90% of that line item (DX 288/51). The Government also approved 100% of the "cable, manholes and pads," which meant that the Government paid twice for the cable which was already included in the lighting equipment line item. Since this line item was a substantial percentage of the entire contract, this was an overpayment comprised of approximately 15% of

the entire contract amount. Since these particular percentages remained throughout the course of the project, the 15% overpayment amounts to $222,209.40.

In addition, as set forth in Exhibit DX 288/64, 2% of the contract amount was set with respect to the delivery of manholes and a separate 2% was established with respect to the installation of manholes and pads. The combined total was 4%. The Government utilized that 4% even after it added, in progress report no. 8 (DX 288/51) the separate line item for cable, manholes and pads. Therefore, when TriGems was paid as a result of Requisition No. 12 (DX 289/13-15) for 100% of the "manholes and pads," it was paid double for the manholes and pads which were part of the two separate line items. Again, this was a clear overpayment. That 2%, which remained throughout, amounted to $29,627.92.

**B. Trenching**

The work element number 2 described as "Trenching" was assigned an initial value of 15% of the entire contract or $180,000.00. (DX289/53). On payment request 5 covering the period of June 15, 1996 to July 15, 1996 the Construction Inspector, Matthew Ward, SrA, certified that TriGems had completed 40% of the trenching or 6% of the 15% assigned to the trenching. Within 2 weeks TriGems submitted payment request 6 covering the period of July 16 to July 31, 1996 at which time the Government approved TriGems at 100% of the trenching. (DX 289/30-31). For unexplained reasons, the percentage assigned to the trenching was reduced to 10% of the overall contract or $130,423.60 even though there was no deduct change order reducing the scope of the trenching. [1] The Government then approved payment on the trenching as 100% complete and paid TriGems based upon that amount. ( DX 289 and 289/30).

[1] It appears that the Government created a new line items for Materials with a value of 22% and therefore, reduced some other line items to come up with 22%.

Subsequently, in or around March of 1997, the Government reduced the percentage assigned to the trenching work element to 9%. (DX 289/8). At this time Modification P00003 had been approved and increased the contract value by $177,874.00 for an adjusted contract value of $1,482,110.00. (JX 52/461). The value of the trenching according to the Government then became 9% of the new adjusted contract price or $133,389.90. In addition, the Government changed the percentage that TriGems had completed to 8% of the 9%, having a value of $118,568.80. This meant that on a pure percentage basis TriGems had been overpaid by $11,854.80 (the $130,423.60 paid on DX 289/30-31 less the $118,568.80). This assumes that TriGems actually properly completed 8/9 of the trenching and is particularly true because Mr. Lyman confirmed during his testimony that the amount of trenching remained the same from the beginning of the project until the end. (Tr. 877/4-25).

However, the dollar amount bears little resemblance to what was actually taking place at the site. On August 6, 1996, shortly after the Government approved 100% of the trenching (DX 289/30-31) Mr. Lyman authored a memorandum in which he noted numerous problems with the construction of the trenches. (JX 13/77-78). Importantly, as of this point in time Tri-Gems had been paid for 100% of the trenching. (Pay request 6 for the period ending July 1996, DX 289/30-31). Even more disturbing is Mr. Lyman's statement that: "There is plenty of trenching left to accomplish." (JX 13 at 78 in which he also concluded that TriGems was defrauding the Government). The Government paid for 100% of the trenching in spite of the fact that there was "plenty" more to be completed and the trenching performed was not done properly.

There are other instances contained in the record in which trenching was ongoing after TriGems had been paid in full for the trenching. A number of the daily inspection reports in

September and October of 1996 confirm ongoing trenching activities. (JX 15/97 -98, 108; JX 17/116).

All of this undercuts Mr. Lyman's second report which was based upon the last pay application (DX 286) because it shows that the amounts paid by the Government do not reflect the conditions in the field. Therefore, the first Lyman report (JX 46) which was prepared after a 3 day review of the site portrays a more accurate depiction of the actual field conditions at the time TriGems was defaulted and the amount of work that needed to be performed by US Fire. While US Fire denies that the second Lyman report is credible, the report concluded that US Fire completed 12.3% of the trenching. That would equate to an overpayment of at least $13,440.66.

**C. <u>Conduit</u>**

The work element number 3 described as "Conduit" was assigned an initial value of 19% of the entire contract or $228,000.00. (DX289/53). On payment request 5 covering the period of June 15, 1996 to July 15, 1996, the Construction Inspector, Matthew Ward, SrA, certified that Tri-Gems had completed 57% of the conduit or 11% of the 19% assigned to the conduit. Within 2 weeks Tri-Gems submitted payment request 6 covering the period of July 16 to July 31, 1996 (DX 289/30-31) which approved TriGems as completing 100% of the conduit. This would mean that in a 2 week span TriGems performed 43% of the conduit for the project in addition to the remaining 60% of the trenching. Again, this was at the same time that Mr. Lyman contended that TriGems was defrauding the Government and Mr. Flemming indicated there were problems with its performance. Similar to the trenching, the percentage assigned to the conduit was reduced from 19% to 15% even though there was no deduct change order reducing the scope of the conduit. (Compare DX 289/31 to 289/41). Either way TriGems received payment for 100% of the conduit (DX 289 and 289/40). Using the 15% as the revised value of that work element,

