NO. 03-2811C
(Judge Horn)

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

UNITED STATES FIRE INSURANCE COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S SUPPLEMENTAL POST TRIAL BRIEF

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, DC 20530
Tele: (202) 307-0282
Fax: (202) 514-8624

OF COUNSEL:

CHRISTOPHER S. COLE
AFLSA/JACN
1501 Wilson Boulevard
Arlington, VA 22209-2403

WILLIAM M. LACKERMANN, JR.
Air Force Materiel Command Law Office
Wright Patterson Air Force Base
Dayton, OH

May 19, 2005

Attorneys for Defendant

## TABLE OF CONTENTS


TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

DEFENDANT'S SUPPLEMENTAL POST TRIAL BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. Contract Terms As An "Input" To The Contracting Officer's Progress Payment Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. Contracting Officer's Experience As An "Input" To Her Progress Payment Decisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III. Ms. DeMito Exercised Her Judgment In Making Progress Payments . . . . . . . . . 5

IV. The Use Of Progress Reports To Make Progress Payments . . . . . . . . . . . . . . . . . 7

V. Analysis Of Progress Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

VI. U.S. Fire Has Failed To Establish That TGB Could Have Completed The Project For The Contract Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## TABLE OF AUTHORITIES

### CASES

Gonzales v. Defense Logistics Agency,
772 F.2d 887 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

UMC Electronics Co. v. United States,
43 Fed. Cl. 776 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNITED STATES FIRE INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-2811C |
| | ) | (Judge Horn) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S SUPPLEMENTAL POST TRIAL BRIEF

Pursuant to the Court's April 20, 2006 order, defendant respectfully submits this supplemental post trial brief analyzing the progress payments made by the Air Force to Tri-Gems Builders, Inc. ("TGB").

INTRODUCTION

A central tenet of Federal government contracting is the legal presumption that Government officials are presumed to act in good faith. Gonzales v. Defense Logistics Agency, 772 F.2d 887, 889 (Fed. Cir. 1985). The contracting officer, Kathleen DeMito, testified that, to "the best of the CCI's [Government construction contract inspectors'] and the contracting officer's knowledge," payments to Tri-Gems were made for work that complied with the plans and specifications. Transcript ("Tr.") 117/14 to 118/12. There is no credible evidence in the record indicating that the contracting officer did not act in good faith in making progress payments to TGB.

In contrast to Ms. DeMito's sworn testimony, United States Fire Insurance Company ("U.S. Fire"), which has the burden of proof, did not produce any contemporaneous records from its bonded contractor, TGB, its completion contractor, Eastern Construction & Electric, Inc.

("Eastern") or its two consultants (Megan Group and Cashin Spinelli) establishing any overpayment.

U.S. Fire also did not call any witnesses from TGB, Eastern, or Megan Group. As discussed in defendant's initial post-trial brief, this failure to produce relevant documentary and testimonial evidence warrants adverse inferences being drawn against Plaintiff's claim. Gov't initial brief at 54-55.

The Court has now ordered an analysis of "the inputs to the contracting officer from Tri-Gems, Air Force inspectors and any other sources, on the amount of progress payments . . . with a discussion of how the inputs shaped the contracting officer's progress payment decisions." As detailed in defendant's initial post-trial brief (and as briefly reviewed below), the terms of the contract, the contracting officer's experience, and the contracting officer's personal knowledge of both the contractor's past and current performance, all are "inputs" into the decision to make progress payments.[1]

Many of the "inputs" to the contracting officer from TGB and Air Force inspectors have already been detailed in the proposed findings of fact section of defendant's initial post-trial brief. For example, many problems were identified by Government inspectors, reported to TGB and then satisfactorily resolved by TGB. However, in order to provide the Court with further analysis, in section V below, defendant now offers even more details from the inspectors' daily

---

[1] As we stated at paragraph 12 of our initial post trial brief, Steven Lyman did not contemporaneously review either progress schedules or progress reports. Tr. 413/12-17. Mr. Lyman was not involved with paying Tri-Gems and did not have any experience as a contracting officer approving or rejecting contractor progress payment invoices. Tr. 420/4-9. Thus, he was not an "input" in the contracting officer's decisions concerning progress payments.

inspection records. The inspection records tend to be brief,[2] but the Court should consider that there is no contractual requirement for the Government to do any inspections (much less any requirement for how detailed the inspection logs should be).

Finally, defendant respectfully submits that the Court cannot now focus solely upon inspector logs or contract progress reports to determine if the contracting officer acted in good faith when making a progress payment. Analysis of Government inspection logs should not elevate the minor and optional role of Government inspectors above the central role of the contracting officer in making progress payments decisions.

I. Contract Terms As An "Input" To The Contracting Officer's Progress Payment Decision

The primary determinate for the contracting officer in making progress payment decisions is the terms of the contract. Pursuant to the express terms of the contract (FAR Clause 52.232-5), TGB was entitled to receive (and the Government was obligated to pay) "progress payments" on a monthly basis on "estimates" of "work accomplished" which met the contract standards. There was no requirement pursuant to this clause for work to be "completed" by TGB (or "accepted" by the Government) before TGB received progress payments. Further, pursuant to Clause 52.232-5, the contracting officer had discretion (that is, "may") - which she exercised in this case - to authorize "material delivered on the site" to be taken into consideration in preparing the estimates of work accomplished for progress payment purposes. Pursuant to

---

[2] Pursuant to the contract, Air Force inspections were for the sole benefit of the Air Force. Gov't initial brief at pp. 17-18, ¶ 61. (citing FAR clause 52.246-12(c)). The daily inspection records made by the inspectors generally reflect that the inspectors are performing "spot checks" of TGB's work and indicate that the inspectors visits tended to be brief. For example, the inspection records for May 1-15, 1996 reflect site visits ranging from 15 minutes to one hour. Defendant's Exhibit ("DX") 295/2-12.

