**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| UNITED STATES FIRE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 03-2811C<br>(Judge Horn) |

**REPLY SUPPLEMENTAL BRIEF ON BEHALF OF PLAINTIFF, UNITED STATES FIRE INSURANCE COMPANY, AFTER SUMMATIONS**

DREIFUSS BONACCI & PARKER, LLP
26 Columbia Turnpike
Florham Park, NJ 07932
Tel: (973) 514-1414
Attorneys for Plaintiff

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......... 3

ANALYSIS .......... 5

PAY APPLICATIONS .......... 8

CONCLUSION .......... 13

**PRELIMINARY STATEMENT**

As we have indicated in our submissions and at oral argument, we respectfully submit that the starting point should be the numerous admissions of the Government's own employees, including Steven Lyman, the Project Engineer, and Donald Bruce, the Contracting Officer. Again, the evidence before this Court as testified to by Donald Bruce (Tr. 312/7-17) was that there was a meeting attended by inspectors as well as Mr. Bruce and they all agreed with Mr. Lyman's first report, marked as JX46. Mr. Lyman supported his report for years as reflected in the unrefuted letter report from Mr. Spinelli marked as PX 174/747-749. Furthermore, as set forth in that letter report, Mr. Lyman's first report was consistent with the experience of the completion contractor, Eastern (PX 174 at 748). Again, that was unrefuted by the Government during the trial. Furthermore, Mr. Spinelli testified that it was consistent with his personal observations (Tr. 657/24-659/11).

In addition to the evidence which we believe is overwhelmingly in favor of the plaintiff and the evidence which we respectfully submit undermines the credibility of the second Lyman report, we also respectfully submit that we have explained how the requisitions and payment records further support the fact that TriGems was significantly overpaid.

The Government has attempted to use the contract progress reports to justify the payments when, by its own admission, those reports lack detail and certainly do not contain enough information to determine retrospectively the percentage of the work elements that was accomplished during any particular period. What is undeniable is that if a work element was paid at 100% complete and subsequent progress reports or letters detail work progressing on that same work element, TriGems could not have been 100% complete and payment at that level comprised an overpayment.

Furthermore, there can be no dispute that in order for TriGems to pull wire and cable, install manholes and pads, install conduit, and install lighting, it had to have had materials to perform these work elements. By the Government's creation of a "materials" work element, it paid TriGems twice because payment for the installation of a work element already included the same materials that were carved out as having a value of 22% of the contract.

Finally, the Government would have this Court believe that it had no duty to inspect the work and that its sole obligation was to pay for work accomplished without regard to whether the work complied with the contract documents. It is respectfully submitted that this position, as set forth in our initial post-trial brief, is contrary to the FARs that were incorporated into the contract and also contrary to the manner in which this contract was actually administered.

Again, it is respectfully submitted that U.S. Fire has established its entitlement to compensation for the Government's overpayment of TriGems.

## ANALYSIS

United States Fire Insurance Company has never argued that the Government's representatives had acted in a manner that was not in "good faith." What United States Fire Insurance Company has maintained is that the Government failed to properly exercise discretion by paying for work that was never completed or was completed improperly. The Government continues to give virtually no weight to Mr. Lyman's May 1998 (JX 46) report and instead places great weight on his report which was prepared by him more than 6 years later and based upon the final progress payment without regard to what actually took place during the construction of the project.

U.S. Fire introduced as evidence not only the testimony of Mr. Spinelli as to his observations of the site before the time U.S. Fire began completion of the project, which were consistent with the observations noted by Mr. Lyman in his first report (Tr. 657/24-659/11), but also Mr. Spinelli confirmed that Eastern had reached a similar conclusion. (PX 174 at 748). Mr. Spinelli adopted the Lyman report as an accurate statement of the state of the project at the time TriGems was terminated. It is no different then if Mr. Spinelli merely rewrote Mr. Lyman's report on his own letterhead. Rather then re-writing the report which he found to be accurate he included it in the invitation to bidders to advise them of the status of the project on which they may be awarded a contract to complete. (Tr. 655/11- 656/16).

