NO. 03-2811C
(Judge Horn)

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

UNITED STATES FIRE INSURANCE COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S REPLY TO U.S. FIRE'S SUPPLEMENTAL POST TRIAL BRIEF

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, DC 20530
Tele: (202) 307-0282
Fax: (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

CHRISTOPHER S. COLE
AFLSA/JACN
1501 Wilson Boulevard
Arlington, VA 22209-2403

WILLIAM M. LACKERMANN, JR.
Air Force Materiel Command Law Office
Wright Patterson Air Force Base
Dayton, OH

June 2, 2006

**TABLE OF CONTENTS**

TABLE OF CONTENTS . . . . . I

TABLE OF AUTHORITIES . . . . . ii

DEFENDANT'S REPLY TO U.S. FIRE'S SUPPLEMENTAL POST TRIAL BRIEF . . . . 1

INTRODUCTION . . . . . 2

I. U.S. Fire Focuses Upon The Wrong Progress Report . . . . . 2

II. U.S. Fire Fails To Challenge Any Progress Payment Other Than No. 6 . . . . . 3

III. The Air Force Did Not Overpay For Materials In Progress Payment No. 6 . . . . . 4

A. The Contracting Officer Complied With The Contract When TGB Added The Materials Line Item . . . . . 5

B. The Percentage Of Payment Was Appropriate . . . . . 6

IV. The August 1996 Lyman Memo . . . . . 7

V. The Trenching And Conduit Payments . . . . . 8

A. Trenching . . . . . 9

B. The Conduit . . . . . 10

VI. Pull Wire And Cable . . . . . 11

VII. The Manholes And Pads . . . . . 12

VIII. Transformers . . . . . 13

CONCLUSION . . . . . 14

# TABLE OF AUTHORITIES

## CASES

Fireman's Fund Ins. Co. v. United States,
909 F.2d 495 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNITED STATES FIRE INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-2811C |
| | ) | (Judge Horn) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO U.S. FIRE'S SUPPLEMENTAL POST TRIAL BRIEF

Pursuant to the Court's April 25, 2006 order, defendant respectfully submits this reply to the supplemental post trial brief submitted by plaintiff United States Fire Insurance Company ("U.S. Fire").

INTRODUCTION

Having been granted another opportunity by the Court to address its failure to carry its burden of proof at trial, U.S. Fire has submitted a supplemental brief lacking any analysis of most of the progress payments made by the Air Force to Tri-Gems Builders, Inc. ("TGB"). Instead, U.S. Fire has provided comments on only six of the fifteen line items contained in the progress reports (to which U.S. Fire was not a party). As we set forth below, most of U.S. Fire's analysis is based upon sheer speculation. However, even with U.S. Fire's speculation, it produces a purported damages calculation of only $415,563.67. This amount is 40 percent less than the $692,870.99 it pursued at trial. See U.S. Fire post trial brief at 12. U.S. Fire's new calculation is no longer broken down into lump sums for allegedly defective work and allegedly incomplete work. We have never seen this calculation before as U.S. Fire is raising it for the first time in its supplemental post trial brief. Accordingly, the Government has been prejudiced because we

have had no discovery on this formulation of the claim, have not had an opportunity to cross examine witnesses, and have had no opportunity to present affirmative evidence in response.

U.S. Fire cites no evidence which indicates that the contracting officer knew, or should have known, she was paying for defective work when she approved progress payments, as opposed to work paid for and then later discovered to be defective. Similarly, U.S. Fire fails to acknowledge corrective work performed by TGB. U.S. Fire's new calculation of its damages only serves to underscore U.S. Fire's failure to prove any amount of damages with a reasonable degree of certainty.

