# In the United States Court of Federal Claims

**No. 03-2811C**
**Filed: September 12, 2007**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | | |
| **UNITED STATES FIRE INSURANCE COMPANY,** | * | |
| | * | Trial; Equitable Subrogation Claim by |
| | * | Surety; Progress Payments; |
| **Plaintiff,** | * | Government Abuse of Discretion. |
| | * | |
| **v.** | * | |
| | * | |
| **UNITED STATES,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

**David C. Dreifuss**, Dreifuss Bonacci & Parker, LLP, Florham Park, New Jersey, for plaintiff. With him was **Derek A. Popeil**, Dreifuss Bonacci & Parker, LLP, Florham Park, New Jersey, of counsel.

**Michael N. O'Connell**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him were **Peter D. Keisler**, Assistant Attorney General, and **Donald E. Kinner**, Assistant Director, Commercial Litigation Branch. Of counsel were **Christopher S. Cole**, Air Force Legal Services Agency, Arlington, Virginia, and **William M. Lackermann, Jr.**, Air Force Materiel Command Law Office, Wright-Patterson Air Force Base, Dayton, Ohio.

## O P I N I O N

**HORN, J.**

This case arises from a construction project to renovate an electrical distribution system at McGuire Air Force Base, New Jersey. The contract was awarded to Tri-Gems Builders, Inc. (Tri-Gems). United States Fire Insurance Company (U.S. Fire)

issued the required performance and payment bonds[1] on behalf of Tri-Gems. U.S. Fire was the surety on the project. After Tri-Gems was terminated for default, the Air Force and U.S. Fire entered into a takeover agreement for U.S. Fire to complete the construction project.

U.S. Fire brought a claim in this court, alleging that the Air Force had caused contract funds to be improperly depleted when the Air Force made improper payments to Tri-Gems for unsatisfactory and partially completed work. As a result, according to U.S. Fire, the surety was prejudiced since the remaining contract funds were less than they would have been had the contract been properly administered by the defendant. The surety alleges that the contract funds remaining after Tri-Gems' default were insufficient to properly compensate U.S. Fire to complete the project, because the defendant had not paid funds to Tri-Gems in proportion to the work actually completed, which plaintiff claims was a contract requirement. U.S. Fire alleges that the Air Force made improper payments to Tri-Gems in the amount of $394,911.79 for work not performed and $296,839.20 for work improperly performed, totaling $691,750.99.

The government brought an early motion to dismiss for lack of subject matter jurisdiction. This court issued an opinion denying the government's motion to dismiss. The court concluded that jurisdiction over claims brought by a surety stems from the doctrine of equitable subrogation, citing by way of support decisions of the United States Court of Appeals for the Federal Circuit. See U.S. Fire Ins. Co. v. United States, 61 Fed. Cl. 494, 499 (2004) (citing, e.g., Ins. Co. of the West v. United States, 243 F.3d 1367, 1370 (Fed. Cir.), reh'g denied, reh'g en banc denied (2001)).[2] After a trial of the facts, the parties submitted post-trial briefs, followed by additional written submissions from both parties and additional motion practice. As discussed below, the court finds in favor of the government.

## FINDINGS OF FACT

The Department of the Air Force solicited bids for the contract at issue to renovate the electrical distribution system in military family housing, at McGuire Air Force Base, New Jersey. The contract, No. F28609-96-C-0003, titled "Replace

[1] A performance bond is for the protection of the government, insuring that the project will be completed, and a payment bond is for the protection of persons supplying labor and material on a government contract. See Nat'l Am. Ins. Co. v. United States, No. 07-5016, 2007 WL 2388896, at *1 n.1 (Fed. Cir. Aug. 23, 2007).

[2] See the United States Court of Appeals for the Federal Circuit's similar conclusion in favor of the surety-plaintiff on the issue of jurisdiction in a recent payment bond case, National American Insurance Company v. United States, No. 07-5016, 2007 WL 2388896, at *5, in which the government argued, unsuccessfully, as U.S. Fire had argued in its earlier motion to dismiss in this case, also unsuccessfully, that the United States Supreme Court case of Department of the Army v. Blue Fox, 525 U.S. 255 (1999), somehow changed the law on sureties and equitable subrogation.

Overhead Power Distribution, FCN [Falcon Court North]," had a not-to-exceed price of $1,202,800.00. The contract required Tri-Gems to renovate the electrical distribution system by removing overhead power lines and by burying those lines in conduits underground.

The contract incorporated by reference a number of Federal Acquisition Regulation (FAR) clauses. Of particular relevance to this case, the contract incorporated FAR 52.232-5 (April 1989), titled "Payments Under Fixed-Price Construction Contracts." The provision requires the government to make payments to the contractor based "on estimates of work accomplished which meets [sic] the standards of quality established under the contract, as approved by the Contracting Officer." 48 C.F.R. § 52.232-5(b) (Oct. 1, 1995). In addition, FAR clause 52.236-15 (April 1984), "Schedules for Construction Contracts," required Tri-Gems to provide the contracting officer with "a practicable schedule" showing how it "proposes to perform the work, and the dates on which the Contractor contemplates starting and completing the several salient features of the work . . . ." 48 C.F.R. § 52.236-15(a) (Oct. 1, 1995). The schedule was to be "a progress chart" which indicated "appropriately the percentage of work scheduled for completion by any given date during the period." 48 C.F.R. § 52.236-15(a). Subsequently, also according to the FAR provision, Tri-Gems was supposed to "enter the actual progress on the chart," and provide it to the contracting officer to determine if Tri-Gems was staying on schedule. 48 C.F.R. § 52.236-15(b) (Oct. 1, 1995). If the contractor fell behind the approved schedule, the contractor, at the direction of the contracting officer, was to take steps to correct and improve its progress. 48 C.F.R. § 52.236-15(b).

The deputy base civil engineer at McGuire AFB, Scott Wilson, after review by his inspectors, reviewed and recommended approval to the contracting officer of the contract progress schedules, along with completion percentages submitted by Tri-Gems. At trial, Mr. Wilson testified that the "key thing" for him in reviewing the contract progress schedule was to watch out for "a contractor's front loading," and whether anything "jumped out" on his review. If the progress schedule, including the percentage of the total job completed, changed for any work element, Tri-Gems was required to submit a revised progress schedule for approval before progress reports for payment purposes could be submitted. The contract progress schedules were revised several times during contract performance. The contracting officer ultimately had to approve the progress schedules.

In addition to the payment clause, the contract also incorporated FAR 52.246-12 (July 1986), titled "Inspection of Construction," which requires the contractor to "maintain an adequate inspection system and perform such inspections as will ensure that the work performed under the contract conforms to the contract requirements." 48 C.F.R. § 52.246-12(b) (Oct. 1, 1995). FAR provision 52.236-6 (April 1984), titled "Superintendence by the Contractor," also required Tri-Gems to have a supervisor on the work site at all times to "superintend the work." 48 C.F.R. § 52.236-6 (Oct. 1, 1995). In addition, FAR 52.236-5 (April 1984), titled "Material and Workmanship," required that,

"[a]ll work under this contract shall be performed in a skillful and workmanlike manner." 48 C.F.R. § 52.236.5© (Oct. 1, 1995).

With regard to progress payments for materials delivered to the site, the contract at issue also contained Air Mobility Command FAR Supplement (AMCFARS) clause 5352.232-1000 (May 1991), titled "Payment for Materials Stored on Site," which complemented the payments clause included in the contract and noted earlier, FAR clause 52.232-5 (April 1989), titled "Payments Under Fixed-Price Construction Contracts." AMCFARS clause 5352.232-1000(b)(3)-(4) required the contractor to submit invoices for high-cost items which must be delivered to an approved location on-site. AMCFARS clause 5352.232-1000(b)(4) also required the contractor to certify that none of the materials would be removed without written permission from the contracting officer.

On November 7, 1995, Tri-Gems obtained payment and performance bonds, as required by the contract, from plaintiff U.S. Fire. The penal sum of the performance bond was $1,202,800.00. The performance bond premium for the contract was $22,350.00.[3] On November 15, 1995, Tri-Gems submitted certified progress payment no. 1 for $22,350.00 for the cost of the performance and payment bonds. That same day, the contracting officer, Kathleen DeMito,[4] approved the invoice and issued Tri-Gems a notice to proceed. Under the terms of the contract, performance was to begin within ten days of issuance of the notice to proceed.

By February, 1996, the contracting officer had become concerned about the project's progress because she still had not received payrolls, material approval submittals, or a progress schedule from Tri-Gems. To determine the contract's status, the contracting officer contacted Tri-Gems on February 22, 1996 to express "concern regarding the performance of this contract and it's [sic] completion by 12 July 1996." According to an internal government memorandum, on March 19, 1996, Tri-Gems met with the contracting officer to discuss the cause of the delay. The government memorandum indicates that Tri-Gems acknowledged that it had not begun to perform under the contract because "the initial sub-contractor hired by Tri-Gems to perform the work under this contract backed out of their contract at the last minute."

---

[3] The performance bond expressly waived any notice to the surety of contract modifications. The "Changes" clause in the contract (August, 1987) was consistent with this waiver, stating that: "The Contracting Officer may, at any time, without notice to the sureties . . . make changes in the work . . . ." 48 C.F.R. § 52.243-4 (Oct. 1, 1995).

[4] Contracting officer DeMito participated in the solicitation, award and administration of the contract between the United States and Tri-Gems. She also participated in the default termination of the contract.

Tri-Gems began work on the contract in March, 1996. The Air Force assigned a construction contract inspector to monitor and inspect the work performed by Tri-Gems.[5] The construction contract inspector inspected the Tri-Gems' work, and submitted a progress report approximately every two weeks.

On April 9, 1996, Tri-Gems and the Air Force agreed to contract modification number P00001, which incorporated an "Addendum No. 2" into the contract, and extended the contract performance period for ten weeks. Contract modification P00001 also made changes to the specifications, and increased the contract price by $104,236.00.

On April 23, 1996, Tri-Gems submitted progress payments invoice no. 2 for the period from November 16, 1995 to April 23, 1996. In this request for progress payments, Tri-Gems sought progress payments for a 5% completion percentage, or $37,790.00, which was for the remainder of the bond and mobilization line items. The contract construction inspector, however, had estimated that Tri-Gems had completed 3% of the bond and mobilization line items. On May 3, 1996 contracting officer DeMito exercised her discretion to change the completion percentage to 4%, rather than the contractor-requested 5%, and to approve payment to Tri-Gems of $29,819.44, rather than the $37,790.00 sought. At this point, Tri-Gems had been paid $22,350.00 for progress payment no. 1 and $29,819.44 for progress payment no. 2, for a total of $52,169.44.

Also on April 23, 1996, the contract construction inspector reported to contract administrator Beth Mendell that: "The Contractor [Tri-Gems] is currently marking the ground as well as digging areas for the lamp post base locations. These areas do not correspond to the drawings. Not only are they in the wrong locations, but also there are not enough markings/diggings to meet the requirements of the project drawings." On May 20, 1996, Tri-Gems and the Air Force agreed to no-cost contract modification P00002, with an effective date of May 16, 1996. Contract modification P00002 relocated the lamp posts.

On May 15, 1996, Tri-Gems submitted progress invoice no. 3 for the period from April 24, 1996 to May 14, 1996. The certified progress reports from both Tri-Gems and the Air Force estimated that Tri-Gems had completed an additional 10% of the work during this period, all of which was for the lighting equipment line item, constituting 24% of the total contract. The contracting officer paid the full amount of $130,423.60.