TriGems was paid $195,636.40. As of pay application 14 the percentage assigned to the conduit remained at 15% despite the fact that an additional $177,874.00 was added to the contract. (DX 289/2-3). Due to payment being made as a percentage of completion of the entire contract, the value of the conduit increased to $222,209.40 (15% of $1,481,396.00). Therefore, TriGems received an additional $26,573.00 along the way not because they performed any more work but merely because payments were made as a percentage of the entire contract.

Once again despite Tri-Gems having been paid for 100% of the conduit, there is evidence that work continued on the conduit. (See JX 17/129-130). Furthermore, Mr. Lyman testified that the surety contractor had to install conduit. (Tr. 738/8-10). If the incomplete and/or improperly completed work is considered to be as low as 1/3, the overpayment would be $73,329.10.

**D. Pull Wire and Cable**

The work element number 4 described as "Pull Wire and Cable" was assigned an initial value of 4% of the entire contract or $48,000.00. (DX289/53) On payment request 5 covering the period of June 15, 1996 to July 15, 1996 the Construction Inspector, Matthew Ward, SrA, certified that TriGems had completed 50% of this element or 2% of the 4% assigned to this element. (DX 289/41) Within 2 weeks Tri-Gems submitted payment request 6 covering the period of July 16 to July 31, 1996 (DX 289/30-31) which resulted in TriGems being approved at having completed 100% of the "pull wire and cable." TriGems was paid 100% for this line item or $52,169.44.

In or around March of 1997, modification P00003 was approved and this line item appears to have been increased to 8% or double its original value. (DX 289/8). Mr. Lyman testified that the amount of work to pull wire and cable did not double. (Tr. 882/2-20).

On the last approved pay request 14, Tri Gems had been approved for 6% of the 8%. (DX 289/2-3). However, prior to the addition but after TriGems had been paid for the initial allotted 4% for this line item, the daily inspection reports indicate that this work was continuing. (JX 17 at Bate Nos. 127, 132, 134-138; 142-143, 146; JX 18 at Bate Nos. 153 and 161). In addition to the continuation of this work after payment of 100% was approved, on March 31, 1997 Mr. Lyman identified that the primary circuit that was installed was improper and was "a single tape shield cable . . . with no neutral conductor." (JX 25/199) He concluded that the "contractor must be directed to install the full size concentric neutral cable as stated in addendum #2." Again in August of 1997 Mr. Lyman expressed concern that the primary cable that was installed was "not properly sealed" per the specifications and that the cables were "laying in water-filled manholes." (JX 29/264). In that same exhibit Mr. Lyman stated that because of the water problem TriGems should be told to forget installing the separate neutral conductor and replace the primary line with the proper neutral conductor.

Again on March 20, 1998, nearly one year after first identifying the problem, Mr. Lyman again stated that the primary cable was not terminated or sealed. (PX 147/631). He included this issue in his first report in May 1998. (JX 46/420). Despite the fact that the primary cable installed by TriGems did not have a neutral conductor and was not sealed per the specification, the Government approved an additional 2% for this line item after it was increased from 4% to 8% paying a total of 6% (or 75% of the line item) for a total of $88,883.76.

As Mr. Lyman confirmed, the "pull wire and cable" did not double yet the amount of money attributable to this item was increased from 4% to 8%. (Tr. 882/2-20; DX 289/53 vs. DX/289/4). Mr. Lyman concludes in his second report that the surety retained contractor installed 40.66% of this line item, or 15.66% more then the one quarter reportedly remaining.

(DX 286/2). He makes no reference to any wire or cable that the surety contractor had to replace. According to Eastern's application for payment, it included a line item to replace the HV cables. (DX 281/4).

Importantly, once again the last pay request on which Mr. Lyman based his final report is an inadequate tool for determining whether TriGems was properly paid because at one point Tri-Gems was paid for 100 percent of this line item, no additional work was added, then the percentage was increased yet the amount of the work remained the same and the surety was required by Mr. Lyman's own account to perform at least 40 % of this work.

Thus, at most, TriGems should have been paid to 60% of the 8% assigned to this work element or $71,107.01 of the $118,511.68. Therefore, the overpayment is at least $17,776.75 (the amount paid to TriGems $88,883.76 less $71,107.01).

**E. <u>Manhole and Pads</u>**

Work element number 5 was described as "Manhole and Pads" and was assigned an initial value of 4% of the entire contract or $48,000.00 (DX 289/53). That allocation is addressed in Subsection A above. On pay request number 6 Tri-Gems was approved for payment for 50% of this line item. (DX 289/31) As of pay request number 9 covering the period of September 17, 1996 to October 15, 1996 Tri-Gems was approved for 100% of this line item. (DX 289/17).