Clause 52.232-5, if TGB achieved "satisfactory progress" during a progress payment period, the contracting officer was required by the mandatory language of the clause, that is, she "shall" "authorize payment to be made in full." On the other hand, the contract gave the Government contracting officer discretion, in that she "may" retain a "maximum of 10 percent," if "satisfactory progress [had] not been made."

The contract expressly stated in Clause 52.232-5 that progress payments "shall not be construed" as "relieving the contractor from the sole responsibility for all material and work upon which [progress] payments have been made or the restoration of any damaged work" or "waiving the right of the Government to require the fulfillment of all of the terms of the contract." In addition to this provision of the Payments clause, there were similar provisions in the "Inspection of Construction" and other clauses of the Tri-Gems contract.

II. Contracting Officer's Experience As An "Input" To Her Progress Payment Decisions

In addition to the terms of the contract, the contracting officer also was guided by her prior experience, both as a contacting officer and with the specific contractor requesting payment. In this case, Ms. DeMito, the contracting officer, had several years of construction contracting experience and was a supervisor of other contracting personnel. Tr. 116/20-21; 117/8 9; 120/16-20; 158/7-12; 309/10-15. Ms. DeMito and other Government witnesses testified that TGB had a good reputation at McGuire AFB for construction projects it had performed in the past. Tr. 153/12-25; 364/24 to 365/5; 462/22 to 463/5.

In this case, the contracting officer also had personal knowledge about contract performance. Ms. DeMito was involved with the solicitation, award and administration of contract no. F28609-96-C-0003 between the United States and TGB. Tr. 119/5-12; see, e.g.,

Joint Exhibit ("JX") No. 2 at 17; JX Nos. 23 & 30-31. In addition, Ms. DeMito testified that she visited the work site "numerous times" prior to the termination of the TGB contract. Tr. 122/20-23.

III. Ms. DeMito Exercised Her Judgment In Making Progress Payments

The contract progress report specifically stated that the information on the form "may" be used for computing progress payments at the "Contracting Officer's discretion" and in accordance with the payments clause of the contract. See, e.g., DX No. 288 at 64 (DX 288/64). The form also contained a "Progress or Completion Certification" which certified that "the contractor has satisfactorily completed the indicated percentage of the contract per contract specifications." Id.

The progress payment invoice was for "work performed" between specific dates. See, e.g., JX 61 at 566. On all of its progress payment invoices, TGB's President (Gothrie Short, Jr.) certified that suppliers and subcontractors were being paid and that "the amounts requested are only for performance in accordance with the specifications, terms and conditions of the contract." See, e.g., id.; Joint Stipulation of Fact ("JSF") 22.

In general, if the percentages agreed on both the contractor's and the inspector's contract progress reports, the contracting officer would approve the progress payment in the amount requested. Tr. 142/23 to 143/12. However, the contracting officer did not automatically approve every TGB progress payment invoice.

When there was a disagreement between the percentages on the contractor's and the inspector's contract progress reports, the parties would meet to try to reach an agreement upon the amount of progress, and the contracting officer would use her discretion to determine

whether or not to approve the progress payment (and if approved, in what amount). Tr. 143/13 to 144/12; see e.g., DX No. 231. For example, on the contract progress reports for the period ending April 22, 1996, TGB certified that it had completed five percent of the job while the Government inspector only considered the job three percent complete. DX No. 288 at 1643-45 (DX 288/63-65). TGB's progress payment No. 2 was certified by TGB's President in the amount of five percent. JX 61 at 566. Ms. DeMito ultimately decided to approve the progress payment in the amount of $29,819.44 (four percent). DX 289/52.

Further, the contracting officer had the discretion (and in some cases, used this discretion) to retain funds from a progress payment request. For example, in approving progress payment No. 14, Ms. DeMito retained $27,356.07 of the requested progress payment amount to insure that light poles (which needed repairs) were properly installed. Tr. 160/9-24; JX No. 38 at 333 & JX No. 61 at 513; DX Nos. 240-41 & 245. In other cases, the contracting officer merely had to use the threat of retainage to motivate TGB's prompt correction of problems. JX Nos. 223 (threat) & 225 (correction).

Finally, the contracting officer had the discretion to deny TGB progress payment invoices and, in fact, did deny some invoices. For example, the record shows that the contracting officer rejected two submittals of TGB's progress payment invoice No. 13, one dated March 17, 1997 and one dated April 8, 1997, since the contracting officer did not consider the contract to be as completed as TGB certified. DX No. 231; DX No. 289 at 1654 & 1652; Tr. 146/7-16; Tr. 151/8-22.

IV. The Use Of Progress Reports To Make Progress Payments

U.S. Fire has challenged the accuracy of the contract progress reports because it alleges the percentages assigned to the line items in these reports "constantly" changed. Closing argument transcript ("Cl. Arg. Tr.") p. 31, line 8. This is incorrect. The first progress report created by both the Air Force and TGB concerned the period from November, 1995, until April 23, 1996. DX 288 at pp. 63-65 (hereinafter DX 288/63-65). For reasons which are not explained in this record, TGB divided the work into 19 line items, while the Air Force used 14 line items. Id. For reasons which are also not explained, the parties thereafter adopted the Air Force formulation. For example, TGB's progress report for the period June 15 to July 15, 1996 (DX 288/53) uses the same 14 line items and percentages as the first Air Force progress report. DX 288/63.

Thereafter, there were only two changes in the progress reports, which are discussed in more detail below. The first of these changes occurred in TGB's progress report for the period July 16 to 31, 1996, when TGB added a line item for materials. DX 288/51. TGB assigned the materials line item 22 percent of the project cost, which required corresponding reductions in the percentages of several other line items. Subsequent progress reports then used these revised percentages through February 1997. Compare DX 288/51 with DX 288/24.

In March 1997, the Air Force issued modification P0003. JX 52. This modification added work to the project and increased the contract price by $177,874. JX 52/461. This changed the percentages of many of the line items. Compare DX 288/23 and 24. After this modification, the percentages for the line items remained the same until TGB departed the project site. Compare DX 288/1 and 23.