In addition, Mr. Spinelli testified that he had interviewed Mr. Lyman in 2002, nearly 2 years before Mr. Lyman authored his second report and four years after his first report (DX 286/1-4), and also around when Eastern completed its work (Joint Statement of Facts No. 50), and Mr. Lyman stood by his first report as being accurate. (Tr. 614/3- 616/16; PX 174/747-749). This was not refuted by the Government. Mr. Lyman confirmed that he was on this project 2-3

times per week from inception. (Tr. 864/19-24). Ms. DeMito testified that the role of the civil engineer (Mr. Lyman) was that they were the "eyes and ears" for the Government in that they were at the site every day inspecting to make sure the Government is "getting what they're paying for". (Tr. 146/17-147/4). While the Government now claims the inspections tended to be brief, they are disregarding the fact that Mr. Lyman was a constant presence and was well informed about the work being performed by TriGems. It is also important to remember that the May 1998 report (JX 46) was not prepared solely by Mr. Lyman but was prepared after a 3 day walk through with the other inspectors (Airman Rodriguez and Mr. Ott) who had prepared the Government's contract progress reports upon which the Government now seeks to rely to justify the payments to TriGems. (Tr. 383/8-19; 869/5-9). Even Ms. DeMito, who the Government now treats as the sole Contracting Officer presumably because Contracting Officer Donald Bruce (who terminated TriGems) admitted the overpayment, did not object to the accuracy of the May 1998 report (Tr. 124/2-6), nor did any other Government representative who was involved with this project. (Tr. 312/16-19; 869/17-23). In fact, Mr. Bruce accompanied Mr. Lyman and Airman Rodriguez on the inspection and therefore had first hand knowledge about the accuracy of the report. (JX 34 at 291).

Mr. Lyman confirmed that if the work performed by TriGems was not installed properly it should not have been paid. (Tr. 863/10-864/18). This is consistent with FAR Clause 52.232-5 which provides that the contractor was entitled to be paid for work accomplished that "meets the standards under the contract." Consistent with this provision, Mr. Bruce stated that the Government only "pays for work satisfactorily completed" (JX 37/330) and Ms. DeMito testified that she would review the progress reports to make certain that the work complied with the plans and specifications. (Tr. 118/25-119/4). There was no testimony or documentation that the

Government exercised discretion and elected to make payments to TriGems for work never performed or performed improperly. Rather it was not until the last progress payment invoice (Number 14, JX 61 at 513) that the Government "retained" any monies for improperly performed work.

The Government now argues, albeit without support, that "many problems were identified by the Government inspectors, reported to [TriGems] and then satisfactorily resolved by [TriGems]." (Supplemental Brief at page 2). If TriGems had in fact corrected all of these problems, there would have been no reason to default TriGems, no need to send letters to U.S. Fire about the quality of the work performed by TriGems (i.e. PX 152/644) and no need for Lyman's first report which would have been a fictional work, rather than a report relied upon by the Contracting Office. In fact, just prior to Mr. Lyman's May 1998 report, Mr. Flemming stated that Mr. Ott and SrA Rodriguez had been tasked to develop a punchlist and scope of work for the bonding company. (JX 36/329). Therefore, there is every reason to believe that the problems set forth in the May 1998 report existed and were never corrected by TriGems given Mr. Bruce's unrefuted statement in February, 1999 that TriGems had not been working on the project for over a year or since around February 1998 (3 months before Lyman's first report). (PX 152/644; Tr. 341/2 – 22). This statement is further confirmed by one of the last daily inspection reports dated April 29, 1998 on which Airman Rodriguez stated that: "This is the last entry due to no one showing up to job site from contractor. Contracting is aware of TriGems activity on this contract and is handling matters legally." (JX 34 at 325).