I. U.S. Fire Focuses Upon The Wrong Progress Report

As we stated at page 7 of our supplemental brief, the Air Force and TGB each produced a progress report for the November, 1995 to April, 1996 time period. Defendant's exhibit 288 at pp. 63-65 (hereinafter "DX 288/63-65). In its progress report, the Air Force divided the work into 14 line items, whereas TGB used 19 line items. Id. The record also shows that both parties thereafter used the Air Force formulation. For example, TGB's progress report for June 15 to July 15, 1996, uses the same 14 line items and percentages as the Air Force progress report for the November 1995 to April 1996 time period. DX 288/53 & 63. There is no evidence in the record which would indicate what role, if any, TGB played in drafting the Air Force progress report.

Although the parties never used TGB's initial breakdown, U.S. Fire nevertheless asserts that TGB's initial progress report helps prove a large overpayment by the Air Force for the materials line item. Since there is no evidence that the parties ever used this progress report for payment purposes, and there is no evidence that TGB's progress report influenced the Air Force

in the creation of its own progress report, U.S. Fire's use of this progress report as the launching point for its analysis is without support in the record. Moreover, since U.S. Fire failed to call any witnesses from TGB to explain this progress report, and failed to call any witnesses who testified that TGB's initial formulation was more accurate than the Air Force progress report which was actually used, U.S. Fire's analysis lacks merit.

II. U.S. Fire Fails To Challenge Any Progress Payment Other Than No. 6

U.S. Fire provides no analysis that establishes that progress payments one through five were made in error. Nor does it establish that there were problems on the project as of the contracting officer's July 19, 1996 certification of invoice no. 5 for payment that would have required her to withhold payments. Defendant's exhibit ("DX") 289 at 40 ("289/40"). Through progress payment no. 5, the Air Force paid TGB a total of $599,948.56. See DX 289/1.

After progress payment no. 5, the Air Force paid TGB $268,218.73 for material invoices attached to certified invoice no. 6, plus an additional $417,385.85 for everything other than materials in progress payments 6 through 14. See, DX 289/1. Thus, in order to arrive even at U.S. Fire's reduced damages calculation of $415,563.67, the Court would have to conclude that virtually all of the (non-materials) progress payments after progress payment no. 5 were in error, that is, $415,563.67 of the $417,385.85 paid. After July 19, 1996, the contracting officer would have been unable to make any meaningful payment to TGB for its labor, equipment, overhead, and profit under U.S. Fire's analysis. However, the record simply does not support such a draconian action upon the part of the contracting officer at anytime in 1996.

One of the central flaws with U.S. Fire's argument is that the problems with TGB's work did not come to light until after the Air Force had paid TGB most of the money it would pay.

The record demonstrates that by the first indication of problems on the project, the August 1996 Lyman memo, discussed below, the contracting officer had already approved payments representing 80 percent of all of the funds that the Air Force would pay TGB.[1] By the end of 1996, the Air Force had paid 93.5 percent of the funds it would pay TGB.[2] As our earlier briefs and U.S. Fire's brief demonstrates, there were various problems found on the project in 1997 and 1998, but the Air Force had virtually stopped paying TGB by then.

III. <u>The Air Force Did Not Overpay For Materials In Progress Payment No. 6</u>

Although there is not a scintilla of evidence in the record from U.S. Fire's replacement contractor, Eastern Construction & Electric, Inc. ("Eastern"), or from its consultant, Cashin Spinelli, that Eastern had to purchase $251,837.22 of materials, U.S. Fire asserts in its supplemental brief that the Government overpaid for materials in this amount. U.S. Fire brief at 8. U.S. Fire's analysis ignores the $268,218.73 in invoices for materials attached to certified invoice no. 6. DX 289/32-38. Assuming that U.S. Fire is not arguing that these invoices were fraudulent, its argument seems to be that the Air Force paid an additional $251,837.22 for materials beyond the $268,218.73 in progress payment no. 6. This would mean that the Air Force paid more than $520,000 for materials. However, the record does not support U.S. Fire's assertion, but rather demonstrates that U.S. Fire can arrive at this amount only by ignoring evidence and through sheer speculation.

---

[1] The Air Force paid TGB a total of $1,285,553.14. Joint Stipulation of Fact 25. Through progress payment no. 6, the Air Force paid TGB a total of $1,030,346.44. DX 289/30, 40, 44, 48, 52, 55.