Government inspection records for the next payment period from May 15, 1996 to June 14, 1996 indicate that Tri-Gems worked primarily on laying conduit. The inspection records also note that initially the conduit was laid without an embedment being placed.[6] The inspection records indicate that the contractor site supervisor was

[5] Over the course of the Tri-Gems contract, there were a total of three government construction contract inspectors.

[6] On May 15, 1996, the government inspection records state that conduit was being laid, that Tri-Gems had made minor repairs to a broken water line and that a permanent fix

notified about the embedment and a 2-inch minimum for digging. The inspection records for May 17, 1996 indicate that Tri-Gems agreed to re-lay the conduit, and by May 20, 1996, the inspector confirmed that sand was being used as embedment. According to the inspection records, by May 28, 1996 Tri-Gems had finished laying conduit in several areas.[7]

On June 12, 1996, the inspection records indicate that a dispute arose relating to trenching. On that day, the inspector noted that trenches in some areas were too shallow at 6-12 inches. The contractor claimed that the trenching had been performed pursuant to instructions by the government's chief of construction management, Joe Flemming. The inspection records indicated that Tri-Gems and the Air Force agreed that the contractor would dig according to the contract specifications, unless the digging was over a water line, in which case the contractor would dig at the 18-24 inch depth.

On June 17, 1996, Tri-Gems submitted progress payments invoice no. 4 for the time period from May 15, 199 to June 14, 1996. Both Tri-Gems and the government estimated that Tri-Gems had completed 21% of the work during that time period, for a total completion percentage of 35%. The reports estimated that Tri-Gems had completed 3% of the 15% assigned to trenching, 8% of the 19% assigned for conduit, and an additional 10% for lighting equipment for a cumulative total of 20% out of 24% assigned for lighting. The contracting officer paid the full amount of progress payments requested, $273,889.56. Inspection records from June 15, 1996 to July 15, 1996 indicated that Tri-Gems continued trenching and conduit work.[8]

---

would be completed the next day. The next day, on May 16, 1996, the conduit was still being laid, but the government construction contract inspector noted that "NO EMBEDMENT WAS BEING PLACED." (emphasis in original).

[7] On May 23, 1996, Tri-Gems placed lamp pole bases on East and West George Streets, finished conduits on Andrews Avenue and continued laying conduit on West Castle. On May 28, 1996, the inspection record stated that the Burtonwood and West Castle conduit was complete, and that the Andrews Lane conduit was 85-90% complete.

[8] The June 17, 1996 government inspection records stated: "Trenches being dug behind houses along W. George," and "Approx. 600 ft. of 4" conduit w/cement encasing laid." On June 18, 1996, the inspection records indicated that trenching was complete along W. George and that other secondary trenching was being performed. The following day, the government inspector noted that he spoke to the contractor's site supervisor regarding cement removal and that the latter agreed to remedy the problem. Other inspection records reflect the following: June 21, 1996, "Secondary trenches dug to 4025," and "4 driveways being ripped up in order to lay lighting conduit underneath"; June 26, 1996, "Lighting conduit being laid under driveways on N. Bolling Ave.," and "Secondary trenches being dug along W. George"; June 27, 1996, "Lighting conduit still being laid under driveways along N. Bolling," and "Secondary trenches being dug along W. George St." From June 28 to July 16, 1996, no inspections were performed.

On July 9, 1996, contracting officer Linda Williams sent Tri-Gems a letter expressing concern about progress on the contract, stating: "A review of the contract file indicates that you are behind your projected schedule by 23.5% as of 30 June 1996." On July 16, 1996, Tri-Gems' president responded with a revised contract progress schedule, "which more accurately reflects our current status and future progress. This should resolve any concerns regarding the progress on this project . . . ."

Also on July 16, 1996, Tri-Gems submitted certified progress payments invoice no. 5 for the period from June 15, 1996 to July 15, 1996, in the amount of $143,465.96. Both Tri-Gems and the government certified that Tri-Gems had completed an additional 11% of the work during that period. The progress reports indicated that this included 3% trenching, 3% conduit, 2% pull wire and cable, 1% manholes and pads, and 2% lighting equipment. The contracting officer paid the total amount requested, $143,465.96.

The government inspection records for the next progress payment period indicated that there were several technical problems with the project during this time. The inspection records for July 17, 1996, stated, "several lamp post bases tilting," and "digging on primary not quite 3' in all areas."[9] On July 25, 1996, the government inspector met with the contractor's site supervisor and reported several performance deficiencies to Tri-Gems. The list included lamp post bases that had shifted in the ground due to settling; ruts in housing occupants' yards; dirt, roots and broken concrete that needed to be removed from the work area; backfill coming out of trenches; and backfilling and compacting procedures that were not being performed in accordance with the specifications and drawings. The July 25, 1996, daily inspection records indicated that Tri-Gems' site supervisor agreed to "remove concrete from W. Castle," "remove excess dirt from primary digs," "repair W. Gate trench," and "fix lamp post bases."

On August 1, 1996, Tri-Gems submitted certified progress payments invoice no. 6 in the amount of $286,931.92, for the period from July 16, 1996 to July 31, 1996. Contract administrator Beth Mendell increased the amount of the invoice to $430,397.88.[10] Starting with this invoice, an additional line item was added to the progress reports for materials delivered to the work site, valued at 22% of the overall

[9] The inspection record indicated that on July 18, 1996, the primary dig was left open and that a tree was "nearly falling over." On July 22, 1996, driveway repair work was being performed. On July 24, 1996, the government inspector was unable to reach the contractor's site supervisor, and noted that the site needed to be cleaned, roots removed from backfill, and cement removed from the work area.

[10] The government states that the contract administrator increased this amount because Tri-Gems had "made mathematical errors in its progress reports which were discovered at some point by Ms. Mendell." The government noted that "the amounts in the '% completed cumulative' column [of the contract progress report for July 16, 1996 to July 31, 1996] were low by two percent for trenching, two percent for the conduit, and one percent for the pull wire and cable, or a total of five percent."

contract price. The addition of this line-item required reduction in the overall percentage of several other line items, e.g., trenching, 15% reduced to 10%; conduit, 19% reduced to 15%; transformers, 14% reduced to 9%; testing, 2% reduced to 0.5%; demolition, 3% reduced to 1%; asphalt paving, 2% reduced to 0.5% percent; site restoration, 2% reduced to 0.5%; and final inspection, 2% reduced to 0.5%.

Tri-Gems' invoice No. 6 included several, supporting, vendor invoices for materials totaling $268,218.73. Including the material invoices, both the Air Force and Tri-Gems estimated that Tri-Gems completed an additional 28% of the work during this period: 22% for materials, 2% for trenching, 2% for conduit, 1% pull wire and cable, and 1% manholes and pads. The government paid the progress payment invoice as modified, in the amount of $430,397.88.

On August 6, 1996, Steven Lyman, the government's project manager on the contract, sent a memorandum to Joe Flemming, the government's chief of construction management, stating, "There are many things the contractor is failing to conduct under the subject contract. The contract documents are not being followed. The contractor seems to do whatever he pleases. We have to get him in line. We cannot continue in this manner." Mr. Lyman then provided a supporting list of deficiencies. He noted that the trenches for the conduit were too shallow, the backfilling of the trenches was not being conducted in accordance with the specifications, the compaction and compaction testing were not being performed according to specifications, the excavations were not being kept dry and free of water, and there were mounds and gullies rather than contoured grading. Mr. Lyman concluded by writing that:

> This specification was carefully written with the intent on getting a professional finished product. The contractor should read these sections of the specification and start adhering to the contract documents. There is plenty of trenching left to accomplish. We cannot allow this contractor to continue in this manner. It is not fair to the other bidders who submitted proposals with the acceptation [sic] to carry out the project according to the specifications and drawings. This contractor is defrauding the Government and we must put a stop to it!!!" (emphasis in original).

In the August 8, 1996 government inspection record, the inspector noted that the cleanup of the areas discussed with Tri-Gems on July 25, 1996 had not begun, and that no new work had been completed. As noted above, the July 25, 1996, daily inspection record had indicated that the contractor's site supervisor agreed to "remove concrete from W. Castle," "remove excess dirt from primary digs," "repair W. Gate trench," and "fix lamp post bases." Based on the above-noted August 6, 1996, memorandum from Steve Lyman, the government's project manager for the contract, to Joe Flemming, the government's chief of construction management, the latter sent an August 8, 1996, memorandum to the contracting officer, Ms. DeMito and the government's contract administrator, Ms. Mendell, reporting Tri-Gems' deficiencies on the contract. In response, in a memorandum dated August 9, 1996, Ms. Mendell informed Tri-Gems of the deficiencies reported to her. Tri-Gems responded in a letter dated August 13, 1996,

stating that the identified deficiencies would be corrected by the week of August 19, 1996. Contract administrator Mendell provided a copy of the letter to Mr. Flemming and the construction contract inspector. Ms. Mendell included in her letter to Mr. Flemming the following notation: "Please make note that Mr. Nelson [Tri-Gems superintendent] has stated he has made several attempts to contact SrA [Senior Airman] Ward [a government construction inspector] to discuss these issues and even had a meeting set up for this morning however, SrA Ward did not show up at the designated time."

The daily inspection records, beginning on August 9, 1996, reflect that site cleanup, site restoration, cement/concrete removal and trenching were in progress during August, 1996. On August 18, 1996, Tri-Gems submitted certified progress payments invoice no. 7 in the amount of $39,127.08 for work performed during the period from August 1, 1996 to August 15, 1996. The contract progress reports from both the government and Tri-Gems estimated that Tri-Gems had accomplished an additional 3% of the project during that period, all in the transformers line item number. Tri-Gems received its requested progress payments of $39,127.08.

On August 23, 1996, the construction inspector noted in the government inspection record that no new work was observed at the project site, and that he had been "notified via fax that sub-contractors had walked off the site due to contract violations with primary contractor." In a letter dated August 27, 1996, with a copy to contract administrator Mendell, Tri-Gems terminated its contract with subcontractor Dynamic Developers, Inc., stating, "[y]ou have abandoned the job as of August 22, 1996 . . . ." On August 29, 1996, Mr. Flemming sent a memorandum to Ms. DeMito and Ms. Mendell informing them that the problems previously reported to Tri-Gems on August 8, 1996, which Tri-Gems had indicated would be corrected by the week of August 19, 1996, had not yet been corrected. Mr. Flemming also indicated in the memorandum that the government construction inspector had spoken with Tri-Gems' site supervisor, and the latter had indicated "that the problems would be taken care of immediately."

On August 30, 1996, the contracting officer responded to Mr. Flemming's August 29, 1996 memorandum regarding deficiencies which had not yet been corrected. In her memorandum, the contracting officer detailed the resolutions to the problems that had been negotiated with Tri-Gems. The contracting officer concluded by stating: "It is the responsibility of the CCI [government construction contract inspector] to make daily inspections and inform the [Tri-Gems'] site superintendent of any deficiencies he notes. All of the issues above could have been pointed out to Mr. Nelson [Tri-Gems' site supervisor] and a date (within a reasonable time frame) set for their remedy." The contracting officer then stated that if corrections were not made in a timely manner, the "correspondence should be forwarded to this office so that a more formal approach can be taken with the contractor. Tri-Gems' [sic] has been made aware of your 29 August 1996 memo and the above responses [to each of Mr. Flemming's cited deficiencies] were coordinated with Mr. Nelson."

The government inspection records for the first half of September, 1996 indicated that Tri-Gems continued trenching, installing lines, and digging for the installation of

electrical manholes.[11] The project had some additional problems during this period. For example, on September 5, 1996, the government's construction inspector reported that children had fallen into concrete vaults left open by Tri-Gems, and the contractor was instructed to secure the vaults with appropriate fencing. Tri-Gems indicated that it would check the vaults daily and insure that they were properly fenced.