Again numerous deficiencies were identified with regard to the manholes and pads. On April 16, 1997 Mr. Lyman wrote that "many of the newly installed manholes and vaults have not been properly sealed." (JX 26/200). In Mr. Lyman's May 1998 report he stated that the manholes/vaults were never sealed and that all of the new manholes needed to be cleaned out. (JX 46/421; see also PX/147/631). Mr. Lyman also stated that the transformer pads were

improperly installed, many were broken and badly marked up requiring them to be repaired. (JX 46 at 422). Again, overpayment has been established.

If, as noted in Subsection A above, this line item is reduced to 2% and we generously conclude that TriGems properly performed 50% of the work, the overpayment would be $14,813.96 (1% of $1,481,396.00).

**F. <u>Transformers</u>**

Work element number 6 was described as "Transformers" and was assigned an initial value of 14% of the entire contract. (DX 289/53) On payment request number 6 the percentage assigned to this line item was reduced to 9% (DX 239/31) and by payment request 14 it had been reduced to 8% of which TriGems was paid 7% of the total contract value.(DX 289/4). In the May 1998 Lyman report he stated that only 20% of the grounding for the transformers was done. (JX 46/419-427) According to Eastern's pay application, it included at line item 12 the completion of the transformer vaults and grounding for a cost of $46,995.20. Clearly, payment of 84% of this item was not justified.

While no precise calculation has been performed as to the amount of work completed, if we estimate that 50% of the work was not completed or not completed properly, the overpayment would be as follows: 8% ($118,511.68) minus 7% paid ($103,697.72) leaving a balance of $14,813.96 vs. $59,255.84 or 4% that should have been remaining for an overpayment of $44,441.88 ($59,255.84 - $14,813.96).

**G. <u>Materials – Additional Comments</u>**

It is indisputable that to perform the installation of the conduit, wire, cable, manholes and pads TriGems would have been required to have in its possession the requisite materials. Accordingly, when pay request 5 (DX 289/40-43) was processed the following relevant amounts

had been approved for payment: trenching (#2) was approved at 6% of 15%; conduit (#3) was approved as 11% of 19%; pull wire and cable (#4) at 2% of 4% and manholes and pads (#5) at 1% of 4%. (DX 289/41) Those percentages necessarily had to include the cost of the materials needed to complete that specific work element. Furthermore, if 100% of a work element was paid the implication is that the entirety of that element was completed. Consequently, on pay request 6 when the Government approved as 100% the conduit and the pull wire and cable elements it had to have included all of the material. (DX 289/31).

For reasons that remain unexplained, the Government reduced the value of various work elements to create a new work element, work element 15, entitled "Cable & Manholes and Pads (Materials)" with a value of 22% or $286,931.92 of the contract value on pay request 6 and paid that amount in full. (DX 289/31). The effect of this was to cause the contract to go from 46% complete in pay request 5 (DX 289/40) to 79% complete on pay request 6 (DX 289/30) with only the trenching, conduit and pull wire and cable being approved for payment. This huge jump in the percentage complete took place within a 2 week period (Pay request 5 for the period ending July 15, 1996 through pay request 6 ending end on July 31, 1996), and in or around the same time the Government's witnesses contended that there were major problems with TriGems performance. (See JX 10/74; JX 13/77-78; JX 16/114; Tr. 408/8-23; Tr. 352/14 – 353/18). In effect, the Government paid twice for the materials; once when it approved payment on the individual work element and again when it created the new work element for materials.

**H. Summary**

While not precise, and concededly based upon some conclusions based upon evidence in the record, it is respectfully submitted that the foregoing establishes overpayments totaling a minimum of $415,563.67 (Materials = $251,837.32; Trenching = $13,440.66; Conduit =

$73,329.10; Pull Wire and Cable = $17,776.75; Manholes and Pads = $14,813.96; Transformers = $44,441.88). It is respectfully submitted that the more reliable approach is to accept the admissions by the Government's own witnesses, including Mr. Lyman (as confirmed by Mr. Spinelli and Eastern as set forth in PX 174/747-749) and Contracting Officer Donald Bruce (PX152/644; Tr. 312/7-17). The Government, it is respectfully submitted, should not be permitted to rewrite a history which it wrote the first time and which is set forth in a number of admissions. The fact of a substantial overpayment is clear from this analysis.

## CONCLUSION

It is respectfully submitted that the analysis directed by this Court confirms the Plaintiff's position that the Government substantially overpaid TriGems as admitted by Mr. Lyman, project engineer, and Donald Bruce, Contracting Officer.

Respectfully Submitted,

DREIFUSS BONACCI & PARKER
Attorneys for Plaintiff United States Fire Ins. Co.

By: __s/David C. Dreifuss___
DAVID C. DREIFUSS

G:\FPDATA\Clients\Universal Bonding-Lumbermens\TRIGEMS\FEDERAL CLAIMS\Supplemental brief.doc