V. Analysis Of Progress Payments

We set forth below our analysis of each of the progress payments made by the Air Force to TGB. However, at this stage of the proceeding, with the record closed, it is virtually impossible to reconstruct precisely what occurred with respect to each progress payment because none of the trial witnesses provided detailed testimony concerning the progress payments, and none of the Air Force inspectors who prepared the Government's progress reports testified at all. Nor did TGB's president, Guthrie Short, who prepared TGB's progress reports and invoices, testify. Nor did U.S. Fire distinguish in its presentation between defective work, which TGB would have been required to fix, and alleged overpayments. What is left then is a contracting officer who testified that to the best of her knowledge she believed she was paying TGB correct amounts, and progress reports from Air Force inspectors and TGB which for the most part matched TGB's invoices. As the party with the burden of proof, this lack of specific evidence from TGB, Eastern, or U.S. Fire's consultants supporting overpayment by the Air Force is fatal to TGB's case.

Progress Payment No. 1

On November 15, 1995, TGB submitted certified progress payment invoice no. 1 in the amount of $22,350. DX 289/55. Neither the Air Force nor TGB had produced a progress report by this point, but this payment was for the cost of the performance and payment bonds. See JX 3 at 57 (listing price of bonds as $22,350).

Progress Payment No. 2

During closing argument, U.S. Fire's counsel attempted to make an issue of TGB's slow start on the project due to its initial electrical subcontractor refusing to perform. Cl. Arg. Tr. 8/

21-25. There is no issue here. The Air Force made no further payments to TGB for five months, that is, not until after TGB had a crew working on site.

TGB submitted certified invoice no. 2 to the Air Force on April 23, 1996 for the period from November 16, 1995 to April 23, 1996. DX 289/52. TGB sought payment for five percent completion, that is, the remainder of the bond and mobilization line item, after the earlier payment for the bonds. The Air Force inspector estimated in his progress report that TGB had completed only three percent of the bond and mobilization line item. DX 288/63-64. The contracting officer exercised her discretion by paying TGB four percent, that is $29,819.44. DX 289/52. The daily inspection records[3] support this payment because they state that TGB had a crew of workers on the project no later than April 18, 1996 and had begun excavating with a backhoe.[4] DX 294/2.

[3] Although the month is visible on all of the daily inspection records, the exact date is not visible for the majority. Our discussion of the dates of these records is based upon cross referencing those reports for which the date is visible with 1996 and 1997 calendars.

[4] On some days, the Air Force performed no inspection. Because of the lack of inspection on some days and the brevity of inspections on most other days, the contract progress reports are the best record of the construction inspectors estimates of work accomplished. The daily inspection records may be used to establish that work was accomplished, but cannot be used to prove that TGB was not performing work unless they state so. Finally, even when the daily inspection records indicate that work was performed, based on this record, there is no way to tell how TGB applied the work identified in the inspection records to the line items in the progress reports. For example, there are repeated references in the inspection records to the excavation and installation of secondary lines. Conceivably, this work could be billed to the trenching, conduit, pull wire and cable, or asphalt paving. Thus, there is no way to determine how TGB invoiced for much of its work.

Progress Payment No. 3

TGB submitted certified invoice no. 3 on May 15, 1996, for the period from April 24, 1996 to May 14, 1996. DX 289/48. The certified progress reports of both TGB and the Air Force estimated that TGB had completed an additional 10 percent of the work during this time period, that is, 10 of the 24 percent of the contract amount allocated for the lighting equipment line item. DX 288/60 & 62. The contracting officer paid TGB the full amount, $130,423.60, bringing total payments to TGB to $182,593.04. DX 289/48.

For the progress payment no. 3 time period, the inspection records support the payment made because they state that TGB's work was focused upon the lighting equipment. The inspection record for April 18, 1996, states "lamp pole base digging in progress." DX 294/2. On April 19, 1996 the record states "works are in order to move light poles across the street." DX 294/3. Other reports state: April 22, 1996: "Digging on Burtonwood for lamp pole foundation" DX 294/4; May 1, 1996: "New areas marked for light poles following addendum # 2 drawings" DX 295/2; May 6, 1996: "Precast light poles being placed on Andrew's Lane" DX 295/5; and May 8, 1996: "Precast light poles being placed on Burtonwood Ave." DX 295/7. Finally, the inspection record for May 14, 1996 states that "90-95% light pole bases have been placed." DX 295/11.

At trial, no witnesses from U.S. Fire's consultants or replacement contractor Eastern testified as to any work that Eastern had to complete or problems that it had to fix with respect to this line item.

Progress Payment No. 4

TGB submitted certified invoice no. 4 on June 17, 1996, for the period from May 15 to June 14, 1996. DX 289/44. TGB estimated that it had completed 21 percent of the work during this time period, for a total completion percentage of 35 percent. DX 288/57 & 59. Similarly, in his progress report, the Air Force inspector estimated that TGB had accomplished 21 percent of the work during this time period. DX 288/56 & 58. The contracting officer then paid TGB the full amount, $273,889.56, for a cumulative total of $456,482.60. DX 289/44. The progress reports estimate that TGB had accomplished 3 of the 15 percent assigned to the trenching, 8 of the 19 percent for conduit, and an additional 10 percent for lighting equipment. DX 288/56-59.

The Air Force inspectors prepared inspection records for some of the work days during this time period. The inspection records support the inspector's estimates of progress completion.[5] The inspection records state that "digging for conduit laying" began on Burtonwood on May 14, 1996. DX 295/11. On May 15, TGB laid conduit on Andrews Lane and West Castle. DX 295/12. On May 16 & 17, TGB continued to lay conduit on Andrews Lane. DX 295/13-14. On May 21, TGB laid conduit on West Castle. DX 295/16. On May 23, TGB placed lamp pole bases on East & West George Street, finished conduit on Andrews Avenue, and continued laying conduit on West Castle. DX 295/18. The inspection record for May 28 states that the Burtonwood and West Castle conduit is complete, and the Andrews Lane conduit is 85-90 percent complete. DX 295 at 20. On June 6, TGB finished the conduit on W. George Street and Andrews Lane and was half complete on Chenault. DX 295/27. On June 11

---

[5] Although some of the inspection records do not specifically mention trenching, that trenching was performed can be inferred since they repeatedly discuss digging for or laying conduit, which would have required trenching. E.g., Tr. 734/11-19.