The Government seems to imply that the Government has no accountability for payment for work known to be defective or for work never performed. It repeatedly states that U.S. Fire did not meet its burden of proof because no one from the completing contractor (Eastern) nor

anyone from TriGems testified. However, as set forth in detail in our other briefs, the most compelling evidence of the overpayments comes directly from Mr. Lyman's May 1998 report (JX 46) that was prepared specifically with an eye toward establishing the status of the project not only for the Government's benefit but also to assist the surety, the documents authored by the Government's own representatives about the quantity of defective work and the amounts paid by the Government, and the testimony of the Government representatives of the accuracy they placed on the first Lyman report. (i.e. JX 39; Tr. 443/7 – 14; PX 152; PX169; Tr. 420/13 – 422/2; Tr. 81/15-23; Tr. 655/11- 656/16). Further, Mr. Spinelli's input as to Eastern's experience and his observations was admitted into evidence with the Government's consent (Tr. 617/5-618/17) and was unrefuted.

**PAY APPLICATIONS**

While we will not attempt to re-review every payment invoice since we have previously addressed in detail the various invoices and payment documents in our initial post-summation brief, there are a number of statements made by the Government that should be addressed.

Initially, the Government has attempted to analyze the overpayment issue on a payment by payment basis by looking at the percentage complete without regard to having any information as to the quantity of the work performed. The Government then speculates that because U.S. Fire offered no direct testimony or evidence on a particular invoice that the amount approved was not justified, it means that payment of the invoice was justified. By contrast, U.S. Fire has not only addressed the project taken as a whole to show that overpayments occurred throughout the course of the Project, but we also respectfully submit that overpayments should be irrefutable where 100 percent of a work element was paid while at the same time work was

continuing by TriGems and there was work undertaken by Eastern as part of the completion of the Project, all as set forth more particularly in our initial post-summation brief.

In the Government's analysis of Progress Payment No. 4 it sets forth a number of observations noted by the inspectors of TriGems "digging for conduit laying". (DX 295/11) In footnote number 5 on page 11 of the Government's brief, it states that the laying of conduit necessarily would have required trenching. Using this information the Government attempts to justify the payment to TriGems without any supporting information as to the amount of linear feet of conduit and/or trenching performed.

The Government speculates about a mathematical error that was discovered by Ms. Mendell on Progress Payment No. 6 at some unidentified point in time to show an exercise of discretion in the amount approved for payment. Rather, the evidence shows that both Matthew Ward and TriGems agreed that 28% of the work had been completed during the period of July 16, 1996 to July 31, 1996. (DX 288/50 and 51). Payment No 5 (DX 289/40) covering the period of June 15, 1996 to July 15, 1996, was approved at 46% and Payment No. 6 (DX 289/30) was approved at 79%. What is important is the percentage used for payment. Based upon the amount of work then allegedly completed (DX 288/50), the Government should only have paid for 74%[1] complete. Yet for reasons unexplained an additional 5% was added to the work elements as completed bringing trenching, conduit and pull wire and cable and the cable material all to 100% complete. (DX289/31). Yet, as set forth in our prior briefs, the Government was well aware of ongoing problems with the performance of TriGems. (See JX 10/74; JX 13/77-78; JX 16/114; Tr. 408/8-23; Tr. 352/14 – 353/18). Thus, the 5% comprised an overpayment as did payment of 100% of the various line items.

[1] The 74% is utilized only for purposes of the math. It is still substantially overstated.

Despite the assertions of the Government that Eastern did not have to perform any of this work, there were issues with the conduit not having a neutral conductor and not being properly sealed (JX 25/199; JX 29/264) and Eastern's schedule of values directly contradicts this position (DX 281/4). Even Mr. Lyman conceded in his second report that Eastern performed trenching, conduit and had to pull wire and cable. (DX 286/1-2).

The Government has presented a chart in an attempt to show how the increase in the contract price of $177,874 for modification P0003 affected the percentages assigned to the work elements (page 22-23 of Government's Supplemental Brief). While the Government appears to concede that modification P0003 had nothing to do with the lighting equipment, the percentage assigned to the lighting equipment was reduced from 24% to 18%. [2] (DX 288/22 & 24). In addition, despite the fact there was no change caused to the lighting equipment by P0003, the Government reduced the amount that had been completed from 23.5 % to 9 of 24% completed. However, TriGems had already been paid for 23% of this work element as of Progress Payment No. 12 (DX 289/13). If, in fact, as of this point TriGems was only 9% complete, the Government had overpaid by 14% (23% -9%). Ultimately, the Government reduced this work element to 18% and approved TriGems for the full 18%. Assuming *arguendo* TriGems had completed 100% of the lighting, the Government overpaid by 5% for this work element ( the 23% previously paid by the Government compared with the adjusted value set at 18%). However, TriGems did not complete all of this work element. As set forth on the quote obtained from Brite-Way Electrical by U.S. Fire, there were 2 street lighting poles that had not been installed (DX 264/2) and Eastern included a charge of $18,798.08 to complete the street lighting

[2] The percentages and all of the percentages set forth herein are of the contract value, not of a line item. Thus, the reduction from 24% to 18% is a reduction of 6% of the entire contract value.