[2] Through progress payment no. 11, the Air Force paid TGB a total of $1,202,473.12. DX 289/1, 17, 21, 26, 30, 40, 44, 48, 52, 55.

A. The Contracting Officer Complied With The Contract When TGB Added The Materials Line Item

As we set forth most recently in our supplemental post trial brief at page 13, the contract that U.S. Fire agreed to bond provided that the contracting officer could pay TGB for materials purchased and stored on site. U.S. Fire does not appear to dispute that the contracting officer could do so. U.S. Fire does allege that when the contracting officer allowed TGB to add a materials line item, this resulted in an overpayment to TGB. U.S. Fire brief at 7. However, any argument by U.S. Fire on this issue is pure conjecture because, at trial, U.S. Fire provided no expert testimony which identified the actual percentage that should have been assigned to each line item. Nor does it do so in its supplemental brief.

Although not entirely clear, the crux of U.S. Fire's argument seems to be that the unused (19 line item) TGB progress report provides special insight to the true weight of the various line items. When the unused TGB progress report is compared to the line items in the actual progress reports after the materials line item was added, U.S. Fire argues that the lighting equipment and manholes and pads line items were overvalued and resulted in overpayments for materials. U.S. Fire brief at 7-8. Assuming for the moment that the unused TGB progress report is a proper benchmark and some line items were overvalued, then it would necessarily follow that other line items were undervalued and TGB would have been underpaid for these line items. For example, TGB's unused progress report contained line items for deliver transformers at 12 percent and install transformers at an additional 2 percent. DX 288/64. However, at the end of the project, the transformers line item was valued at only 8 percent. DX 288/1. As we set forth in section VII below, TGB furnished and installed all of the transformers. Thus, it appears that even if

some items were overvalued, the undervaluing of other items would have caused the Air Force to recoup the difference. For example, the decrease in the transformers would have saved the Air Force six percent of the contract price.

On a related note, if we again assume that the unused TGB progress report is meaningful, the various "deliver" line items in that progress report add up to 43 percent of the progress report. DX 288/64.[3] Although U.S. Fire faults the Air Force for later allowing TGB to add a line item for 22 percent materials, U.S. Fire's preferred progress report would support a payment for materials that is almost double what the Air Force actually agreed to pay.

B. The Percentage Of Payment Was Appropriate

Finally, U.S. Fire also suggests that the Air Force payment in progress payment no. 6 was too high at 33 percent for only a two week period. U.S. Fire brief at 15. However, 22 percent of this amount was materials (supported by invoices) and 11 percent for other work. DX 289/31. The earlier progress payment no. 4, not challenged by U.S. Fire, demonstrates that TGB could perform 11 percent of the work in two weeks. In the progress payment no. 4 time period, May 15 to June 14, 1996, TGB performed 21 percent of the work. Id.

In addition, contrary to U.S. Fire's argument that progress payment no. 6 paid for work already performed, the timing of the material invoices supports a finding that TGB incurred significant material costs in the progress payment no. 6 time period, July 16 to July 31, 1996. DX 289/30. For example, the largest single materials invoice, in the amount of $156,891.78 is dated July 16, 1996. DX 289/35. Two other invoices totaling approximately $8,000 are dated

[3] This progress report stated: deliver conduit, 7 percent; deliver transformers, 12 percent; deliver manholes, 2 percent; deliver lighting equipment, 7 percent; and deliver wire and cable, 15 percent.

July 17 & 24, 1996. DX 289/37-38. Other invoices attached to certified invoice no. 6 are close enough in time to support TGB's billing for the materials in that time period. For example, the second largest materials invoice, in the amount of $54,527.83, was received by TGB on July 15, 1996. DX 289/34.