On September 17, 1996, Tri-Gems submitted certified progress payments invoice no. 8, for $78,254.16, for the period from August 16, 1996 to September 16, 1996. Both the government and Tri-Gems estimated that Tri-Gems accomplished an additional 6% of work during that period: 5% for the transformers line item and 1% for the manholes and pads line item. The contracting officer paid the invoice in full.

The government inspection records for the next payment period, the last half of September, 1996 and first half of October, 1996, indicate that Tri-Gems performed work on several line items, including lighting equipment, manholes, and transformers and pads.[12] The inspection records during this time period indicated that one of the electric manholes and concrete vaults was "half full of water." The government inspector informed Tri-Gems' subcontractor of the problem and that the condition constituted a safety violation. The inspection records reflect that the subcontractor indicated it would take immediate action to pump the water out with a water pump. On another occasion during this time period, while digging for the installation of electric manholes, the contractor encountered a water line. The inspector and the contractor agreed that the problem would be corrected at no cost to the government.

In a memorandum dated September 26, 1996 to the government's contract administrator, Beth Mendell, Tri-Gems' construction superintendent, Randy Nelson, advised that Tri-Gems had been unable to place manholes as specified in the contract drawings due to encountering underground utilities at the sites. Mr. Nelson further advised that, in the new location, to which he was directed for manhole placement, he found the waterline to be too high, and was directed to move the manhole location once again. In this regard, the government's project manager, Steven Lyman, advised the

---

[11] The government's inspection records for September, 1996, report, for example, the following work on successive days: "Placement of transformer precast concrete vault/pad several areas"; "digging for installation of concrete vaults"; "raking several areas where existing ruts remain due to trenching of primary line." Tri-Gems also performed placement of concrete vaults, trenched for primary and secondary lines, poured concrete, and installed primary and secondary lines.

[12] The inspection records for the last half of September, 1996 and first half of October, 1996, on successive days, indicated that Tri-Gems poured concrete on the primary lines for electric manholes, performed trenching for secondary lines and digging for installation of electric manholes, excavated and installed secondary lines, excavated and installed an electric manhole, continued to perform trenching and placement of the secondary lines behind several quarters, placed manhole covers and graded trenches for several quarters, sawcut the asphalt parking lot for secondary lines, and installed a concrete vault.

contract administrator on September 27, 1996, that it was Tri-Gems' responsibility to place the manholes so as to avoid underground utilities.

On October 15, 1996, Tri-Gems submitted certified progress payment invoice no. 9 in the amount of $26,084.72 for the period from September 17, 1996 to October 15, 1996. Both the government and Tri-Gems indicated in their progress reports that Tri-Gems had completed an additional 2% of the work during this time period: 1% for lighting equipment and 1% for manholes and pads. The contracting officer paid this invoice in full on October 15, 1996.

Government inspection records for the second half of October, 1996 and first half of November, 1996, indicate that excavation continued for primary and secondary lines and installation of manholes.[13] On October 23, 1996, the inspection record reflects that carport lights for several quarters were damaged by a Tri-Gems subcontractor. The Tri-Gems site supervisor committed to correction of the damage. The inspection record for October 31, 1996 reflects that the government's project manager for the contract, Mr. Lyman, and a government construction inspector, inspected every single house to determine if a proposed Tri-Gems change order for sawcutting was required.

Tri-Gems' progress payments invoice no. 10 is not contained in the record. However, the record does reflect that the Air Force paid Tri-Gems $13,042.36, or 1% of the contract price, on November 25, 1996, for this progress payment. The progress reports for the October 16, 1996 to November 15, 1996 period estimate that Tri-Gems accomplished 1% of the switches contract line number work. The contract officer paid this invoice on November 25, 1996.

The progress reports for the next payment period, November 16, 1996 to December 15, 1996, indicate that Tri-Gems worked on installing secondary lines, blacktopping, and lighting equipment.[14] Some problems with the project were identified

---

[13] The government inspection records in this October -November, 1996 timeframe note the following work on successive days: excavation and installation of secondary lines for quarters; "pulling wire in several areas"; primary conduit layout, connection for electrical manholes, and concrete pouring for primary lines; primary conduit tie up for transformer and electrical manhole; excavation and installation of secondary lines for several quarters; pulling wire between manholes; and wire pulling for transformers.

[14] The government inspection records identify the following work by Tri-Gems during the November 16, 1996 to December 15, 1996 period: excavated and installed secondary lines for quarters, worked on water lines for selected quarters; blacktop/patching of driveways and road cut; installed lamp posts in several areas; pulling wire in several areas; excavated driveways at several quarters to connect street light conduits; concrete patching of manholes and transformer pads; cable pulling in several areas.

during this time period. For example, on November 19, 1996, the construction inspector had to bring exposed water lines to the site supervisor's attention.[15]

Tri-Gems' certified invoice no. 11 is not contained in the record. However, the record does reflect that, on December 17, 1996, Tri-Gems requested $22,153.94 in progress payments invoice no. 11, or approximately 1.69% of the total contract price. On December 19, 1996, the Air Force paid Tri-Gems less than requested, $15,618.36, or approximately 1.2 percent of the contract price. In the progress reports for the November 16, 1996 to December 15, 1996 period, Tri-Gems had estimated that it accomplished 1.5% of the work, with .5% accomplished in switches, .5% in transformers, and .5% in lighting equipment. The Air Force inspector estimated that Tri-Gems had accomplished 1% of the total work during the time period, with .5% each in the switches and lighting equipment, causing the government to reduce the progress payments.

The inspection records for the last half of December, 1996, indicated that Tri-Gems continued working on lamp posts. Inspection records noted that washers were being used in the installation of the lamp posts, and that Tri-Gems was informed that this method was not acceptable. Most of the daily inspection records for the last half of December, 1996, indicated "no new work observed."

On January 12, 1997, the government inspector met with Tri-Gems' site supervisor and identified a total of fifteen concrete bases that needed to be leveled. Later in January, 1997, the government inspector gave Tri-Gems' site supervisor a list of site violations. Tri-Gems' site supervisor advised that the violations would be corrected during the week of January 27, 1997. The inspection record reflects that at the end of January 31, 1997, Tri-Gems worked on removal of concrete bases and gravel.

Inspection records for February, 1997, are not contained in the record. However, on February 4, 1997, a site tour was conduced by Mr. Flemming, the government's chief of construction management, and government inspectors AIC [Airman First Class] Ricardo Rogriquez and AIC Calvin Carter. The site tour produced a list of deficiencies, by housing unit. On February 11, 1997, the contracting officer sent a letter to Tri-Gems regarding sidewalks that were sinking or broken. On February 13, 1997, the contracting officer sent Tri-Gems another letter with a list of deficiencies generated by the February 4, 2007 site tour. In that letter, contracting officer DeMito directed Tri-Gems to take corrective action, and further, that: "If Tri-Gems' Builders fails to take corrective action by 24 February 1997 the Government would take 10% retainage from all future invoices until the deficiencies are corrected."

---

[15] Also according to the November 19, 1996 inspection record, Tri-Gems' site supervisor informed the government inspector that blacktop paving for open road cuts/driveways were going to be taken care of "this week weather permitting," and that this was the second time in two months the inspector had been so advised.

Tri-Gems submitted certified progress payments invoice no. 12 on February 27, 1997, for a two-month period, from December 16, 1996 to February 15, 1997. The invoice requested payment for $1750.00. The contract progress reports from both Tri-Gems and the government reflect no percentage completion during this period, however, the progress payment invoice itself computed on the face of it $1300.00 for line item 2 (trenching) and $450.00 for line item 3 (conduit), which apparently led the contracting officer to approve the invoice for the total of $1750.00. This amount constituted 0.13% of the total contract price of $1,304,236.00.

On March 17, 1997, Tri-Gems submitted progress payments invoice no. 13 in the amount of $10,466.36, for the period February 16, 1997 to March 14, 1997. Although not reflected in invoice no. 13, five days before the date of the invoice, on March 12, 1997, the parties entered into contract modification P00003. This modification incorporated addenda nos. 5 and 6. These addenda made several technical changes to the scope of the work, including allowing for the cutting of driveways to install conduit. This modification increased the contract price by $177,874.00, with a not to exceed contract price of $1,484,910.00. The contract completion date was extended 60 days, to May 7, 1997. In the contract progress report for the February 16-28, 1997, the government inspector reduced his estimate of the work accomplished by Tri-Gems from 92% to 71%. The largest completion decrease in a single line item was in lighting equipment, which went from 23.5% completed before contract modification P00003, to 9% completed after P00003. In the contract progress report for the period from March 16-31, 1997, the overall percentage of completion is listed by the government as 69.5%, and some items changed as a percentage of the total work. For example, lighting equipment went from being viewed as 24% of the total job to 18% of the total job.

As noted above, on March 17, 1997, Tri-Gems submitted progress payments invoice no. 13 in the amount of $10,466.36, reflecting a 93% project completion percentage. The record contains no inspection records for March, 1997, but with a government contract progress report, dated February 28, 1997, reflecting that Tri-Gems had completed 71% of the work, the contracting officer rejected the invoice with its 93% completion percentage. The contracting officer would reject a second request for invoice no. 13, before paying a third invoice no. 13, discussed below, based on work the government believed Tri-Gems had completed by the date of the third submission.

On March 20, 1997, Tri-Gems and the government agreed to contract modification P00004. This modification incorporated addendum no. 4, which generally revised the work and decreased the price of the contract by $714.00, to $1,481,396.00, with a not to exceed price of $1,484,196.00.

On April 8, 1997, Tri-Gems submitted its second certified invoice for progress payment no. 13. Tri-Gems sought payment of $27,085.56, this time for the period February 17 to April 1, 1997. The record contains no government inspection records for April, 1997. The contracting officer again rejected this invoice for progress payment no. 13. At trial, contracting officer DeMito explained that Tri-Gems "submitted the invoice for percentage complete 83 percent, and [Tri-Gems] obviously wasn't at 83 percent." A

government contract progress report covering the period March 16, 1997 to March 31, 1997, reflected a 69.5% percentage completion of the contract.

On April 16, 1997, government project manager Lyman sent a memorandum to the base contracting office, with photographs, indicating that Tri-Gems had broken into existing manholes and had not properly sealed the penetrations, and requiring that the manholes and vaults be cleaned out and properly sealed. The government's inspection records indicate that during May, 1997, the government inspector had a meeting with Tri-Gems and it was determined that transformers were to be placed on top of the vaults as a safety measure. The May, 1997 inspection records also note that asphalt was removed for installation of secondary lines, secondary lines were installed, and landscaping begun.

The government inspection records for June, 1997 indicate that Tri-Gems continued working on lamp posts and secondary lines. During the process of excavation to install temporary electricity, a broken coupling for a secondary line was observed, which the Tri-Gems site supervisor indicated would be fixed the next day. The site supervisor also was directed to close three transformer boxes with electrical cables hanging out, and to fix a water line leak. The government inspection records reflect that Tri-Gems replaced the coupling for the secondary line, closed and secured transformers that had electrical cables hanging out, and fixed the water leak during June, 1997.

On August 1, 1997, Tri-Gems submitted progress payment invoice no. 13 for the third time. Tri-Gems requested payment of $49,306.50, approximately 3.3% of the revised contract price, $1,481,396.00, for the period from February 17, 1997 to July 15, 1997. The progress payment request reflected an 84.5% percentage completion of the project. In the government's contract progress report for the period ending March 31, 1997, the first progress report incorporating the percentage changes brought about by contract modification P00003, the Air Force inspector had reduced Tri-Gem's percentage completion to 69.5%. In the progress report for the period ending July 31, 1997, both the Air Force inspector and Tri-Gems estimated that Tri-Gems had accomplished 84.5% of the contract work by this date, an increase of 15% over the earlier 69.5%. The line item increases corresponding to this change in the completion percentage were: bond and mobilization, from 4.5% complete to 5% complete; pull wire and cable, 4.5% to 6%; transformers, 5% to 7%; switches, 0% to 1%; lighting equipment, 7% to 14%; and asphalt paving, 0% to 3%. The Air Force paid the invoice in full.