& 12, TGB performed trenching from W. George to W. Castle behind Andrews Lane and laid four inch conduit encased in cement in that trench. JX 9 at 71-72.

At trial, no witnesses from U.S. Fire's consultants or Eastern testified as to any work that Eastern had to complete or problems that it had to fix with respect to this progress payment.

Progress Payment No. 5

TGB submitted certified invoice no. 5 for $143,465.96 on July 16, 1996 for the period from June 15 to July 15, 1996. DX 289/40. The progress reports prepared by both TGB and the inspector estimated that TGB had accomplished an additional 11 percent of the work during this period. DX 288/52-54. The progress reports stated that this 11 percent consisted of three percent trenching, three percent conduit, two percent pull wire and cable, one percent manholes and pads, and two percent lighting equipment. Id. The contracting officer paid the invoice in the amount requested, bringing total payments to $599,948.56. DX 289/40.

The Air Force inspector prepared inspection records for some of the work days during this time period. The descriptions of the work accomplished support the inspector's estimate of progress completion. The June 17, 1996 inspection record states "Trenches being dug behind houses along W. George" and "Approx. 600 ft. of 4" conduit w/ cement encasing laid." DX 296/4. Similarly, other inspection records state as follows: June 18: "Trenching complete along W. George" and "Secondary trenching done behind 4025 A/B" (DX 296/5); June 21: "Secondary trenching dug to 4025" and "4 driveways being ripped up in order to lay lighting conduit underneath" (DX 296/8); June 26: "Lighting conduit being laid under driveways on N. Bolling Ave." and "Secondary trenching being dug along W. George" (DX 296/11); June 27: "Lighting

conduit still being laid under driveways along N. Bolling" and "Secondary trenching being dug along W. George St." (DX 296/12).

At trial, no witnesses from U.S. Fire's consultants or Eastern testified as to any work that Eastern had to complete or problems that it had to fix with respect to this progress payment.

Progress Payment No. 6

In accordance with contract Clause 5352.232-1000, "Payment for Materials Stored on Site," and FAR Clause 52.232-5, "Payments Under Fixed-Price Construction Contracts," Ms. DeMito permitted TGB to include a "percentage of the total job" on the contract progress schedule (and the contract progress reports) for materials delivered to the work site. JX No. 11; Tr. 136/16 to 137/5. Starting on July 16, 1996, the progress reports contained a line item for materials, valued at 22 percent of the contract price. DX 288/51-52. The addition of this materials line item resulted in the following reductions in other line items: trenching, 15 to 10 percent; conduit, 19 to 15 percent; transformers, 14 to 9 percent; testing, 2 to 0.5 percent; demolition, 3 to 1 percent; asphalt paving, 2 to 0.5 percent; site restoration, 2 to 0.5 percent; and final inspection, 2 to 0.5 percent. DX 288/51-52.

On August 1, 1996, TGB submitted certified invoice no. 6, in the amount of $286,931.92, for the period from July 16-31, 1996. DX 289/30. The contract administrator, Beth Ann Mendell, increased the invoice amount to $430,397.88, which the contracting officer approved.[6] Id. The record is unclear as to why TGB submitted the invoice at the amount that it did.

[6] U.S. Fire called Ms. Mendell and Ms. DeMito as witnesses at trial, but did not examine them on this issue.

The invoice attached several invoices from TGB's suppliers totaling $268,218.73. DX 289/32-38. Both the TGB and Air Force project reports during this time period estimated that TGB had completed 28 percent of the work during this time period: 22 percent for the materials; 2 percent for trenching; 2 percent for conduit; 1 percent pull wire and cable; and 1 percent manholes and pads. DX 288/50-51.[7] 28 percent of the contract price would have entitled TGB to payment of $365,186.08, approximately $78,000 more than it requested. On the other hand, payment by the Air Force of $430,397.88 represented 33 percent of the contract price.

From reviewing the June and July progress reports, it appears that TGB made mathematical errors in its progress reports which were discovered at some point by Ms. Mendell. DX/288/51, 53, 55. By the end of July, the amounts in the "% completed cumulative" column were low by two percent for the trenching, two percent for the conduit, and one percent for the pull wire and cable, or a total of five percent. DX 288/51. It appears that the contracting officer determined to add this amount to the progress payment. With this adjustment, TGB was 79 percent complete, and without, 74 percent. DX 288/50, 51. In either case, TGB was actually well ahead of schedule. The Air Force progress report for this period states that the schedule provided for TGB to be only 52 percent complete at this point. Thus, even if the contracting officer paid more than the original invoice amount, she was well within her discretion in doing so based upon the progress reports. At this point, it would have appeared to the contracting

[7] On the days that an inspection was performed, the inspection records are for the most part silent as to what work TGB is performing. DX 296/14-22. For example, the inspection record for July 25, 1996 indicates that TGB had eight workers on site, but the record does not indicate what they were doing. DX 296/21.

officer that TGB was performing satisfactorily. It was not until after the contracting officer certified this invoice for payment, that the first sign of trouble appeared.

During closing argument, TGB's attorney alleged that the Air Force was on notice as of August 6, 1996 that TGB's work was defective and the Air Force should have stopped paying TGB or reduced payments to TGB. Cl. Arg. Tr. 14/16 to 15/14. However, the record shows that the parties promptly addressed the issues raised by Mr. Lyman. The document which purportedly put the Air Force on notice is an August 6, 1996 memo from Mr. Lyman to the inspector, Senior Airman Ward, through Joe Fleming, the chief of construction management. JX 13. Although it is true that at the end of the memo Mr. Lyman stated that "the contractor is defrauding the Government," the factual underpinnings of the memo do not establish fraud in the legal sense, but rather ordinary performance issues. For example, the memo discussed problems with the depth and backfilling of trenches. JX 13 at 77. There is no suggestion that TGB was committing fraud by submitting claims to the Air Force which TGB knew to be false and intended to deceive the Air Force by submitting them. See, e.g., UMC Electronics Co. v. United States, 43 Fed. Cl. 776 (1999) (discussing the various fraud remedies available to the Government).