(DX 281/4). This is further confirmed by Mr. Lyman in his second report in which he concluded that TriGems had not completed this entire work element (DX 286/3).

The Government acknowledges a gap between the amount paid by U.S. Fire to complete the Project and the contract balance remaining at the time of takeover. The Government, however, attempts to explain the difference based upon an audit of the completion contractor Eastern's books in which the auditor concluded it cost Eastern $621,677 to complete, even though U.S. Fire paid it over $900,000.00. First, that same audit was never introduced into evidence (Tr. 724/1-8), which should result in adverse influences. Second, that figure, even if true, contains no amount for profit and allegedly represented only the costs incurred by Eastern. In that regard, if profit was only 10%, it would still raise the cost of Eastern to at least $680,000 more than the remaining contract funds. Third, Ms. Bunting reduced the costs to complete because they had "unsupported costs and some unreasonable costs" and "because they didn't segregate their costs by repair and completion costs." (Tr. 715/13 – 717/7). While perhaps appropriate if Eastern was seeking a claim based upon its costs, this evidence establishes that Ms. Bunting did not have all of the information to determine how much more than the $621,677 it actually cost Eastern; she only knew it cost more. In that regard, it should be noted further that Ms. Bunting received no technical support in performing the audit even though she requested it from the same office that requested the audit; thereby undermining the reliability and relevance of her analysis. (Tr. 719/16-18)

The Government continues to maintain that the cost to complete does not take into account materials purchased by TriGems that were on site and available to Eastern, yet provides no evidence that any such material existed. In fact, the only person to testify about the materials was Mr. Spinelli who stated there were no materials of any consequence left on the Project. (Tr.

627/3- 628/9). This position is further supported by Mr. Bruce when he wrote to Thomas Keeley-Cain on February 12, 1998 that "[w]ork crews have been nonexistent as has any material to complete the work." (JX 37 at 331).

The Government also states that inflation over the years would have affected the cost to complete without any evidence that costs went up. It is just as possible that costs went down. However, either way, the issue presented is whether TriGems was overpaid, not what it cost the surety since the surety obtained the best price after soliciting competitive bids and the surety's costs exceed the amount of the overpayment.

Finally, the Government mischaracterizes U.S. Fire's overpayment claim. The claim is that the Government failed to properly exercise discretion by making payments for work which TriGems never completed or which did not meet the contract standards. Whether TriGems' bid price was sufficient to complete the project is irrelevant. If the contract price was $1.00 and TriGems completed 83% of the contract there should have been $0.17 left to be paid. However, if TriGems had only really completed 40% ($0.60 left to be paid) and was paid as if 83% had been completed, the overpayment was $0.43 regardless of what it cost the surety to complete. U.S. Fire is entitled to the contract balance that should have remained at the time TriGems was defaulted. That is not to say that U.S. Fire would have had no loss in its completion of this Project; rather its loss would have been offset by the additional contract balance that should have been retained by the Government if it paid TriGems properly.

## CONCLUSION

The Government admitted on many occasions that an overpayment had occurred as set forth in our prior briefs. The assertions as to the amount of work actually completed were agreed to by Mr. Spinelli and confirmed by the experience of Eastern in the completion of the project. Again, it is respectfully submitted that the Government should not be permitted to rewrite history.

Respectfully Submitted,

DREIFUSS BONACCI & PARKER, LLP
Attorneys for Plaintiff United States Fire Insurance Company

By: __s/David C. Dreifuss___
DAVID C. DREIFUSS

c: universal\trigems\reply supplemental briefr1