## IV. The August 1996 Lyman Memo

U.S. Fire again raises the August 6, 1996 memo from Steven Lyman that was critical of TGB's work in support of its claim. JX 13. However, in this memo, Mr. Lyman merely criticizes U.S. Fire's excavation and backfilling/compaction of the trenches. He does not state that TGB is being paid for trenching that it is not actually performing. He does not criticize TGB's performance of any of the other line items for which it was paid through invoice no. 6, that is, bond and mobilization, conduit, pull wire and cable, manholes and pads, lighting equipment, and materials. These items constituted the vast majority of the amounts paid to TGB through progress payment no. 6. JX 13 at 77-78; DX 288/50. Thus, the memo at most criticizes a small percentage of TGB's work. Moreover, since the contracting officer's unrebutted trial testimony was that TGB performed all of the work that the Government directed TGB to perform to address these problems (Tr. 180/24-25), it is unclear why U.S. Fire asserts that the August 1996 Lyman memo supports an overpayment.

U.S. Fire also points out that the inspection records indicate that TGB continued to perform trenching after it was paid for all of the trenching in invoice no. 6. However, the

inspection records do not distinguish between TGB work to remedy the problems identified in the August 1996 Lyman memo and new trenching.[4] E.g., JX 15 at 97-99.

Review of the inspection records and progress reports with respect to the trenching and other line items demonstrates that it is an inexact science to translate a lump sum contract into 14 or 15 progress report line items, and then into payments. As we pointed out in our supplemental brief at page 9, fn. 4, there are repeated references in the inspection records to the excavation and installation of secondary lines. Conceivably, this work could be billed to the trenching, conduit, pull wire and cable, or asphalt paving. Thus, the inexact nature of this process validates the considerable discretion granted the contracting officer in making progress payments. See, e.g., Fireman's Fund Ins. Co. v. United States, 909 F.2d 495, 498 (Fed. Cir. 1990) ("[T]he Government contracts for a broad range of rights which are designed to promote continuation of the contract work. These provisions give the Government considerable discretion and flexibility in administering the contract. Public policy supports this flexibility in light of the various unforeseen circumstances which may hinder performance.")

V. The Trenching And Conduit Payments

The only contemporaneous evidence of the amount of trenching and conduit that TGB actually performed is contained in the drawings that Mr. Lyman marked up in 1998. Mr. Lyman testified that when he did his three day walk through of the project in 1998 he made certain "highlights" on drawings (DX 292) E-4, E-5, and E-6. Tr. 429/9-13. He testified that the blue highlighting over the dashed lines on those drawings are areas where TGB trenched and placed

[4] The Air Force inspector later revised his progress report to show that the trenching work was not complete. DX 288/24.

conduit. Tr. 734/11 to 735/3. The dashed line without the blue highlighting indicated areas where TGB had not trenched or placed conduit when it left the project site. Id. Visual comparison of the highlighted and unhighlighted areas on these drawings indicates that TGB performed the vast majority of the trenching and conduit work. While we cannot assign exact completion percentages to our visual review, the contemporaneous marking on the drawings appear to be consistent with Mr. Lyman's 2004 report. In his 2004 report, Mr. Lyman calculated that TGB performed about 88 percent of the trenching line item and 93 percent of the conduit line item. DX 286/1, 4.

A. Trenching

U.S. Fire asserts in its brief that the Air Force overpaid the trenching by $13,440.66. U.S. Fire brief at 10. It arrives at this figure by selectively accepting and ignoring parts of the 2004 Lyman report without explaining why it is doing either. It accepts Mr. Lyman's statement that 12.3 percent of the trenching work remained for Eastern to complete. In other words, Mr. Lyman calculated that TGB performed 7.89 of the 9 percent assigned to the trenching line item. DX 286/1. While U.S. Fire accepts this calculation, it does not acknowledge Mr. Lyman's related calculation with respect to the correctness of the Air Force's trenching payment. Since TGB performed 7.89 of the 9 percent trenching work, it would have been entitled to 7.89 percent of the contract price for this work. As Mr. Lyman correctly stated in his 2004 report, the actual Air Force payment to TGB with respect to the trenching was correct within about a tenth of percent, that is, the Air Force paid 8 of the 9 percent for the trenching. DX 286/1. U.S. Fire ignores this related aspect of Mr. Lyman's calculation. U.S. Fire does states that it still believes that the 1998 Lyman report is the "more accurate depiction of the actual field conditions" but why it states this

with respect to the trenching is unclear. The 1998 Lyman memo does not discuss any problems with the trenching. JX 46.