According to the government's inspection records, the government and Tri-Gems met on August 12, 1996, to discuss progress on the contract. The government construction contract inspector discussed performance deficiencies with Tri-Gems, including "street lights, landscaping, etc.," and contracting officer DeMito warned Tri-Gems about the possibility of termination for default. Tri-Gems' president, Gothrie Short, indicated that work was not being performed on the contract because of "lack of money." He estimated that an additional $500,000.00 was needed to complete the

project. However, the government indicated at the August 12, 1997 meeting that it would continue to withhold money because of labor rate problems.

In an August 25, 1997 memorandum to the base contracting office, government project manager Lyman expressed concern that Tri-Gems had installed primary cable, but had failed to properly seal the cable ends, permitting water to migrate into the cable. The record reflects that, between August, 1997 and May, 1998, Tri-Gems taped the cable ends, but there still was concern on the part of the government as to whether the cable would need to be replaced.

On September 5, 1997, contracting officer DeMito issued a "show cause notice," for Tri-Gems to show cause why its contract should not be terminated for default due to failure to complete the contract on time. The show cause notice also asked Tri-Gems to provide justification as to why liquidated damages should not be assessed. On September 25, 1997, Tri-Gems and contracting officer DeMito met to discuss the September 5, 1997 show cause notice, during which meeting Ms. DeMito agreed to approve a progress payments invoice reflecting completion of 4% of the job. The amount requested by Tri-Gems was $59,255.84, computed as 4% of the total revised contract amount, $1,481,396.00. This would become progress payments invoice no. 14, which was submitted to the government for payment on November 19, 1997, as is discussed below. On October 15, 1997, Ms. DeMito issued contract modification no. P00005, which extended the contract performance period sixty days, to December 15, 1997, and also gave notice to Tri-Gems that liquidated damages would begin to accrue on December 16, 1997, if the contract work was incomplete on that date.

Government inspection records indicate that Tri-Gems performed some work on the contract during September, October, and early November, 1997.[16] The government, however, learned that lamp posts had been installed incorrectly by Tri-Gems. The contracting officer sent Tri-Gems a letter on October 22, 1997, notifying Tri-Gems of the deficiency, and stating that, as a result of this problem, the government would not pay Tri-Gems the full 4% progress payment discussed earlier with Ms. DeMito on September 5, 1997.

Nevertheless, on November 19, 1997, Tri-Gems submitted progress payment invoice no. 14, for the full 4% percent of the total revised contract amount, $1,481,396.00, or $59,255.84, the amount discussed at the September 25, 1997 meeting with contracting officer DeMito. However, because of the incorrectly installed lamp posts, Ms. DeMito informed Tri-Gems that it was not entitled to the full 4%. Ms. DeMito reduced the requested progress payment amount to $31,899.77, withholding $27,356.07 for the repair of the lamp posts. Tri-Gems responded with a corrective action plan for the lamp posts on November 24, 1997.

[16] During September, October, and early November, 1997, government inspection records reflect that Tri-Gems continued work on excavating and installing secondary lines, and reconnecting/installing street lights.

At trial, contracting officer DeMito was asked about progress payment invoice no. 14:

> Q [by defendant's counsel] And did you decide to withhold money [on invoice no. 14] from Tri-Gems?
>
> A [by Ms. DeMito] Yes.
>
> Q And why did you do that? Why did you withhold money from Tri-Gems?
>
> A Because they did not repair the [lamp] poles properly.
>
> Q And then on Defendant's Exhibit 289/2 [invoice no. 14], did you approve payment to Tri-Gems in any amount?
>
> A In the amount of $31,899.77.
>
> Q And why did you approve payment to Tri-Gems?
>
> A Because they said that they couldn't make their payroll, and that they had done work. And they were going to cure the work. They gave me dates for the cures. But they couldn't bring the people in to do the work without making payroll.
>
> Q And did you have some belief that Tri-Gems had accomplished some work?
>
> A Yes.
>
> Q And when does this invoice [no. 14] cover?
>
> A It covers the period 16 July, '97 through the 25th of November, '97.

Progress payments invoice no. 14, in the amount of $31,899.77, was approved on December 2, 1997 by contracting officer DeMito, and brought the total paid to Tri-Gems on the contract to $1,285,553.14. This was the last progress payment the Air Force made to Tri-Gems. On December 12, 1997, the government sent Tri-Gems another show cause notice, indicating that the government was considering terminating the contract for default. On December 16, 1997, Tri-Gems sent a letter to the contracting officer, indicating that it would be making asphalt repairs within the next few weeks, and requesting full payment of progress payment invoice no. 14. On January 7, 1998, the contracting officer informed Tri-Gems that liquidated damages in the amount of $90.00 per day were being imposed, beginning December 16, 1997. On February 2, 1998, Mr. Flemming, the government's chief of construction management, sent a memorandum to the contracting officer informing her that it was "[t]he general

consensus within the Civil Engineer/Contract community [ ] that the Contractor [Tri-Gems] will not finish this project." In a letter dated February 12, 1998, the contracting officer informed Tri-Gems that the government would not pay for work to be completed, but only for completed work. The February 12, 1998 letter also estimated that Tri-Gems had "only completed 17% of the contract over the last eleven months with less than 2% of that from August [1997] until the present time [February 1998]." The letter concluded by stating: "It is imperative that Tri Gems come out to the job site immediately and complete this contract."

In another show cause letter to Tri-Gems, dated March 18, 1998, and with an information copy to plaintiff U.S. Fire, the contracting officer stated that the progress payments included in invoice no. 14 should have been enough to begin repairs on the lamp posts, but no recent work on the lamp posts had been observed, and that, if Tri-Gems "fails to mobilize a full workforce and returns [sic] to the jobsite within one week, the Government will begin Termination for Default proceedings."

On April 1, 6 and 13, 1998, government project manager Lyman and government construction contract inspectors performed what they termed an "interim inspection" of Tri-Gems' work to date. On May 19, 1998, Mr. Lyman sent a memorandum to contracting officer Donald Bruce regarding the inspection. The memorandum stated that: "The Government has paid the contractor 86% of the contract total, including the addendum's [changes to the specifications]. CE [Civil Engineering] has determined that the project is actually about 60% installed, [and] of this 60% approximately 1/3rd needs to be reworked, repaired or renewed due to poor workmanship on behalf of the contractor." The interim inspection report noted, among other items, that the primary cable had not been sealed properly at the time of installation; the neutral conductor had been installed on about 30% of the system and needed to be installed on the rest of the primary system; manholes/vaults were not properly sealed; the specifications called for galvanized bolts to be used on the streetlights, and Tri-Gems had installed the correct bolt on about 80% of the poles; transformer pads were improperly installed; and about 80% of the landscaping remained to be accomplished.

On February 24, 1999, contracting officer Bruce issued a final decision terminating Tri-Gems' contract for default. The contracting officer's final decision noted the government's show cause notices to Tri-Gems on December 12, 1997 and March 17, 1998, and what Mr. Bruce termed as inadequate or no responses from Tri-Gems to the show cause notices. The decision also noted that liquidated damages were imposed on Tri-Gems, beginning on December 16, 1997. The letter to Tri-Gems continued:

> It has been determined, by the Government completing a walking inspection of the job site, that only 40% of the contract was complete. Tri Gems has been paid approximately 80% of the contract price. Therefore, Tri Gems has been over paid for the work accomplished. Of the 40% completed, only 12% were [sic] accomplished between March 1997 and October 1997. The Contracting Officer did agree and authorize you to

> continue to work, while on liquidated damages status, from 16 December 1997 to 17 May 1998. Although given the additional time to perform, you chose not to complete the contract requirements. The only performance accomplished during that timeframe was remedial in nature and even then you did not cure all of the defective prior performance. The contract period has expired and you have refused to continue contract performance with the contract period having expired.
>
> On 17 April 1998, you were put on notice by the Contracting Officer that you would be permitted to continue performance of the contract from the 16 December 1997 date to 17 May 1998.[17] You were advised that if you failed to complete the remaining work on the contract within that timeframe, the Government would be within its rights and would exercise its rights pursuant to the Termination for Default clause and the law. As of this date, you have failed to make any further progress. Therefore, the contract is hereby terminated for default.

On February 25, 1999, U.S. Fire sent a letter to the contracting officer acknowledging receipt of the termination for default of Tri-Gems. On May 19, 1999, Tri-Gems filed an appeal of the decision to terminate the contract for default with the Armed Services Board of Contract Appeals (ASBCA). Then, on June 11, 1999, Tri-Gems filed a petition for bankruptcy. The ASBCA subsequently dismissed Tri-Gems' case based on the bankruptcy trustee's decision not to prosecute Tri-Gems' ASBCA appeal.

On May 23, 2000, the contracting officer sent a letter to U.S. Fire to obtain the name of the replacement contractor at McGuire AFB. U.S. Fire in turn requested information about the status of Tri-Gems' performance. The Air Force provided information to U.S. Fire, and included Mr. Lyman's May 19, 1998, inspection report. Contracting officer Bruce also testified that U.S. Fire had visited the work site at McGuire AFB during 1999. On August 4, 2000, U.S. Fire issued an invitation for bids (IFB) to complete the project. The IFB included Mr. Lyman's May 19, 1998 inspection report regarding the status of the project. In this regard, Michael Spinelli, a professional architect and witness for U.S. Fire, testified that he was retained by U.S. Fire to prepare

---

[17] According to the government's daily inspection record, in December, 1997, Tri-Gems patched secondary line road cuts with asphalt. The inspection report for December 23,1997 indicated that all asphalt patching of secondary line roadcuts had been completed by Tri-Gems. The next daily inspection entry contained in the record was March 30, 1998. That inspection report stated that Tri-Gems was replacing studs in lamp post bases, and noted that Tri-Gems had completed about 75% of the stud replacement work. The March 30, 1998 inspection record is the final inspection record which identifies work performed by Tri-Gems. The April 6, 1998 inspection record indicated that stud replacement work on 20% of the lampposts remained uncompleted. The inspection record for April 29, 1998 indicated that this was the last entry due to contractor personnel not showing up at the job site; however, a subsequent inspection record in 1998 indicated that Tri-Gems had contacted contracting officer Bruce about further stud replacement work on lamp posts.

the IFB and to find a completion contractor. Mr. Spinelli testified that he included the 1998 Lyman memorandum in the IFB he compiled because, in his view, the document represented "what the owner believes to be probable defective work on the job site." Mr. Spinelli continued:

> [I]n our invitation to bid we tell the contractors if we know about any defects that are on site, we'll bring it to their attention, and that we're making every effort to give them accurate information. If we know about defective work that was on the jobsite and didn't tell a contractor about it, first of all my opinion it would be dishonest. Second of all, I think we'd be setting ourselves up for a lawsuit at the end of the day. The contractor would ultimately get on site, he'd find work that was defective, he would learn that we knew about it and didn't tell him, and he'd file a claim against the surety for additional compensation.