The record next shows that, two days later, on August 8, 1996, Mr. Fleming wrote a memo to Ms. Mendell and Ms. DeMito. JX 14 at 81. This memo summarized the problems identified in the Lyman memo from two days before and attached a copy of that memo. The following day, August 9, Ms. Mendell wrote to TGB, forwarding a memo setting forth the problems identified in Mr. Lyman's memo. DX 216/1-2. Four days later, on August 13, 1996, TGB's president wrote to Ms. Mendell stating, among other things, that it "will go over the

procedures with Sr.A. Ward and rectify any inconsistencies with the backfilling and compacting procedures." JX 14 at 80. At trial Ms. DeMito testified that TGB performed all of the work that it promised to perform in the August 13, 1996 letter. Tr. 180/24-25.

Through progress payment no. 6, the Air Force paid TGB a total of $1,030,346.40 of the $1,285,553.14 (JSF 25) that it would pay TGB. The Air Force paid TGB a total of only $255,206.70 after progress payment 6.

At trial, no witnesses from U.S. Fire's consultants or Eastern testified as to any work that Eastern had to complete or problems that it had to fix with respect to this progress payment.

Progress Payment No. 7

TGB submitted certified invoice no. 7 in the amount of $39,127.08, on August 19, 1996, for the period from August 1-15, 1996. DX 289/26. The progress reports for the Air Force inspector and TGB estimated that TGB had accomplished an additional three percent of the project during the August 1-15, 1996 period. DX 288/48-49. Both progress reports estimated that TGB had accomplished three of the nine percent transformers line item. Id. The contracting officer paid this invoice in full, bringing total payments to $1,069,473.40.

Daily inspection records are available for only a few of these dates. DX 296/22-31. These inspection records indicate that TGB was performing cleanup related to the "primary digs" (DX 296/25), cleanup related to the removal of the overhead primary lines (DX 296/26), and unspecified site cleanup and restoration, DX 296/28-29. However, it is unclear from the record as to which line items TGB intended to bill this work. Only three of the records list the numbers of workers on site. On August 9, TGB had six workers on site. DX 296/25. On August 14 & 15, it had 11 workers and two backhoes. DX 296/28-29.

At trial, no witnesses from U.S. Fire's consultants or Eastern testified as to any work that Eastern had to complete or problems that it had to fix with respect to this progress payment.

Progress Payment No. 8

On September 17, 1996, TGB submitted certified invoice no. 8 for $78,254.16 for the period from August 16 to September 15, 1996. DX 289/21. In their progress reports, both the inspector and TGB estimated that TGB accomplished an additional six percent of the work in this time period: five percent in the transformers line item and one percent in manholes and pads. DX 288/44-47. The contracting officer paid this invoice in full, for cumulative payments of $1,147,727.50.

Daily inspection records are available for some of these dates. DX 296/30-31; JX 15 at 82-99. The inspection records indicate that TGB performed work on these items, as well as others for which it received no payment during this period. On August 19, the inspection record states that TGB is performing trenching. DX 296/31. On September 3, TGB performed "placement of transformer precast concrete vault/pad several areas." JX 15 at 92. On September 4, TGB was "digging for installment of concrete vaults." JX 15 at 93. On September 5, 6 and 9, TGB performed placement of concrete vaults. Id. at 94-96. On September 11, TGB is trenched for primary and secondary lines and pouring concrete. Id. at 97. On September 12, TGB continued to trench and place secondary line. Id. at 98. Finally, on September 13, TGB installed primary and secondary lines. Id. at 99.

At trial, no witnesses from U.S. Fire's consultants or Eastern testified as to any work that Eastern had to complete or problems that it had to fix with respect to this progress payment.

Progress Payment No. 9

On October 15, 1996, TGB submitted certified invoice no. 9 in the amount of $26,084.72, for the period from September 17 to October 15, 1996. In their progress reports, the inspector and TGB estimated that TGB accomplished an additional two percent of the work in this time period: one percent in the lighting equipment and one percent in the transformers and pads. DX 288/40-43. The contracting officer paid this invoice in full, for a cumulative total of $1,173,812.20.

Inspection records are available for some of the dates in this period. The inspection records indicate that TGB performed work in these line items, as well as other items for which they were not paid, during this time period. The inspection record for September 16, 1996 states that TGB installed "electric manholes EMH-11 & EMH-9" and performed raking and grading of primary and secondary lines. JX 15 at 100. On September 19, TGB poured concrete on the primary lines for electric manholes EMH-11 and EMH-9. JX 15 at 103. On September 26, TGB performed trenching for secondary lines and digging for installation of electric manholes. JX 15 at 108. On September 27, TGB excavated and installed a secondary line and excavated and installed an electric manhole. JX 15 at 110. On September 30, TGB excavated and installed a secondary line. JX 15 at 111.

On October 1 and 2, 1996, the inspection records state that TGB performed trenching and placement of secondary line behind several of the quarters. JX 15 at 112-13. On October 3, TGB performed trenching and conduit installation for secondary line at several quarters. JX 17 at 116. On October 4, TGB placed manhole covers and graded trenches for several quarters. JX 17 at 117. On October 7, TGB excavated and performed conduit layout for secondary line for

several quarters. JX 17 at 118. On October 8, TGB excavated and performed conduit layout for secondary line for several quarters and saw cut the asphalt parking lot for secondary line. JX 17 at 119. On October 9, TGB saw cut pavement and excavated for layout of conduit secondary line for several quarters. JX 17 at 120. On October 10, TGB installed a concrete vault. JX 17 at 121. On October 15, TGB excavated and installed secondary line for several quarters. JX 17 at 124.

At trial, no witnesses from U.S. Fire's consultants or Eastern testified as to any work that Eastern had to complete or problems that it had to fix with respect to this progress payment.