B. The Conduit

With respect to the conduit, U.S. Fire points to no evidence that the conduit work was performed incorrectly or that the Air Force overpaid for the conduit. It suggests that the value of the incomplete or defective conduit is $73,329.10, but this amount is nothing more than a guess that one-third of the conduit was incomplete or defective. However, no witness testimony supported this assertion with respect to the conduit, and U.S. Fire cites none.

U.S. Fire also questions the percentage changes in the conduit line item. It states that at the time of progress payment no. 6 "the percentage assigned to the conduit was reduced from 19% to 15% even though there was no deduct change order reducing the scope of the conduit." U.S. Fire brief at 10. However, it fails to mention that this reduction occurred when the 22 percent materials line item was added to the progress reports, requiring a total of 22 percent in reductions from other line items. Since U.S. Fire has presented no evidence as to what it considers to have been the correct percentage of conduit, either with or without a materials line items, its quibbling with the conduit percentages is without meaning.

Similarly, U.S. Fire complains that for pay application 14, the conduit remained at 15 percent even though modification P0003 added $177,874 to the contract price. U.S. Fire brief at 11. U.S. Fire asserts that TGB "received an additional $26,573.00 along the way not because they performed any more work but merely because payments were made as a percentage of the entire contract." Id. Why U.S. Fire makes this statement is unclear. Modification P0003 added additional conduit. Addendum no. 5 to the modification provided that "for Buildings 4231,

4232, 4233, 4246, 4247, and 4238 run the conduit and connect wire into existing disconnect switches as shown on marked-up sketch." JX 52 at 463 (Emphasis added). Addendum no. 6 to the modification provided that the contractor was to provide additional saw cuts and "after sawcut, open blacktop and soil to the appropriate depth and install conduit." Id. at 462 (Emphasis added). Since U.S. Fire did not provide any testimony at trial that the percentages changes brought about by P0003 were incorrect, U.S. Fire has no evidence to challenge the P0003 changes.

## VI. Pull Wire And Cable

Reference to modification P0003 also demonstrates the fallacy of U.S. Fire's arguments with respect to pull wire and cable. As U.S. Fire points out, this line item increased from four to eight percent during the course of the project. U.S. Fire brief at 11. However, U.S. Fire does not state when or why this happened. The February 1997 progress reports show pull wire and cable at four percent (DX 288/24-25), whereas the March 1997 reports show it at eight percent. DX 288/22-23. P0003 was executed in early March, 1997. JX 52 at 460. As U.S. Fire states, it added $177,874 to the contract price, an increase of 13.6 percent. Id. As stated in our preceding paragraph, this modification provided for additional wire and cable because it stated "for Buildings 4231, 4232, 4233, 4246, 4247, and 4238 run the conduit and connect wire . . ." JX 52 at 463 (Emphasis added). P0003 further provided that TGB was to "extend the new service," that is, the electrical service, to several buildings. Id. at 463.

U.S. Fire quotes Mr. Lyman as testifying that the amount of the cable did not double. U.S. Fire brief at 12. However, as set forth above, the cable clearly increased but U.S. Fire fails to acknowledge this increase. Nor does it state what the "correct" percentage for the wire and

cable was at the end of the project. P0003 added 13.6 percent to the contract price, but U.S. Fire has denied in its brief that it added conduit or that it would have caused a four percent increase to the wire and cable. What then did this modification add?