U.S. Fire solicited the completion contract work on a "lump sum" basis. Mr. Spinelli testified that the surety solicited the work as a lump sum rather than using unit pricing because

> we had less than 30 days to prepare an invitation to bid, arrange for a prebid walkthrough and get a contractor on site. These things usually take weeks if not months to prepare. I mean, I prepared this invitation to bid in less than a week. That's almost unheard of. We didn't have the time to finesse every single detail of the bid because of the time constraints. Also, because an insurance company is involved, it's a private entity. We have the right to negotiate with the bidder once the bids come back. If I get a bid back, and it seems like it's through the roof, I can ask for more detail, and I can ask the bidder to show me what information he used to arrive at his bid, and I can negotiate their number if I feel the numbers I'm getting from the bidder are unfair or unreasonable.

Four bids were received on the McGuire AFB work. Eastern Construction & Electric, Inc. (Eastern) submitted the low, lump sum bid. Eastern's lump sum bid of $939,904.00 covered both the cost to correct work previously performed, as well as the cost to complete the work not performed. On December 19, 2000, U.S. Fire and Eastern entered into a "Completion Agreement," in which U.S. Fire agreed to pay Eastern $939,904.00 to complete the project at McGuire AFB.

On January 29, 2001, the Air Force entered into a takeover agreement with U.S. Fire to complete the McGuire AFB project. On March 20, 2001, pursuant to contract modification P00006, the Air Force incorporated the takeover agreement with U.S. Fire into the original contract with Tri-Gems. In the takeover agreement, the Air Force agreed that the sums that had not previously been paid to Tri-Gems would be available to the surety for work remaining to be performed on the contract. The takeover agreement recited that $198,642.61 remained unexpended for the contract, but that

reducing this amount by $36,360.00[18] in liquidated damages left $162,282.61 available to the surety for the remaining work, which the surety paid Eastern a total of $939,904.00 to complete. The takeover agreement between the Air Force and U.S. Fire also stated that, "U.S. Fire contends that it possesses various defenses and/or affirmative claims against the Air Force in connection with said contract, including, but not limited to overpayment to Tri Gems, failure to mitigate damages and lack of cooperation and U.S. Fire intends to pursue its claims as against the Air Force . . . ."

By June, 2002, Eastern had completed the McGuire AFB work, and was paid in full by U.S. Fire. After the work was completed, the Air Force paid U.S. Fire the remaining balance of the contract price. In its complaint before the court, U.S. Fire alleges that the Air Force made improper payments to Tri-Gems of $394,911.79 for work not performed and $296,839.20 for work improperly performed, totaling the claimed amount of $691,750.99.

Project manager Lyman was the author of the May 19, 1998 report on Tri-Gems' progress on the McGuire AFB project, discussed above. Mr. Lyman subsequently prepared a second report, dated December 10, 2004, after U.S. Fire's complaint in this court had been filed. The earlier, May 19, 1998, Lyman report concluded that the Air Force had paid the Tri-Gems about 86% of the contract's total price, while only about 60% of the work had been completed, and of the work completed, about a third required correction. Mr. Lyman's second, post-complaint report concluded that Tri-Gems had completed more work than he had estimated in the May 19, 1998 report. In a detailed analysis, contract work element by work element, Mr. Lyman concluded that Tri-Gems actually had completed 83.27% of the contract, not 60%.

## DISCUSSION

I. Subject Matter Jurisdiction

After the trial, the government renewed its argument that this court lacks subject matter jurisdiction to consider U.S. Fire's claims. The court previously found that it possessed jurisdiction over surety U.S. Fire's claims under the doctrine of equitable subrogation. See U.S. Fire Ins. Co. v. United States, 61 Fed. Cl. at 501. Subject matter jurisdiction may be challenged at any time by the parties, by the court sua sponte, and even on appeal. Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); Fanning, Phillips, Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998) (quoting Booth v. United States, 990 F.2d 617, 620 (Fed. Cir.), reh'g denied (1993)); United States v. Newport News Shipbuilding and Dry Dock Co., 933 F.2d 996, 998 n.1 (Fed. Cir. 1991); North Star Alaska Hous. Corp. v. United States, 76 Fed. Cl. 158, 185, appeal dismissed, 226 Fed. Appx. 1004 (Fed. Cir. 2007). "In fact, a court has a duty to inquire into its jurisdiction to hear and decide a case." Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) (citing Johannsen v.

[18] Liquidated damages against Tri-Gems were computed in the takeover agreement at $90.00 per day times 404 days, or $36,360.00.

Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990); see also View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not.").

Pursuant to Rule 8(a)(1) of the United States Court of Federal Claims (RCFC) and Rule 8(a)(1) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds upon which the court's jurisdiction depends . . . ." RCFC 8(a)(1); Fed. R. Civ. P. 8(a)(1). However, "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.), reh'g denied (1997) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1 (1983)); see also Edelmann v. United States, 76 Fed. Cl. 376, 379 (2007). Nevertheless, "[c]onclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998); see also Briscoe v. LaHue, 663 F.2d 713, 723 (7th Cir. 1981), aff'd, 460 U.S. 325 (1983) ("[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss.").

When deciding a case based on a lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Conley v. Gibson, 355 U.S. 41, 45-46 (1957); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003); Pixton v. B & B Plastics, Inc., 291 F.3d 1324, 1326 (Fed. Cir. 2002); Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1338 (Fed. Cir. 2001) (quoting New Valley Corp. v. United States, 119 F.3d 1576, 1580 (Fed. Cir. 1997)), cert. denied, 535 U.S. 1096 (2002); Boyle v. United States, 200 F.3d 1369, 1372 (Fed. Cir. 2000); Perez v. United States, 156 F.3d 1366, 1370 (Fed. Cir. 1998); Highland Falls-Fort Montgomery Cent. School Dist. v. United States, 48 F.3d 1166, 1167 (Fed. Cir. 1995) (citing Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)), cert. denied, 516 U.S. 820 (1995); Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995); Hamlet v. United States, 873 F.2d 1414, 1416 (Fed. Cir. 1989); Ho v. United States, 49 Fed. Cl. 96, 100 (2001), aff'd, 30 Fed. Appx. 964 (Fed. Cir. 2002); Alaska v. United States, 32 Fed. Cl. 689, 695 (1995), appeal dismissed, 86 F.3d 1178 (Fed. Cir. 1996) (table).

As discussed in the court's earlier opinion, well-established principles of surety law, more specifically, the doctrine of equitable subrogation, give this court jurisdiction to decide the claim of a subrogee, which steps into the shoes of a defaulted government contractor. The United States Court of Appeals for the Federal Circuit has stated that, "sureties traditionally have asserted claims against the government under the equitable doctrine of subrogation. This approach dates back at least to 1896 . . . ." Ins. Co. of the West v. United States, 243 F.3d 1367, 1370 (Fed. Cir.), reh'g denied, reh'g en banc denied (2001); see also Fireman's Fund Ins. Co. v. England, 313 F.3d 1344, 1351 (Fed. Cir. 2002) ("'[O]ur [Federal Circuit] case law has long established that a surety can sue

the Government in the Court of Federal Claims under the non-contractual doctrine of equitable subrogation.'" (quoting Admiralty Constr., Inc. by Nat'l Am. Ins. Co. v. Dalton, 156 F.3d 1217, 1221 (Fed. Cir. 1998))); Nat'l Sur. Corp. v. United States, 118 F.3d 1542, 1545-46 (Fed. Cir. 1997) ("The surety's rights and obligations are not based on third-party beneficiary concepts, but on principles of suretyship law . . . . The Court of Claims, by whose precedent we are bound, has long recognized the surety's right to subrogation in the security held by the government."); Balboa Ins. Co. v. United States, 775 F.2d 1158, 1163 (Fed. Cir. 1985) ("[W]e hold that both the Claims Court and this court have jurisdiction to hear the claim of a Miller Act surety against the United States for funds allegedly improperly disbursed to a contractor."); Commercial Cas. Ins. Co. of Georgia v. United States, 71 Fed. Cl. 104, 110 (2006); Liberty Mut. Ins. Co. v. United States, 70 Fed. Cl. 37, 42-53 (2006).

In an attempt to overcome the court's determination of jurisdiction based on the doctrine of equitable subrogation, the government makes a number of further challenges to this court's jurisdiction. The government points out that, at the time the court denied the earlier motion to dismiss, "facts were still in dispute." The government agrees that a surety may recover for overpayments made to a contractor in certain situations, but argues that those situations are not present in this case. The government then proceeds to argue the facts and the law on the merits, and includes United States Court of Federal Claims cases in its favor and tries to distinguish other Court of Federal Claims cases. Defendant also cites FAR clauses incorporated into the Tri-Gems' contract, urging in one instance for the court to read the contract clause "as a whole," and in favor of defendant's position. Defendant also argues that the contracting officer did not abuse her discretion, marshaling the facts in support of its contention. What the government believes to be clear, however, is not so clear. Material facts in dispute led to a trial of the facts. Contract clauses require interpretation. Binding authority needs to be interpreted and applied; potentially persuasive authority cited needs to be reviewed and evaluated. Plaintiff's claims do not appear to the court to be frivolous, but to warrant serious review.

The thrust of the government's argument is that this court lacks jurisdiction over U.S. Fires' claims because the surety gave no notice to the government to cease progress payments to Tri-Gems; the government did not depart from the terms of the contract; and the contracting officer did not abuse her discretion in making progress payments to Tri-Gems. Defendant's argument, however, conflates subject matter jurisdiction with the merits of U.S. Fire's claims. While the court may look beyond the pleadings in resolving issues relating to subject matter jurisdiction, when issues of fact are central to both jurisdiction and the merits of the claim, the trial court should assert jurisdiction for the purpose of establishing relevant facts and dispose of all aspects of the case through trial. Moreover, the government cannot be certain of victory in the case, particularly because plaintiff has charged the contracting officer with abuse of discretion, a legitimate issue requiring a trial and detailed review of the facts. In this regard, see American Insurance Company v. United States, 62 Fed. Cl. 151, 157 (2004) ("[V]arious cases suggest that if the Air Force abused its discretion in making progress payments that too could be viewed as an impairment of plaintiff's suretyship and give

rise to damages." (citing Nat'l Sur. v. United States, 118 F.3d 1542, 1546 (Fed. Cir. 1997); U.S. Fid. & Guar. Co. v. United States, 201 Ct. Cl. 1, 475 F.2d 1377, 1384 (1973); and Argonaut Ins. Co. v. United States, 193 Ct. Cl. 483, 434 F.2d 1362, 1368 (1970))).

The United States Court of Appeals for the Federal Circuit, in Moden v. United States, stated that:

> In Spruill we concluded that subject matter jurisdiction exists when a petitioner asserts a nonfrivolous claim:
>
> > To the extent a successful claim against the government requires compliance with all statutory elements of the claim, failure of proof of an element of the cause of action means the petitioner is not entitled to the relief he seeks. To conclude in such a case that the petitioner loses because the forum is "without jurisdiction" is to obscure the nature of the defect. It would be more accurate to conclude that the petitioner has failed to prove the necessary elements of a cause for which relief could be granted. The forum has jurisdiction to hear the matter in the first instance – that is, subject-matter jurisdiction existed – as long as the petitioner asserted nonfrivolous claims.
>
> [Spruill v. Merit Sys. Prot. Bd.,] 978 F.2d 679, 687-88 [(Fed. Cir. 1992)]. Similarly, the Supreme Court has identified that "[d]ismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) (quoting Oneida Indian Nation of N.Y. v. County of Oneida, 414 U.S. 661, 666 (1974)) (citations omitted).