Progress Payment No. 10

TGB's certified invoice no. 10 does not appear to be in evidence. However, the summary of all payments at DX 289/1 indicates that the Air Force paid TGB $13,042.36, one percent of the contract price, on November 25, 1996 for this progress payment. The progress reports for the October 16 to November 15 period estimate that TGB accomplished one percent of the switches work. DX 288/36-39. The contracting officer paid this invoice, bringing total payments to $1,186,854.50.

To the extent that they are available, the progress reports identify the following work by TGB during this period: October 16-17, excavation and installation of secondary line for several quarters (JX 17 at 125-26); October 18, "pulling wire several areas" (JX 17 at 127); October 22, primary conduit layout and connection for electrical manholes and concrete pouring for primary lines (JX 17 at 129); October 23, primary conduit tieup for transformers (JX 17 at 130); October 24, excavation and installation of secondary line for several quarters (JX 17 at 132); October 28, excavation and installation of secondary line at several quarters and pulling wire between

manholes (JX 17 at 134); October 29, excavation and installation of secondary lines for several quarters, and wire pulling for transformers; (JX 17 at 135); October 30, excavation and installation of secondary lines at several quarters and pulling wire between transformers (JX 17 at 136); October 31, excavation and installation of secondary line for several quarters (JX 17 at 137); November 1, pulling wire in several areas (JX 17 at 138); November 13-14, excavation and installation of secondary lines at several quarters (JX 17 at 142-43).

At trial, no witnesses from U.S. Fire's consultants or Eastern testified as to any work that Eastern had to complete or problems that it had to fix with respect to this progress payment.

Progress Payment No. 11

TGB's certified invoice no. 11 does not appear to be in evidence. However, the summary of all payments at DX 289/1 indicates that TGB invoiced for $22,153.94 on December 17, 1996 and the Air Force paid TGB $15,618.36, approximately 1.2 percent of the contract price, bringing total payments to $1,202,472.80. DX 289/1. In the progress reports for the November 16 to December 15, 1996 period, TGB estimated that it had accomplished 1.5 percent of the work, with one half percent accomplished in the switches, transformers, and lighting equipment. DX 288/33, 35. The Air Force inspector estimated that TGB accomplished only one percent of the work during this time period, with one half percent each in the switches and lighting equipment. DX 32/34.

The progress reports identify the following work by TGB during this period. On November 19, 1996 TGB excavated and installed secondary line for quarters. JX 17 at 146. On November 21, TGB performed "blacktop/patching" of driveways and "road cut," and excavation and installation of secondary lines for several quarters. JX 18 at 150. On November 25, TGB

installed lamp posts in several areas. JX 18 at 151. On November 27, TGB performed "pulling wire several areas." JX 18 at 153. On December 3, TGB excavated driveways at several quarters "to connect street lights conduits." JX 18 at 157. On December 4-5, TGB performed concrete patching of manholes and transformer pads where ductbanks come in. JX 18 at 158, 160. On December 6, TGB performed cable pulling in several areas. JX 18 at 151.

At trial, no witnesses from U.S. Fire's consultants or Eastern testified as to any work that Eastern had to complete or problems that it had to fix with respect to this progress payment.

Progress Payment 12

TGB submitted its next certified invoice on February 27, 1997 for the period December 16, 1996 to February 15, 1997. It requested payment for $1,740.00, which, based upon hand writing upon the invoice, was apparently changed to $1,750.00. DX 289/13. The Air Force paid TGB this amount, which constituted 0.13 percent of the contract price, for total payments of $1,204,222.80. DX 289/1.

The inspection records indicate that TGB performed some work during this period but its presence on the site became more sporadic. On December 16, TGB installed lamp posts on West Castle Drive. JX 18 at 167. On January 8, 1997, TGB poured concrete for several driveways. JX 20 at 185. On January 31, TGB worked on the concrete bases for the light poles. JX 20 at 191. The inspection records for February, if any exist, are not in the record.

At trial, no witnesses from U.S. Fire's consultants or Eastern testified as to any work that Eastern had to complete or problems that it had to fix with respect to this progress payment.

Progress Payment No. 13

TGB submitted a certified invoice no. 13 three times, the first two of which were rejected by the contracting officer. On March 17, 1997 TGB first submitted this invoice in the amount of $10,466.36. DX 289/9. The contracting officer then rejected this invoice. Id.

Although not reflected in this invoice, five days before the date of the invoice, on March 12, 1997, the parties entered into modification P0003. JX 52. This modification added additional conduit, wire, and asphalt paving to the project and increased the contract price by $177,874. JX 52 at 460-64. After this work was added, the line items in the progress reports changed as follows:

| No. | ITEM | OLD | NEW | COMMENTS |
|---|---|---|---|---|
| | | | | |
| 1 | Bond & Mobilizat. | 5% | 5% | Unchanged |
| 2 | Trenching | 10 | 9 | Decreased as overall percentage of project |
| 3 | Conduit | 15 | 15 | Conduit added - stays at 15% of project |
| 4 | Pull Wire & Cable | 4 | 8 | Additional cable added by modification |
| 5 | Manholes & Pads | 4 | 4 | Unchanged |
| 6 | Transformers | 9 | 8 | Decreased as overall percentage of project |
| 7 | Switches | 2 | 1.5 | Decreased because addendum 5 called for reuse of existing switches. JX 52 at 464 |
| 8 | Lighting Equipment | 24 | 18 | Decreased as overall percentage of project |
| 9 | Final Connections | 2 | 1.5 | Decreased because addendum 5 called for reuse of existing switches. JX 52 at 464 |
| 10 | Testing | 0.5 | 0.5 | Unchanged |
| 11 | Demolition | 1 | 1 | Unchanged |
| 12 | Asphalt Paving | 0.5 | 5.5 | Addendum 6 adds large no. of saw cut and patches. JX 52 at 462 |

| | | | | |
|---|---|---|---|---|
| 13 | Site Restoration | 0.5 | 0.5 | Unchanged |
| 14 | Material | 22 | 22 | Additional cable added by modification |
| 15 | Final Inspection | 0.5 | 0.5 | Unchanged |

Compare DX 288/22 & 24.