U.S. Fire's reliance upon Mr. Lyman concerning the percentage increases in the wire and cable highlights another of the weaknesses in U.S. Fire's case. Instead of focusing upon the contracting officers, the only Government officials authorized to make the progress payments and issue modifications, U.S. Fire focused its whole case upon Mr. Lyman and one document he wrote, a 1998 memo. However, the contract, case law and the record all show that U.S. Fire has focused upon the wrong individual. Mr. Lyman did not contemporaneously review either progress schedules or progress reports. Tr. 413/12-17; 414/5-7. Further, Mr. Lyman was not involved with making progress payments to TGB and he did not have any experience as a contracting officer approving or rejecting contractor progress payment invoices. Tr. 420/4-9. If U.S. Fire wished to challenge the percentages assigned to various line items, it should have done so through the contracting officer. Instead, it tried to do so through Mr. Lyman who is undoubtedly expert in electrical engineering, but has no known expertise in contract administration.

VII. The Manholes And Pads

With respect to the manholes and pads, U.S. Fire argues that there was an overpayment because the manholes were not properly sealed and had to be cleaned out at a later date. U.S. Fire brief at 13. It does not allege that TGB did not furnish and install the manholes. In this respect, Mr. Lyman's testimony is unrebutted:

Q Do you know how many manholes that Tri-Gems installed?

A They installed all of them.

Q Do you know how many vaults that Tri-Gems installed?

A They installed all of them.

Q How do you know that Tri-Gems installed all the manholes and all the vaults?

A I saw most of them go in, and plus on our original [19]98 walkthrough, we witnessed that all of them were installed.

Tr. 742/14-24.

In support of its argument, U.S. Fire again cites Mr. Lyman's 1998 memo, in which Mr. Lyman stated that in April 1998 he found that some of the vaults needed to be resealed and cleaned out. JX 46 at 421. However, this memo refers back to work that was done up to two years earlier, in 1996. The memo states that TGB sealed the manholes, but the seals later failed.[5] There is no evidence in the record which indicates that the seals were faulty in 1996. When the contracting officer paid TGB in 1996, there is simply no way she could have known that in 1998 Mr. Lyman would discover that the seals did not hold. Thus, since the manholes were sealed when TGB installed them, there is no evidence in the record that the Air Force payments to the manholes were anything but proper at the time that they were made.

VIII. Transformers

U.S. Fire "estimate[s]" in its brief that the Air Force overpaid for the transformers by 50 percent, or $44,441.48. U.S. Fire brief at 14. However, without supporting testimony from

[5] As we stated at length in our previous briefs, the contract in the progress payment and warranty clauses envisions that the contractor may be paid for work that is later found to be defective and requires the contractor to either fix the work or pay the Government back with interest. See, e.g., post trial brief at 44-46.

TGB, Eastern, or its expert, this estimation is nothing more than a guess or a self-serving statement.

In his 2004 report, Mr. Lyman stated that all of the transformers were delivered and set in place by TGB, but Eastern had to secure and connect them. DX 286/2. He also stated that materials made up 80 percent of this line item. Id. During his testimony, U.S. Fire's expert, Mr. Spinelli, was given the opportunity to dispute Mr. Lyman's analysis. However, Mr. Spinelli could only state that he thought that Eastern had to replace a few of the transformers, but did not otherwise dispute Mr. Lyman's conclusions for this line item. Tr. 648/3-19. There was no evidence or testimony from Eastern as to its transformer work, if any. Thus, U.S. Fire's contentions with respect to the transformers lack merit.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in our earlier briefs, defendant respectfully submits that U.S. Fire has no jurisdictional basis to assert this claim and has failed to carry its burden of proof. Defendant, therefore, requests that the Court enter judgment in its favor.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/Michael N. O'Connell
MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor,
1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0282
Fax (202) 514-8624

OF COUNSEL:

CHRISTOPHER S. COLE
AFLSA/JACN
1501 Wilson Boulevard
Arlington, VA 22209-2403

WILLIAM M. LACKERMANN, JR.
Air Force Materiel Command
Law Office
Wight-Patterson Air Force Base
Dayton, OH

June 2, 2006

Certificate of Filing

I hereby certify that on June 2, 2006, a copy of the foregoing notice of motion was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Michael N. O'Connell