Moden v. United States, 404 F.3d 1335, 1340-41 (Fed. Cir.), reh'g and reh'g en banc denied (2005); see also Lowe v. United States, 76 Fed. Cl. 262, 267 (2007). So long as the plaintiff's claim is not frivolous or "so insubstantial, implausible, foreclosed by prior decisions, or otherwise completely devoid of merit as not to involve a federal controversy," Moden v. United States, 404 F.3d at 1341, this court may assert subject matter jurisdiction over the claim. The court does not conclude that the government has met this standard in the present case. The court previously determined that, in the above-captioned case, subject matter jurisdiction is appropriate under the doctrine of equitable subrogation. See U.S. Fire Ins. Co. v. United States, 61 Fed. Cl. at 501; see also Liberty Mut. Ins. Co. v United States, 70 Fed. Cl. at 43 n.9 ("[S]ureties subrogated to the rights of a contractor in privity with the government may avail themselves of the waiver of sovereign immunity in the Tucker Act."). The government's arguments will be addressed on the merits of this case, with the benefit of a full trial of the facts.

Accordingly, this court once again finds that it possesses jurisdiction over U.S. Fire's claims and, therefore, proceeds to the merits. The parties also are referred to the decision on jurisdiction issued earlier by this court, which is incorporated into this decision.

II. Government Liability to the Surety

The plaintiff in this case brings its claim under the doctrine of equitable subrogation, alleging that the Air Force depleted available contract funds by improperly making payments to Tri-Gems for improperly performed work and by making payments before work was completed, in violation of contract requirements. "A surety bond creates a three-party relationship in which the surety becomes liable for the debt or duty of the principal (in this case the contractor) to the third party obligee (in this case the Government)." Westchester Fire Ins. Co. v. United States, 52 Fed. Cl. 567, 574 (2002). "Under a performance bond, a surety guarantees that the project will be completed if a contractor defaults." Dependable Ins. Co. v. United States, 846 F.2d 65, 66 (Fed. Cir. 1988); see also Nat'l Am. Ins. Co. v. United States, No. 07-5016, 2007 WL 2388896, at *1 n.1. Performance bonds exist for the benefit of the United States and are "designed to ensure 'that [the government] is not left with a partially completed project because of an insolvent contractor.'" Dependable Ins. Co. v. United States, 846 F.2d at 66 (quoting Morrison Assurance Co. v. United States, 3 Cl. Ct. 626, 632 (1983) (brackets in original)). If the primary contractor does default on its contract with the government, the performance bond "generally gives the surety the option of taking over and completing performance or of assuming liability for the government's costs in completing the contract which are in excess of the contract price." Ins. Co. of the West v. United States, 243 F.3d at 1370.

A. The Surety's Absence of Notice to the Government

Under the doctrine of equitable subrogation, when a surety takes over performance on the contract or finances completion of the contract, it succeeds to the contractual rights of a contractor against the government. See Ins. Co. of the West v. United States, 243 F.3d at 1370. However, in order to recover for funds allegedly improperly released to a contractor, the surety ordinarily provides notice to the government that the contractor is in default, thereby placing the government in the role of a stakeholder, with a duty of care toward the surety. See Nova Cas. Co. v. United States, 69 Fed. Cl. 284, 297 (2006) ("Notice [by the surety] that the contractor is in default and that the surety is invoking its rights to the remaining contract proceeds converts the government to a stakeholder with duties to the surety . . . ." (quoting American Ins. Co. v. United States, 62 Fed. Cl. at 155) (brackets in original))); see also Balboa Ins. Co. v. United States, 775 F.2d 1158, 1161-62 (Fed. Cir. 1985).

The United States Court of Appeals for the Federal Circuit opinion in Fireman's Fund Insurance Company v. United States, 909 F.2d 495 (Fed. Cir.), reh'g denied (1990), illustrates the need for notice by a surety to the government. In Fireman's Fund, the contract required the government to retain a portion of each progress payment

(10%) unless the contractor made satisfactory progress during a progress payment period. Id. at 496. Subsequently, the contractor in Fireman's Fund requested the retainage because of "cash flow problems," which the government provided to the contractor. Id. The contractor subsequently abandoned the contract, and six days later (and almost five months after the government had released the retainage), the surety notified the government not to make any further payments to the contractor without the consent of the surety. Id. at 496, 499. Fireman's Fund declined to assume the contract on what it considered short notice, and defaulted on its performance bond. Id. The government reprocured, and assessed the excess reprocurement costs against Fireman's Fund. Id. at 497. Fireman's fund challenged the assessment, based on what it considered to be a premature release of the progress payments retainage by the government to the contractor. Id.

The United States Court of Appeals for the Federal Circuit found, in Fireman's Fund, that the government owed no equitable duty to the surety because the surety did not notify the government that the contractor had defaulted under the bonds until five months after the release of the retainage.

> [T]he government as obligee owes no equitable duty to a surety like Fireman's Fund unless the surety notifies the government that the principal has defaulted under the bond. . . . [N]otice by the surety is essential before any governmental duty exists. . . . Only when the surety may be called upon to perform, that is, only when it may become a party to the bonded contract, should the government owe it any duty. The surety knows best when this may occur; consequently, only notice by the surety triggers the government's equitable duty.

Fireman's Fund Ins. Co. v. United States, 909 F.2d at 498-99.

At trial, U.S. Fire's counsel acknowledged that "[t]he surety did not give notice that the government should stop making [progress] payments [to Tri-Gems] . . . ." Therefore, it is undisputed that U.S. Fire did not give notice to the government that the contractor was in default, and plaintiff may not recover on that basis.

B. Government Compliance with the Payment Terms of the Contract

U.S. Fire attempts to rely on exceptions to the notice requirement to establish its equitable subrogation claim. Plaintiff first argues that the government departed from the contract's payment provisions in making payments to Tri-Gems, which resulted in significant overpayment to Tri-Gems for work that was defective or incomplete – thereby depleting available contract funds that otherwise would have been made available to U.S. Fire for completing the project.

In National Surety Corporation v. United States, 118 F.3d 1542 (Fed. Cir. 1997), the United States Court of Appeals for the Federal Circuit distinguished Fireman's Fund Insurance Company v. United States, recognizing a circumstance in which a surety was

not required to provide notice in order to invoke the doctrine of equitable subrogation. In National Surety, the contract explicitly required the government to retain 10% of all progress payments until the government had approved the contractor's performance schedule. Nat'l Sur. Corp. v. United States, 118 F.3d at 1543. The contractor's schedule was not approved, or even submitted, but the government did not withhold the 10% retainage as required by the contract. Id. at 1543-44. The initial contractor subsequently abandoned the project and was terminated for default by the government. Id. at 1544. National Surety completed the project under the performance bond and, as in the present case, was paid the difference between the contract price and the amount paid to the initial contractor. Id. The surety then filed a claim for the retainage which the contract required to be withheld by the government from the progress payments, even though the surety had not provided the government with notice of the contractor's default. Id. The Federal Circuit in National Surety held that:

> In contrast [to Fireman's Fund], Dugdale's [the contractor in National Surety] bonded contract gave no discretion to the government to depart from the requirement of the ten percent retainage until after the complete project arrow diagram was submitted and approved. That condition was never met. . . . The holding in Fireman's Fund did not change the rules of subrogation, but simply dealt with the rights and obligations of the parties on the conditions of that case.
>
> We conclude that National Surety's right of subrogation was not defeated by the government's release of the retainage in contravention of the terms of the bonded contract.

Nat'l Sur. Corp. v. United States, 118 F.3d at 1547 (footnote omitted; bracketed material added). Thus, the court in National Surety found that the surety may recover when the contract required withholding of retainage and the government deviated from that provision of the contract, even when the surety failed to give notice to the government to refrain from making payments to the initial contractor. See also Hartford Fire Ins. Co. v. United States, 40 Fed. Cl. 520, 524 n.2 (1998) ("[T]he court [in National Surety] concluded that notice to the government regarding the need to retain payments was unnecessary where the contract required the government to retain a percentage of the progress payments."), aff'd, 185 F.3d 885 (Fed. Cir. 1999) (table). However, in order "to recover under this theory, it must be shown that the government actually departed from the terms of its contract with the primary obligor." Am. Ins. Co. v. United States, 62 Fed. Cl. at 157 (citing Nat'l Sur. v. United States, 118 F. 3d at 1546).

Tri-Gems' contract contained the clause at FAR 52.246-12, Inspection of Construction (July 1986), which provided, in part, that:

> The Contractor shall maintain an adequate inspection system and perform such inspections as will ensure that the work performed under the contract conforms to contract requirements. The Contractor shall maintain complete inspection records and make them available to the Government.

> All work shall be conducted under the general direction of the Contracting Officer and is subject to Government inspection and test at all places and at all reasonable times before acceptance to ensure strict compliance with the terms of the contract.

48 C.F.R. § 52.246-12(b).

The Tri-Gems contract also incorporated FAR clause 52.236-15, Schedules for Construction Contracts (April 1984), which required Tri-Gems to provide the contracting officer with "a practicable schedule" showing how the contractor "proposes to perform the work . . . ." 48 C.F.R. § 52.236-15(a). The schedule was to be "a progress chart" which indicated "the percentage of work scheduled" by any given date over the course of the project. Id. Subsequently, Tri-Gems was to "enter the actual progress" on the schedule and provide it to the contracting officer to determine if Tri-Gems was staying on schedule. 48 C.F.R. § 52.236-15(b).

At trial, the contracting officer explained how this process worked:

> Q [defendant's attorney] Can you explain how the process for paying the contractor, in this case Tri-Gems, works at McGuire?
>
> A [Ms. DeMito] When the invoice is submitted, contract progress reports should have already been submitted by the contractor and the contract inspector for the government. If they agree with the percentage on the invoice, the contract administrator brings it to the contracting officer for certification for payment.
>
> Q What happens when there is a conflict in the progress reports?
>
> A If it's more than five percent, a meeting is held. Normally a contract inspector and the contractor representative on site get together to make sure that they agree on their progress reports before submitting them.

In asserting that the government departed from the terms of the contract in making progress payments to Tri-Gems, plaintiff relies on the clause at FAR 52.232-5, Payments Under Fixed-Price Construction Contracts (April 1989), which was incorporated by reference into the Tri-Gems contract. The provision states in pertinent part that:

> (b) The Government shall make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the Contacting Officer, on estimates of work accomplished which meets [sic] the standards of quality established under the contract, as approved by the Contracting Officer. The Contractor shall furnish a breakdown of the total contract price showing the amount included therein for each principal category of the work, which shall substantiate the payment amount

> requested in order to provide a basis for determining progress payments, in such detail as requested by the Contracting Officer. . . .
>
> (c) Along with each request for progress payments, the contractor shall furnish the following certification, or payment shall not be made:
> I hereby certify, to the best of my knowledge and belief, that–
> (1) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract . . . .
>
> (d) If the Contractor, after making a certified request for progress payments, discovers that a portion or all of such request constitutes a payment for performance by the Contractor that fails to conform to the specification, terms, and conditions of this contract (hereinafter referred to as the *unearned amount*), the Contractor shall–
> (1) Notify the Contracting Officer of such performance deficiency ....
>
> (e) If the Contracting Officer finds that satisfactory progress was achieved during any period for which a progress payment is to be made, the Contracting Officer shall authorize payment to be made in full. However, if satisfactory progress has not been made, the Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved. . . .

48 C.F.R. § 52.232-5(b)-(e) (emphasis in original).

The plaintiff argues that these procedures, which were specified in the contract, required the Air Force "to make progress payments only for work performed and which was done in compliance with the terms of the contract." The government argues that Tri-Gems "was entitled to receive (and the Government was obligated to pay) 'progress payments' on a monthly basis on 'estimates' of 'work accomplished' which met the contract standards."