Addenda 5 and 6 attached to P0003 indicate that, although the modification was not issued until March, 1997, the addenda are dated October 2, and November 1, 1996, respectively. JX 52 at 462-63. In his progress report dated February 28, 1997, the Air Force inspector reduced his estimate of the work accomplished by TGB from 92 to 71 percent. Compare DX 288/24 & 26. This was the last progress report at the old percentages. The soon to be executed modification increased the contract price by approximately 13.6 percent and would explain much of the decrease in the inspector's completion percentage. The largest decrease in a single line item came in the lighting equipment which went from 23.5 of 24 percent complete to 9 of 24 percent complete. As indicated in the chart above, the lighting equipment was declining from 24 to 18 percent of the overall contract price. By this time the tilting of the light poles had become an issue, and the reduction may have been a reflection of this issue. E.g., JX 4 at 63.[8] In any event, Mr. Lyman's 2004 report concluded that TGB completed 98 percent of the work included in this line item. DX 286/3. He found that TGB fixed the tilting problem by the time it left the project site (Tr. 747/23 to 748/22), and also installed the galvanized bolts. (Tr. 418/12 to 419/12).

[8] This exhibited is dated January 6, 1996, but since it refers back to a December 23, 1996 TGB letter, the correct date would seem to be January 6, 1997.

On April 8, 1997, TGB submitted its second certified invoice for progress payment 13. DX 289/7. It sought payment of $27,085.56 for the period February 17 to April 1, 1997. Id. The contracting officer again rejected this invoice. Id.

On August 1, 1997, TGB submitted invoice no. 13 for the third time. DX 289/5. It requested payment of $49,306.50, approximately 3.3 percent of the revised contract price, for the period from February 17, to July 15, 1997. Id. In his progress report for the period ending March 31, 1997 (the first progress report incorporating the percentage changes brought about by modification P0003), the Air Force inspector had reduced TGB's percentage completion from 71 to 69.5 percent. DX 288/22. In the progress reports for the period ending July 31, 1997, both the Air Force inspector and TGB estimated that TGB had accomplished 84.5 percent of the contract work by this date, an increase of 15 percent. DX 288/13-14. The line items increases corresponding to this change were: bond and mobilization from 4.5 to 5 percent; pull wire and cable, 4.5 to 6 percent; transformers 5 to 7 percent; switches 0 to 1 percent; lighting equipment 7 to 14 percent; and asphalt paving 0 to 3 percent. The Air Force paid this invoice in full, bringing total payments to $1,253,529.30. DX 289/1.

There are no inspection records in evidence for March, April and July 1997. Some inspections were performed during May and June and the records are in evidence. The records that are available indicate that TGB performed the following work during the February 17, to July 15, 1997 time period. On May 6, TGB set transformers on top of vaults. JX 27 at 203. On a date between May 6 and 15, TGB removed asphalt for installation of a secondary line. JX 27 at 205. On May 16-17, TGB installed secondary line for several quarters. JX 27 at 207-08.

On June 3-4, TGB installed lamp posts in several areas. JX 27 at 214-15. On June 10, TGB saw cut several driveways for secondary lines. JX 27 at 219. On June 11, TGB replaced a coupling for a secondary line and backfilled the trench, closed and secured transformers that had electrical cables hanging out, and fixed a water leak and backfilled the trench. JX 27 at 221.

Progress Payment No. 14

As we set forth in our initial brief at paragraph 72, TGB was required to complete the contract work by September 20, 1996. The contracting officer issued a show cause notice to Tri-Gems on September 5, 1997 due to Tri-Gems's "failure to complete Contract No. F28609-96-C-0003 within the time required by its terms." JX 30 at 265; JSF 30. The Air Force sent U.S. Fire a copy of this show cause notice and U.S. Fire received it. JX 30 at 266; JSF 30. There is no evidence in the record of U.S. Fire responding in any way to the Government or TGB regarding the show cause notice.

After the Air Force sent the show cause notice to Tri-Gems on September 5, 1997, the parties met on September 25, 1997, at which time Ms. DeMito allegedly agreed to approve an invoice for four percent. JX 38 at 333. At the same time, Ms. DeMito decided she needed to re-establish the contract completion date and the date for assessing liquidated damages. On October 15, 1997, Ms. DeMito unilaterally issued Modification No. P005 "to establish a new contract completion date." JX 31 at 267-68; JSF 18 & 31. This modification extended the contract performance period to December 15, 1997, and informed Tri-Gems that liquidated damages would start accruing on December 16, 1997. JX 31 at 267-68; JSF 18 & 31.

On November 19, 1997, Tri-Gems submitted a progress payment invoice for the four percent ($59,255.84) agreed to at the September meeting. DX 289/2. In late October 1997, the

contracting officer sent Tri-Gems a letter notifying Tri-Gems of the problem with the lamp posts, asking for a corrective action plan and stating that the Government would not pay the full four percent progress payment. JX 37 at 330 & JX 38 at 333; DX 240-41. In a letter dated November 24, 1997, Tri-Gems provided a corrective action plan. JX 37 at 330; DX 243-44.

The Air Force approved Tri-Gems' corrective action plan, but then Tri-Gems informed the contracting officer that Tri-Gems would not start work without being paid. JX 38. At that point (December 2, 1997), the contracting officer made a business decision to pay the progress payment invoice (No. 14) because Tri-Gems stated that it could not meet payroll if it were not paid and that it had done some work; and because she wanted the lamp pole repairs started. The Air Force retained $27,356.07 to ensure that the light poles were properly repaired. Tr. 161/3-11; JX 38 at 333 & JX 61 at 513; DX 245. The Air Force notified Tri-Gems of this decision in a letter dated December 10, 1997. DX 245. This was the last payment the Air Force made to Tri-Gems prior to the termination for default. JSF 25. U.S. Fire did not request that the Air Force refrain from making this payment to TGB.