After reviewing the progress reports and progress payments in this case, the court is persuaded that the government's payments to Tri-Gems did not violate the provisions of the contract and were reasonable under the facts and circumstances of the case. First, the contracting officer made payments based on "estimates of work accomplished," as required by the contract and FAR 52.232-5(b). On all of its contract progress reports, Tri-Gems' president certified that suppliers and subcontractors were being paid and that the "amounts requested are only for performance in accordance with the specifications, terms and conditions of the contract . . . ." The government inspector also submitted estimates of work completed by Tri-Gems, which generally corresponded to the contractor's estimates. Where there was a discrepancy, the record reflects how the contracting officer resolved it. For example, for the invoice dated April 22, 1996, Tri-Gems certified that the project as 5 percent complete, while the government estimated that the project was 3 percent complete. Because there was less than a 5 percent discrepancy, the contracting officer exercised her discretion and

approved the invoice at 4 percent completion, for a progress payment in the amount of $29,819.44.

Plaintiff has not demonstrated that the government knowingly paid for defective work, that is, work which it knew at the time, after review, did not meet "the standards of quality established under the contract . . . ." 48 C.F.R. § 52.232-5(b). To the contrary, the record reflects instances of work subsequently found to be defective which were not known to be defective when the government paid for it, or which subsequently became defective. For example, government project manager Lyman testified that none of the transformers and switch pads had defects when the government initially paid Tri-Gems for them, but later the equipment cracked. The record also reflects that in May, 1996, the inspection records reported that 90 to 95% of the lamp post bases had been installed, resulting in the government making a 10% progress payment to Tri-Gems for the lighting equipment line item. Subsequent inspections indicated that the lamp bases began to tilt and were in need of repair. The contracting officer reduced Tri-Gems' progress payments invoice no. 14 by $27,356.07 because of the lamp post deficiencies. The record also reflects that when the government estimated that Tri-Gems had not made as much progress as claimed, progress payment invoices were rejected. Progress payment invoice no. 13 was rejected twice for this reason.

The present case is distinguishable from the National Surety case. In National Surety, the contract stated explicitly that: "This contract shall have 10 percent retainage withheld on each progress voucher until the complete project arrow diagram has been approved." Nat'l Sur. Corp. v. United States, 118 F.3d at 1543. The initial contractor in National Surety did not provide the project arrow diagram, therefore, the government should have, but did not withhold, the 10% retainage from progress payments. Id. The United States Court of Appeals for the Federal Circuit found the government liable under those facts and circumstances. Id. at 1547-48. In contrast, Tri-Gems' contract did not have a mandatory retainage clause. Instead, the progress payments language was permissive: "if satisfactory progress has not been made, the Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved." 48 C.F.R. § 52.232-5(e) (emphasis added).

The present case is similar to the case of American Insurance Company v. United States, in that the same permissive progress payments clause language was at issue ("[T]he Contracting Officer may retain a maximum of 10 percent of the amount of the [progress] payment . . . ." 48 C.F.R. § 52.232-5(e)). The court in American Insurance held that:

> The use of the permissive terms "may" and "maximum" plainly allowed, but did not require, the contracting officer to retain up to 10 percent of the payment for a given period. In other words, this language authorized the contracting officer to make payments in full despite the contractor's lack of progress. The language here thus stands in stark contrast to the mandatory terms – "shall have 10 percent retainage withheld" – employed

> in the contract in National Surety. [Nat'l Sur. Corp. v. United States, 118 F.3d] at 1543.

Am. Ins. Co. v. United States, 62 Fed. Cl. at 157 (footnote omitted); see also Lumbermans Mut. Cas. Co. v. United States, 67 Fed. Cl. 253, 256 (2005) (finding that if the contract's terms are permissive, the government's duty to the surety may be less). Due to the permissive nature of the contract language in the government's contract with Tri-Gems, the court cannot conclude in the present case "that the government actually departed from the terms of its contract with the primary obligor." Am. Ins. Co. v. United States, 62 Fed. Cl. at 157 (citing Nat'l Sur. Corp. v. United States, 118 F.3d at 1546).

In addition to claiming overpayment for contract performance, U.S. Fire also alleges that the government overpaid for materials purchased by Tri-Gems. However, regarding materials, the progress payments clause at FAR 52.232-5 states: "In the preparation of estimates the Contracting Officer may authorize material delivered on the site and preparatory work done to be taken into consideration." 48 C.F.R. § 52.232-5(b). In accordance with this contract clause, after progress payment invoice no. 5, the Air Force added a line-item for materials and paid Tri-Gems for material invoices attached to progress invoice no. 6, which accounted for 22% of the contract. U.S. Fire alleges that this payment resulted in overpayment to Tri-Gems for materials. However, Tri-Gems submitted vendor invoices for the materials, and both Tri-Gems' progress report and the government inspector's progress report indicated that the appropriate estimate for the materials was 22% of the contract. Vendor invoices in the record totaling $268,218.73 and paid under Tri-Gems' progress payment request no. 6 were either dated or received by Tri-Gems, on July 2, 1996, July 8, 1996, July 11, 1996, July 15, 1996, July 16, 1996, July 17,1996, and July 29, 1996, all within or near the progress payments invoice no. 6 dates of July 16 - 31, 1996. Based on the evidence introduced at trial, the court cannot conclude that the contracting officer's decision to pay Tri-Gems for materials delivered to the work site, pursuant to the contract clause at FAR 52.232-5, with vendor invoices accompanying a certified progress payment request from Tri-Gems, "actually departed from the terms of the contract." Am. Ins. Co. v. United States, 62 Fed. Cl. at 157 (citing Nat'l Sur. Corp. v. United States, 118 F.3d at 1546).

C. Government Discretion in Making Progress Payments

U.S. Fire also argues that, even if the government did not deviate from the terms of the contract in making payments to Tri-Gems, the government should still be "held accountable to the surety for impairment giving rise to damages if the Contracting Officer did not exercise his/her discretion properly." In this regard, the court in American Insurance stated:

> various cases suggest that if the Air Force abused its discretion in making progress payments that . . . could be viewed as an impairment of plaintiff's suretyship and give rise to damages. "During the performance of the contract," the Court of Claims once stated, "the Government has a duty to exercise its discretion responsibly and to consider the surety's interest in

> conjunction with other problems encountered in the administration of the contract." Argonaut Ins. Co. v. United States, 193 Ct. Cl. 483, 434 F.2d 1362, 1368 (1970); see also Nat'l Surety, 118 F.3d at 1546; U.S. Fidelity & Guaranty Co., 475 F.2d at 1384. But, this is not to say that the United States must, in all circumstances, exalt the surety's interests over its own. To the contrary, courts have recognized that, during the performance of a contract, the government "has an important interest in the timely and efficient completion of the contract work," Argonaut Ins., 434 F.2d at1367, and is "far from being a simple stakeholder," U.S. Fidelity & Guaranty Co., 475 F.2d at 1384; see also U.S. Fidelity and Guaranty Co. v. United States, 230 Ct. Cl. 355, 676 F.2d 622, 630 (1982). "[W]here the Government representative is notified of the contractor's nonpayment of obligations during the performance of the contract, the representative is faced with the task of balancing the Government's interest in proceeding with the contract, against possible harm to the surety." U.S. Fidelity & Guaranty Co., 475 F.2d at 1384; see also United Bonding Ins. Co. v. Catalytic Constr. Co., 533 F.2d 469, 475 (9th Cir. 1976). Numerous cases have recognized, generally, that contracting officer's discretion in performing this weighing of interests and in deciding whether to withhold a progress payment is necessarily "broad," and, more specifically, that, unless restricted by the contract, the government may make progress payments to the contractor beyond what is warranted by the contractor's actual performance where, for example, the contractor is experiencing cash flow problems. See Nat'l Surety, 118 F. 3d at 1546; Fireman's Fund, 909 F.2d at 498 (noting that the government has "considerable leeway" in this regard); Argonaut Ins. Co., 434 F.2d at 1367-68; United Pac. Ins. Co. v. United States, 16 Cl. Ct. 555, 557 (1989).
>
> The key question then becomes whether the Air Force's contracting officer did, in fact, responsibly exercise the discretion given him.

Am. Ins. Co. v. United States, 62 Fed. Cl. at 157-58. The court in American Insurance found no abuse of discretion on the part of the contracting officer in that case, reasoning that the contracting officer made the progress payments in question to the initial contractor because the latter was experiencing cash flow problems. Id. at 158 & 158 n.9. This rationale for payment also was voiced to the government by Tri-Gems president Gothrie Short, who, at one point, indicated that work was not being performed because of "lack of money."

The plaintiff asserts that the contracting officer failed to exercise appropriate discretion in making progress payments to Tri-Gems because she "relied upon inspection reports and ignored the input from Mr. Lyman [the government's project manager] and Mr. Flemming [the government's construction management chief] that he/she [the contracting officers] was in fact paying a substantially greater percentage of the contract balance as compared to the actual percentage of work completed in addition to the significant problems with the work that was installed." During closing

argument, plaintiff's attorney also argued that the contracting officer should have been on notice early in the project to stop payments to Tri-Gems because there were indications of serious problems with Tri-Gems' performance from the beginning. Plaintiff's attorney specifically referenced Tri-Gems' delay in beginning work on the contract; Mr. Lyman's August 6, 1996 memorandum in which he stated that the contractor was "defrauding the Government"; and Mr. Flemming's testimony that there were problems with Tri-Gems' work from the beginning. A close examination of the record, however, does not support plaintiff's abuse of discretion charge.

The administration of the Tri-Gems contract was not without flaws, and in that sense, it was perhaps a typical construction contract, worse than some, but perhaps better than others. In any event, the court does not conclude that the Air Force abused its discretion vis-a-vis U.S. Fire's suretyship interests. The Air Force did not abdicate its responsibilities, but reasonably attempted to monitor and obtain performance from Tri-Gems. The Air Force did not accept all of Tri-Gems' progress payment requests carte blanche, but reduced, and even rejected, requests deemed to claim too high a percentage of completion. As problems arose during contract administration, they were not ignored, but were addressed by the Air Force, and also appeared not to be ignored by Tri-Gems, which undertook corrections during much of the contract. While numerous of these corrections later proved to be deficient, the deficiencies did not surface until much later in the contract performance, after most of the contract funding had already been paid to Tri-Gems.

The record reflects that in February, 1996, when the contracting officer had not received submittals from Tri-Gems, she met with the contractor to resolve the problem. When Tri-Gems hit a gas line in April, 1996 while installing lampposts, government inspection records reflect that the contract was modified, and by May 14, 1996, 90-95% of the light pole bases had been moved. On April 23, 1996, Tri-Gems submitted progress payments invoice no. 2 for progress payments reflecting a 5% completion percentage, which the contracting officer, in her discretion, reduced to 4%. On May 15, 1996, the government inspector reported that conduit was being laid without embedment. By May 20, 1996, Tri-Gems was addressing the problem. In June, 1996, Tri-Gems' site supervisor alleged that he was instructed by Mr. Flemming to trench at depths that contradicted the contract requirements. Government inspection records indicated that the dispute was resolved with the agreement that Tri-Gems would dig according to contract specifications, unless the digging was over a water line, in which case Tri-Gems would dig at a different depth. In July, 1996, the contracting officer expressed concern to Tri-Gems that it was behind schedule; Tri-Gems responded with a revised contract progress schedule. The government inspector also met with Tri-Gems' site supervisor in July, 1996, and obtained agreement from the latter to correct several performance deficiencies.

The above events were followed by government project manager Lyman's August 6, 1996 memorandum, during contract performance, citing to contract specifications with which Tri-Gems was required to adhere, and concluding with the allegation that, "This contractor is defrauding the Government and we must put a stop to

it!!!" (emphasis in original). The Lyman deficiencies were communicated to Tri-Gems by the contracting officer. The president of Tri-Gems, in response, agreed to the corrections, and a correction date of August 19, 1996.