Inspection records are available for some dates in the September through November, 1997, time period. They reflect the following work. On September 8-9, 1997, TGB excavated and installed secondary line. JX 28 at 235-36. On September 12 & 15, 1997, TGB excavated and reconnected "PUC lights for street lights in several areas." JX 28 at 239-40. On September 16, TGB installed street lights in several areas. JX 28 at 241. On September 17-18, TGB excavated and installed secondary lines. JX 28 at 244. On September 29, TGB installed street lights in several areas. JX 28 at 247.

On October 2, 1997, TGB worked on making the street lights plumb. JX 28 at 250. On an unknown date between October 16 and 24, TGB performed "tie in for the street lights PUC lines." JX 28 at 254. On October 27, the inspector stated that there was no new work on that day but noted that TGB had replaced a driveway on West George Street. JX 28 at 256. On an unknown date in early November, TGB did tie-ins for the street light lines on Chenault Lane. JX 28 at 258.

On December 18-19, 1997, TGB patched road cuts. JX 34 at 277-79. On December 22, TGB patched road cuts "for secondary electric lines." JX 34 at 281. On December 23, the inspection record states that all asphalt patching for the secondary lines road cuts has been completed. JX 34 at 283. The next inspection record in the record here is March 30, 1998. It states that TGB was replacing studs in lamp post bases, and notes that TGB is 75 percent complete with this replacement. JX 34 at 287. This is the final inspection record which identifies work performed by TGB.

## VI. U.S. Fire Has Failed To Establish That TGB Could Have Completed The Project For The Contract Price

During closing argument, the Court stated that it "assumed[d] that there is no issue in the case that there wasn't some overpayment." Cl. Arg. Tr. 67/2-3. In response, Government counsel referenced the 2004 Lyman report which calculated only a three percent difference between completion and the amounts paid to TGB. Id. at 67/6-7. Since there is nothing in the record which would indicate that this difference would represent anything other than repair work for which TGB and, by extension, U.S. Fire were responsible, there is no evidence that there was any overpayment.

The Government recognizes that there is a gap of $423,000 between the $621,677 (Tr. 716/22) it cost U.S. Fire's replacement contractor to complete the project, and the $198,642.61 (PX 171 at 742) in contract funds that remained when TGB left the project. However, the Court should not draw the conclusion that this $423,000 difference was caused by payments for defective or incomplete work by the Air Force to TGB. This $423,000 does not take into account the materials purchased by TGB that were on site and available to the replacement contractor and which U.S. Fire identified in its invitation for bids. JX 41 at 356. Nor does it take into account the five years between TGB's and Eastern's bids, and the effect of inflation over these years upon Eastern's bid price. JSF 3 & 46. In addition, by bringing in a replacement contractor during a project there will necessarily be inefficiencies. For example, Eastern was paid $46,995.20 for bond, mobilization, and site surveying, work which TGB had already incurred on its contract. DX 281/4.

More importantly, U.S. Fire's damages theory is implicitly based upon two assumptions: that the Air Force overpaid TGB, and TGB's bid price (as modified) would have been sufficient to complete the project. U.S. Fire's theory of its case is that, but for the Air Force's actions in overpaying TGB, there would have been sufficient contract funds remaining when U.S. Fire took over the work for U.S. Fire to complete the project. However, neither of these assumptions has been proven by U.S. Fire. No witnesses from TGB testified that it could have completed the project for its bid price as modified. Neither of the expert witnesses who testified for U.S. Fire testified that TGB could have completed the contract at its bid price as modified. In fact the evidence strongly suggests that its bid was inadequate.

First, TGB provided only a site superintendent and subcontracted out the bulk of the project work. Tr. 415/1-12. Unfortunately for TGB, as Ms. DeMito testified, the subcontractor that TGB "had based its bid on was nowhere to be found when the job was awarded and had to be started." Tr. 183/20-22. TGB had to turn to another subcontractor, and eventually a third. Tr. 152/22 to 153/9. The precise impact of TGB losing the subcontractor upon which it based its bid (and then its second choice) is unknown. However, some indication may be found in the bid results, which show that six of the seven bidders who bid a higher amount than TGB bid more than $2 million. DX 204.

Second, on March 31, 1997, Tri-Gems filed a claim with the Air Force requesting $320,677 for having to lay more expensive, rigid (steel) conduit and PVC piping encased in concrete (rather than cheaper, un-encased PVC piping). PX 169 at 705. The Air Force denied this claim and Tri-Gems appealed the final decision to the Armed Services Board of Contract Appeals ("ASBCA") (where it was docketed as ASBCA No. 50969). PX 169 at 705. The ASBCA appeal was eventually dismissed with prejudice when the bankruptcy trustee decided not to proceed with prosecution of the appeal. JSF 59; DX 297 at 3-4.

Finally, during a meeting at the project site in August 1997, TGB's president informed the Air Force that TGB was not working on the project "due to lack of money." JX 28 at 233. Mr. Short stated that TGB "was in the hole" by "approx. $400K." This amount corresponds approximately to the gap between the remaining contract funds and Eastern's completion costs.

Thus, this evidence suggests that there would have been a shortfall between the contract balance and U.S. Fire's completion costs even if the Air Force had not allegedly overpaid TGB. As the party with the burden of proof, this is fatal to U.S. Fire's claim.

CONCLUSION

For the foregoing reasons, defendant respectfully submits that U.S. Fire has failed to prove any overpayment by the Government and has failed to carry its burden of proof. Defendant, therefore, requests that the Court enter judgment in its favor.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/Michael N. O'Connell
MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor,
1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0282
Fax (202) 514-8624

OF COUNSEL:

CHRISTOPHER S. COLE
AFLSA/JACN
1501 Wilson Boulevard
Arlington, VA 22209-2403

WILLIAM M. LACKERMANN, JR.
Air Force Materiel Command
Law Office
Wight-Patterson Air Force Base
Dayton, OH

May 19, 2006

Certificate of Filing

I hereby certify that on May 19, 2006, a copy of the foregoing notice of motion was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Michael N. O’Connell