The contracting officer paid progress payment invoice no. 6 in the amount of $430,397.88, on August 6, 1996, including 22% for materials delivered on site, and another 6% for trenching, conduit, pull wire and cable, and manholes and pads. With progress payment no. 6, approved by the contracting officer on August 6, 1996, Tri-Gems had been paid nearly 80% of the contract price. The record reflects that Tri-Gems' posture to this point in time was one of acknowledging and taking action to correct deficiencies brought to its attention by the government. Under such circumstances, the court should not substitute its judgment for that of the contracting officer on the decision to pay, not pay, or adjust progress payments claimed in invoice no. 6, which also included invoices for materials delivered on site totaling $268,218.73. Following the August 6, 1996, progress payment no. 6, during the September - December, 1996 timeframe, the record reflects that Tri-Gems continued working on the project, that government inspectors continued to identify deficiencies in Tri-Gems' performance, and that Tri-Gems, in response, continued to take corrective action.

Progress payments invoice no. 11 was approved on December 19, 1996. Tri-Gems requested $22,153.94 in progress payments, but based on lower completion estimates by the government inspector, the contracting officer, exercising her discretion, approved only $15,618.36. By the end of 1996, the Air Force had paid to Tri-Gems over 90% of the total funds it would pay the contractor.

On January 12, 1997, additional performance deficiencies were identified by the government inspector, which Tri-Gems, as before, acknowledged, and took corrective action by January 31, 1997, according to the inspection reports. On February 13, 1997, the contracting officer sent Tri-Gems a letter with a list of deficiencies, including the admonition, "[i]f Tri-Gems Builders fails to take corrective action by 24 February 1997 the Government will take 10% retainage from all future invoices until the deficiencies are corrected."

The contracting officer paid progress payment invoice no. 12 on March 3, 1997, in the relatively small amount of $1750.00. The contracting officer used her discretion to reject Tri-Gems' progress payment request no. 13 in March, 1997 and again in April, 1997. Contracting officer DeMito testified at trial that Tri-Gems invoiced at a completion percentage it had not achieved, so the requests were rejected. The record reflects that Tri-Gems continued to work on the project during April, May and June, 1997, that government inspectors continued to find discrepancies, which Tri-Gems acknowledged and corrected.

On August 1, 1997, Tri-Gems re-submitted progress payment invoice no. 13 for the third time. This invoice was paid in the amount of $49,306.50, about 3.3% of the contract price, for work performed during the five-month period between February 17, 1997 and July 15, 1997. On August 12, 1997, contracting officer DeMito and

government inspectors met with the president of Tri-Gems, Gothrie Short, at which time Tri-Gems' president indicated that work was not being performed because of "lack of money." At the same time, the contract inspector discussed performance deficiencies with Tri-Gems and the contracting officer warned Tri-Gems about the possibility of termination for default.

When performance had still not improved, the contracting officer sent Tri-Gems a show cause notice on September 5, 1997, to show cause why the contract should not be terminated for default, or, why liquidated damages should not be assessed. On October 15, 1997, contracting officer DeMito issued contract modification no. P00005, which extended contract performance sixty days, to December 15, 1997, and also gave notice to Tri-Gems that liquidated damages would begin to accrue on December 16, 1997.

On November 19, 1997, Tri-Gems submitted progress payment invoice no. 14, for 4% of the revised contract price of $1,481,396.00, or $59,255.84. Although Tri-Gems had performed some work during September, October, and early November, 1997, according to government inspection reports, the contracting officer noted that lamp posts had been installed incorrectly and, as a result, withheld $27,356.07 of the $59,255.84 Tri-Gems had requested. Contracting officer DeMito explained at trial that progress payment request no. 14 was reduced because of the defective lamp posts, but that some progress payments were approved, because Tri-Gems had performed some work, and because she believed Tri-Gems could not make its payroll without the payment. Tri-Gems responded with a corrective action plan for the lamp posts on November 24, 1997, but progress payment no. 14 was the last progress payment made to Tri-Gems.

Progress payment no. 14 was approved by contracting officer DeMito on December 2, 1997, bringing the total payments to Tri-Gems $1,285,553.14. On December 12, 1997, the government sent Tri-Gems a show cause notice, for Tri-Gems to show cause why the contract should not be terminated for default. On December 16, 1997, Tri-Gems requested the funds withheld by the contracting officer on progress payment no. 14. The funds were not forthcoming. Instead, on January 7, 1998, the contracting officer informed Tri-Gems that, as provided in contract modification no. P00005, which had extended contract performance to December 15, 1997, liquidated damages in the amount of $90.00 per day would be assessed from December 16, 1997. A total of $36,360.00 in liquidated damages were assessed against Tri-Gems.

In a show cause letter dated March 18, 1998, the contracting officer informed Tri-Gems that if it did not mobilize a full workforce and return to the job site within one week, a termination of the contract for default would be initiated. The Tri-Gems contract was ultimately terminated for default on February 24, 1999.

Based on what was termed an interim inspection, government project manager Lyman sent a May 19, 1998 memorandum to the contracting officer stating that the government had paid Tri-Gems 86% of the contract price, while only 60% of the work

had been performed, and about one-third of that needed correction. The termination for default itself essentially repeated these figures, stating that about 80% of the contract price was paid to Tri-Gems, but only about 40% of the work was complete (presumably Mr. Lyman's 60% complete figure minus his estimate of 20% of the work needing corrective action). Mr. Lyman also issued a December 10, 2004 report, which concluded that Tri-Gems had actually completed 83.27% of the work on the contract. While the first Lyman report focused on deficiencies, such as defects in street lamps, the second Lyman report analyzed Tri-Gems' performance in a detailed review of the fifteen contract work elements (trenching, conduit, etc.). Mr. Lyman explained that the Tri-Gems' completion percentage in his second report was higher, because

> items which were expected to require rework were not assigned any value as completed work in place (which would not necessarily be known until a pre-final inspection had been performed – as was [done] at the time of the T4D [termination for default]). Subsequently, it turned out that the primary cable was in much better condition than the inspection team anticipated. This meant the re-work was much less than anticipated, which increased the actual amount of work completed by TGB [Tri-Gems Builders] on work elements #4 [Pull Wire and Cable] and #14 [Cable, Manholes, Pads, Transformers (Material)]. [ ] <u>In reality, the interim inspection report should not have discounted any tasks which required rework or repair as that would not normally be known until the prefinal inspection is performed</u>, so the payments for work which was later found to be defective were paid properly if the defects remained undiscovered until the prefinal inspection. (emphasis in original).

After observing Mr. Lyman at trial and reviewing his two reports, plaintiff has not convinced the court of the unreasonableness of Mr. Lyman's second report, which estimated that Tri-Gems had actually completed over 80% of the work on the contract, rather than the earlier estimate of 60%. However, regardless of Tri-Gems' actual percentage of completion, an analysis of the record does not reflect that the Air Force contracting officer knowingly or unreasonably paid for incomplete or defective work. The record, instead, reflects reasonable, even robust inspection and oversight of Tri-Gems' work by the government's civil engineering and contracting communities; the identification of deficiencies which Tri-Gems, for much of the contract, acknowledged and on which Tri-Gems took corrective action; appropriate reduction and even rejection of progress payment requests by the contracting officer depending on Tri-Gems' progress; and also a legitimate interest on the part of the government in the completion of the contract. "During performance of a contract, the Government has a vital interest in the contract's completion and, as such, its contracting officer is vested with broad discretion in administering the contract for the purpose of promoting performance." <u>U.S. Fid. & Guar. Co. v. United States</u>, 230 Ct. Cl. 355, 364, 676 F.2d 622, 628 (1982); <u>see also</u> <u>U.S. Fid. & Guar. Co. v. United States</u>, 201 Ct. Cl. at 13-14, 475 F.2d at 1384; <u>Argonaut Ins. Co. v. United States</u>, 193 Ct. Cl. at 493, 434 F.2d at 1367 ("The defendant has an important interest in the timely and efficient completion of the contract work.").

In the present case, the contracting officer was dealing with a contractor which acknowledged mistakes and purported to take corrective action for much of the contract, and also with project deficiencies which did not surface until later in the contract, after the majority of the contract price had been paid to Tri-Gems. In this regard, the Air Force continued efforts to complete the project throughout 1996 and 1997. However, with progress payment request no. 6, which was approved by the contracting officer on August 6, 1996, Tri-Gems had been paid nearly 80% of the of the funds on the contract. With progress payment no. 11, approved by the contracting officer on December 19, 1996, Tri-Gems had been paid over 90% of the contract funds. The court views the evidence of record as a reasonable attempt on the part of the Air Force to properly monitor progress and payment requests to complete the contract.

Furthermore, the Air Force was dealing with a contractor which the government had reason to believe did not have the financial resources to complete the project, without some further payment. In this regard, the United States Court of Appeals for the Federal Circuit, in Fireman's Fund, stated:

> It is true that retainage is an incentive to complete the contract, but it is equally true that contractors may need full progress payments to finance the work. In this case, the government believed the contract might not be completed unless it released the retainage to alleviate Westech's cash flow problems. . . . [T]he government has considerable leeway in administering its contracts. . . .We are unwilling to read into the contract a limitation on discretion that the parties did not themselves contemplate."

Fireman's Fund Ins. Co. v. United States, 909 F.2d 495, 498, reh'g denied (1990); see also Argonaut Ins. Co. v. United States, 193 Ct. Cl. at 493-94, 434 F.2d at 1368-69 ("[T]he facts are sufficient to show that the government's . . . determination that the payment of Progress Payment No. 3 to Wells Fargo Bank was essential to the continued performance and timely completion of the contract, [and was] well within the range of discretion conferred on the contracting agency . . . ."); Lumbermens Mut. Cas. Co. v. United States, 67 Fed. Cl. 253, 256 (2005); Am. Ins. Co. v. United States, 62 Fed. Cl. at 158 ("[U]nless restricted by the contract, the government may make progress payments to the contractor beyond what is warranted by the contractor's actual performance where, for example, the contractor is experiencing case flow problems. . . . [I]t appears that the contracting officer made the [progress] payments in question because the contractor was experiencing cash flow problems. Plaintiff has not shown, in the least, that this action was an abuse of discretion and, therefore, this theory too is unavailing.").

In sum, the court does not find that the government contracting officers failed to reasonably exercise discretion in making progress payments to Tri-Gems, but that the Air Force made reasonable, even aggressive attempts to monitor proper contract completion. The record demonstrates that Air Force personnel were in regular contact with Tri-Gems, that Tri-Gems' performance was fairly and reasonably inspected, and that, when Tri-Gems' performance declined, the contracting officers exercised their

discretion by attempting to correct deficiencies, with a view toward project completion. With the goal of project completion in mind, as well as government estimates on project completion, the contracting officers at times used their discretion to reduce or reject progress payments, and also, with Tri-Gems short on cash to meet payroll, used their discretion to introduce that element into the progress payments calculus. The court will not substitute its judgment for that of the contracting officers on such a discretionary matter. Because the court finds that U.S. Fire did not put the Air Force on notice to withhold progress payments from Tri-Gems; that the government did not deviate from the permissive, not mandatory progress payment terms of the contract; and that the contracting officers did not abuse their discretion in making progress payments to Tri-Gems, based on project percentage completion and also on project completion needs, but exercised practical, common sense, reasonable discretion, U.S. Fire's equitable subrogation claim must fail.

## CONCLUSION

For the foregoing reasons, the court finds for the defendant. The clerk's office shall **DISMISS** the plaintiff's complaint, with prejudice, and enter **JUDGMENT** for defendant. Each party shall bear its own costs.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**